LESSIE SIMMONS v. C. W. MYERS TRADING POST, INC.

No. 8121DC553

(Filed 6 April 1982)

1. **Landlord and Tenant § 8.1— plaintiff's claim not covered by Residential Rental Agreements act**

   Plaintiff's claim for relief based upon an alleged breach of the Residential Rental Agreements act by defendant was invalid since the act did not become effective until 1 October 1977 and the written agreement between plaintiff and defendant was signed one year prior to that date.

2. **Consumer Credit § 1— Retail Installment Sales Act—lease with option to purchase trailer—consumer credit sale**

   An agreement between the parties, entitled "Lease with Option to Purchase Trailer," constituted a consumer credit sale under North Carolina's Retail Installment Sales Act. G.S. § 25A-2(b).

3. **Uniform Commercial Code § 26— damages for breach of warranty**

   Under G.S. § 25-2-714(2), damages for defendant's violation of its express warranty to repair a trailer leased to plaintiff is the total payments made by plaintiff over the total value of the trailer as warranted since plaintiff had not made the total payments required to exercise her option to buy the trailer. If the jury returned a verdict in favor of plaintiff, she would be entitled to treble damages. G.S. § 25A-44(4).

4. **Evidence § 45— plaintiff's opinion as to value of property—erroneously excluded**

   In an action concerning violation of express warranty to repair a trailer sold by defendant to plaintiff, the trial court erred in excluding plaintiff's opinion as to the value of the trailer while she inhabited it, the value of the trailer in the condition it was purchased, and the amount plaintiff paid in excess of

the trailer's worth since the evidence was sufficient to show that plaintiff possessed the familiarity, knowledge and experience to testify about the trailer's value.

Judge VAUGHN concurring in part and dissenting in part.

APPEAL by plaintiff from *Alexander, Judge.* Judgment entered 10 February 1981 in District Court, FORSYTH County. Heard in the Court of Appeals 1 February 1982.

On 18 September 1976, plaintiff signed a lease with option to purchase a 1969 Fleetwood house trailer from defendant. On that date the cash value of the trailer was approximately $5,500 to $6,000. Pursuant to this agreement, plaintiff agreed to pay rent in the amount of $85 per month for ninety-six months. Upon completion of these payments, plaintiff was to become owner of the trailer. Plaintiff lived in the trailer until 14 July 1979 when it was destroyed by fire. She had paid defendant a total of $2,370.

In her complaint, filed on 4 December 1979, plaintiff alleged that prior to the execution of the written agreement signed by the parties, defendant's agent, C. W. Myers, agreed to repair defects in the trailer; that Myers failed to remedy the majority of these defects and that his failure to do so reduced the fair market rental value of the trailer from $85 to $50 per month. In her first claim for relief, she alleged that defendant had violated the Residential Rental Agreements act by failing to maintain the trailer in fit and habitable condition. N.C. Gen. Stat. §§ 42-38 to -44 (Cum. Supp. 1981). In her second claim for relief, plaintiff sought recovery under the Retail Installment Sales Act. N.C. Gen. Stat. §§ 25A-1 to -45 (Cum. Supp. 1981). In her final claim, plaintiff alleged that a portion of her payment to defendant represented her equity in the trailer. She further alleged that defendant had received insurance proceeds due to the destruction of the trailer; and that she was "entitled to receive from defendant a sum representing her share of the insurance proceeds, in an amount to be proven at trial."

In its answer defendant denied plaintiff's claim for relief and alleged that plaintiff, by failing to comply with the terms and conditions of the written agreement, did not exercise her option to buy the trailer. Defendant further alleged that plaintiff had an option to insure her interest in the trailer but failed to do so.

The case proceeded to trial against defendant on the following three issues:

*Issue No. 1* — Did the defendant give plaintiff an express warranty to repair the trailer?

*Issue No. 2* — Did the defendant knowingly and wilfully include in the contract a provision limiting, excluding, modifying or in any manner altering the terms of an express warranty given by the defendant to the plaintiff?

*Issue No. 3* — In what amount, if any, has plaintiff been damaged as a result of her relying on defendant's promises to make repairs?

After plaintiff presented evidence at the jury trial, defendant moved for a directed verdict. Plaintiff appeals from the judgment directing a verdict in defendant's favor and dismissing plaintiff's action with prejudice.

*Legal Aid Society of Northwest North Carolina, Inc., by Kate Mewhinney, for plaintiff appellant.*

*Badgett, Calaway, Phillips, Davis, Stephens, Peed & Brown, by Richard G. Badgett and Herman L. Stephens, for defendant appellee.*

MARTIN (Harry C.), Judge.

Plaintiff's first three assignments of error concern the trial court's exclusion of her testimony regarding the value of the trailer in question. She argues that this testimony was competent in determining the issue of damages. She further contends that its exclusion constituted prejudicial error, because the trial court granted defendant's motion for a directed verdict on the basis of plaintiff's failure to present evidence of damages.

[1] In evaluating the merits of plaintiff's argument, this Court must first determine the merits of plaintiff's three claims for relief. Plaintiff's first claim for relief, based upon the alleged breach of the Residential Rental Agreements act by defendant, is invalid. This act did not become effective until 1 October 1977. The written agreement between plaintiff and defendant was signed almost one year prior to this date. In plaintiff's third claim for relief, she sought to recover a share of the insurance proceeds recovered by defendant after the trailer burned. Plaintiff failed to present any authority or evidence supporting this claim.

Moreover, upon considering the three issues presented to the jury, it appears that plaintiff relied solely upon her second claim for relief at trial.

[2]   Plaintiff's second claim for relief relies upon a breach of the Retail Installment Sales Act. In her complaint plaintiff alleged that the agreement between the parties, entitled "Lease with Option to Purchase Trailer," constituted a consumer credit sale under North Carolina's Retail Installment Sales Act. Under this act such a sale

> includes but is not limited to any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the goods and services involved, and it is agreed that the bailee or lessee will become, or for no other or for a nominal consideration, has the option to become, the owner of the goods and services upon full compliance with his obligations under such contract.

N.C. Gen. Stat. § 25A-2(b) (Cum. Supp. 1981). The parties' written agreement comes within this definition. The parties stipulated that plaintiff had missed some of her monthly payments. This delinquency, though, did not terminate the agreement since defendant never exercised its option in the agreement to terminate the contract upon plaintiff's failure to make a payment. Plaintiff further alleged in her complaint that defendant violated N.C.G.S. 25A-20 of the Retail Installment Sales Act by including in the agreement the words, "Leased as is." These words excluded defendant's express warranty to repair the trailer. She alleged that a willful violation of N.C.G.S. 25A-20 constituted an unfair trade practice entitling her to treble damages. *See* N.C. Gen. Stat. § 25A-44(4) (Cum. Supp. 1981).

At trial plaintiff presented testimony that Myers informed her he would fix specified defects in the trailer before it was delivered; that the trailer was delivered in its defective condition; that plaintiff repeatedly requested Myers to repair the trailer after it was delivered; that Myers continued to promise that the repairs would be made, and that the defects were never repaired. Plaintiff also offered into evidence the written agreement signed by the parties. This agreement contained a list of defects to be repaired. Plaintiff, therefore, was entitled to present evidence of

damages caused by the alleged breach of defendant's express warranty to repair.

[3]    Under the Uniform Commercial Code, the general measure of damages for breach of warranty "is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." N.C. Gen. Stat. § 25-2-714(2) (1965). Special circumstances in the case sub judice would seem to require that plaintiff recover only a fraction of the difference between the fair market value of the trailer as delivered and the value of the trailer as warranted. Specifically, at the time the trailer burned, plaintiff had not made the total payments required to exercise her option to buy the trailer. The fraction to which she is entitled is therefore the total payments made by plaintiff over the total value of the trailer as warranted. In the event of a jury verdict in favor of plaintiff upon retrial, she would be entitled to treble damages. N.C. Gen. Stat. § 25A-44(4) (Cum. Supp. 1981).

[4]    During the trial the court sustained defendant's objections to questions pertinent to the issue of damages. These questions concerned plaintiff's opinion as to the value of the trailer while she inhabited it, the value of the trailer in the condition it was purchased, and the amount plaintiff paid in excess of the trailer's worth. In response to a question concerning the fair market value of the trailer at the time it burned, plaintiff indicated that the value was "[a]bout half of what I was supposed to pay for it." The court instructed the jury to disregard this answer. We disagree with defendant's argument that plaintiff was not a competent witness regarding the value of her trailer.

> A witness may give his opinion as to the value of specific personal property if he has obtained his knowledge of value from experience, information, and observation. The witness need not be an expert; it is sufficient that he is familiar with the thing upon which he places a value and has the knowledge and experience necessary to enable him to intelligently value it. 1 Stansbury, North Carolina Evidence § 128 (Brandis rev. 1973).

*State v. Revelle*, 301 N.C. 153, 160, 270 S.E. 2d 476, 480 (1980). In the case sub judice, plaintiff's testimony reveals that she lived in

the trailer at issue for three years and that she had previously purchased another trailer from defendant. This evidence is sufficient to show that plaintiff possessed the familiarity, knowledge and experience to testify about the trailer's value. The trial court denied plaintiff's testimony on the erroneous basis that such evidence of value would have to be given by "a realtor specialist or somebody in that field."

Defendant argues in its brief that regardless of plaintiff's qualifications to answer questions concerning the value of the trailer, she failed to place her answers in the record for purposes of review. Defendant emphasizes that no prejudice has been shown by the court's action. In *Currence v. Hardin,* 296 N.C. 95, 249 S.E. 2d 387 (1978), the Court was confronted with this issue and came to the following conclusion:

> [W]e . . . hold that, whether an objection be to the admissibility of testimony or to the competency of a witness to give that, or any, testimony, the significance of the excluded evidence must be made to appear in the record if the matter is to be heard on review. Unless the significance of the evidence is obvious from the record, counsel offering the evidence must make a specific offer of what he expects to prove by the answer of the witness.

*Id.* at 99-100, 249 S.E. 2d at 390. The second sentence quoted from *Currence* is dispositive of the question before us. At trial plaintiff attempted to show how much the value of the trailer as promised had been diminished by the defects in the trailer. The significance of this testimony, in determining damages caused by the breach of defendant's express warranty, clearly did not depend upon the exact numerical answers plaintiff would have given. It is obvious from her complaint that she would have testified that the trailer's value as delivered was less than the value of the trailer as promised.

In light of the trial court's erroneous exclusion of this testimony regarding the value of the trailer, the order allowing defendant's motion for directed verdict upon failure of plaintiff to show damages must be reversed. When a defendant moves for a directed verdict at the close of plaintiff's evidence, the trial judge must determine whether the evidence when considered in the light most favorable to the plaintiff and when given the benefit of

every reasonable inference to be drawn therefrom, is significant to withstand defendant's motion. *Beal v. Supply Co.*, 36 N.C. App. 505, 244 S.E. 2d 463 (1978). Plaintiff's testimony, including that pertaining to the trailer's value, constitutes sufficient evidence of an action for breach of an express warranty under the Retail Installment Sales Act and of damages caused by the breach.

As to plaintiff's first and third claims for relief, the trial court's directed verdict and dismissal against plaintiff is affirmed. The directed verdict and dismissal in regards to plaintiff's second claim for relief is reversed. In light of this holding, we deem it unnecessary to discuss plaintiff's fourth assignment of error. The cause is remanded to the District Court of Forsyth County for a new trial on plaintiff's second claim for relief.

Reversed in part; affirmed in part.

Chief Judge MORRIS concurs.

Judge VAUGHN concurs in part and dissents in part. (Judge VAUGHN'S concurring and dissenting opinion is reported at page 816.)

———————

CARLIE PEELE AND WIFE, LESSIE PACE PEELE, BERTA PEELE FLOWERS, WIDOW, JOHN VERNON PEELE, JR. AND WIFE, FRANCES BRYANT PEELE, RUBY PEELE WILLIAMS AND HUSBAND, HULON WILLIAMS, WILLIAM ROGER PEELE AND WIFE, NELLIE SMITH PEELE, MILDRED PEELE MORRIS AND HUSBAND, WALTER C. MORRIS, AND GRETCHEN PEELE WHITAKER AND HUSBAND, MERLE WHITAKER v. WILSON COUNTY BOARD OF EDUCATION AND W. E. EDWARDS

No. 817SC680

(Filed 6 April 1982)

1. **Deeds §§ 12.1, 16.2— fee on condition subsequent not created—provision repugnant to estate conveyed**

A provision in a 1922 deed after the description stating that the grantee agreed "that if this site is ever abandoned for school purposes . . . the site shall be offered for sale first to" the grantor or his heirs or assigns for a specified price did not create a fee on condition subsequent since it did not contemplate an unconditional right to reenter the premises or to institute an action to terminate the grantee's possessory estate. Furthermore, where the granting clause, habendum and warranty were sufficient to pass fee simple title to the grantee, such provision will be rejected as being repugnant to the estate conveyed.

2. **Deeds § 21; Vendor and Purchaser § 1— preemptive right—violation of rule against perpetuities**

    A provision in a deed stating that "if this site is ever abandoned for school purposes . . . the site shall be offered for sale first to" the grantee or his heirs or assigns for a specified price created a preemptive right which was void as being in violation of the rule against perpetuities.

APPEAL by plaintiffs from *Stevens, Judge.* Judgment filed 12 May 1981 in Superior Court, WILSON County. Heard in the Court of Appeals 4 March 1982.

    The sole issue on appeal involves the construction of a deed conveying a tract of land to defendant school board. Plaintiffs are the heirs of the grantors, R. B. Peele and wife. The date of the conveyance was 20 April 1922. The granting clause reads as follows:

> That said R. B. Peele and wife in consideration of Seven Hundred and Fifty Dollars to them paid by said Board of Education the receipt of which is hereby acknowledged, have bargained and sold, and by these presents do bargain, sell and convey to said County Board of Education and their successors in office a certain tract or parcel of land in Wilson County . . ..

The habendum clause reads:

> TO HAVE AND TO HOLD the aforesaid tract or parcel of land, and all privileges and appurtenances thereto belonging to the said County Board of Education and their successors in office to their only use and behoof forever.

The warranty clause reads:

> And the said R. B. Peele and wife covenant with said County Board of Education and their successors in office that they are seized of said premises, in fee, and have the right to convey in fee simple . . ..

Of particular interest, however, is the following clause which appears in the deed immediately after the description of the property conveyed and before the habendum clause:

> (It is agreed by the County Board of Education that if this site is ever abandoned for school purposes that the site shall be offered for sale first to R. B. Peele or his heirs or as-

signs at the purchase price herein named; then in case said Peele or his heirs or assigns do not care to purchase this school site at the price above named, then the county Board of Education may sell the same to any other person or persons at such price as they may consider reasonable and just)

Plaintiffs instituted this action in an effort to establish ownership of the property. The parties stipulated that the defendant school board abandoned the property for school purposes shortly after the 1977-78 school year and soon afterwards received notification of plaintiffs' intention to purchase the property for $750. Defendant, however, offered the property for sale at public auction. Before final sale, plaintiffs obtained a restraining order preventing further sales of the property pending trial of the issues raised in the complaint.

Trial was held without a jury and the court concluded that "[t]he granting clause, the habendum and the covenants of warranty in the deed are consistent and harmonious and, therefore, conveys [sic] a fee simple title. The paragraph in parentheses is repugnant to the fee simple estate conveyed and is rejected." The court also concluded that "G.S. 39-1.1(a) has no application in the case before the Court because the deed . . . was executed and delivered prior to January 1, 1968"; and "[t]he paragraph in parentheses . . . could not be more than an option or right of 'first refusal' running to the Grantors or their heirs . . . to repurchase" which "must be fixed and is limited to a period within the rule against perpetuities." The court found the right to repurchase "fatally vague."

From the judgment in favor of the defendant school board, plaintiffs appeal.

*Kirby and Clark, by J. Russell Kirby, and Kirby, Wallace, Creech, Sarda & Zaytoun, by David F. Kirby and Peter J. Sarda, for plaintiff appellants.*

*Rose, Jones, Rand & Orcutt, by Z. Hardy Rose, for defendant appellee Wilson County Board of Education.*

MARTIN (Harry C.), Judge.

Plaintiffs contend that the manifest intention of the grantors in the deed to the school board limited the conveyance to a grant

of less than fee simple and that "the trial judge erred by failing to consider all parts of the deed in determining the estate conveyed." Plaintiffs argue that the plain and express words indicate that the Peeles intended to grant a fee on condition subsequent.

[1] Assuming, arguendo, that we adopt plaintiffs' position that the conditional provision in the deed must be given weight as an expression of the grantors' intent, we cannot agree that the provision has the effect of preserving in the grantors a right of entry for condition broken.

> The future interest in real property known as the right of entry for condition broken arises after the creation of the possessory estate known as the fee simple estate subject to a condition subsequent. Typical language for the creation of a fee simple subject to a condition subsequent specifies that a grantee or devisee shall have a fee simple estate "on condition that," "provided that," but "to be null and void if" a certain event occurs, or to be forfeited upon the happening or failure of continuance of certain facts. *This interest is the retention of a "right," or more accurately a "power," to reenter the premises or to institute an action to terminate the grantee's or devisee's possessory estate when the forfeiting event occurs.*

Webster, *The Quest for Clear Land Titles—Whither Possibilities of Reverter and Rights of Entry,* 42 N.C.L. Rev. 807, 810 (1964) (emphasis ours).

The provision upon which plaintiffs rely to establish their right to the property in question contemplates not an unconditional right to reenter the premises or even to institute an action to terminate the defendant school board's possessory estate, but rather gives them a preemptive right to purchase the property for a specified amount of money upon certain conditions. The language is inconsistent with any purported intent of the grantors to retain an interest in the property conveyed.

However, we reject plaintiffs' contention for more compelling reasons. The facts of this case fall squarely within the rule enunciated in *Artis v. Artis,* 228 N.C. 754, 761, 47 S.E. 2d 228, 232 (1948), that "where the entire estate in fee simple, in unmistakable terms, is given the grantee in a deed, both in the

granting clause and *habendum*, the warranty being in harmony therewith, other clauses in the deed, repugnant to the estate and interest conveyed, will be rejected." *See also Whetsell v. Jernigan*, 291 N.C. 128, 229 S.E. 2d 183 (1976); *Kennedy v. Kennedy*, 236 N.C. 419, 72 S.E. 2d 869 (1952).

We agree with plaintiffs that the above-mentioned rule is one of construction and not one of law, and that it does not place an absolute bar to a consideration of the grantors' intent. At the threshold of plaintiffs' argument is that the use of words "successors in office" renders the language in the deed less than clear to convey an estate in fee simple, thus requiring the court to look beyond the language to ascertain the grantors' intent. This contention was considered in *College v. Riddle*, 165 N.C. 211, 81 S.E. 283 (1914), in which the Court stated:

> The original charter makes provision that it is to establish a female college, and for that purpose, among other things, may take, receive, and hold property, real and personal, which may be conveyed to said corporation or to said trustees and their successors for the use and benefit of the same, etc., and it is held with us and by the weight of authority elsewhere that the words of this habendum do not have the effect contended for by the defendant, appropriating the specific property to school purposes, under condition subsequent, but, unless there is imperative and express provision to the contrary . . . these and words of similar import shall be held to express only the purpose of the grantor in making the deed, and that as to third persons the power of the trustees or other corporate authority to convey the property is not impaired.

*Id.* at 216-17, 81 S.E. at 285.

In light of the foregoing, a reading of the Peele deed discloses that the words of the granting clause, the habendum clause, and the warranty are fully sufficient to pass fee simple title to defendant school board. We see no reason to strain the rules of construction by journeying beyond the four corners of the deed in a mission of exploration into the realm of intent.

[2] Plaintiffs next contend that the trial court erred in concluding that the rights of the grantors to purchase the property were vague or void for violating the rule against perpetuities.

The law with respect to preemptive rights has most recently been enunciated in *Smith v. Mitchell*, 301 N.C. 58, 269 S.E. 2d 608 (1980). With respect to the duration of the right the Court wrote: "We believe the better rule is to limit the duration of the right to a period within the rule against perpetuities and thus avoid lengthy litigation over what is or is not a reasonable time within the facts of any given case." *Id.* at 66, 269 S.E. 2d at 613. In order to avoid a violation of the rule against perpetuities, the property interest must vest, if at all, within a life-in-being plus twenty-one years. Thus, the preemptive right in the deed sub judice violates the rule; that is, there was the possibility at the time of the conveyance that the school board would continue to use the property for school purposes well beyond the time limit set by the rule.

Plaintiffs, however, contend that their rights should be determined in light of *Joyner v. Duncan*, 299 N.C. 565, 264 S.E. 2d 76 (1980). They rely on the following language: "Due to our holdings . . . application of the wait and see doctrine is not necessary to the decision of this case. Therefore, we will have to wait and see in future decisions of this Court, what application, if any, this doctrine will have in North Carolina." *Id.* at 582, 264 S.E. 2d at 89. Plaintiffs urge us to apply the "wait and see" doctrine in the case sub judice.

We do not foreclose the possibility that, under some set of facts where equity dictates the necessity, our courts may adopt the "wait and see" doctrine; however, the clear import of *Mitchell, supra*, suggests that the doctrine has no place in a preemptive rights setting. The Court in *Mitchell* attempted to establish measurable standards by which a preemptive right could be judged reasonable. It would be anomalous to now hold that we should "wait and see" if the duration of a preemptive right is reasonable. We are, moreover, reluctant to further complicate, by exceptions, the rule our Supreme Court has chosen to adopt as a measuring guide for determining the reasonableness of a time limit on preemptive rights.

There is certainly good reason to limit the option in gross to a relatively short period of time, but the rule against perpetuities is obviously not suited to the commercial transaction. The rule against perpetuities was formulated in the context of donative transfers of family wealth. Lives in being

plus 21 years has no purpose in the commercial field. It seems that a limit of a specific number of years is called for.

T. Bergin and P. Haskell, *Preface to Estates in Land and Future Interests* 212 (1966).

We are unable to accept plaintiffs' contention that the preemptive right does not violate the rule against perpetuities because the right vested immediately in the grantors and their heirs. "[T]he option to purchase specific land is a contract which creates something in the nature of an equitable *contingent* interest . . .." *Id.* at 211 (emphasis ours). Plaintiffs' interest could not vest until the option was exercised, an event which would not occur until the school board ceased using the property for school purposes, which could occur well beyond the time limit set by the rule. *Mitchell, supra.*

We hold that the trial court's findings of fact were sufficient to support the conclusions of law, and the judgment is affirmed.

Judges MARTIN (Robert M.) and WHICHARD concur.

---

JAMES L. OWENS D/B/A OWENS GROCERY v. GREEN VALLEY SUPPLY COMPANY, INC.

No. 8125SC702

(Filed 6 April 1982)

1. **Trial § 33.6— misstating a fact in charge to jury—no proper objection—no error**

   The trial court did not err in denying plaintiff's motion for a new trial on the ground that the trial judge had misstated a fact in the charge to the jury where the record did not reflect that plaintiff made a proper objection to the trial judge's summary of the evidence, and where a question asked by the jury showed that they recalled the evidence correctly despite the judge's instructions.

2. **Trial § 10.1— court's comment concerning list of items—no error**

   In an action concerning merchandise destroyed by fire, the trial judge did not err in stating: "It will take all week to try this case if you go through the list (of items destroyed) item by item and ask detailed questions," where the list of items destroyed by the fire was properly introduced into evidence and shown to the jury.

**3. Evidence § 49— hypothetical questions—expert witnesses—rulings on questions improper**

   The trial court improperly sustained an objection to a properly phrased hypothetical question posed to plaintiff's witness which clearly called for an opinion which he was better qualified than the jury to give. Further, the trial court improperly overruled plaintiff's objection to a question posed by defendant which asked a witness to state his opinion upon whether a "reasonable person" could have foreseen that a fire could originate in bales of either hay or straw by reason of spontaneous combustion, as the question, as phrased, asked the witness for an expert's opinion upon that which the jury would be equally qualified to give; that is, what a "reasonable person" would have foreseen.

APPEAL by plaintiff from *Freeman, Judge*. Judgment entered 5 February 1981 in Superior Court, CALDWELL County. Heard in the Court of Appeals 5 March 1982.

This is a negligence action arising out of the destruction by fire of plaintiff's merchandise and personal property stored in a wooden building, part of which was rented by plaintiff from W. F. Simmons. Plaintiff alleges that the fire was the result of uncured hay being stacked negligently by defendant under a tin roof against the side of the wooden building under conditions which were favorable for spontaneous combustion to ignite the hay. Defendant denies negligence.

The jury found that defendant was not negligent, and plaintiff appeals from the judgment entered upon that verdict.

*Tuttle & Thomas, by Bryce O. Thomas, Jr., for plaintiff-appellant.*

*Patton, Starnes & Thompson, by Thomas M. Starnes, for defendant-appellee.*

HILL, Judge.

In 1973 or 1974, plaintiff rented a portion of a wooden building located behind defendant to store seasonal merchandise for his store and personal property. Plaintiff testified that around 10:00 a.m. on 27 June 1977, he was notified that the building was on fire. The next morning plaintiff saw remnants of organic material which he identified as "uncured hay mixed with some straw."

Jerry Thomas Ennis, who lived across from the wooden building, testified that prior to the fire, he saw a farm trailer with

bales in it next to the building. Ennis stated that it had rained during the time that the bales were in the trailer and that the bales later were removed from the trailer and stacked under the overhanging roof of the building. Michael Lane Coffey, Fire Chief and Building Inspector for Granite Falls, testified that "the point of origin of the fire is the bale of organic material at the end of the structure." In his opinion, the cause of the fire was spontaneous combustion within one bale of uncured organic material.

Earle Teague, a witness for defendant, testified that defendant "has dealt in straw ever since they have been in business, about nine or ten years." William Hugh Kirby, an employee of defendant at the time of the fire, also testified that defendant had straw for use in landscaping. Upon hearing Coffey state that he thought the fire was caused by the spontaneous combustion of uncured hay, Kirby stated, "I told him that there was no hay, that it was straw, and that to my knowledge you couldn't get spontaneous combustion from dry straw."

Tommy E. Andrews, Caldwell County Agricultural Extension Agent, identified photographs of the organic material found near the wooden building on 27 June 1977 as cured, dry, small grain straw. In his opinion, a reasonable person would not have anticipated that a fire would originate by spontaneous combusion of that material.

[1] The principal contention of plaintiff's first argument is that the trial judge erred in misstating a fact in his charge to the jury, thereby causing the jury to over-emphasize the importance of the misstated fact. The judge charged the jury that "the evidence of the plaintiff tended to show that sometime in June of 1977 that he had merchandise from the store and furniture that he owned . . . stored in a building that he rented from the defendant, Green Valley Supply Company . . .." After the jurors retired to begin their deliberations, they returned to the courtroom with the following question: "We, the members of the jury, would like to know if Mr. Teague, the defendant, had permission from Mr. Simmons, who we understand owns the building—if Mr. Teague had permission to build the shed and stack the hay beside the building?" Counsel for the parties conferred with the trial judge out of the hearing of the jury, and the judge announced that "by stipulation of counsel, in answer to that question, they did in fact

have permission to build the shed and store the material there." The jury again retired to deliberate and returned with a verdict fifteen minutes later. In an affidavit appended to plaintiff's motion for a new trial, plaintiff's counsel stated that he brought to the trial judge's attention the misstatement in the charge that defendant owned the building. However, the trial record does not reflect this objection.

Plaintiff argues that the stipulated answer "gave implicit approval to the jury to consider that fact—whether the defendant had permission to stack the bales there—as a significant, controlling, case determining fact." We disagree. Plaintiff's argument is mere conjecture. The trial judge told the jurors that they must trust their own recollection of the evidence and be guided exclusively by it. The question asked by the jury shows that they recalled evidence, despite the judge's instructions, that Simmons, not defendant, owned the building. Even so, the trial record does not reflect that plaintiff made a proper objection to the trial judge's summary of the evidence. By failing to do so, plaintiff has waived the objection. *State v. Hammonds*, 301 N.C. 713, 272 S.E. 2d 856 (1981); *Vandiver v. Vandiver*, 50 N.C. App. 319, 274 S.E. 2d 243, *disc. rev. denied*, 302 N.C. 634, 280 S.E. 2d 449 (1981). This argument is without merit.

[2] In his second argument, plaintiff contends that the trial judge expressed his opinion on plaintiff's evidence of items that were destroyed by the fire. Plaintiff introduced a list of such items which was shown to the jury and began to describe them in detail. After plaintiff began that testimony, the judge said, "It will take all week to try this case if you go through the list item by item and ask detailed questions." Plaintiff argues that this statement "left the impression that this case was not worth taking one week to try, regardless." We find that the list of items destroyed by the fire properly was introduced into evidence and shown to the jury. Under these circumstances, we cannot condemn as error the trial judge's plea for economy of time in plaintiff's examination.

[3] Plaintiff's third argument assigns as error various evidentiary rulings made by the trial judge. Two such rulings were made following objections to hypothetical questions asked of the parties' expert witnesses concerning the foreseeability that spontaneous combustion could occur in the bales.

Coffey, plaintiff's expert witness, was asked the following question:

> Chief Coffey, if the jury should find by the greater weight of the evidence that on June 27, 1977 that Green Valley Supply stored 90 to 100 bales of hay under a roof off a wooden building and that these bales were stacked tightly and they were stacked three to five bales high, and that this organic material within the bales consisted of uncured, low-grade hay, and that it was visible to someone knowledgeable with hay and straw as a merchant such as Green Valley Supply by looking at it with the naked eye, do you have an opinion satisfactory to yourself, assuming these facts to be true, whether or not it was reasonably foreseeable that spontaneous combustion would occur in these bales and could be seen by someone who deals regularly with hay and straw or an employee of Green Valley Supply?

Defendant's objection to this question was sustained. However, defendant's expert witness, Andrews, was asked to assume certain facts and answer the following question: "[D]o you have an opinion satisfactory to yourself as to whether a reasonable person could have anticipated that any fire would originate in any one or more of those bales by reason of spontaneous combustion?" Plaintiff's objection to the question was overruled, and Andrews' opinion was that it would not be reasonable to expect that fire could originate in the bales by reason of spontaneous combustion.

As a general rule, an expert opinion is admissible "where the witness is better qualified than the jury to draw appropriate inferences from the facts." 1 Stansbury's N.C. Evidence (Brandis rev. 1973) § 132, p. 425. *See State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978). Effective 1 October 1981, the legislature eliminated the requirement "that expert testimony be in response to a hypothetical question." G.S. 8-58.12. *See* 1981 N.C. Sess. Laws, c. 543, § 4. However, when the present case was tried, to elicit an expert's opinion, the question (1) should include only such facts that are in evidence, or such facts that the jury may infer from the evidence; (2) the facts should be sufficient on which to base a satisfactory opinion; and (3) the facts should be stated hypothetically. 1 Stansbury's N.C. Evidence (Brandis rev. 1973) § 137, pp. 452-53. The opinion elicited by a properly phrased

hypothetical question is entitled to be considered by the jury as it would the testimony of other witnesses. *See Hedgepeth v. Coleman*, 183 N.C. 309, 111 S.E. 517 (1922); *see also* 1 Stansbury's N.C. Evidence (Brandis rev. 1973) § 126, pp. 394-95.

The question posed to Coffey clearly called for an opinion which he is better qualified than the jury to give. The question stated hypothetical facts, sufficient on which to base a satisfactory opinion, which were in evidence or which could be inferred from the evidence by the jury. It therefore was error for the trial judge to sustain defendant's objection to the properly phrased hypothetical question and exclude Coffey's opinion.

In addition, we find error in the trial judge's ruling which allowed Andrews to state his opinion upon whether a "reasonable person" could have foreseen that a fire could originate in the bales by reason of spontaneous combusion. The question, as it is phrased, asks Andrews *for an expert's opinion upon that which the jury would be equally qualified to give;* that is, what a "reasonable person" would have foreseen. Thus, the expert opinion elicited by this question does not survive the test of admissibility.

We do not discuss the matters brought forward by plaintiff's other assignments of error as they may not recur in the new trial.

For errors committed by the trial judge, we grant a

New trial.

Judges WELLS and BECTON concur.

KAPLAN SCHOOL SUPPLY CORPORATION, PLAINTIFF v. HENRY WURST, INC., HENRY WURST, INC.—RALEIGH AND H. R. WURST, DEFENDANTS AND THIRD-PARTY PLAINTIFFS v. PRECISION SERVICE AND SUPPLY, INC., AND PRECISION GAMES, INC., THIRD-PARTY DEFENDANTS

No. 8121SC667

(Filed 6 April 1982)

**Constitutional Law § 24.7; Process § 9.1 — foreign corporations — personal jurisdiction — insufficient minimum contacts**

The third-party defendants had insufficient contacts with North Carolina to permit the courts of this State to assert *in personam* jurisdiction over them in an action to recover damages for the allegedly defective printing, binding and mailing of plaintiff's sales catalogs where the third-party defendants are foreign corporations which carry on no activity whatsoever in North Carolina; their contract to prepare plaintiff's sales catalogs was solely with the third-party plaintiff, a Missouri corporation, and the payment for their work was to be from the third-party plaintiff; the binding, printing and addressing of the catalogs was done by third-party defendants solely in Iowa for the Missouri third-party plaintiff; and the plaintiff had no contact whatsoever with the third-party defendants.

APPEAL by third-party defendants from *Wood, Judge.* Order entered 23 April 1981 in Superior Court, FORSYTH County. Heard in the Court of Appeals on 3 March 1982.

This appeal arises out of the denial of third-party defendants' motion to dismiss, for lack of personal jurisdiction, the third-party complaint filed against them.

The relevant facts disclosed by the record are as follows:

Plaintiff Kaplan School Supply, which is not a party to this appeal, is a North Carolina corporation with its principal place of business in Forsyth County. Defendant, third-party plaintiff Henry Wurst, Inc. is a Missouri corporation with its principal place of business in Missouri. Defendant, third-party plaintiff Henry Wurst, Inc.—Raleigh, is a North Carolina corporation with its principal place of business in North Carolina. Third-party defendant Precision Service and Supply is incorporated in Nebraska and maintains its principal place of business in Council Bluffs, Iowa. Third-party defendant Precision Games is an Iowa corporation with its principal place of business in Council Bluffs, Iowa.

Plaintiff entered into a contract with defendants whereby defendants would print, assemble, affix address labels to, and mail or ship plaintiff's sales catalogs. Defendant, third-party plaintiff Henry Wurst, Inc. subcontracted with the third-party defendants whereby the third-party defendants agreed to print the catalog covers, bind the catalogs, affix the address labels to the catalogs, and mail or ship them.

On 2 January 1980, plaintiff filed a complaint against defendant Henry Wurst, Inc.—Raleigh and Henry Wurst, Inc., seeking damages in tort and for breach of contract pertaining to the allegedly defective preparation of plaintiff's sales catalogs. Defendants answered and filed a third-party complaint against the third-party defendants, seeking indemnity and reimbursement from the third-party defendants for any sums that might be adjudged against defendants in favor of plaintiff Kaplan School Supply as a result of plaintiff's tort and contract action. On 20 March 1980, third-party defendants moved to dismiss the third-party complaint on the grounds that third-party defendants were not subject to *in personam* jurisdiction in North Carolina.

Third-party defendants have never qualified to do business in, had an office in, or appointed an agent for service of process in the State of North Carolina. They have never owned assets in, solicited any business in, conducted any sales activity in, or advertised in the State of North Carolina. They have never paid any tax to or filed a corporate tax return with the State of North Carolina. Third-party defendants are in the business of doing printing, binding, and mailing work for other printing companies, pursuant to subcontracts. Third-party defendants have never contracted with any company located in North Carolina to do any kind of printing, binding, or mailing work.

Defendant, third-party plaintiff Henry Wurst, Inc. (hereinafter referred to as the "Missouri third-party plaintiff") made the initial contact with third-party defendants with respect to the formation of the subcontract to prepare and mail plaintiff's sales catalogs. This contact was a call from the Missouri third-party plaintiff, from its offices in Missouri, to the offices of third-party defendants in Iowa. During the negotiations for the subcontract, third-party defendants never had any dealings with plaintiff Kaplan and never entered North Carolina to negotiate or discuss

the contract. Third-party defendants' negotiations for the subcontract were held solely with the Missouri third-party plaintiff, and the subcontract was solely between the Missouri third-party plaintiff and third-party defendants.

Pursuant to their subcontract with the Missouri third-party plaintiff, third-party defendants shipped unbound catalog material from third-party plaintiff's Missouri offices to Iowa, where third-party defendants bound the printed material, printed the catalog covers, and affixed the address labels to the finished catalogs. Of those catalogs, some were loaded on postal trailers brought to third-party defendants' Iowa plant and provided by the post office; these catalogs were to be mailed to their designated addresses, and 7,326 were to be mailed to addresses in North Carolina. Other catalogs, numbering 38,117, were loaded on commercial trucks in Iowa and shipped to plaintiff Kaplan in North Carolina. Earlier, samples of the completed catalogs were sent via air freight by third-party defendants to plaintiff Kaplan. No one from the third-party defendants left Iowa or entered North Carolina to deliver the catalogs. Third-party defendants' shipping instructions came from the Missouri third-party plaintiff and the only revenues third-party defendants anticipate from their work on the subcontract is payment they hope to receive from the Missouri third-party plaintiff.

The trial court, "after having reviewed and considered the pleadings, motion, affidavits, depositions and answers to interrogatories filed by the parties," made findings of fact and conclusions of law, including the following:

> By contracting to print and bind the catalogs of a North Carolina business, to send samples of the catalog to the North Carolina business in Winston-Salem, North Carolina, to mail thousands of copies of the catalog to North Carolina addresses and to ship to the Plaintiff in North Carolina a substantial quantity of the catalogs, the Third Party Defendants have the necessary "minimum contacts" with North Carolina to support the exercise of personal jurisdiction over them by this Court in an action based upon a claim arising from those contacts.

The trial court thereupon denied the third-party defendants' motion to dismiss for lack of personal jurisdiction. Third-party defendants appealed.

*Womble, Carlyle, Sandridge & Rice, by Jimmy H. Barnhill and Francis C. Clark, for third-party plaintiff appellees.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by C. T. Leonard, Jr. and Reid L. Phillips, for third-party defendant appellants.*

HEDRICK, Judge.

The sole question presented by this appeal is whether the trial court erred in denying third-party defendants' motion to dismiss the third-party complaint for lack of personal jurisdiction.

The resolution of the question of *in personam* jurisdiction involves a two-fold determination: (1) do the statutes of North Carolina permit the courts of this jurisdiction to entertain this action against third-party defendants, and (2) does the exercise of this power by the North Carolina courts comport with due process of law. *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 231 S.E. 2d 629 (1977). Both questions must be answered in the affirmative before *in personam* jurisdiction may be asserted over a nonresident defendant.

"The first of these considerations is easily met." *Mabry v. Fuller-Shuwayer Co.*, 50 N.C. App. 245, 248, 273 S.E. 2d 509, 511, *disc. rev. denied,* 302 N.C. 398, 279 S.E. 2d 352 (1981). G.S. § 1-75.4, commonly referred to as the "long-arm" statute, is a legislative attempt to allow the courts of this State to assert *in personam* jurisdiction to the full extent permitted by the Due Process Clause of the United States Constitution, and is accorded a liberal construction in favor of finding personal jurisdiction, subject only to due process limitations. *Phoenix America Corp. v. Brissey,* 46 N.C. App. 527, 265 S.E. 2d 476 (1980); *Dillon v. Numismatic Funding Corp., supra.* Since the requisite statutory authorization for personal jurisdiction is coextensive with federal due process, the critical inquiry in determining whether North Carolina may assert *in personam* jurisdiction over a defendant is whether the assertion thereof comports with due process. *Mabry v. Fuller-Shuwayer Co., supra; Phoenix America Corp. v. Brissey,*

*supra; Parris v. Garner Commercial Disposal, Inc.*, 40 N.C. App. 282, 253 S.E. 2d 29, *disc. rev. denied and appeal dismissed,* 297 N.C. 455, 256 S.E. 2d 808 (1979).

The due process clause makes the exercise of personal jurisdiction over a defendant contingent on there being some act by which defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws. *United Buying Group, Inc. v. Coleman,* 296 N.C. 510, 251 S.E. 2d 610 (1979). "Due process requires that a nonresident defendant have certain minimum contacts with the forum state such that the maintenance of the suit [in the forum state] does not offend 'traditional notions of fair play and substantial justice.'" *Phoenix America Corp. v. Brissey, supra* at 530, 265 S.E. 2d at 479.

In the present case, third-party defendants carry on no activity whatsoever in North Carolina. They have never contracted with any company located in North Carolina to do any kind of printing, binding, or mailing work. Their contract to prepare plaintiff's sales catalogs was solely with the Missouri third-party plaintiff, and the payment for their work was to be from the Missouri third-party plaintiff. The binding, printing, and addressing of the catalogs was done by third-party defendants solely in Iowa for the Missouri third-party plaintiff. The plaintiff, Kaplan, insofar as this record discloses, had no contact whatsoever with the third-party defendants. Indeed, there is nothing in this record to indicate that Kaplan knew or had reason to know that the Missouri third-party plaintiff had subcontracted any part of the work to anyone. There is no reason on this record for the North Carolina courts to exercise personal jurisdiction over the third-party defendants and become involved in a controversy which is solely between residents of two foreign states. Hence, as in *Modern Globe, Inc. v. Spellman,* 45 N.C. App. 618, 625, 263 S.E. 2d 859, 864, *disc. rev. denied,* 300 N.C. 373, 267 S.E. 2d 677 (1980), the third-party defendants' "connection with the State of North Carolina is far too attenuated, under the standards implicit in the Due Process Clause of the Constitution, to justify imposing upon [them] the 'burden and inconvenience' of defense in North Carolina."

We hold that the trial court erred in denying third-party defendants' motion to dismiss the third-party complaint for lack of *in personam* jurisdiction.

Reversed and remanded.

Chief Judge MORRIS and Judge VAUGHN concur.

---

STATE OF NORTH CAROLINA v. JON LEE BRIDWELL

No. 8115SC906

(Filed 6 April 1982)

1. **Rape and Allied Offenses § 4.3— evidence of victim's use of birth control pills — evidence that victim told defendant of use — properly excluded**

    Under G.S. 8-58.6, the trial court did not err in excluding testimony that the victim was using birth control pills at the time of the alleged rape. Further, from the record, the Court can find no prejudicial error in the court's refusal to allow evidence that the prosecuting witness told defendant, during the time of the incident, that she was using birth control pills.

2. **Rape and Allied Offenses § 4— corroborating testimony by officer**

    The trial court did not commit prejudicial error by allowing a police officer to testify that the prosecuting witness had told him that "the only thing that kept running through her mind was a scene from a movie which she had seen named 'Looking for Mr. Goodbar' in which a girl was killed in a similar situation." The evidence was admissible to corroborate testimony of a previous witness.

3. **Rape and Allied Offenses § 5— second degree rape — sufficiency of evidence**

    Where the evidence taken in the light most favorable to the State established all the elements of second degree rape, the trial court did not err in failing to grant defendant's motion for nonsuit.

4. **Criminal Law § 99.11— court's comment to jury — no error**

    The trial court did not err in stating to the jury before the arguments of counsel that he had earlier stated "the defendant would have an opportunity to present evidence, but whether he did so or not was up to him."

APPEAL by defendant from *McLelland, Judge.* Judgment entered 7 January 1981 in Superior Court, ALAMANCE County. Heard in the Court of Appeals 4 February 1982.

The defendant appeals from a conviction of second degree rape and a maximum prison sentence of eight years.

*Attorney General Edmisten, by Special Deputy Attorney General Myron C. Banks, for the State.*

*Raiford & Harviel, by R. Chase Raiford, for defendant appellant.*

BECTON, Judge.

The defendant brings forth six arguments on this appeal: (1) that the trial court erred when it applied the rape victim shield statute to evidence concerning the use of birth control pills by the prosecuting witness; (2) that the trial court erred in allowing into evidence statements made by the prosecuting witness to an investigating officer when the statement included new evidence not testified to by the prosecuting witness; (3) that the trial court erred in refusing to allow defendant's motions for dismissal at the close of the State's evidence; (4) that the trial court erred in commenting to the jury that the defendant had a right to present evidence but had elected not to do so, without further instructions that such an election should not prejudice him in any way; (5) that the trial court erred in its instruction to the jury that the defendant could be found guilty even if they found that the prosecuting witness could have resisted the defendant; and (6) that the trial court improperly expressed its opinion on the merits of the case in its instructions to the jury. We conclude that defendant's trial was free of prejudicial error. Our analysis follows.

I

The defendant's conviction arises from an alleged rape of an 18-year old Elon College freshman on 5 September 1980. The victim had gone to the Ramada Inn Motel in Burlington to attend a dance. While at the dance, she met the defendant for the first time, after which she danced and had drinks with him. Thereafter, the two left the dance hall and went outside to talk. "While we were sitting there, he asked me if I would like a beer and I said yes, sure; so we walked to his room. He just opened the door and he walked in and I left the door open."

From this point on, the evidence from the parties is in conflict. The evidence from the State tends to show the following.

After entering the room, the prosecuting witness sat on the bed; the defendant went to the bathroom but returned without

beer and with no shoes on; the two of them sat on the bed and watched TV for a while, during which time the defendant attempted to kiss her. After the kissing attempt, the prosecuting witness started to leave the room but was prevented from doing so by the defendant. The defendant clasped his hand over her mouth and pushed her onto the bed. The prosecuting witness was told to take her pants off or someone would get hurt. The defendant ended up disrobing her from the waist down. The prosecuting witness, afraid for her safety at this time, pleaded to go to the bathroom, which she was allowed to do. While inside the locked bathroom, she contemplated things to do but was primarily concerned that anything she attempted would anger the defendant and thereby increase the danger to herself. She, therefore, went back into the room where she was pushed back onto the bed and was thereafter sexually assaulted by the defendant. She managed to escape when he collapsed. The prosecuting witness reported the incident to her friends and later to the police.

The defendant presented no evidence, nor did he testify on his own behalf. Evidence of the defendant's version of the incident was introduced by the State, in the form of testimony by Lieutenant Jerry Barbee of the Burlington Police. As related by Lt. Barbee, the defendant's story tends to show the following.

The defendant met the prosecuting witness at the dance, danced with her, had some beer with her and then left the lounge area in order to take a walk and get some air. After leaving the lounge area, they went to his room. The television was not on, and they were on the bed talking and began to kiss. He stated to the prosecuting witness that he was tired and sleepy and was ready to go to bed. After disrobing, he got under the covers to go to sleep. Soon afterwards he was joined by the prosecuting witness who had also disrobed. They thereafter had sexual intercourse. Some conversation followed and the prosecuting witness later got up, dressed, and left.

II

[1] The defendant challenges the constitutionality and the application of G.S. 8-58.6, the Rape Shield Statute, to his case. We readily dispose of his constitutional argument on the authority of *State v. Fortney*, 301 N.C. 31, 269 S.E. 2d 110 (1980). There, our Supreme Court held that the statute did not deny the defendant

State v. Bridwell

his Sixth Amendment right to confront a witness. The Court upheld the statute stating that (1) "there [was] no constitutional right to ask a witness questions that are irrelevant;" (2) that the statute was "primarily procedural and does not alter any of defendant's substantive rights;" and (3) that the statute was supported by "valid policy reasons, aside from relevance questions. . . ." *Id.* at 35-36, 269 S.E. 2d at 112.

The Court went on to say that the statute was "nothing more . . . than a codification of this jurisdiction's rule of relevance as that rule specifically applies to the past sexual behavior of rape victims." *Id.* at 37, 269 S.E. 2d at 113. "[Evidence] is relevant if it reasonably tends to establish the probability or the improbability of a fact in issue." *Freeman v. Ponder,* 234 N.C. 294, 304, 67 S.E. 2d 292, 300 (1951). If the probative value of the evidence is outweighed by its prejudicial effects, the evidence is to be excluded. *Pearce v. Barham,* 267 N.C. 707, 149 S.E. 2d 22 (1966).

In the case *sub judice,* the State moved, out of the presence of the jury, to exclude introduction of evidence that the victim was using birth control pills at the time of the alleged rape. After hearing arguments from counsel for both sides, the court ruled that evidence of the use of contraceptive pills was evidence of sexual activity and that it was excluded by G.S. 8-58.6. That may be true, and with this ruling, we have no quarrel. After this ruling, counsel for defendant inquired of the court if evidence that the prosecuting witness had told defendant, during the time of the incident, that she was using birth control pills could be introduced by direct evidence from the defendant. This request was denied. On this particular point we find no prejudicial error.

It is quite probable that a statement by a prosecuting witness to a defendant that she was using birth control pills may be relevant on a fact situation similar to this one. That is, if a prosecuting witness were to make such a statement to a defendant and then disrobe and follow him into bed as the defendant maintains was done here, it would seem to us that the evidence would be relevant on the issue of consent. We cannot say as much for this trial, however. The defendant did not tender evidence at the *voir dire* hearing showing the context of the statement. We are unable to determine from the record what the testimony would have been or what the circumstances surrounding the

statement were. Such information is critical to our review. The lack of evidence on the circumstances surrounding which the alleged statement was made prevents us from finding any prejudice to the defendant. As was stated in *State v. Milano,* 297 N.C. 485, 497, 256 S.E. 2d 154, 161 (1979), "we cannot tell whether the court's ruling prejudiced the defendant in any way." Consequently, we overrule this assignment of error.

### III

[2] The defendant next argues that the court erred when it allowed the police officer to testify that the prosecuting witness had told him that "the only thing that kept running through her mind was a scene from a movie which she had seen named 'Looking for Mr. Goodbar' in which a girl was killed in a similar situation." We find no prejudicial error.

Evidence is admissible to corroborate the testimony of a previous witness, and whether it in fact corroborates the witness' testimony is a question for the jury. *State v. Case,* 253 N.C. 130, 136, 116 S.E. 2d 429, 433 (1960), *cert. denied* 365 U.S. 830, 5 L.Ed 2d 707, 81 S.Ct. 717 (1961). The testimony by Officer Barbee does contain the additional sentence above, the import of which is no different from what the witness had testified to earlier. Our courts have held that slight variances in original and corroborating testimony do not render the evidence inadmissible. *State v. Bryant,* 282 N.C. 92, 97, 191 S.E. 2d 745, 749 (1972), *cert. denied sub nom White v. North Carolina,* 410 U.S. 958, 35 L.Ed. 2d 691, 93 S.Ct. 1432 (1973). Any possibility of prejudice was reduced by the court's elaborate instruction on corroboration evidence. This assignment of error is overruled.

### IV

[3] The defendant next contends that the trial court erred when it denied defendant's motion for nonsuit at the end of the State's evidence. We summarily dismiss this assignment as the law is clear: On a motion for nonsuit, the court is to consider the evidence in the light most favorable to the State and every inference which can be drawn therefrom. If the evidence and inferences establish all of the elements of the offense charged, the motion for nonsuit must be denied. *State v. Bell,* 285 N.C. 746, 750, 208 S.E. 2d 506, 508 (1974). The evidence here, taken in the

light most favorable to the State, established all of the elements of second degree rape.

V

[4]   The defendant's next assignment of error is that the trial court erred in commenting to the jury that the defendant had no duty to present evidence without further telling them that such a decision should not prejudice him in any way. We do not disagree with the defendant that a trial court is required to instruct the jury that the defendant's choice not to present evidence or testify in his behalf should not be held against him. We do not agree with the defendant's argument on the facts of this case, however. In the present case, the court's comment to the jury was no more than an explanation to the jurors of the stage of the proceedings. The court's comments are set out below, and they clearly show that the court did not err.

Members of the jury, I will ask you next to listen to the arguments that counsel will make you. You remember I mentioned earlier (that the defendant would have an opportunity to present evidence, but whether he did so or not is up to him. He has elected not to do so and the hour is such that we cannot finish this afternoon.) [S]o I told them I'll let them do their arguments seriatim in the morning and that gives you a little early break today.

VI.

The defendant's last two assignments involve the court's instruction to the jury which is set out below:

Please note that the proof of guilt required by the law does not include proof that [the prosecuting witness] exercised sound judgment or conducted herself in such a fashion that there would have been no opportunity for defendant to have sexual intercourse with her. If you find beyond a reasonable doubt that the defendant had sexual intercourse with her by force and against her will, though you also find that that would have [sic] have occurred had she not gone to the defendant's room or, having gone, had fled at defendant's first advance or had kept herself locked in the bathroom or had screamed or had otherwise offered resistance, your duty would be to return a verdict of guilty.

We find no error in the court's charge. Even though the language used may be unusual, the defendant was not prejudiced since the court repeatedly charged the jury that they had to find, beyond a reasonable doubt, that defendant raped the prosecuting witness.

For the foregoing reasons, we find

No error.

Judge HEDRICK and Judge HILL concur.

STATE OF NORTH CAROLINA v. RICHARD CHARLES DOWLESS

No. 8130SC996

(Filed 6 April 1982)

1. **Criminal Law § 75.11— in-custody statement—waiver of right to counsel**
    Even if defendant initially invoked his right to counsel when he asked the interrogating officer if he could provide him with an attorney and the officer responded that he could not do this but that defendant could telephone an attorney, defendant subsequently waived counsel by informing the officer that he would respond to those questions which he desired to answer.

2. **Criminal Law § 57— foundation for ballistics testimony**
    A proper foundation was laid for opinion testimony by an expert in the field of firearms that bullet fragments removed from a murder victim's head were fired from a pistol which was taken from defendant where the witness gave a detailed description of the tests performed by him which formed the basis for his opinion.

3. **Homicide § 21.7— second degree murder—sufficiency of evidence**
    The State's evidence *aliunde* defendant's confession was sufficient to support conviction of defendant for second degree murder where a neighbor testified that he saw defendant arrive at the victim's house around 8:00 p.m. on a certain date and leave fifteen or twenty minutes later; a pathologist fixed the time of death as occurring on that date between 6:00 p.m. and 8:00 p.m.; another witness testified that some time after midnight defendant told him that he had killed someone and pointed a pistol at the witness, and that the witness wrestled the pistol from the defendant and later turned it over to the authorities; and a firearms expert testified that in his opinion bullet fragments removed from the victim's body were fired from this pistol.

State v. Dowless

APPEAL by defendant from *Sitton, Judge.* Judgment entered 15 May 1981 in Superior Court, JACKSON County. Heard in the Court of Appeals on 1 March 1982.

Defendant was charged in a proper bill of indictment with the first degree murder of Bonnie Buchanan. The jury found defendant guilty of second degree murder. From a judgment imposing a prison term of 60 years maximum and 50 years minimum, defendant appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Lemuel W. Hinton, for the State.*

*Creighton W. Sossomon, for defendant appellant.*

HEDRICK, Judge.

[1] Defendant assigns as error the trial court's denial of his motion to suppress an alleged confession. Prior to trial defendant filed this motion to suppress evidence of statements made by him following his arrest on 31 January 1981. He alleged that the statements were taken after he had requested counsel, that this request was ignored by law enforcement officials, and that he never knowingly withdrew his request. At the *voir dire* hearing on this motion, Dan Crawford, an S.B.I. agent, testified that he saw defendant at the Rutherford County Jail at approximately 5:05 p.m. on 31 January 1981. In Crawford's opinion, defendant "was in full possession of his faculties." Crawford read defendant his *Miranda* rights, and defendant indicated he understood them. Crawford testified further:

> I then asked him [defendant] if he would sign the written waiver. He then asked me if I would be able to provide him an attorney today, and I instructed him that I was not able to be the one to provide him with an attorney today through the courts. At that time I advised him that I was not able to call an attorney, that there was a telephone on the desk and a telephone book, and he stated he did not want to call an attorney.
>
> He first refused to sign the waiver, and by the statement he made then it implied to me that he wanted an attorney.

Then, he said he did not want to make a written state-
ment and sign it, and I asked him if he was willing to talk to
me on the condition that if he did not want to answer any
particular question he could refuse to do so. He said he
understood this, and he would talk to me without an attorney
present, and I again handed him the rights form, and at that
time he signed it.

.   .   .

This form was signed January 31, 1981, a short time
after 5:05 p.m.

On this exhibit [waiver of rights form] appears the ques-
tion "Do you want a lawyer?" and following that in the blank
line appears the word "yes" which was written in and then
marked through. It was marked through by me. This is my
handwriting. I did this after Mr. Dowless questioned me
about appointing him a lawyer, and after I had advised him
that I could not and had given him the opportunity to make a
phone call. He then stated he would talk to us on the condi-
tion that he could answer only those questions which he
wanted and refused to answer those he did not wish to
answer. At that point he signed the waiver of rights. I struck
out the word "yes" prior to the time that this exhibit was
handed to the defendant and prior to the time that he signed
it.

The entire conversation took approximately 1 hour and
45 minutes. During this time, no threats were made by
myself or Sheriff Holcombe to induce the defendant to make
a statement. No promises were made by either myself or
Sheriff Holcombe to the defendant.

Defendant's *voir dire* testimony tends to show that on the
evening of 30 January 1981 he was arrested for driving under the
influence and placed in the Rutherford County Jail. On the follow-
ing day Crawford informed him that he was not under arrest for
the murder of Ms. Buchanan and read him his *Miranda* rights.
Defendant then asked for a lawyer. He signed the rights form
after Crawford informed him that a lawyer could not be "gotten
and that was it." Defendant verified the statement allegedly made
by him after Crawford indicated that his brother was being held

in custody. After hearing the *voir dire* testimony, the trial court made detailed findings of fact consistent with the State's evidence and concluded, *inter alia*, that defendant "freely, knowingly, intelligently and voluntarily waived each of his Constitutional rights."

Defendant argues in his brief that the court's findings of fact are not supported by the evidence as it is interpreted by the law, particularly by that promulgated in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed. 2d 378 (1981). We disagree. In *Edwards*, the defendant was arrested on 19 January 1976 and asserted his right to counsel and his right to remain silent. Without furnishing defendant an attorney, policemen confronted him the next morning. As a result of this confrontation, defendant made incriminating oral admissions. The Court held:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold than an accused, such as Edwards, having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. [Footnote omitted.]

451 U.S. at 484-85, 101 S.Ct. at 1884-85, 68 L.Ed. 2d at 386. In the case *sub judice*, it is not even clear that defendant invoked his right to counsel. Defendant merely asked Agent Crawford if he could provide him with an attorney. Crawford responded that he could not do this but that defendant could telephone an attorney. Defendant then indicated that he did not wish to call an attorney. Even if defendant did initially invoke his right to counsel, he subsequently waived counsel by informing Crawford he would respond to those questions he desired to answer. This waiver was also knowingly and intelligently given. Defendant testified on *voir dire* that he understood how a lawyer is appointed to represent a defendant because one had been appointed for him when he had been jailed in the past, that he understood his *Miranda* rights, and that no one threatened or made any promises to him. Since

the trial court's findings of fact are supported by this evidence of-
fered on *voir dire*, they will not be disturbed on appeal. *State v.
Harris*, 290 N.C. 681, 228 S.E. 2d 437 (1976). The findings of fact,
in turn, support the conclusion that the defendant's statements
were made voluntarily and knowingly.

Defendant also assigns as error the admission into evidence
of certain testimony given by Agent Crawford. Crawford testified
that defendant informed him that immediately prior to his
shooting Ms. Buchanan, he obtained a pistol from the nightstand
beside his bed. Crawford admitted that this statement was not
part of the notes made by him during his 31 January 1981 inter-
view with defendant. Instead, this statement was recorded in
notes Crawford made on 27 April 1981 at the request of the
District Attorney. Defendant argues that the State was limited to
the contents of the notes taken by Crawford during the 31
January 1981 interrogation; and that the admission of this
testimony concerning the whereabouts of the pistol "can hardly
be characterized as 'harmless' or consistent." We fail to see how
defendant possibly could have been prejudiced by this testimony.
In the notes recorded on 31 January 1981 and allegedly verified
by defendant, he informed Crawford that he began working for
Ms. Buchanan as her housekeeper in December of 1980. The notes
further indicate that defendant planned to visit his father in
Fayetteville on the evening of 30 January 1981; that Ms.
Buchanan did not want him to leave; that she threatened to call
the sheriff and that as she was trying to call, he shot her in the
face with a .22 caliber pistol. In light of this evidence and our
determination of its admissibility, we conclude that the location of
the pistol carried little if any weight in the jury's deliberation of
defendant's guilt or innocence.

[2] During the trial, Agent Douglas Branch was accepted by the
court as an expert in the field of firearms and tool mark iden-
tification. Defendant has assigned error to Branch's opinion
testimony that the bullet fragments removed from Ms.
Buchanan's head were fired from the pistol which was taken from
defendant's possession on the evening of 31 January 1981. Defend-
ant contends that a proper foundation was not laid before this
testimony was admitted. Specifically there was no evidence that
Branch performed tests upon which his opinion testimony was
based. The testimony of Branch totally refutes defendant's con-

tentions. Branch gave a detailed description of the tests he performed. When the facts upon which an expert bases his opinion are within his own knowledge, the expert may relate these facts and give his opinion. Also the trial judge has the discretionary power to allow the expert to give his opinion first and then leave the facts to be elicited on cross-examination. *See State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978). This assignment of error is therefore overruled.

[3] Defendant further assigns error to the court's denials of his motions for nonsuit made at the close of the State's evidence and at the close of all the evidence. When a motion for nonsuit is made in a criminal action, the trial court must consider all of the evidence in the light most favorable to the State. The court must then determine whether there is a reasonable basis upon which the jury might find that the offense charged in the indictment was committed and that defendant was the perpetrator. *State v. Hyatt*, 32 N.C. App. 623, 233 S.E. 2d 649, *disc. rev. denied*, 292 N.C. 733, 235 S.E. 2d 786 (1977). In the case *sub judice* defendant argues that his motions should have been granted because the State erroneously relied upon defendant's alleged confession in proving its case. The State's evidence, *aliunde* this confession, was sufficient to allow the submission of the case to the jury. A neighbor testified that he saw defendant arrive at Ms. Buchanan's house around 8:00 p.m. on 30 January 1981 and leave fifteen or twenty minutes later. The pathologist, who examined the body, fixed the time of death as occurring between 6:00 p.m. and 8:00 p.m., "give or take two hours." Timothy Hudgins testified that he saw the defendant soon after midnight on 31 January 1981 when defendant stopped and asked directions to Morganton. Defendant told Hudgins he had killed someone and then pointed a pistol at him. Hudgins wrestled the pistol from defendant and later turned the weapon over to the authorities. A firearms expert testified that in his opinion the bullet fragments removed from Ms. Buchanan's body were fired from this pistol. Based on this evidence alone, defendant's motions for nonsuit were properly denied.

Defendant's final assignment of error concerns two instances of alleged expressions of opinion made by the trial judge during his instructions to the jury. We have carefully examined those portions of the charge and find no error. We further note that defendant had the burden of showing a prejudicial effect from

these alleged expressions and has failed to make such a showing. *State v. Faircloth*, 297 N.C. 388, 255 S.E. 2d 366 (1979).

We hold defendant had a fair trial free of prejudicial error.

No error.

Chief Judge MORRIS and Judge VAUGHN concur.

---

APPEAL OF DONALD BRENT WILLETT FROM THE DECISION OF THE REFUND COMMITTEE OF THE UNIVERSITY OF NORTH CAROLINA AT GREENSBORO TO CLAIM HIS NORTH CAROLINA INCOME TAX REFUND UNDER THE SET-OFF DEBT COLLECTION ACT

No. 8114SC713

(Filed 6 April 1982)

**Administrative Law § 4; Taxation § 28.4— Setoff Debt Collection Act—UNC-G not exempt from hearing procedures**

> The University of North Carolina at Greensboro is not exempt from the hearing procedures of the Setoff Debt Collection Act, G.S. 105A-8. Therefore, a hearing conducted by the Refund Committee of the University to review the asserted basis for a setoff of a student debtor's delinquent account against his income tax refund should have been recorded and an "official record" of the hearing as set forth in G.S. 150A-37 should have been made.

APPEAL by respondent from *Herring, Judge*. Order entered 27 May 1981 in Superior Court, DURHAM County. Heard in the Court of Appeals 10 March 1982.

*Attorney General Edmisten, by Associate Attorney Lisa Shepherd, for respondent-appellant.*

*Eure & Willis, by Michael W. Willis, for petitioner-appellee.*

HILL, Judge.

In June, 1977, petitioner, then a resident of Kentucky, applied for admission to the University of North Carolina at Greensboro [hereinafter referred to as "UNC-G"]. He was accepted for admission and subsequently was billed for six semester hours at $156, the in-state tuition rate, which he paid. Petitioner

enrolled, found it necessary to quit attending classes, and withdrew from UNC-G. Although the deadline to drop courses at UNC-G and still receive a tuition refund was 8 September 1977, petitioner's request to drop the six semester hours was delivered on 5 October.

On 29 November 1977, petitioner received a letter from the Cashier's Office which informed him of an additional charge of $573, representing the difference between in-state and out-of-state tuition, which was due immediately because petitioner had been erroneously classified as an in-state student. Petitioner appealed the additional charge, but the Refund Committee at UNC-G informed him that the charge was justified. On 25 April 1980, the Cashier's Office informed petitioner that it intended to claim all of his 1979 income tax refund to pay his delinquent account pursuant to the Setoff Debt Collection Act, G.S. 105A-1 to -16. Petitioner then requested a hearing on this matter before the Refund Committee.

Petitioner's hearing was held on 20 June 1980. The minutes of that meeting and the decision of the Refund Committee were recorded as follows:

DATE: Friday, June 20, 1980

TIME: 10:00 a.m.

PLACE: Leon Sartin's Office, Accounting Office

MEMBERS PRESENT: Eleanor Morris, Jerry Harrelson, Leon Sartin

GUESTS: Brent Willett and Carol Sanders

Carol Sanders presented the information on which the University's claim against Mr. Willett's tax refund was based, which was the fact that Mr. Willett had been charged out-of-state tuition for Fall 1977 and paid the in-state rate.

Mr. Willett presented his case which was that he dropped the classes and did not feel that he should have to pay for services he did not receive. He also stated that he was not aware of the residence requirements and the difference in costs.

The Refund Committee's decision was that there was no additional information presented to reverse the original decision of the Committee which was based on an appeal Mr. Willett made in November of 1977 on this same charge. Therefore, the money is due to UNC-G.

Mr. Willett stated he would be requesting a hearing in his own county. If we have not heard from his legal counsel by July 18, 1980, the Cashier's Office will proceed to certify Mr. Willett's debt to the Department of Revenue.

Respectfully,

s / CAROL M. LAMBERT
Carol M. Lambert

Petitioner subsequently supplemented this account of the 20 June 1980 meeting.

On 8 September 1980, petitioner petitioned for judicial review of the Refund Committee's decision alleging that he was denied due process of law and that the decision was not supported by "substantial evidence." The trial judge entered an order on 27 May 1981 finding the following facts:

(1) THAT the fact that the hearing of June 20, 1980, was held before a panel made up of three University administrators who are members of the Standing Refund Committee of the University of North Carolina at Greensboro, does not constitute a violation of due process.

(2) THAT no transcript of the June 20, 1980, hearing of petitioner's case by the Standing Refund Committee was prepared or received by this court, and that no other data was presented which was sufficient to relate what took place at the June 20, 1980 hearing.

.   .   .   .

In connection with this, G.S. 150A-47 provides that within thirty (30) days after receipt of the copy of the Petition for Review, or within such additional [sic] as the Court may allow, the agency shall transmit to the reviewing court the original or a certified copy of the entire record of the proceedings under review.

(3) THAT the Administrative Procedures [sic] Act requires, as set forth in G.S. 150A-36, that a final decision or order of an agency in a contested case shall be made, after review of the official record as defined in G.S. 150A-37(a) in writing and shall include findings of facts and conclusions of law.

. . . .

Exhibit L [the minutes of the 20 June 1980 meeting] of the Record of Administrative Proceedings in this is [sic] case contains no written findings of facts on which to support any conclusions of law, nor are there any conclusions of law.

. . . .

(4) THAT petitioner should have been given a hearing de novo by the Standing Refund Committee on June 20, 1980.

. . . .

Instead the minutes found in Exhibit L of the Record recite that no additional information was presented by the petitioner to warrant a reversal of the Committee's original decision in January 1978. The Administrative Procedures [sic] Act requires that findings and conclusions be made as a result of a hearing at which there is an opportunity to present evidence.

The judge concluded that "petitioner is not entitled to the relief he seeks," and that "this court has discretion to remand this case to the Standing Refund Committee with directions that proper findings of fact and conclusions of law be stated by the agency pursuant to the provisions of G.S. 150A, after hearing de novo." The trial judge then remanded the case to the Refund Committee and ordered the following:

(2) THAT since this Court has no way of knowing exactly what sort of record was made at the June 20, 1980 hearing nor the contents of any such record, that a hearing de novo be conducted by the Standing Refund Committee in accordance with G.S. 150A and that petitioner be given adequate notice of the time and place of that hearing.

. . . .

(3) THAT no prior administrative decision made at any time in this case shall be given any consideration or effect in the hearing de novo, and that petitioner be allowed to present oral evidence, and that an adequate record of that evidence shall be recorded.

.   .   .   .

(4) THAT the memorandum of decision as stated in the June 20, 1980, "Minutes of the Refund Committee Meeting" be vacated and is hereby set aside.

Respondent appeals from this order.

Respondent's appeal may be decided by our answer to the question of whether UNC-G is specifically exempted from the hearing procedures of the Setoff Debt Collection Act, G.S. 105A-8(a), which provides that "[i]f a claimant agency receives written application of the debtor's intention to contest at hearing the claim upon which the intended setoff is based, *it shall grant a hearing according to procedures established under Chapter 150A, the Administrative Procedure Act, to determine whether the claim is valid.*" (Emphasis added.) G.S. 150A-1(a) of the Administrative Procedure Act provides, in part, as follows:

Article 4 of this Chapter, governing judicial review of final agency decisions, shall apply to the University of North Carolina and its constituent or affiliated boards, agencies, and institutions, *but the University of North Carolina and its constituent or affiliated boards, agencies, and institutions are specifically exempted from the remaining provisions of this Chapter.*

(Emphasis added.)

Of course, in ascertaining the intent in drawing G.S. 105A-8(a) of the Setoff Debt Collection Act, "it is always presumed that the Legislature acted with full knowledge of prior and existing law." *Ridge Community Investors, Inc. v. Berry*, 293 N.C. 688, 695, 239 S.E. 2d 566, 570 (1977). It is clear that UNC-G, a constituent member of the University of North Carolina, is specifically exempted from the Administrative Procedure Act except for the judicial review provisions of Article 4. We believe that the legislature merely selected those portions of the Administrative Pro-

cedure Act dealing with hearing procedures and adopted them as the hearing procedures of the Setoff Debt Collection Act. However, this adoption does not mandate a conclusion that UNC-G also is specifically exempted from those procedures under the Setoff Debt Collection Act, although it is so exempted under the Administrative Procedure Act. We therefore conclude that UNC-G is not specifically exempted from the hearing procedures of the Setoff Debt Collection Act.

G.S. 150A-37, which outlines the requirements of an "official record" for the Setoff Debt Collection Act, provides as follows:

(a) An agency shall prepare an official record of a hearing which shall include:

(1) Notices, pleadings, motions, and intermediate rulings;

(2) Questions and offers of proof, objections, and rulings thereon;

(3) Evidence presented;

(4) Matters officially noticed, except matters so obvious that a statement of them would serve no useful purpose;

(5) Proposed findings and exceptions; and

(6) Any decision, opinion, order, or report by the officer presiding at the hearing and by the agency.

(b) Proceedings at which oral evidence is presented shall be recorded, but need not be transcribed unless requested by a party. Each party shall bear the cost of the transcript or part thereof or copy of said transcript or part thereof which said party requests.

Our review of the minutes of the Refund Committee's 20 June 1980 meeting reveals a substantial noncompliance with these requirements. Those proceedings should have been recorded and an "official record" made.

For the reasons stated in this opinion, the order of the trial court is

Affirmed.

Judges WELLS and BECTON concur.

---

STATE OF NORTH CAROLINA v. FLORINE H. ELAM

No. 8112SC1007

(Filed 6 April 1982)

1. **Criminal Law § 85— character evidence—excluded testimony cumulative—no error**

   There was no prejudicial error in the court's exclusion of character and reputation testimony by a witness where (1) the record did not reflect what the witness would have answered, and (2) other witnesses had testified as to defendant's good character and the testimony would have been cumulative.

2. **Criminal Law § 119— refusal to give requested instruction**

   The trial judge did not abuse his discretion in refusing to instruct the jury that it can infer from the State's failure to produce written statements made by eyewitnesses that the statements were damaging to the State's case since there was no intimation that the evidence was destroyed, defendant did not make his motion to produce the statements until immediately before trial, and since although the officers looked for the material, they were unable to produce it. G.S. 15A-902(a).

3. **Homicide § 28— failure to instruct on deceased's reputation for violence—no prejudicial error**

   The trial court's failure to apply evidence of deceased's reputation for violence to the question of defendant's reasonable apprehension of death or great bodily harm was not prejudicial error where the jury was fully charged on the law of self-defense.

4. **Homicide §§ 27.2, 28.8— failure to instruct on accidental killing and involuntary manslaughter proper**

   Where all the evidence, including that of defendant, indicated that she intentionally fired a weapon, the trial court properly failed to instruct on the defense of an accidental killing and involuntary manslaughter since there was no evidence of an accidental discharge of the pistol.

5. **Constitutional Law § 48— effective assistance of counsel—refusal of request of counsel to testify**

   Defendant was not denied effective assistance of counsel because her counsel did not insist that the court rule on her motion for mistrial so that counsel could testify to impeach two of the State's witnesses. Ethical Consideration EC5-10 of the Code of Professional Responsibility of The North Carolina State Bar, under some circumstances, allows counsel to testify

without withdrawing. Further, counsel stipulated for the jury what she would have testified if called as a witness, and a tape recording of the disputed statements was played for the jury.

APPEAL by defendant from *Clark, Judge.* Judgment entered 16 February 1981. Heard in the Court of Appeals 2 March 1982.

Defendant appeals her conviction of murder in the second degree.

The state's evidence tended to show that on 12 July 1980, defendant's estranged husband, William Elam, and two friends passed defendant's house in Mr. Elam's car. Mr. Elam was driving. They saw a woman wearing a white uniform standing on the porch. They drove south past the house to an intersection where Mr. Elam made a U-turn and headed back north. Mr. Elam's friends then noticed a Ford LTD approaching them from the rear. The Ford pulled up on the left side of Mr. Elam's car, striking the left front and forcing it toward the ditch. The defendant jumped out of the Ford, asked "Why did you hit my car?" and before Mr. Elam could move or respond, the defendant shot him once in the face. Defendant left the scene. As a result of the gunshot wound, Elam died.

Defendant testified that on 12 July she arrived home at 10:30 p.m. and as she did so, she saw her husband and two other men drive by. She entered the house, changed into her uniform, and as she left for work, she noticed a car parked down the road. She proceeded north in her car. At that time Mr. Elam's car came speeding up behind her and forced her out of her lane. She pulled back into the right lane and her car collided with Mr. Elam's. When she stopped her car, Mr. Elam and a tall man got out of Elam's car and Mr. Elam said, "Get her! Get her!"

Defendant testified that the tall man had something in his hand and Mr. Elam held a gun; that she fired her .22-caliber pistol to scare them off; and that she did not mean to hit or hurt anyone when she fired. She further testified that there had been violent domestic quarrels between the two and that Mr. Elam had threatened her life on several occasions and had assaulted her.

*Attorney General Edmisten, by Associate Attorney Walter M. Smith, for the State.*

*Assistant Appellate Defender Marc D. Towler for defendant.*

MARTIN (Harry C.), Judge.

[1] Defendant first contends the court erred in excluding the testimony of the witness Barbara Jenkins concerning the character and reputation of defendant in her "work setting." We find no error. First, the record does not reflect what the witness would have answered; therefore, we cannot determine if the exclusion was prejudicial. *State v. Martin,* 294 N.C. 253, 240 S.E. 2d 415 (1978); *State v. Darden,* 48 N.C. App. 128, 268 S.E. 2d 225 (1980). Further, assuming the testimony would have been favorable to defendant, it was cumulative. Three other witnesses testified defendant had a good character and reputation. Two of the witnesses were Baptist ministers. Under these circumstances, we cannot hold the exclusion of the testimony, if erroneous, was prejudicial. *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966); *State v. Lindsey,* 25 N.C. App. 343, 213 S.E. 2d 434, *cert. denied,* 287 N.C. 468 (1975).

[2] The trial judge refused to instruct the jury that it could infer from the state's failure to produce written statements made by the eyewitnesses Rhone and Thompson that the statements were damaging to the state's case. Defendant argues this was error, relying upon *People v. Zamora,* 28 Cal. 3d 88, 615 P. 2d 1361 (1980). In *Zamora,* the city attorney's office had directed the destruction of all records of citizen complaints against police officers if the complaints were considered unmeritorious. The court held that the trial judge should instruct the jury that the officers had used excessive force in the incidents complained of in the destroyed records. Such is not the case here. There is no intimation that the evidence was destroyed. Defendant did not make her motion to produce until immediately before trial, and although the officers looked for the material, they were unable to produce it. The statutory discovery process contemplates that it shall be done pretrial. N.C. Gen. Stat. § 15A-902(a) (1978). In most instances, pretrial discovery will eliminate the very problem here complained of. We find no abuse of discretion by the ruling of the trial court. *See State v. Smathers,* 287 N.C. 226, 214 S.E. 2d 112 (1975).

[3]   We find no prejudicial error in the trial court's failure to apply evidence of deceased's reputation for violence to the question of defendant's reasonable apprehension of death or great bodily harm from the alleged assault by deceased. The jury was fully charged on the law of self-defense. On this state of facts, we find *State v. Rummage*, 280 N.C. 51, 185 S.E. 2d 221 (1971), to be controlling. Although this was error, we do not find it, standing alone, sufficient to require a new trial. *Id.*

[4]   Defendant argues the court should have charged on the defense of an accidental killing and involuntary manslaughter. All the evidence, including that of defendant, indicates that she intentionally fired the weapon. There was no evidence of an accidental discharge of the pistol. Defendant testified, "I had a pistol and fired to scare them off. . . . After I fired the gun . . .." She says she intentionally fired the gun. The assignments of error are meritless. *State v. Redfern*, 291 N.C. 319, 230 S.E. 2d 152 (1976); *State v. Efird*, 37 N.C. App. 66, 245 S.E. 2d 226 (1978), *cert. denied*, 301 N.C. 98 (1980).

Defendant argues that the solicitor in four instances committed prejudicial error in his jury argument. We have carefully examined the entire argument of counsel and cannot find it to contain prejudicial error so as to require a new trial. The trial judge has broad discretion in controlling the argument of counsel, especially in hotly contested cases. *State v. Britt*, 288 N.C. 699, 220 S.E. 2d 283 (1975). We find no abuse of that discretion.

[5]   Last, defendant insists that she was denied effective assistance of counsel because her counsel did not insist that the court rule on her motion for mistrial so that counsel could testify to impeach state's witness Daws, to the effect that Daws was present during the entire interview of state's witnesses Rhone and Thompson. Ethical Consideration EC5-10 of the Code of Professional Responsibility of The North Carolina State Bar, volume 4A of the General Statutes of North Carolina (Cum. Supp. 1981), states: "In the exceptional situation where it will be manifestly unfair to the client for the lawyer to refuse employment or to withdraw when he will likely be a witness on a contested issue, he may serve as advocate even though he may be a witness." A mistrial was not necessary in order for defendant's counsel to testify in the case. Whether she could withdraw as counsel was a

matter in the sound discretion of the trial judge. *State v. Brady,* 16 N.C. App. 555, 192 S.E. 2d 640 (1972), *cert. denied,* 282 N.C. 582 (1973). *See Smith v. Bryant,* 264 N.C. 208, 141 S.E. 2d 303 (1965); 81 Am. Jur. 2d *Witnesses* §§ 98, 98.5 (1976). A motion to allow defense counsel to testify in this case on a collateral matter, impeachment of a witness, would have been in the discretion of the trial judge. *People v. Stratton,* 64 Mich. App. 349, 235 N.W. 2d 778 (1975).

Moreover, here counsel stipulated for the jury what she would have testified if called as a witness. Further, a tape recording of the disputed statements was played for the jury. We find no violation of defendant's right to effective counsel.

No error.

Judges MARTIN (Robert M.) and WHICHARD concur.

---

NADINE BEACH MOORE, As ADMINISTRATRIX OF THE ESTATE OF GWYN BEACH, PLAINTIFF/APPELLANT v. PIEDMONT PROCESSING COMPANY AND LUMBERMEN'S MUTUAL INSURANCE COMPANY, DEFENDANTS/APPELLEES

No. 8110IC572

(Filed 6 April 1982)

**Master and Servant § 68— workers' compensation—occupational disease—denial of compensation proper**

The Industrial Commission's findings that decedent was not disabled as a result of an occupational disease were supported by the evidence and the findings supported the conclusion and award denying benefits. Further, the Commission was not bound to find from the evidence that plaintiff's bronchitis was caused by exposure to cotton dust and, even if bronchitis were an occupational disease, plaintiff had not proven that bronchitis due to cotton dust exposure caused decedent any calculable degree of disability.

APPEAL by plaintiff from the North Carolina Industrial Commission. Opinion and Award entered 19 February 1981. Heard in the Court of Appeals 3 February 1982.

Plaintiff sought Workers' Compensation benefits for the pulmonary disability of her decedent allegedly caused by ex-

posure to cotton dust. Commissioner Shuford entered an opinion and award denying the claim, and the full Industrial Commission affirmed. Plaintiff appealed.

*Gillespie & Lesesne, by Louis L. Lesesne, Jr., for plaintiff appellant.*

*Hedrick, Feerick, Eatman, Gardner & Kincheloe, by Edward L. Eatman, Jr., for defendant appellees.*

WHICHARD, Judge.

The Industrial Commission concluded that plaintiff's decedent "did not suffer from disability as a result of an occupational disease within the meaning of the Workers' Compensation Act." We find that the findings of fact, which are supported by competent evidence, adequately support this conclusion; and we therefore affirm the denial of benefits.

The chief medical witness testified as follows: Decedent worked 48 years in cotton mills, smoked about one pack of cigarettes a day for forty years, and was totally disabled when he applied for benefits. The primary causes of decedent's disability were bronchitis and emphysema. (In his 1979 examination report the witness had listed his "first two impressions" as "1. pulmonary emphysema" and "2. chronic bronchitis.") Bronchitis is more commonly found among cotton mill workers than among members of the general public, but is not "peculiar to" cotton mill workers. It is impossible to distinguish the relative contributions of bronchitis and emphysema to decedent's disability. Exposure to cotton dust "probably" contributed to his disability, but cannot be said to have "caused" it. Smoking played a "large role" in his disability and "could or might" have caused either the bronchitis or the emphysema or both. The relative contributions of cotton dust and smoking to the bronchitis cannot be distinguished. Decedent had no classic history of "Monday morning" symptoms.

To obtain benefits plaintiff must show that (1) decedent suffered from an "occupational disease," that is, one "due to causes and conditions which are characteristic of and peculiar to a particular . . . occupation . . ., but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment," G.S. 97-53(13); and (2) this occupational disease

resulted in disability to work. *Morrison v. Burlington Industries,* 304 N.C. 1, 12, 282 S.E. 2d 458, 466-67 (1981).

Plaintiff assigns error to the following findings and conclusion of the commission:

### FINDINGS OF FACT

. . . .

6. . . . [The doctor's] primary diagnosis or impression was pulmonary emphysema . . . .

7. . . . There were no symptoms referable to the work environment . . . .

8. Deceased was not disabled as a result of an occupational disease within the meaning of the Workers' Compensation Act . . . .

9. The primary cause of deceased becoming disabled was the disease emphysema, which is not characteristic of or peculiar to the textile industry. The primary cause of deceased's emphysema was the almost "40 pack years" of cigarette smoking.

\*   \*   \*   \*   \*   \*   \*

. . .

### CONCLUSIONS OF LAW

1. Deceased . . . did not suffer from disability as a result of an occupational disease within the meaning of the Workers' Compensation Act.

The findings of fact made by the Commission are conclusive on appeal if supported by competent evidence in the record. *Walston v. Burlington Industries,* --- N.C. ---, ---, 285 S.E. 2d 822, 827 (1982) (as corrected by N.C. Supreme Court order No. 116A81, filed 8 March 1982); *Morrison v. Burlington, Inc.,* 304 N.C. 1, 6, 282 S.E. 2d 458, 463 (1981). The conclusions of the commission will not be disturbed if justified by the findings of fact. *Inscoe v. Industries, Inc.,* 292 N.C. 210, 216, 232 S.E. 2d 449, 452 (1977); *Rutledge v. Tultex Corp.,* --- N.C. App. ---, --- S.E. 2d --- (filed 16 March 1982).

We hold that the Commission's findings are adequately supported by the medical testimony, and that the findings support the conclusion and award denying benefits.

The Commission made no findings regarding bronchitis. Plaintiff argues that under *Hansel v. Sherman Textiles,* 304 N.C. 44, 283 S.E. 2d 101 (1981), "this case [must] be remanded to the Industrial Commission for further findings as to the role of other diseases in causing decedent's disability, particularly with respect to the disease of chronic bronchitis." A remand was necessitated in *Hansel* because our Supreme Court was "unable to say that the findings justify the Commission's conclusion as to causation and its award" since "the medical evidence in the record [was] not sufficiently definite . . . to permit effective appellate review." *Hansel,* 304 N.C. at 50-51, 283 S.E. 2d at 105. The chief medical witness' testimony here was "sufficiently definite" to support the Commission's conclusion that decedent "did not suffer from disability *as a result of* an occupational disease." (Emphasis added.)

Although there was evidence to support a finding that cotton mill workers were subject to "increased risk" of contracting bronchitis, *see Booker v. Medical Center,* 297 N.C. 458, 472, 256 S.E. 2d 189, 198 (1979), there was no compelling evidence that any higher incidence of bronchitis among cotton mill workers was "*due to* . . . conditions . . . characteristic of and peculiar to" that occupation, G.S. 97-53(13) (emphasis added). The chief medical witness testified only that bronchitis "could or might be caused in some instances by conditions characteristic of work in the cotton textile industries." The Commission was not bound to find from this evidence alone that bronchitis was an occupational disease.

Further, the Commission was not bound to find from the evidence that plaintiff's bronchitis was caused by exposure to cotton dust. The chief medical witness testified that he was "unable to state with any degree of medical certainty the degree that either cigarette smoking or cotton dust exposure could or might have played in [decedent's] bronchitis." Thus, even if bronchitis were an occupational disease, plaintiff could properly be denied benefits because she had not proven that bronchitis *due to cotton dust exposure* caused decedent any calculable degree of disability.

> When a claimant becomes incapacitated for work and part of that incapacity is caused, accelerated or aggravated by an occupational disease and the remainder of that incapacity for work is not caused, accelerated or aggravated by an occupational disease, the Workers' Compensation Act of North Carolina requires compensation only for that portion of the disability caused, accelerated or aggravated by the occupational disease.

*Morrison, supra,* 304 N.C. at 18, 282 S.E. 2d at 470. Plaintiff had "the burden of proof 'to show not only . . . disability, but also its degree.' " *Id.,* 304 N.C. at 13, 282 S.E. 2d at 467.

We note that this is not a situation where "a pre-existing, *nondisabling, non-job-related* condition is aggravated or accelerated . . . by an occupational disease so that . . . the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent." *Id.,* 304 N.C. at 18, 282 S.E. 2d at 470. There is no evidence that decedent entered into cotton mill employment with a distinct condition that could have been aggravated by cotton dust exposure.

Because plaintiff failed to carry her burden of proving that decedent's disability resulted from a disease caused by conditions characteristic of his occupation, we affirm the findings, conclusions and award of the Industrial Commission denying benefits. *See Walston v. Burlington Industries, supra; Rutledge v. Tultex Corporation, supra.*

Affirmed.

Judges CLARK and ARNOLD concur.

Whitener v. Whitener

WARREN B. WHITENER v. OLLIE VEE WHITENER

No. 8129DC381

(Filed 6 April 1982)

1. **Process § 9— action for an accounting—no in rem or quasi in rem jurisdiction**

   In an action in which plaintiff asked for an accounting from the defendant for money which she received in Florida, the action was neither *in rem* nor *quasi in rem* since the action did not affect the debt which was owed by the persons in North Carolina to the parties to the suit nor did the plaintiff garnish the debt in this State as an ancillary proceeding to the action.

2. **Process § 9— interest in note secured by deed of trust—no minimum contact— no in personam jurisdiction**

   The district court properly dismissed an action by plaintiff for an accounting by defendant of monies she had received in Florida as payments on a purchase money note secured by a deed of trust on property in North Carolina due to lack of *in personam* jurisdiction. Defendant sold the property in North Carolina in 1968; she has not been in North Carolina since that time; and G.S. 1-75.4(6)(b) does not give the North Carolina court jurisdiction for a suit against the defendant for an accounting of money she received on the note.

APPEAL by plaintiff from *Greenlee, Judge.* Judgment entered 17 February 1981 in District Court, HENDERSON County. Heard in the Court of Appeals 19 November 1981.

The plaintiff has appealed from an order dismissing this action on the ground the court did not have *in personam* jurisdiction over the defendant. The pleadings establish that the parties to this action were married in 1926 and divorced in 1973. The parties were residing in Florida in 1968 at which time they sold a parcel of real estate in Henderson County and took for it a purchase money note secured by a deed of trust. The defendant has been domiciled in Florida since the property in Henderson County was sold. The plaintiff, who is now domiciled in North Carolina, brought this action for an accounting by the defendant of monies she has received in Florida as payments on the purchase money note. In his complaint the plaintiff alleged that on 2 August 1977 an action identical in substance to the instant case was filed in which an order had been issued to the payors of the note to deliver all payments to the Clerk of Superior Court of Henderson County. A voluntary dismissal has been taken in that action. In his prayer for relief the plaintiff asked for an accounting, a money judgment for any sum due, and that the Clerk of Superior Court

of Henderson County be ordered to continue holding the money paid to him pursuant to the order in the previous action.

The defendant was served process by mailing a copy of the complaint to her by certified mail.

*Lee Atkins for plaintiff appellant.*

*Prince, Youngblood, Massagee and Creekman, by James E. Creekman, for defendant appellee.*

WEBB, Judge.

[1] The plaintiff first contends that the district court has jurisdiction because this is an *in rem* or *quasi in rem* action. Plaintiff argues this is so because there is a debt owed by persons in North Carolina to the parties to this suit. We do not believe this is an action *in rem* or *quasi in rem*. An *in rem* action deals with a proceeding regarding a thing. An action is *quasi in rem* if a thing which is not the subject of an action is attached or garnished in an ancillary proceeding in order to make it subject to the judgment against the defendant. *See Holt v. Holt*, 41 N.C. App. 344, 255 S.E. 2d 407 (1979); *Balcon, Inc. v. Sadler*, 36 N.C. App. 322, 244 S.E. 2d 164 (1978); *Allen and O'Hara, Inc. v. Weingart*, 23 N.C. App. 676, 209 S.E. 2d 839 (1974). In this case the plaintiff has asked for an accounting from the defendant for money which she received in Florida. This does not affect the debt which is owed by the persons in North Carolina to the parties to this suit. This is not an *in rem* action. The plaintiff has not garnished the debt in this state as an ancillary proceeding to this action. This is not a *quasi in rem* action.

[2] The plaintiff also contends the court has *in personam* jurisdiction of the defendant. The parties agree that the defendant was in form properly served so that the court has jurisdiction if this is an action in which the defendant may be served with process outside the state. If the court has *in personam* jurisdiction, it is under G.S. 1-75.4 which provides:

"A Court of this State having jurisdiction of the subject matter has jurisdiction over a person served in an action pursuant to Rule 4(j) of the Rules of Civil Procedure under any of the following circumstances:

\*   \*   \*

(6) Local Property.—In any action which arises out of:

\*   \*   \*

    b. A claim to recover for any benefit derived by the defendant through the use, ownership, control or possession by the defendant of tangible property situated within this State either at the time of the first use, ownership, control or possession or at the time the action is commenced . . . ."

The plaintiff contends this action involves a claim to recover for a benefit the defendant derived by the ownership of real estate in North Carolina, which was sold in 1968 and now is the security for the payment of a note, and this brings defendant within the purview of G.S. 1-75.4(6)(b).

In interpreting G.S. 1-75.4(6)(b) as applied to the facts of this case we have to be mindful of the due process requirements of the Fourteenth Amendment to the United States Constitution. The due process clause requires that in order for a court to have personal jurisdiction over a person not domiciled in the state and not served with process in the state that the person must have certain minimum contacts with the state. *See Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed. 2d 683 (1977) and *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945). In *Shaffer*, the United States Supreme Court held that the fact that a person held stock in a Delaware corporation was not a sufficient contact to give the Delaware courts jurisdiction over that person. The subject matter of the action did not involve the defendant's rights as a stockholder although it did involve his action as an officer of the corporation. In *Balcon v. Sadler, supra*, this Court held there was not a sufficient minimum contact to support jurisdiction over a Maryland resident who owned real estate in this state when the plaintiff, also a Maryland resident, brought an action in this state on a claim that arose in Maryland and was unrelated to the North Carolina real estate. In *Holt v. Holt, supra*, this Court held that the district court had jurisdiction over a resident of another state who owned real estate in North Carolina. In that case the plaintiff sued on a Missouri alimony judgment. The court in that case held

there were several factors which showed there was a relationship between the defendant's North Carolina property and the controversy between the parties. The defendant bought the property shortly after the entry of the Missouri decree which led the court to conclude that he was spending part of his income on the North Carolina property rather than making his alimony payments in Missouri. The parties in a separation agreement had divided property they owned in North Carolina. This Court held that these factors showed that the North Carolina property was a part of the source of the underlying controversy between the plaintiff and the defendant and the court had jurisdiction in a *quasi in rem* action.

In the instant case the record discloses that the defendant sold property in North Carolina in 1968. So far as we can tell from the record she has not been in North Carolina since that time. She does own an interest in a note secured by a deed of trust on property in this state. There is no dispute between the parties as to whether the note should be paid. The only dispute is what has the defendant done with the payments. In *Shaffer v. Heitner, supra,* the fact that the defendants relied on Delaware law to protect their interests as stockholders did not give the Delaware court jurisdiction of the defendants in an action unrelated to their rights as stockholders. We believe that if we read G.S. 1-75.4(6)(b) to give the North Carolina court jurisdiction for a suit against the defendant for an accounting of money she received on the note it would violate the rule of *Shaffer.* This case is distinguishable from *Holt* in that in *Holt* the defendant had invested his money in property in this state rather than pay alimony as ordered by a Missouri decree. The defendant in the instant case had sold her property five years prior to the Florida divorce decree. There is no indication the sale was connected with the Florida action.

In light of the serious constitutional problems that would arise were we to hold otherwise, we hold that G.S. 1-75.4(6)(b) does not give the District Court of Henderson County *in personam* jurisdiction in this case. The action was properly dismissed.

Affirmed.

Judges VAUGHN and HILL concur.

---

MICHAEL W. GOWER, AND EDWARD E. HUGHES, T/A GOWER-HUGHES IN-VESTMENT PROPERTIES, A PARTNERSHIP v. STROUT REALTY, INC.

No. 818SC596

(Filed 6 April 1982)

1. **Brokers and Factors § 8— brokers not licensed in North Carolina—co-broker-age agreement unenforceable**

   A co-brokerage or commission sharing agreement between plaintiffs, licensed real estate brokers and agents in California, and defendant was in violation of the Real Estate License Law, G.S. 93A-1, and invalid and unenforceable because plaintiffs were not licensed in this State.

2. **Brokers and Factors § 6— contract to buy real estate and share in commis-sion—no violation of licensing statute**

   Where plaintiffs alleged a contract to buy real estate on their own account under the terms of a listing agreement made by the owner with defendant-broker and to share in the sales commission with defendant, plaintiffs were not engaging in brokerage activities "for others" but were acting for themselves in buying the land and reducing the purchase price through the commission shar-ing agreement with defendant, and the agreement did not violate the licensing statute and is enforceable. G.S. 93A-2.

APPEAL by plaintiffs from *Tillery, Judge*. Judgment entered 11 May 1981 in Superior Court, LENOIR County. Heard in the Court of Appeals 5 February 1982.

Plaintiff Gower, a licensed real estate broker in the State of California, and plaintiff Hughes, a licensed real estate agent in the State of California, seek to recover of the defendant under a co-brokerage agreement an amount equal to one-half of a real estate commission in the sum of $19,725.00, alleging that they found a ready, able and willing buyer for the Carriage House Apartments in Lenoir County which was listed for sale by the owner with defendant for $789,000.00 with a 5% commission as provided in the written listing contract.

In their second claim for relief plaintiffs allege that the ready, able, and willing buyer was the plaintiff Hughes; and that

plaintiffs and defendant, through its agent Irvin Staton, agreed to share the commission even if the plaintiff Hughes was the purchaser of the property; and that said plaintiff became a ready, able and willing buyer and tendered the purchase price in cash on 6 April 1979, but that the owner had cancelled the listing agreement.

Plaintiffs also allege false representation by defendant that it had a listing agreement with the owner and fraud by Irvin A. Staton, agent for defendant; and they pray for both punitive damages and for treble damages under G.S. 75-1.1 for deceptive trade practices.

Defendant in its answer denied the co-brokerage agreement, denied that plaintiffs produced a ready, able and willing buyer, and pleaded as a defense that plaintiffs were not licensed real estate brokers in this State and could not recover a realty commission in North Carolina.

Defendant moved for summary judgment. The only supporting matter offered in support of the motion by the defendant was the affidavit that plaintiffs were not licensed real estate brokers or salesmen in North Carolina. The trial court allowed summary judgment for the defendant.

*White, Allen, Hooten, Hodges & Hines by John M. Martin for plaintiff appellants.*

*Jeffress, Morris, Rochelle & Duke by Thomas H. Morris and Vernon H. Rochelle for defendant appellee.*

CLARK, Judge.

The question on appeal is whether the trial court erred in allowing summary judgment for the defendant, which offered in support of its motion only the affidavit that plaintiffs were not licensed real estate brokers or salesmen in North Carolina. It thus appears that defendant and the trial court relied on the principle of law that the co-brokerage or commission sharing agreement between plaintiffs and defendant as alleged was in violation of the Real Estate License Law, Chapter 93A of the General Statutes, and invalid and unenforceable because plaintiffs, though allegedly licensed in California, were not licensed in this State. G.S. 93A-1 forbids an unlicensed agent to be engaged in the

business of real estate broker or salesman, and our courts have
held that a contract to engage in such business by an unlicensed
person in this State is invalid. *Raab & Co. v. Independence Corp.*,
9 N.C. App. 674, 177 S.E. 2d 337 (1970); *McArver v. Gerukos*, 265
N.C. 413, 144 S.E. 2d 277 (1965). This rule of law is also applied in
other jurisdictions. *See* Annot., 118 A.L.R. 646 (1939); Annot., 42
A.L.R. 1226 (1926); Annot., 30 A.L.R. 834 (1924); and Annot., 4
A.L.R. 1087 (1919).

[1] In their first claim for relief plaintiffs allege an agreement
with defendant to split the commission if they "procured a buyer
who was ready, willing and able to meet the purchase price and
terms set out . . . ." Does the procurement of a buyer constitute
engaging in the business of real estate broker or salesman? In
pertinent part G.S. 93A-2(a) defines a real estate broker as one
who for compensation "lists or offers to list, sells or offers to sell,
buys or offers to buy, auctions or offers to auction . . . or
negotiates the purchase or sale or exchange of real estate, . . ."
G.S. 93A-2(b) provides in general terms that a real estate
salesman is one who, under the supervision of a broker, for a com-
pensation "is associated with or engaged by or on behalf of a
licensed real estate broker to do, perform or deal in any act . . ."
defined in G.S. 93A-2(a).

The alleged agreement in the first cause of action is general-
ly referred to as a "finder's fee" contract, an arrangement by
which an intermediary finds, introduces, and brings together par-
ties to a real estate transaction, leaving the ultimate transaction
and consummation of the transaction to the broker. There is a
split of authority on the question of whether a "finder's fee" con-
tract is invalid because it violates licensing law. *See* Annot., 24
A.L.R. 3d 1160, 1172, *et seq.* We find the better view to be that,
though the finder or originator does not assist in the ultimate
negotiations of sale, the real estate licensing statutes would
become meaningless if unlicensed parties were able to carry on
traditional brokerage activities under a finder's fee contract. We
find the agreement alleged in plaintiffs' first cause of action in
violation of G.S. 93A-1 and invalid. Summary judgment for de-
fendant on this first claim was properly entered.

[2] In their second claim plaintiffs allege that in addition to their
co-brokerage agreement, the defendant further agreed that the

commission would be due even if plaintiff Hughes were the purchaser of the property. G.S. 93A-2 defines "real estate broker" as a person who does the acts specified "for others." In *McArver v. Gerukos, supra,* the court stated:

"Thus, it is clear that the Legislature did not intend for this act to apply to a person, partnership or association who purchases land for his or its own account, even though such purchase is for resale. Therefore, a contract by one who is not a licensed real estate broker or salesman with another person to buy land, or an option thereon, for their own account and, thereafter, to resell such land, or option, and divide the profits would not be a contract to do an act prohibited by this statute." *Id.* at 418, 144 S.E. 2d at 281.

In *McArver* it was held that a contract between the unlicensed plaintiff and the defendant, a licensed real estate broker, providing for payment to plaintiff by defendant of a portion of the commissions, profits and payments received by defendant in connection with the sale of the options (which plaintiff assisted defendant-broker in obtaining) and the negotiation of the lease, was a valid and enforceable contract and not in violation of G.S. 93A-2. In the case *sub judice* the plaintiffs allege a contract to buy real estate on their own account under the terms of the listing agreement made by owner with defendant-broker and to share in the sales commission with defendant. Plaintiffs were not engaging in brokerage activities "for others" but were acting for themselves in buying the land and in reducing the purchase price through the commission sharing agreement with defendant. The agreement does not violate the licensing statute and is enforceable. The trial court erred in allowing summary judgment for defendant on the second claim for relief.

In the second claim for relief the plaintiffs also allege, in addition to breach of the commission sharing agreement, a fraudulent misrepresentation of the listing agreement, and they pray for punitive damages. In the third claim for relief plaintiffs allege a violation of the unfair and deceptive trade statute (G.S. 75-1.1) and seek treble damages pursuant to G.S. 75-16. Since the appeal is from the judgment allowing summary judgment for defendant and not from judgment on the pleadings under G.S. 1A-1, Rule 12(c), we find that whether plaintiffs failed to state a

claim for fraud and for violation of G.S. 75-1.1 are not issues properly before the Court on this appeal. We do note that G.S. 1A-1, Rule 9(b), requires that the circumstances constituting fraud shall be stated with particularity.

The summary judgment for defendant on the plaintiffs' first claim for relief is affirmed, and the summary judgment on the second and third claims for relief is reversed.

Affirmed in part; reversed in part.

Judges ARNOLD and WHICHARD concur.

---

STATE OF NORTH CAROLINA v. WILLIE JACKSON

No. 8116SC820

(Filed 6 April 1982)

**1. Criminal Law § 83— husband-wife privilege—admission of confidential communications—harmless error**

Even if an officer's testimony as to what defendant's wife told him about defendant's conduct on the day in question concerned confidential communications between husband and wife which tended to show flight, tended to bolster testimony by the prosecutrix that defendant was drinking, and showed that defendant did not deny guilt to his wife, the admission of such testimony was not prejudicial error where there was other evidence of flight and drinking and defendant's statements to his wife contained no admission of guilt.

**2. Criminal Law § 99.2— denial of unnamed motion—no expression of opinion**

The trial court did not express an opinion when the court asked defense counsel at the close of the evidence whether he wanted to make a motion, defense counsel stated, "Yes, sir, I would," and the court responded, "Motion denied," since it appears that both defense counsel and the trial court understood the motion to which each was referring and that no error resulted.

APPEAL by defendant from *Barefoot, Judge.* Judgment entered 19 March 1981 in Superior Court, ROBESON County. Heard in the Court of Appeals 12 January 1982.

Defendant was indicted for larceny of a firearm. He pleaded not guilty.

State presented Grace Turner as a witness. She testified that the defendant came to her home on the morning of 26 October

1980 to borrow a wrench. Defendant sat in a chair next to a television while Turner went into another room to get the wrench. Upon returning, Turner noticed that the .38 pistol that she kept on the television was gone. She accused defendant, but he denied taking the pistol. Defendant gave Turner his name and address and telephone number. Defendant had a liquor bottle stuck under his belt in front, and he took a drink from the bottle and got a drink of water from Turner before leaving. Turner then called the police. Officer Elbert Ivey responded to the call. He saw defendant about half a block away from Turner's house. Defendant took something from his pocket and put it under a car. Officer Ivey stopped and retrieved a liquor bottle from underneath the car. He called defendant over and saw "the impression of some type of handgun" sticking in defendant's belt under his shirt. He said that he wanted to talk to defendant about a gun, and defendant ran away. The officer went on to defendant's house and talked with defendant's wife. The officer testified

> she said he hadn't been home since early that morning, and when he left, he was drinking pretty heavy, and he had some whiskey with him. I went back later for him in the afternoon and talked with Miss Jackson, and she stated that Willie came home, got some canned goods in a bag, and a blanket and said he was going to the woods; said the law was looking for him.

The officer arrested defendant two days later but did not recover Turner's pistol.

Defendant was convicted and sentenced to imprisonment. Defendant appeals.

*Attorney General Edmisten, by Associate Attorney John R. Corne, for the State.*

*Appellate Defender Adam Stein, by Assistant Appellate Defenders Malcolm R. Hunter, Jr., and Lorinzo L. Joyner, for defendant appellant.*

MARTIN (Robert M.), Judge.

[1] Defendant's first argument on appeal involves the testimony of Officer Ivey, quoted above, as to what defendant's wife told him about defendant's conduct on the day in question. Defendant

argues that the wife's declarations concern confidential communications between husband and wife and that the trial judge should have excluded this testimony on his own motion. Defendant cites *State v. Dillahunt*, 244 N.C. 524, 94 S.E. 2d 479 (1956), and *State v. Warren*, 236 N.C. 358, 72 S.E. 2d 763 (1952). Accepting defendant's contentions *arguendo*, we nonetheless find the error harmless in this case. In awarding a new trial in *Warren*, our Supreme Court noted that the inference contained in the statement attributed to the defendant's wife in that case was "unmistakably incriminating and harmful." *Id.* at 360, 72 S.E. 2d at 764. We cannot say the same here. Defendant argues that his wife's declarations were prejudicial since they provided evidence of flight, since they showed that he had been drinking and thereby bolstered Turner's testimony, and since they showed that he did not deny his guilt to his wife. However, there was other evidence of flight through the testimony of Officer Ivey. Officer Ivey's testimony also tended to show that the defendant was carrying a bottle of liquor on the day in question. Although the wife's declarations contained no denial of defendant's guilt, they contained no admission of guilt either. Defendant only told her that the law was looking for him. In short, we conclude that defendant has not carried the burden imposed by G.S. 15A-1443(a) of showing that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."

[2] In his second argument on appeal, the defendant contends that the trial judge expressed an opinion on the merits of the case through his denial of a defense motion at the close of evidence and through his unbalanced summary of the evidence. At the close of evidence we find the following exchange:

> [DEFENSE COUNSEL]: . . . Defendant offers no evidence, your Honor.
>
> THE COURT: You want to make a motion?
>
> [DEFENSE COUNSEL]: Yes, sir, I would.
>
> THE COURT: Motion denied.

Defendant cites *State v. Goode*, 300 N.C. 726, 268 S.E. 2d 82 (1980); however, that case is easily distinguishable from the present one. In *Goode* the trial judge in the presence of the jury

denied unnamed motions before they were made and then immediately denied defense counsel's request for a short recess to decide whether defendant would offer evidence. In finding an abuse of discretion, our Supreme Court relied almost exclusively on the denial of the defense motion for a recess. *Goode* does not stand for the proposition that the denial of unnamed motions alone constitutes an abuse of discretion or the expression of an opinion prejudicial to defendant. Although we do not approve the practice, we believe that in the present case both defense counsel and the trial judge understood the motion to which each was referring and that no error resulted. Defendant also argues that the trial judge's summary of the evidence in his charge was unbalanced in favor of the State. G.S. 15A-1232 requires the trial judge to summarize the evidence only to the extent necessary to explain the application of the law thereto. Where, as in the present case, defendant presents no evidence, the judge must nonetheless summarize evidence favorable to defendant which is brought out on cross-examination if necessary to explain the application of the law. However, this requirement does not apply when the evidence on cross-examination is of only an impeaching effect and does not go to the establishment of a substantive defense. *State v. Moore*, 301 N.C. 262, 271 S.E. 2d 242 (1980). We find no error in the summary of the evidence herein.

No error.

Judges WEBB and WELLS concur.

---

GAIL H. WILLIFORD AND TINA GAIL WILLIFORD v. DAVID E. WILLIFORD

No. 8116DC674

(Filed 6 April 1982)

1. **Divorce and Alimony §§ 21, 24.4— failure to make alimony and child support payments—order finding contempt proper**

The trial court did not err in entering an order adjudging defendant in wilful contempt for failure to make alimony and child support payments where defendant voluntarily left the employment he had when a separation agreement was entered, defendant remarried and had a child by the second marriage, he applied his income to matters other than his obligations under the

agreement and court orders, and where defendant failed to comply with an order to specifically perform the provisions of the separation agreement.

**2. Divorce and Alimony § 19.5— specific performance of separation agreement does not subject it to modification**

　　The exercise of the equitable remedy of specific performance does not alter the contractual nature of a separation agreement and does not render it a court order subject to modification; therefore, where the court ordered specific performance of the provisions of a separation agreement concerning alimony and support payments, the court did not err in refusing to admit evidence of defendant's changed circumstances and to modify the alimony provision.

APPEAL by defendant from *Ellis, Judge.* Order entered 30 January 1981 in District Court, SCOTLAND County. Heard in the Court of Appeals 4 March 1982.

Defendant appeals from an order adjudging him in wilful contempt for failure to make alimony and child support payments.

*Terry R. Garner and David F. Tamer for plaintiff appellees.*

*John C. B. Regan, III, for defendant appellant.*

WHICHARD, Judge.

The complaint alleged and the answer admitted that defendant and plaintiff Gail H. Williford had entered a Separation Agreement providing for payment by defendant of alimony and child support. On the basis of defendant's admission, summary judgment was allowed and defendant was ordered specifically to perform the provisions of the agreement.

Thereafter the court adjudged defendant in contempt for non-compliance. It prescribed a method whereby he could purge the contempt. Defendant again failed to comply, however, and a further contempt order was entered.

Defendant appeals from this order, assigning as error (1) entry of the order, and (2) refusal to admit his evidence of changed circumstances and to modify the alimony provisions. We affirm.

[1] Defendant contends he lacked the means to make the payments, and that his failure to comply thus was not wilful. He attributes his inability to make the payments to (1) reduction in income, and (2) acquisition of a second family.

The court found the following facts:

Defendant voluntarily left the employment he had when the agreement was entered. He obtained new employment at a reduction in gross annual salary of approximately $7,000.00. He then voluntarily left that employer to work for an unnamed concern for undisclosed compensation. His income situation was thus "of his own making."

Defendant remarried and had a child by the second marriage. He applied his income to matters other than his obligations under the agreement and court orders. Since entry of the orders he had continued to pay his country club dues, truck payments, and bank loan payments. Despite no ownership interest therein, he had commenced making the payments on a home owned by his second wife.

These findings are supported by competent evidence. They are thus conclusive on appeal and are reviewable only as to their sufficiency to warrant the order. *Clark v. Clark*, 294 N.C. 554, 243 S.E. 2d 129 (1978); *Rose's Stores v. Tarrytown Center*, 270 N.C. 206, 154 S.E. 2d 313 (1967); *State Board of Registration v. Testing Laboratories, Inc.*, 52 N.C. App. 344, 278 S.E. 2d 564 (1981); *Jones v. Jones*, 52 N.C. App. 104, 278 S.E. 2d 260 (1981).

"[O]ne does not act willfully in failing to comply with a judgment if it has not been within his power to do so since the judgment was rendered." *Lamm v. Lamm*, 229 N.C. 248, 250, 49 S.E. 2d 403, 404 (1948). *See also Mauney v. Mauney*, 268 N.C. 254, 150 S.E. 2d 391 (1966); *Vaughan v. Vaughan*, 213 N.C. 189, 195 S.E. 351 (1938); *Jones v. Jones, supra; Teachey v. Teachey*, 46 N.C. App. 332, 264 S.E. 2d 786 (1980). However, "[a] defendant may not deliberately divest himself of his property and in effect pauperize himself for appearance at a hearing for contempt and thereby escape punishment because he is at that time unable to comply with the court order." *Bennett v. Bennett*, 21 N.C. App. 390, 393, 204 S.E. 2d 554, 556 (1974). Further, "[p]ayment of alimony may not be avoided merely because . . . the husband has remarried and voluntarily assumed additional obligations." *Sayland v. Sayland*, 267 N.C. 378, 383, 148 S.E. 2d 218, 222 (1966). This principle also prevails with regard to child support. *Crosby v. Crosby*, 272 N.C. 235, 158 S.E. 2d 77 (1967); *Hemby v. Hemby*, 29 N.C. App. 596, 225 S.E. 2d 143, *disc. rev. denied*, 290 N.C. 661, 228 S.E.

Williford v. Williford

2d 452 (1976). *See also Beasley v. Beasley,* 37 N.C. App. 255, 245 S.E. 2d 820 (1978), *aff'd,* 296 N.C. 580, 251 S.E. 2d 433 (1979); 3 Lee, North Carolina Family Law, § 229, p. 132 (4th ed. 1981).

Pursuant to these principles the above findings, supported by competent evidence, sufficed to warrant the order. The assignment of error to its entry is therefore overruled.

[2] Defendant further contends the court erred in refusing to admit evidence of his changed circumstances and to modify the alimony provisions. He argues that by securing an order of specific performance, plaintiffs changed the agreement from "a mere contract . . . which could not be modified, to a court order . . . which can be modified . . . based upon changed conditions."

Defendant relies on cases involving separation agreements which had been incorporated into court decrees and compliance therewith ordered. *See Bunn v. Bunn,* 262 N.C. 67, 136 S.E. 2d 240 (1964); *Britt v. Britt,* 36 N.C. App. 705, 245 S.E. 2d 381 (1978). In such cases the agreement becomes an adjudication by the court and thus subject to modification by court order. *Mitchell v. Mitchell,* 270 N.C. 253, 154 S.E. 2d 71 (1967); *Sayland v. Sayland, supra.* Except in such cases, however, "[t]he ordinary rules governing the interpretation of contracts apply to separation agreements and the courts are without power to modify them." *Church v. Hancock,* 261 N.C. 764, 765, 136 S.E. 2d 81, 82 (1964).

The Separation Agreement here had not been incorporated into a court decree with which the parties had been ordered to comply. Because the available remedy at law for enforcement of a separation agreement not incorporated into a judicial decree is inadequate, plaintiff was entitled to a decree of specific performance ordering defendant to comply with the agreement. *Moore v. Moore,* 297 N.C. 14, 252 S.E. 2d 735 (1979). *See also Henderson v. Henderson,* --- N.C. App. ---, 286 S.E. 2d 657 (1982). Defendant cites no authority, however, and our research discloses none, holding that exercise of the equitable remedy of specific performance alters the contractual nature of a separation agreement, and renders it a court order subject to modification. The agreement would thus appear to remain a contract which the courts are without power to modify. *Church v. Hancock, supra; see also Henderson v. Henderson, supra; Haynes v. Haynes,* 45 N.C. App. 376, 263 S.E. 2d 783 (1980).

State v. McGee

Assuming the contrary, however, *arguendo* only, defendant is not availed thereby. The excluded evidence establishes that defendant's changed circumstances resulted largely from his voluntary changes of employment and his remarriage; and there was no evidence demonstrating good faith efforts by defendant to comply with the provisions of the Separation Agreement. Under these circumstances modification was not merited.

The order is

Affirmed.

Judges MARTIN (Robert M.) and MARTIN (Harry C.) concur.

---

STATE OF NORTH CAROLINA v. ARTHUR JASON McGEE

No. 8118SC1032

(Filed 6 April 1982)

**Criminal Law § 29— capacity to stand trial—further hearing required**

Where on 16 March 1981 a competency hearing was held concerning defendant's ability to stand trial, and defendant was found not competent to assist in his defense; where on 13 April 1981, the competency hearing was reconvened and defendant was found to be competent to stand trial; and where on 1 May 1981, before defendant could be tried, another judge ordered defendant recommitted for observation and treatment, the trial judge erred in relying on his 13 April 1981 order concluding that defendant was competent to stand trial. The 1 May order finding defendant "may be incapable of proceeding in this case," established a presumption that defendant was not competent to proceed to trial under the standard established in G.S. 15A-1001(a). Prior to defendant's trial, therefore, the court had an obligation to inquire again into the defendant's mental capacity to proceed to trial.

APPEAL by defendant from *Rousseau, Judge.* Judgments entered 15 May 1981, in Superior Court, GUILFORD County. Heard in the Court of Appeals 3 March 1982.

Defendant was indicted on two counts of first degree murder and one count of assault with a deadly weapon with intent to kill inflicting serious injury. On 16 March 1981, prior to defendant's May trial, defense counsel moved for a competency hearing, which was allowed. During the hearing, a forensic psychiatrist, Dr. Allen

J. Sherrow, testified that defendant was suffering from schizophrenic disorder, paranoid type, which had not been adequately treated for the purpose of proceeding with the charges against him. A second psychiatrist, Dr. Billy J. Royal, testified that he had examined defendant in December 1980, when defendant was committed by court order to Dorothea Dix Hospital. Dr. Royal stated that, in his opinion, the defendant was competent to stand trial. That opinion, however, changed after Dr. Royal was allowed to examine defendant in private during the competency hearing. After the examination, he concluded that defendant was not competent to assist in his defense and was, therefore, not competent to stand trial. Dr. Royal recommended further examinations.

As a result of this hearing, the trial court, without determining defendant's capacity to proceed with trial, ordered defendant committed again to Dix Hospital for re-evaluation and treatment. On 13 April 1981, the competency hearing was reconvened. Dr. Royal testified that, with proper medication (twenty milligams of Navane per day), defendant could handle his chronic illness and that, in his opinion, at that time defendant had the capacity to comprehend his position, to understand the object and nature of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with counsel. Based on Dr. Royal's testimony as well as that of a Guilford County Deputy Sheriff who had observed defendant during his incarceration, Judge Rousseau concluded that defendant was competent to stand trial.

On 1 May 1981, before defendant could be tried, however, Superior Court Judge Albright ordered defendant recommitted to Dix Hospital for observation and treatment. In his order, Judge Albright found that defendant "may be incapable of proceeding in this case, and in need of treatment." On 11 May, with a letter from Dr. Royal, defendant was returned to the Guilford County Jail. The letter stated simply that the Dix Hospital staff had completed their evaluation and observation. When his case was called for trial, defendant, through counsel, again raised the issue of defendant's competence to stand trial. When defense counsel could offer no evidence to support his contention of incapacity to proceed, Judge Rousseau relied on his 13 April 1981 order concluding that defendant was competent to stand trial.

The case immediately proceeded to trial, and the jury found defendant guilty of two counts of second degree murder and one count of assault with a deadly weapon inflicting serious injury. From judgment imposing active prison terms, defendant appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General J. Chris Prather, for the State.*

*McNairy, Clifford & Clendenin, by Locke T. Clifford and Michael R. Nash, for defendant-appellant.*

WELLS, Judge.

The sole question we consider is whether the trial court erred in concluding that defendant was capable of pleading and standing trial at the time of his arraignment and trial. Because we find that Judge Albright's order recommitting defendant to Dorothea Dix Hospital for further observation established a presumption of a lack of capacity, we hold that a further hearing on the issue of his capacity to proceed to trial should have been held.

Under G.S. 15A-1001(a), "[n]o person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner." Ordinarily, it is within the trial court's discretion to determine whether circumstances brought to its attention require a formal inquiry as to whether a defendant has sufficient mental capacity to plead to the indictment and to conduct a rational defense. *State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968).

In the present case, the evidence elicited in the competency hearings of 16 March and 13 April 1981 indicated that defendant's mental capacity was tenuous at best. In recommitting defendant to Dix Hospital on 1 May 1981, Judge Albright found that he "may be incapable of proceeding in this case." Judge Albright's order established a presumption that defendant was not competent to proceed to trial under the standard established in G.S. 15A-1001(a). Prior to defendant's trial, therefore, the court had an

obligation to inquire again into the defendant's mental capacity to proceed to trial. *State v. Reid*, 38 N.C. App. 547, 248 S.E. 2d 390 (1978); *disc. rev. denied*, 296 N.C. 588, 254 S.E. 2d 31 (1979). This is so even though defense counsel stated that he had no evidence concerning defendant's capacity to proceed. *Cf. State v. Propst*, supra (where defendant's counsel stated that "he had nothing that had transpired" since defendant's last clinical report but the Supreme Court found necessary a further competency hearing).

The failure of the trial court to appropriately rehear and redetermine the question of whether the defendant was mentally competent to proceed to trial invalidated the subsequent trial. *State v. Reid*, supra. The verdict and the judgment must be vacated, and the cause is remanded to Superior Court for further proceedings consistent with this opinion.

Since defendant's other assignments of error are unlikely to occur at a new trial, we need not discuss them here.

Vacated and remanded.

Judges HILL and BECTON concur.

---

GENE B. BRIDGERS, JUNE B. WARREN, ET VIR, G. WINSTON WARREN, ANNE B. HOWELL, ET VIR, C. WAYNE HOWELL, WALTER M. BRIDGERS AND BEATRICE M. BRIDGERS v. DEWEY W. BRIDGERS ET UX, FRANCES L. BRIDGERS

No. 816SC719

(Filed 6 April 1982)

1. Partition § 1.2— persons entitled to petition for sale of timber
    G.S. 46-25, which changed the common law by permitting a life tenant to petition for a sale of timber for profit, is not limited in application to only those tracts of land in which interests are subject to a life estate.

2. Partition § 1.2— cotenants need not have same interest to partition
    G.S. 46-25 does not require all cotenants to have the same type interest in the land in order to petition for a sale of standing timber from land.

**3. Partition § 2— authority to sell timber—no requirement that partition not possible**

Remainderman in a one-half interest in two tracts of land could seek a sale of the timber on the two tracts of land even if an equitable division of the property was possible.

APPEAL by plaintiffs from *Fountain, Judge.* Judgment entered 3 March 1981 in Superior Court, NORTHAMPTON County. Heard in the Court of Appeals 10 March 1982.

The present action involves two non-adjoining tracts of land in Northampton County. Tract 1 contains approximately 161 acres, of which approximately 100 acres are woodland. Tract 2 contains 27.3 acres, of which 15.86 acres are woodland.

Plaintiffs, Gene B. Bridgers, June B. Warren, Anne B. Howell, and Walter M. Bridgers, are cotenants in remainder of a one-half (1/2) undivided interest in Tracts 1 and 2. Their remainder interest is subject to a life estate in plaintiff, Beatrice M. Bridgers. Defendant, Dewey W. Bridgers, owns the other one-half (1/2) undivided interest in possession of Tracts 1 and 2. Beatrice Bridgers does not own a life interest in the one-half (1/2) undivided interest of Dewey Bridgers.

On 3 May 1979, plaintiffs petitioned the Clerk of Superior Court of Northampton County for a sale of the standing timber upon the two tracts of land, pursuant to G.S. 46-25. Defendant counterclaimed, seeking an actual partition of the tracts of land into two shares of equal value. He desired one share to be allotted to himself and one share to be allotted to the petitioners.

After considering the evidence of the parties, the clerk made the following pertinent findings:

. . .

"17. The timber can be harvested without damage to the crop land or the other real estate.

18. The timber is not equally spread throughout each tract. While the land can be divided equally without the timber on it, and the growing timber could be divided equally without regard to the real estate, the growing timber and the real estate together can not [*sic*] be divided equally."

The clerk concluded that cutting the timber was in keeping with good husbandry and that no substantial injury would be done to the remainder interest. He concluded that petitioners were entitled to the relief they had demanded.

Defendants appealed to the Superior Court. After hearing evidence, the judge found that the real estate was capable of division into two shares of substantially equal value, and that partition would not injure any of the parties. He concluded that G.S. 46-25 did not authorize the sale of the interest of Dewey Bridgers in the real estate since Mr. Bridgers' one-half (1/2) interest was not subject to an outstanding life estate. The judge ordered that the clerk's judgment be set aside. He remanded the cause to the clerk for an order appointing Commissioners to make an actual partition of the real estate of Tracts 1 and 2.

*Revelle, Burleson, Lee and Revelle, by L. Frank Burleson, Jr., for plaintiff appellants.*

*Allsbrook, Benton, Knott, Cranford and Whitaker, by J. E. Knott, Jr., for defendant appellees.*

VAUGHN, Judge.

At issue is the construction of G.S. 46-25 and its applicability to the present cause. G.S. 46-25 states the following:

"When two or more persons own, as tenants in common, . . . a tract of land, either in possession, or in remainder or reversion, subject to a life estate, or where one or more persons own a remainder or reversionary interest in a tract of land, subject to a life estate, then in any such case in which there is standing timber upon any such land, a sale of said timber trees, separate from the land, may be had upon the petition of one or more of said owners, or the life tenant, for partition among the owners thereof, including the life tenant, upon such terms as the court may order, and under like proceedings as are now prescribed by law for the sale of land for partition: Provided, that when the land is subject to a life estate, the life tenant shall be made a party to the proceedings, and shall be entitled to receive his portion of the net proceeds of sales. . . . Provided further, that prior to a judgment allowing a life tenant to sell the timber there must

be a finding that the cutting is in keeping with good husbandry and that no substantial injury will be done to the remainder interest."

The Superior Court judge was of the opinion that G.S. 46-25 does not authorize a sale of standing timber in the present situation. There appears to be two reasons for that opinion. First, he concludes that the statute only authorizes the sale of timber from land in which the interest of all parties is subject to a life estate. In the present cause, the one-half undivided interest of Dewey Bridgers is not subject to an outstanding life estate. Second, he seems to conclude that where an actual division of the real estate is possible, a sale of standing timber cannot be had. We conclude that the judge erred in his construction of G.S. 46-25.

[1] G.S. 46-25 changes the common law by permitting a life tenant to petition for a sale of timber for profit. *Piland v. Piland*, 24 N.C. App. 653, 211 S.E. 2d 844, *cert. denied*, 286 N.C. 723, 213 S.E. 2d 723 (1975). The statute is not limited in application, however, to only those tracts of land in which interests are subject to a life estate. When the statute speaks of tenants in common "either in possession, or in remainder or reversion, subject to a life estate," the phrase "subject to a life estate" modifies only the words "remainder" and "reversion." Tenants in common who presently possess a tract of land may also petition for a sale of timber. *See Chandler v. Cameron*, 229 N.C. 62, 47 S.E. 2d 528 (1948).

[2] We further conclude that the statute does not require all cotenants to have the same type interest in the land. A cotenant in remainder may petition for a sale of standing timber from land in which the other cotenant has a present possessory interest. Such an interpretation is consistent with G.S. 46-3, which authorizes the partition of real estate upon a cotenant's petition without regard to the possessory interests of his cotenants.

We, therefore, hold that cotenants, Gene Bridgers, June Warren, Anne Howell, and Walter Bridgers, properly petitioned under G.S. 46-25 for a sale of the land's standing timber. Their interest is subject to a life estate in Beatrice Bridgers. Entitled to be made a party to the proceeding, she chose to join the remaindermen in their petition.

[3] The next question is whether the petitioners were required to show that an equitable partition of the tracts was not possible

before the court could authorize a sale of the timber apart from the realty. We hold that they were not.

A comparison of G.S. 46-25 with other statutes is helpful. G.S. 46-22 provides for a sale of property only when "an actual partition of the lands cannot be made without injury to some or all of the parties interested." G.S. 46-26 provides for the sale of mineral interests only where "it would be for the best interests of the tenants in common . . . or if actual partition of the same cannot be had without injury to some or all of such tenants. . . ."

G.S. 46-25, on the other hand, makes no mention of a partition of the real estate. When the petitioners for a sale of standing timber are cotenants in the land, a sale of timber trees "may be had . . . upon such terms as the court may order." When the petitioner is a life tenant, the court must find "that the cutting is in keeping with good husbandry and that no substantial injury will be done to the remainder interest." In neither situation is the court required to first find that partition of the land would cause injury before it can order a sale of the standing timber. We, therefore, conclude that the present plaintiffs could seek a sale of the timber on the two tracts of land, even if an equitable division of the property was possible.

As defendants point out, G.S. 46-25 is a permissive statute. *Chandler v. Cameron, supra.* Upon a petition for the sale of standing timber, the court *may* order such a sale. A discretionary order is ordinarily not subject to review unless there has been an abuse of discretion. *GMC Trucks v. Smith,* 249 N.C. 764, 107 S.E. 2d 746 (1959). Since there is no mandate that the court grant plaintiffs' petition, defendants argue the court's denial is not subject to review unless plaintiffs show an abuse of discretion.

Defendants' argument would have merit if the Superior Court had exercised its discretion under G.S. 46-25. In denying a sale of the standing timber, however, the court concluded that G.S. 46-25 did not apply. We have held that this conclusion resulted from a misconstruction of the statute. "[W]here it appears that the judge below has ruled upon matter before him upon a misapprehension of the law, the cause will be remanded to the Superior Court for further hearing in the true legal light." *State v. Grundler,* 249 N.C. 399, 402, 106 S.E. 2d 488, 490 (1959). The order is, therefore, vacated and the present record remanded

to the Superior Court for findings and conclusions consistent with the opinion herein.

Vacated and remanded.

Chief Judge MORRIS and Judge HEDRICK concur.

LOMAN-GARRETT SUPPLY COMPANY, INC. v. E. C. DUDNEY AND DUDNEY, INC.

No. 8118SC660

(Filed 6 April 1982)

**Guaranty § 2; Rules of Civil Procedure § 8; Seals § 1— action to enforce guaranty —failure to plead lack of consideration—summary judgment improper**

The trial court erred in granting summary judgment for plaintiff where a guaranty was signed after plaintiff had extended credit to the corporate defendant and an issue arose as to whether new consideration was required to make the guaranty enforceable. The fact that defendant failed to plead the affirmative defense of failure of consideration as required by G.S. 1A-1, Rule 8(c) did not prevent the trial court from considering the question of failure of consideration in ruling upon plaintiff's motion for summary judgment since defendant raised his defense of failure of consideration in his affidavit. Nor was the consideration defense rendered moot by the fact that the guaranty was signed under seal as the effect of a seal is not to preclude the court's consideration of the issue entirely, but only to raise a presumption of consideration which may be rebutted by clear and convincing evidence.

APPEAL by defendant from *Collier, Judge.* Judgment entered 14 April 1981 in Superior Court, GUILFORD County. Heard in the Court of Appeals 2 March 1982.

Plaintiff first brought this action against the individual defendant alone, seeking the unpaid balance allegedly due on an account set up by defendant in the name of the corporate defendant. The plaintiff pleaded Dudney's written guaranty of the account as the basis for his liability.

The trial court denied plaintiff's motion for summary judgment, suggesting that Dudney, Inc. be joined as a necessary party. Plaintiff filed an amended complaint against both Dudney and Dudney, Inc.

Dudney denied individual liability on grounds that plaintiff had failed to fulfill a condition precedent to Dudney's obligation on the guaranty, i.e. that plaintiff extend additional credit to Dudney, Inc. In his affidavit opposing plaintiff's summary judgment motion, defendant asserted that "the alleged consideration for the signing of [the] 'Guaranty of Third Persons' . . . was to be the furnishing of new credits to Dudney, Inc." and that no new credits had been extended.

The trial court granted plaintiff's second motion for summary judgment, finding the individual defendant liable for the unpaid balance of the account, plus costs and attorney's fees. Judgment was also entered against Dudney, Inc., by default after it failed to file an answer to the complaint.

Defendants appeal.

*Tuggle, Duggins, Meschan, Thornton & Elrod, by Thomas S. Thornton and Rayford K. Adams, III, for plaintiff appellee.*

*Ralph G. Jorgensen for defendant appellants.*

ARNOLD, Judge.

As their first assignment of error, defendants contend that the court erred in granting summary judgment against the individual defendant. Since the guaranty was signed after plaintiff had extended credit to the corporate defendant, new consideration was required to make the guaranty enforceable and no such consideration was given.

Plaintiff defends the court's grant of summary judgment on grounds that a guaranty under seal requires no consideration, and that, in any event, defendant failed to plead the affirmative defense of failure of consideration as required by G.S. 1A-1, Rule 8(c). Plaintiff notes that the affirmative defense which defendant did set forth in his answer, that of failure to fulfill a condition precedent, is one strongly disfavored by courts and that it was not supported by defendant's affidavit.

We agree with plaintiff that the relevant question is one of consideration, not of condition precedent. We do not agree, however, that the court could not properly consider the question of failure of consideration in ruling upon plaintiff's motion for summary judgment.

Summary judgment is a drastic remedy which should be granted only upon a showing that there exists no material factual issue and that the movant is entitled to judgment as a matter of law. *Atkinson v. Wilkerson*, 10 N.C. App. 643, 179 S.E. 2d 872 (1971). In determining the existence of a triable issue of fact, the judge may consider verified pleadings and affidavits submitted by the parties in support thereof. Indeed, our Supreme Court has held that for the purpose of opposing a summary judgment motion an affirmative defense may be raised for the first time by affidavit. *Bank v. Gillespie*, 291 N.C. 303, 230 S.E. 2d 375 (1976). Defendant having raised his defense of failure of consideration in his affidavit, we hold that his failure to plead the defense was not fatal even though the preferred practice is to require a formal amendment to the pleadings. *Bassett v. Griggs*, 47 N.C. App. 104, 266 S.E. 2d 702 (1980). We note, moreover, that plaintiff was placed on notice of the substance, if not the label, of defendants' affirmative defense by the pleadings. The stated basis for defendants' claim of failure of condition precedent is precisely that which supports the defense of failure of consideration.

Even if properly raised, plaintiff argues that the consideration defense was rendered moot by the fact that the guaranty was signed under seal. It is true that a seal "imports consideration" in North Carolina. *Mobil Oil v. Wolfe*, 297 N.C. 36, 39, 252 S.E. 2d 809, 811 (1979); *First Peoples Savings & Loan Association v. Cogdell*, 44 N.C. App. 511, 261 S.E. 2d 259 (1980). However, the effect of a seal is not to preclude the court's consideration of the issue entirely as plaintiff suggests, but only to raise a presumption of consideration which must be rebutted by clear and convincing evidence. *Mills v. Bonin*, 239 N.C. 498, 80 S.E. 2d 365 (1954); *Little v. Oil Company*, 12 N.C. App. 394, 183 S.E. 2d 290 (1971). Defendant is entitled to have a jury determine whether his evidence is sufficient to rebut the presumption here since this is an issue of fact. Summary judgment was therefore improper and must be reversed.

Defendants' remaining assignments of error relating to the propriety of the court's entry of default judgment against the corporate defendant attack that judgment on purely technical grounds. We hold that any error in the judge's failure to substitute the word "Judge" for that of "Clerk" on the judgment form was harmless as a matter of law.

The summary judgment against E. C. Dudney in his individual capacity is reversed and the cause remanded for trial.

The default judgment against Dudney, Inc. is affirmed.

Judges CLARK and WEBB concur.

---

KENNETH J. FOREMAN, JR. v. CHARLES W. BELL, LETA BAHN, FREDERICK E. BROGDON, WILLIAM GUY DELANEY, JAMES F. FORD, MARY HAMMOND, COLLIER S. HARVEY, JR., WILLIAM G. HAZEN, A. RUDOLPH HENDRICKS, C. DOOLEY HITCH, THOMAS L. JONES, III, BRYON H. KNIGHT, KATHERINE MORTON, RICHARD PORTER, HERBERT C. RULE, III, W. HERBERT SMITH, JR. CONSTITUTING THE MOUNTAIN RETREAT ASSOCIATION MANAGEMENT COUNCIL, AND THE MOUNTAIN RETREAT ASSOCIATION, INC., A NORTH CAROLINA CORPORATION

No. 8128SC460

(Filed 6 April 1982)

**Corporations § 3.1— dispute over election of directors of corporation—no jurisdiction to challenge**

G.S. 55-71 may not be used by a shareholder to challenge the selection of persons who act as trustees or fiduciaries pursuant to a separate trust agreement. Therefore, a shareholder in a corporation did not have standing to challenge the election of the Trustees of Stock, an entirely separate and independent entity from the Board of Directors of the corporation, since the business of electing Trustees of Stock was separate from that of electing directors of the Corporation.

APPEAL by plaintiff from *Allen, Judge.* Judgment entered 5 November 1980 and final judgment entered on 13 December 1980 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 5 January 1982.

Plaintiff, a shareholder of stock in the Mountain Retreat Association, a private corporation, brought this action under G.S. 55-71 and sought to challenge thereunder the election of directors of the corporation. From an order of the superior court dismissing the plaintiff's petition, the plaintiff appeals.

*Bennett, Kelly & Cagle, by Harold K. Bennett, for plaintiff appellant.*

*McGuire, Wood, Worley, Bissette & Wolcott, P.A., by Richard A. Wood, Jr., and Adams, Hendon, Carson & Crow, P.A., by Samuel J. Crow, for respondent appellees.*

BECTON, Judge.

The record and exhibits in this case document in detail the history of the Mountain Retreat Association (Corporation) from its inception to the present. Much of the history of the Corporation is not necessary for the disposition of the issues before us, however. The facts essential to the resolution of this dispute are set out below.

The Corporation was originally chartered in 1897 by the North Carolina Legislature as a municipal corporation. In 1906, the Corporation became a stock corporation when the legislature amended the Corporation's charter to allow for issuance of $500,000 of common stock and $250,000 of preferred stock. In 1917, some owners of stock transferred their stock, pursuant to a Declaration of Trust, to a body denominated Board of Trustees of Stock. As a result of the transfers, 73 to 74 percent of the outstanding stock was held pursuant to the Declaration of Trust. The Declaration of Trust provided how and from what bodies the Trustees of Stock, numbering from 25 to 50 members, were to be elected. It also provided that the Trustees of Stock "shall have and are vested with full authority and power to change the charter" of the Corporation; that the purpose and intent of the Trust is that the Corporation's property be forever used under the auspices of the Presbyterian Church; and that the Trustees of Stock shall use, hold, vote and control the stock to insure and guarantee accomplishment of such purposes. Over the years, various amendments were made to the charter of the Corporation which affected the manner by which Trustees of Stock were elected. In 1958, the Corporation's charter was amended so that Trustees of Stock could be elected and could serve as the Board of Directors of the Corporation. In 1967, the Legislature terminated all of the Corporation's municipal rights and transferred them to the City of Montreat.

Foreman v. Bell

The plaintiff holds one share of stock in the Corporation which he acquired in 1979 by purchasing a lot and the stock certificate. He complains that the present members of the Board of Directors hold their offices illegally in that they were elected by Trustees of Stock who were not themselves properly elected. He argues that because the Trustees were not elected according to the terms of the Trust, all of their acts are null and void, including the election of directors of the Corporation. We do not consider the merits of plaintiff's arguments as we dispose of this case on jurisdictional grounds.

This action was brought pursuant to G.S. 55-71 which provides in pertinent part:

(a) Any shareholder or director of a domestic corporation may commence a summary proceeding in the superior court to determine any controversy with respect to any election or appointment of any director or officer of such corporation, and any shareholder or director of a foreign corporation authorized to transact business in this State shall have the same right with respect to any election held within this State.

This statute allows a summary procedure to be held, without the benefit of service of process, G.S. 55-71(c), whenever there is a dispute surrounding the election of corporate officers or directors. It is remedial in nature and designed to maintain the status quo while the disputes regarding an election are resolved. *Thomas v. Baker*, 227 N.C. 226, 229, 41 S.E. 2d 842, 844 (1947). Further, the statute is applicable to contested elections after the fact and not to prospective elections. *Swenson v. Assurance Co.*, 33 N.C. App. 458, 463, 235 S.E. 2d 793, 796 (1977).

The plaintiff seeks to have G.S. 55-71 applied in such a manner as to give him standing to challenge the election of the Trustees of Stock, an entirely separate and independent entity from the Board of Directors of the Corporation. We refuse to do so since the allegations in his petition and the prayer for relief do not fall within the purview of G.S. 55-71. Plaintiff, in his petition, prayed for the following relief, among others:

1. That the Court adjudge that the respondents are not legally holding the office of members of the Board of Trustees

of Stock, and are not legally entitled to manage the affairs of said Mountain Retreat Association as directors or in any other capacity whatever.

2. That the Court adjudge and declare that the respondents and all of their predecessors since 1972 have illegally and in violation of the Declaration of Trust and the law of North Carolina acted and voted as Trustees of Stock and as Directors of the Corporation and have thereby forfeited their right to any office either as Trustee of Stock or as Director or other officer of said corporation.

The Trustees of Stock are required by the Declaration of Trust to hold and vote the stock. These Trustees vote on directors of the Corporation at shareholders' meetings. Sometimes, the Trustees of Stock elected directors from among themselves. In fact, subsequent amendments to the Corporation's charter and by-laws provided that the same persons elected as Trustees should also be elected directors of the Corporation. How the Trustees of Stock are elected is determined by the Declaration of Trust. On its face, G.S. 55-71 pertains only to corporate elections. It does not apply to the selection of persons who hold and vote stock for others. If this were not so, G.S. 55-71 could be used by shareholders to challenge the selection of trustees of voting trusts or to challenge the selection of fiduciaries holding and voting stock for the benefit of others. The business of electing Trustees of Stock is separate from that of electing directors of the Corporation. Consequently, we hold that G.S. 55-71 may not be used by a shareholder to challenge the selection of persons who act as trustees or fiduciaries pursuant to a separate trust agreement.

We reach this result even though the Declaration of Trust was incorporated into the Corporation's charter. In 1917, the Legislature amended the Corporation's charter by including in the charter the Declaration of Trust. The provisions under the Declaration of Trust thereby became a part of the Corporation's charter, which like all other provisions in the charter, could be later amended by the stockholders. It does not matter for purposes of this suit that subsequent amendments varied from some provisions of the Declaration of Trust since the charter of the corporation governed the election of the directors of the Corporation.

As long as the charter was properly amended by the stockholders, and we find that it has been, it does not matter that the charter and Declaration of Trust are not identical. Further, the Declaration of Trust is still binding on the Trustees of Stock, and it is this document, not the Corporation's charter, from which their fiduciary duties as Trustees of Stock arise.

Because we believe that plaintiff's petition should have been dismissed on jurisdictional grounds, rather than on substantive grounds, we

Remand for entry of judgment consistent with this opinion.

Remanded.

Judge CLARK and Judge WHICHARD concur.

─────────────────

IN RE: APPEAL OF AND PETITION FOR JUDICIAL REVIEW BY C. DAVID BROWN, WENDELL HEDDEN, AND GENE MILLER, FOR THEMSELVES AND THE CITIZENS OPPOSED TO OFF-PREMISES SALE OF BEER IN ANDREWS, NORTH CAROLINA, OF THE DECISION OF THE NORTH CAROLINA STATE BOARD OF ELECTIONS, DATED AUG. 14, 1980, PERTAINING TO THE PROTEST OF THE ELECTION FOR OFF-PREMISES SALE OF BEER IN THE TOWN OF ANDREWS, NORTH CAROLINA, ON FEBRUARY 23, 1980

No. 8110SC665

(Filed 6 April 1982)

**Elections § 10— irregularities not affecting result of election**
    The State Board of Elections did not err in refusing to set aside an election where it found that, although eleven persons voted who were ineligible to vote, such irregularities did not affect the result of the election, and that there was no evidence of fraud or corruption in the conduct of the election.

APPEAL by petitioners from *Bailey, Judge.* Judgment entered 26 March 1981 in Superior Court, WAKE County. Heard in the Court of Appeals 3 March 1982.

Petitioners, registered voters in the Town of Andrews, contested an election held on 23 February 1980 for approval of off-premises sale of beer in the Town of Andrews. In their petition,

petitioners alleged that certain irregularities occurred in the election. Following a hearing, the Cherokee County Board of Elections made findings of fact, which findings were submitted to the State Board of Elections for appropriate conclusions of law. The County Board declined to certify the election pending review by the State Board. The State Board directed the County Board to hold a further hearing and make additional findings of fact. The County Board complied. Following review of the findings of the County Board, the State Board entered an order certifying the election. On appeal, the Superior Court affirmed the order of the State Board. Petitioners' appeal to this Court is from the judgment of the Superior Court.

*Snyder, Leonard, Biggers & Dodd, P.A., by Gary A. Dodd, for petitioner-appellants.*

*Attorney General Rufus L. Edmisten, by Deputy Attorney General James Wallace, Jr., for respondent-appellee, State Board of Elections.*

*Bailey, Dixon, Wooten, McDonald & Fountain, by J. Ruffin Bailey and R. Mayne Albright for appellee-intervenors.*

WELLS, Judge.

The standard and scope of judicial review of an order of the State Board of Elections is found in the provisions of Chapter 150A of the General Statutes, the Administrative Procedure Act. G.S. 150A-51 provides:

> § 150A-51. Scope of review; power of court in disposing of case.—The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or

(5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or

(6) Arbitrary or capricious.

If the court reverses or modifies the decision of the agency, the judge shall set out in writing, which writing shall become a part of the record, the reasons for such reversal or modification. (1973, c. 1331, s. 1.)

Petitioners do not contend that the provisions of subsection (1), (2), (3), or (6) are at issue here.

The only question properly preserved and presented in this appeal is whether the State Board's conclusions and opinion quoted below support its judgment.

1. Based upon the foregoing, the State Board of Elections concludes that certain irregularities shown on the part of the election officials are not shown to have affected the results of the election.

2. That the Board finds eleven persons voted who were not eligible to vote, but conclude that the results of the election, 379 For and 361 Against are not changed, and that the irregularities and ineligible voters shown does not require a new election.

Now therefore, the results of the election conducted in the Town of Andrews on February 23, 1980 shall be certified by this Board following the expiration of time, from the date recorded hereinbelow, stipulated in G.S. 150A-45.

In its order, the State Board found certain irregularities to have occurred in the election, but entered the following critical finding of fact:

11. There is no evidence of fraud or corruption in the conduct of the election, although there are irregularities shown which do not materially affect the results of the election.

Petitioners did not except to any finding or conclusion made by the State Board, nor does the record include any of the evidence before the State Board. The Superior Court's conclusion

that the Board's findings and conclusions were supported by substantial competent and material evidence is, therefore, binding on appeal. *Tinkham v. Hall*, 47 N.C. App. 651, 267 .S.E. 2d 588 (1980), *Bethea v. Bethea*, 43 N.C. App. 372, 258 S.E. 2d 796 (1979), *disc. rev. denied*, 299 N.C. 119, 261 S.E. 2d 922 (1980).

It is settled law that an election will not be disturbed for irregularities where it is not shown that such irregularities are sufficient to alter the result. *Gardner v. Reidsville*, 269 N.C. 581, 153 S.E. 2d 139 (1967); *Starbuck v. Havelock*, 255 N.C. 198, 120 S.E. 2d 440 (1961); *Overton v. Comrs. of Hendersonville*, 253 N.C. 306, 116 S.E. 2d 808 (1960). *See also Green v. Briggs*, 243 N.C. 745, 92 S.E. 2d 149 (1956). This often-stated rule of elections law clearly applies in this case.

For the reasons stated, the judgment of the trial court is

Affirmed.

Judges HILL and BECTON concur.

STATE OF NORTH CAROLINA v. MELVIN SURGEON

No. 8112SC1045

(Filed 6 April 1982)

**Criminal Law § 34.8— evidence of prior crimes—proper to show common plan or scheme**

   In a prosecution for armed robbery, evidence of defendant's previous involvement in unspecified armed robberies tended to establish a common plan or scheme to use a weapon during the commission of robbery for the purpose of obtaining money and was properly admissible.

APPEAL by defendant from *Clark, Judge*. Judgment entered 22 April 1981 in Superior Court, CUMBERLAND County. Heard in the Court of Appeals 5 March 1982.

The defendant, Melvin Surgeon, was indicted on two counts of armed robbery, convicted of both charges, and given consecutive prison sentences of 30 years to life and 22 to 30 years. Both robberies occurred within a six-hour period on 3 December

1980, the first being at Auto Insurance and the second being at Beck's Motel.

*Attorney General Edmisten, by Assistant Attorney General Reginald L. Watkins, for the State.*

*Appellate Defender Adam Stein, by Assistant Appellate Defender Marc D. Towler, for defendant appellant.*

BECTON, Judge.

The sole issue on appeal is whether the trial court erred in admitting evidence of prior crimes committed by defendant. Before discussing the applicable rules of law, we set out first, in context, the challenged testimony:

[A.] [The defendant] made a statement to me regarding the robbery of Beck's Motel. He said that he did Beck's Motel alone except for the person who was driving the car. I asked him if it was a man or woman and he wouldn't tell me. He would not implicate anyone else in any of the other crimes.

Q. Did you ask him about any other robbery here in Fayetteville?

A. Yes, I did.

Q. And did he make any statement about any other robbery here in Fayetteville?

A. Yes, he did. Several others.

Q. Did he make any other statements about robbery in general?

A. He said that he usually stuck with armed robbery—

MR. MORRIS: Your Honor, I'm going to object to all this. This has got nothing to do with the alleged offenses.

COURT: Overruled, sir, on those grounds.

A. He said that he usually stuck with armed robberies.

MR. MORRIS: Well, objection.

COURT: Overruled.

MR. MORRIS: Motion to strike.

COURT: Denied, sir.

We must determine whether the trial court properly admitted this evidence of other crimes as being relevant to the issues in the case *sub judice*. Since evidence of other crimes is likely to have a prejudicial effect on the fundamental right of the accused to a fair trial, the general rule is this: In a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent or separate offense, even though the other offense is of the same nature as the crime charged. *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954). However, "[t]he general rule excluding evidence of the commission of other offenses by the accused is subject to certain well-recognized exceptions, which are . . . founded on as sound reasons as the rule itself." *Id.* at 174, 81 S.E. 2d at 366. Two of the exceptions enunciated in *McClain* are "motive" and "a common plan or scheme." With regard to these two exceptions, the McClain Court said:

> 5. Where evidence tends to prove a motive on the part of the accused to commit the crime charged, it is admissible even though it discloses the commission of another offense by the accused. [Citations omitted.]

> 6. Evidence of other crimes is admissible when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the crime charged and to connect the accused with its commission. [Citations omitted.] Evidence of other crimes receivable under this exception is ordinarily admissible under the other exceptions which sanction the use of such evidence to show criminal intent, guilty knowledge, or identity.

*Id.* at 176, 81 S.E. 2d at 367. In the case *sub judice* the defendant's statement acknowledges previous involvement in unspecified armed robberies and tends to establish a common plan or scheme to use a weapon during the commission of a robbery for the purpose of obtaining money. On the basis of *McClain* we believe the challenged testimony to be relevant. *See State v. Carey*, 288 N.C. 254, 269-70, 218 S.E. 2d 387, 397 (1975), *death*

Rhoads v. Bryant

*sentence vacated* 428 U.S. 904, 49 L.Ed. 2d 1209, 96 S.Ct. 209 (1976), and *State v. Grace*, 287 N.C. 243, 213 S.E. 2d 717 (1975). To state our position differently, we quote from Judge Erwin's opinion in *State v. Judge*, 49 N.C. App. 290, 291, 271 S.E. 2d 89, 90 (1980):

> The test of the relevancy of evidence "is whether it tends to shed any light on the subject of the inquiry or has as its only effect the exciting of prejudice or sympathy." *State v. Braxton*, 294 N.C. 446, 462, 242 S.E. 2d 769, 779 (1978). Evidence offered by the State, which tends to prove a relevant fact, "will not be excluded merely because it also shows defendant to have been guilty of an independent crime. [authorities omitted] Where evidence tends to prove a motive on the defendant's part to commit the crime charged, it is admissible even though it discloses the commission of another offense by the defendant." *State v. Cherry*, 298 N.C. 86, 109, 257 S.E. 2d 551, 565 (1979).

In the defendant's trial, we find

No error.

Judge WELLS and Judge HILL concur.

---

ELIZABETH M. RHOADS, PLAINTIFF v. FLETCHER BRYANT, DEFENDANT AND THIRD PARTY PLAINTIFF v. D. EDWIN RHOADS, JR., THIRD PARTY DEFENDANT

No. 816SC750

(Filed 6 April 1982)

**Automobiles § 95.2— admissions of automobile ownership and of driver's negligence — summary judgment proper for third party**

In an action in which plaintiff sought to recover for injuries sustained when an automobile in which she was a passenger hit a bull, admissions establishing plaintiff's ownership of the automobile and third party defendant's negligence in driving it established plaintiff's contributory negligence as a matter of law, thus defeating her claim against defendant.

APPEAL by plaintiff from *Fountain, Judge.* Judgment entered 18 February 1981 in Superior Court, NORTHAMPTON County. Heard in the Court of Appeals 12 March 1982.

Plaintiff appeals from the trial court's grant of summary judgment for defendant as to plaintiff's negligence action. The facts of the case will be discussed in the body of the opinion.

*Thomas L. Jones, for plaintiff-appellant.*

*Baker and Jones, by Ronald G. Baker, for defendant-appellee.*

WELLS, Judge.

The factual and procedural history of this case is as follows. At approximately 9:30 p.m. on 6 September 1978, plaintiff and her husband, both Virginia residents, were driving on a dark, rural road in Northampton County, North Carolina. Plaintiff owned the car which her husband was driving. A bull owned by defendant was standing in the middle of the unlit road; plaintiff's car struck the bull, and as a result, plaintiff suffered personal injury. Plaintiff instituted this action against defendant, a North Carolina resident, alleging that defendant knew the bull had escaped before, and negligently had allowed the bull to roam at large in violation of G.S. 68-16. Defendant filed an answer denying negligence, and filed a third party complaint against plaintiff's husband, alleging that he had been negligent in driving recklessly, above the speed limit, and without maintaining a proper lookout. Defendant also prayed for damages from third party defendant for the value of his bull. In an amendment to his complaint, defendant also alleged that the negligence of third party defendant should be imputed to plaintiff, owner of the automobile, in bar of her claim.

Prior to the institution of her claim against defendant, plaintiff had brought an action against her husband in the Virginia courts, alleging the negligence of her husband in driving her car. The Virginia action terminated when plaintiff gave her husband a covenant not to sue for the consideration of $6,000.00.

Pursuant to discovery in the North Carolina action, defendant filed requests for admissions by plaintiff, under the provisions of G.S. 1A-1, Rule 36(b) of the Rules of Civil Procedure. In response, plaintiff admitted the truth of the following relevant allegations in her motion for judgment in the Virginia action:

7. That at the said time and place aforesaid, the defendant, Rhoads, carelessly, recklessly and in a negligent manner did fail to drive at a reasonable speed under the circum-

stances and conditions existing at the time, fail to keep his vehicle under reasonable and proper control at all times; fail to apply brakes in order to avoid hitting an animal in the road; fail to maintain and keep a reasonable and proper look-out, and otherwise fail to obey and comply with the traffic laws and statutes of the Commonwealth of Virginia for such cases made and provided.

. . .

11. That notwithstanding the duties [of Bryant] as aforesaid, the defendant, Rhoads, carelessly, recklessly and in a negligent manner failed to operate said vehicle at a reason-able and proper speed under the circumstances and condi-tions existing at the time, failed to keep said vehicle under reasonable and proper control at all times, failed to maintain and keep a reasonable and proper lookout; failed to apply brakes and slow down, and failed to obey and comply with the traffic laws and statutes of the Commonwealth of Virginia for such cases made and provided.

Plaintiff also admitted that she owned the automobile which her husband was driving, and that she was riding in the front seat as a passenger at the time of the accident. Based on these admissions, defendant moved for summary judgment. Plaintiff submitted an affidavit stating that "[p]laintiff's husband did everything he could to avoid colliding with said bull." Judge Fountain granted defendant's G.S. 1A-1, Rule 56 motion, and also dismissed plaintiff's claim with prejudice.

Plaintiff's argument on appeal is that there were outstand-ing, material issues of fact in regard to defendant's negligence in allowing his bull to escape into a public road, which rendered en-try of summary judgment improper. We do not agree. The effect of an admission made pursuant to a Rule 36(b) request is that: "Any matter admitted under this Rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Plaintiff made no motion to withdraw or to amend the admissions she made in response to defendant's requests for admissions during discovery. Plaintiff's affidavit opposing sum-mary judgment does not overcome the conclusive effect of her previous admissions, and, therefore, no issue of fact is raised by

her assertion that her husband did everything he could to avoid the collision.

The next issue, then, is the effect of the admissions of plaintiff's ownership of the automobile and of third party defendant's negligence in driving it on plaintiff's claim against defendant. Where the driver's negligence has been conclusively established, in the absence of any rebuttal evidence on agency, the driver's negligence is imputed to an owner who was a passenger in the automobile at the time of the collision. *Randall v. Rogers*, 262 N.C. 544, 138 S.E. 2d 248 (1964); *Industries, Inc. v. Tharpe*, 47 N.C. App. 754, 268 S.E. 2d 824 (1980), *disc. rev. denied*, 301 N.C. 90, 273 S.E. 2d 311 (1980); *Hearne v. Smith*, 23 N.C. App. 111, 208 S.E. 2d 268 (1974); *cert. denied*, 286 N.C. 211, 209 S.E. 2d 315 (1974); *see generally*, 2 Strong's N.C. Index 3d, Automobiles, § 95.2; Annot., 50 A.L.R. 2d 1281. The effect of this imputed negligence is to establish plaintiff's contributory negligence as a matter of law, thus defeating plaintiff's claim against defendant. *Industries, Inc. v. Tharpe*, supra; *Hearne v. Smith*, supra. For the reasons stated, the trial court did not err in granting summary judgment for defendant.

Affirmed.

Judges HILL and BECTON concur.

_____

CAROLINA BUILDERS CORPORATION v. GELDER & ASSOCIATES, INC., CLARENCE W. GELDER AND EDGAR R. BAIN, SUBSTITUTE TRUSTEE

No. 8110SC415

(Filed 6 April 1982)

**Rules of Civil Procedure § 15— failure to allow amendment of complaint—error**

In an action to enjoin the foreclosure of two deeds of trust on lands owned by plaintiff, the trial court erred as a matter of law in failing to rule on plaintiff's motion to amend its complaint before granting defendants' motion for summary judgment where the motion to amend was filed less than four months after the original complaint and eight months before the hearing on defendants' motion for summary judgment.

APPEAL by plaintiff from *Canady, Judge.* Judgment entered 30 October 1980 in Superior Court, WAKE County. Heard in the Court of Appeals 8 December 1981.

Plaintiff commenced this action on 26 October 1979 to enjoin the foreclosure of two deeds of trust on lands owned by plaintiff. In its original complaint plaintiff alleged that defendant Clarence Gelder had acquired, by assignment, two deeds of trust and the accompanying promissory notes, which constituted liens on a 16.4 acre tract of land owned by plaintiff. The notes were executed to obtain funds with which to develop the Idlewood Village Subdivision in Wake County, North Carolina. The deeds of trust securing the notes covered numerous lots in the Subdivision in addition to plaintiff's property.

When the notes became delinquent, Gelder threatened to foreclose on plaintiff's property. Plaintiff contended that Gelder released five Subdivision lots, owned by defendant Gelder & Associates, Inc., from the lien of the deeds of trust without requiring payment of the release fees that were required by specified loan agreements that were incorporated by reference in the deeds of trust. According to plaintiff, Gelder thereby cast a greater burden of payment for the remaining balance of the notes on plaintiff's property. Plaintiff, therefore, asked the court (1) to enjoin Gelder's foreclosure of the deeds of trust and (2) to require Gelder to credit against the notes the proper release payments.

Defendants filed answer on 26 November 1979 and moved for summary judgment on 30 November 1979.

On 18 February 1980, prior to a hearing on defendants' summary judgment motion, plaintiff filed a motion to amend its complaint on the ground that since the filing of its original complaint it had obtained previously unobtainable documents which established an additional basis for its claim against defendants. Plaintiff also tendered an amended complaint with supporting exhibits.

The amended complaint set forth a second cause of action based upon two additional provisions in the loan agreements underlying the deeds of trust and providing for the cancellation of the deeds of trust covering plaintiff's property at the borrower's option following release by the lender of a certain number of Sub-

division lots from the lien of the deeds of trust. Plaintiff alleged that the requisite number of lots had been released and that it was therefore entitled to enforce the cancellation provisions. Attached to the amended complaint were copies of the aforementioned loan agreements.

Without ruling on plaintiff's motion to amend its complaint, the trial court allowed defendants' motion for summary judgment. Plaintiff has appealed.

*Joslin, Culbertson, Sedberry & Houck, by William Joslin, for plaintiff appellant.*

*Edgar R. Bain and Elaine F. Capps for defendant appellee.*

BECTON, Judge.

Plaintiff assigns error to the trial court's failure to rule on the motion to amend its complaint. The trial court apparently gave no consideration to the amended complaint in ruling on the summary judgment motion for it refused to allow plaintiff to include it in the record on appeal. We subsequently allowed plaintiff to file it as an amendment to the record pursuant to App. R. 9(b)(6).

We hold that the trial court's failure to rule on the motion to amend was error as a matter of law and that the trial court prematurely ruled on defendant's motion for summary judgment.

"The Rules of Civil Procedure achieve their purpose of insuring a speedy trial by providing for and encouraging liberal amendments to pleadings under Rule 15." *Taylor v. Triangle Porsche-Audi, Inc.*, 27 N.C. App. 711, 714, 220 S.E. 2d 806, 809 (1975), *cert. denied*, 289 N.C. 619, 223 S.E. 2d 396 (1976). Failure to rule on a motion to amend contravenes this purpose by inviting piecemeal litigation and preventing consideration of the merits of the action on all the evidence available. *See Gladstein v. South Square Assoc.*, 39 N.C. App. 171, 249 S.E. 2d 827 (1978), *disc. review denied*, 296 N.C. 736, 254 S.E. 2d 178 (1979); *Johnson v. Johnson*, 14 N.C. App. 40, 187 S.E. 2d 420 (1972).

We further hold that in this case the motion to amend should have been allowed. Rule 15(a) of the Rules of Civil Procedure states that leave to amend pleadings "shall be freely given when

justice so requires." *See Public Relations, Inc. v. Enterprises, Inc.*, 36 N.C. App. 673, 245 S.E. 2d 782 (1978); *see also Foman v. Davis*, 371 U.S. 178. 9 L.Ed. 2d 222, 83 S.Ct. 227 (1962).

In the present case, we perceive no apparent reason why the motion to amend should not have been allowed, and the trial court stated none. In *Public Relations, Inc.*, we found neither undue delay nor prejudice when the plaintiff filed a motion to amend its complaint so as to allege personal jurisdiction over the defendant approximately six weeks after the defendant had filed a motion to dismiss for lack of jurisdiction *and one day after the trial court had allowed that motion to dismiss*. In the present case the motion to amend was filed less than four months after the original complaint and eight months before the hearing on defendants' motion for summary judgment. It is conceivable that it took plaintiff four months to obtain, through discovery, the documents necessary to support the new claim contained in the amended complaint. Allowance of the amendment will not prejudice defendants as they will have ample opportunity to respond to it. Nor can we say that allowance of the motion to amend would be futile even though upon remand the trial court may determine that plaintiff cannot recover on the claim asserted in the amended complaint.

Entry of summary judgment in favor of defendants is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

Judge CLARK and Judge WHICHARD concur.

## CASES REPORTED WITHOUT PUBLISHED OPINION

### Filed 6 April 1982

| | | |
|---|---|---|
| HAYNES v. LITTLE PIGS<br>No. 8128SC516 | Buncombe<br>(79CVS593) | No Error |
| HENSLEY v. THOMAS<br>No. 8129SC790 | McDowell<br>(77CVS224) | Appeal Dismissed |
| IN RE ATWATER<br>No. 8115SC687 | Orange<br>(80CVS697) | Affirmed |
| IN RE LONG<br>No. 8110DC1110 | Wake<br>(81SP528) | Affirmed |
| IN RE McNAIR v. ESTES<br>No. 8126SC649 | Mecklenburg<br>(81CVS2663) | Affirmed |
| MARLEY v. TILLES<br>No. 8119SC739 | Randolph<br>(79CVS127) | Affirmed |
| PHOENIX v. BD. OF<br>ALDERMEN<br>No. 8119SC676 | Cabarrus<br>(81CVS351) | Affirmed |
| SCHLOSSER v. SCHLOSSER<br>No. 8121DC479 | Forsyth<br>(79CVD3921) | Reversed &<br>Remanded |
| SPRINKLE v. WHEELER<br>No. 8128SC691 | Buncombe<br>(79CVS2978) | New Trial |
| STATE v. AVERY<br>No. 813SC890 | Carteret<br>(80CRS7149)<br>(80CRS7150) | No Error |
| STATE v. BAILEY<br>No. 817SC899 | Nash<br>(80CRS10608) | No Error |
| STATE v. BANKS<br>No. 8110SC1013 | Wake<br>(80CRS68931) | No Error |
| STATE v. BUTNER<br>No. 8121SC956 | Forsyth<br>(81CR1506) | No Error |
| STATE v. EARLEY<br>No. 814SC1120 | Onslow<br>(81CRS4351) | No Error |
| STATE v. FREEMAN<br>No. 8120SC1027 | Moore<br>(81CRS640)<br>(81CRS1431) | Affirmed |
| STATE v. HARDY<br>No. 8121SC1098 | Forsyth<br>(81CRS8208) | No Error |

| | | |
|---|---|---|
| STATE v. HARMON<br>No. 8128SC1028 | Buncombe<br>(80CRS23843)<br>(80CRS23844) | No Error |
| STATE v. HARPER<br>No. 813SC1049 | Pitt<br>(80CRS11923) | No Error |
| STATE v. HARRISON<br>No. 814SC1057 | Onslow<br>(81CRS2044) | No Error |
| STATE v. McCULLERS<br>No. 8110SC942 | Wake<br>(80CRS66267) | No Error |
| STATE v. O'MALLEY<br>No. 814SC1130 | Onslow<br>(80CRS23182)<br>(80CRS23184) | No Error |
| STATE v. PAGE<br>No. 8114SC789 | Durham<br>(80CRS24867) | No Error |
| STATE v. PINNIX<br>No. 8115SC762 | Alamance<br>(80CRS13846) | Reversed |
| STATE v. REYNOLDS<br>No. 8119SC1046 | Randolph<br>(80CRS12382)<br>(80CRS12383) | No Error |
| STATE v. WHITE<br>No. 8112SC1018 | Cumberland<br>(80CRS28050)<br>(80CRS28388)<br>(80CRS28389)<br>(80CRS28471) | Affirmed |
| TALAFERRO v. WRIGHT<br>No. 8115DC671 | Orange<br>(78CVM58) | Reversed &<br>  Remanded for<br>  Trial |
| WALSER v. WALSER<br>No. 814DC745 | Onslow<br>(80CVD993) | Affirmed |
| WILLIAMS v. COLEMAN<br>No. 816SC661 | Hertford<br>(79CVS41) | Affirmed |

THE PROPERTY SHOP, INC. v. MOUNTAIN CITY INVESTMENT COMPANY

No. 8128SC641

(Filed 6 April 1982)

1. **Rules of Civil Procedure § 32— compelling defendant to offer certain portions of deposition into evidence**

Where defendant offered part of a deposition into evidence, the trial court did not err in compelling defendant to offer certain additional deposition testimony relevant to that already in evidence. G.S. 1A-1, Rule 32(a)(5).

2. **Brokers and Factors § 1.1— knowledge that broker procuring cause of sale— instructions concerning**

In an action concerning a real estate commission, the trial judge did not err in failing to give instructions on the duty of a broker to inform a seller that a prospective purchaser was procured by the broker's efforts since the issue before the jury was whether the seller knew or should have known that the broker was the procuring cause of the sale, and the court properly instructed on that issue.

3. **Brokers and Factors § 6— breach of broker's contract—instructions concerning damages**

In an action concerning a real estate broker's commission, the trial court properly instructed that if the jury reached the damage issue, it would have already determined that the parties had entered into an agreement for the payment of a commission of six percent of the sales price of the property. The evidence was uncontroverted that the owner of the property told the broker that the "prospective price" for the property was $750,000 and that plaintiff would receive a six percent commission, and though the owner subsequently accepted $710,000 for the motel, the broker performed the service of producing a buyer who consummated the sales transaction to the satisfaction of the owner.

APPEAL by defendant from *Ferrell, Judge.* Judgment entered 22 January 1981 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 12 February 1982.

This is an action by plaintiff to recover a real estate commission on the sale of defendant's property to a purchaser allegedly procured by plaintiff.

Plaintiff alleged in its amended complaint that defendant listed the Downtowner Motel in Asheville with plaintiff at a sales price of $750,000 with a 6% commission; that plaintiff produced a purchaser who was ready, willing and able to buy defendant's property; that the purchaser, Bhagu Patel, purchased the motel for $710,000; that the contract to purchase the property contained

a provision in which the buyer warranted he had not been represented by a realtor entitled to a commission; that defendant refused to pay a real estate commission to plaintiff after the sale was completed; and that plaintiff was entitled to recover $42,600 (6% of $710,000), plus interest.

Defendant's answer denied the material allegations of the complaint.

At trial, plaintiff's evidence was as follows: Bernard Goldstein (hereinafter "Goldstein"), president of defendant company, is Ellen Goldstein's (hereinafter "Ellen") uncle by marriage. Defendant owned the Downtowner Motel in Asheville and its Board was discussing selling the motel. Ellen was a broker with plaintiff realty company. In February 1978 Goldstein agreed to allow Ellen to find a purchaser for the motel. The terms were a sales price of $750,000 with $200,000 down payment, and a commission to plaintiff of 6%. Defendant never executed the exclusive listing agreement prepared by plaintiff. Ellen obtained financial information on the motel from Jim Crawford, manager of the motel.

Ellen contacted Allied Business Brokers in Asheville and through them reached Frank Dostal, a broker in Macon, Georgia. Dostal brought Paul Patel to Asheville in August 1978 to look at the motel. Paul Patel made an offer for the motel. The offer was written on a form with the heading showing Dostal's Macon real estate company and listed Dostal as salesman. Glenn Snipes, Secretary of defendant, rejected the offer as being too low. Goldstein was given a copy of this offer.

In September Ellen told Goldstein that Dostal was bringing another client to see the motel and set up a meeting with the officers on 4 October 1978. Dostal arrived with the client, Bhagu Patel (hereinafter "Patel"), and they registered at the motel. Dostal informed Ellen that Patel was not interested in the motel and cancelled the meeting. Ellen learned in November that Patel had purchased the motel.

Several months after the sale, Dostal told Ellen that he had taken Patel to Waynesville on 4 October 1978 to meet Aaron Prevost, Vice President of defendant. Dostal introduced himself and told Prevost that he was working with plaintiff to secure a buyer for the motel. Prevost told Dostal that there was no listing

contract with plaintiff. After hearing this, Dostal left the room, and Patel and Prevost made arrangements for the sale. Bhagu Patel later offered Dostal $500 "to keep his mouth shut."

Goldstein learned from Prevost that Dostal was with Patel when they discussed purchase of the motel. He told Ellen to let the sale go through and that something would work out later concerning the commission because Patel would probably have to pay it due to the indemnity clause in the sales agreement.

Defendant's evidence was as follows: Goldstein testified that before the contract was signed, neither Ellen nor anyone else told Goldstein that Patel was the man to whom Dostal had shown the motel. Goldstein knew that Dostal was a broker who was trying to sell the motel, and he knew that Patel had come to Asheville with Dostal. Patel told Goldstein he was not represented by any broker and voluntarily signed a statement to that effect.

Jim Crawford, manager of the motel, testified that when Dostal could not reach Goldstein or Snipes on October 4, he suggested Dostal contact Prevost in Waynesville. Crawford called Prevost and told him there was a broker at the motel who had shown the property with Ellen and who was unable to contact Goldstein or Snipes. Dostal, Patel and Prevost agreed to meet in Waynesville to discuss the motel. Prevost and Snipes both knew that Ellen was trying to sell the motel, but they believed that defendant had not listed the property with any broker. Dostal told Prevost he had no interest in the matter, and Patel signed a statement that no broker was involved.

By deposition Bhagu Patel stated that he learned that the Downtowner was for sale through a cousin in High Point, Sombahai Patel. Dostal asked to go along with Patel to show him other property in Atlanta and Asheville. Plaintiff moved the court pursuant to Rule 32 of the North Carolina Rules of Civil Procedure to require defendant to offer certain portions of Patel's deposition, which motion was granted. In this further testimony Patel stated that he told Dostal he was going to look at the Downtowner. Dostal did not tell Patel that he had a listing on that motel and did not tell him that he had set up a meeting with the officers to discuss the sale of the motel. Neither Dostal nor Prevost ever mentioned plaintiff to Patel. Patel did not learn of the Downtowner through Paul Patel.

In rebuttal, Dostal testified that Bhagu Patel called him and said that he had been given Dostal's name by Paul Patel. Dostal sent Bhagu Patel financial information on the Downtowner and showed him the offer made by Paul Patel. Dostal told Prevost he was not working for Patel, but represented the sellers of the property.

The jury's verdict was that the parties entered into an agreement in which defendant agreed to pay plaintiff a commission if plaintiff sold defendant's property; that plaintiff procured a ready, willing and able purchaser; that defendant knew or should have known before the sale of the property that plaintiff had procured the purchaser; and that plaintiff was entitled to recover $42,600 from defendant. Defendant's motions for judgment notwithstanding the verdict and for a new trial were denied. Defendant appeals.

*Bennett, Kelly & Cagle by Harold K. Bennett for plaintiff appellee.*

*Adams, Hendon, Carson & Crow by George Ward Hendon for defendant appellant.*

CLARK, Judge.

Defendant first argues that the court erred in excluding portions of Bhagu Patel's testimony. Patel was allowed to testify that he learned of the Downtowner in a conversation with his cousin, Sombahai Patel, who lived in High Point. The court excluded Patel's testimony that his cousin said the property was nice and the reasons his cousin did not want to buy the property himself. We do not believe that the excluded statements were material or that excluding the testimony was prejudicial to defendant. *Hege v. Sellers,* 241 N.C. 240, 84 S.E. 2d 892 (1954). We find no merit to this exception and overrule it.

[1] Likewise, we find no merit in defendant's next argument that the trial court erred in compelling defendant to offer into evidence certain portions of the Bhagu Patel deposition. Defendant offered portions of the deposition concerning how Patel learned of the Downtowner's availability, his trip to Asheville, his meeting in Waynesville with Prevost, and his subsequent negotiations to purchase the motel. Upon plaintiff's motion, the court required de-

fendant to offer certain additional testimony relevant to that already in evidence and which concerned how Patel became acquainted with Frank Dostal and details of their arrangements to go to Asheville together to look at several motels. We think the court properly required defendant to introduce these portions of the deposition pursuant to G.S. 1A-1, Rule 32(a)(5), which reads as follows:

> "If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which is relevant to the part introduced, and any party may introduce any other parts."

We find that the additional testimony was relevant to portions of the deposition defendant had previously introduced and therefore overrule this exception.

Defendant argues that the trial court erred in overruling its objection to the jury argument by plaintiff's counsel in which he stated that Bhagu Patel might have to pay any bill in the case. G.S. 84-14 states that "In jury trials, the whole case as well of law as of fact may be argued to the jury." The general rule is that counsel may argue all the evidence to the jury, as well as any reasonable inferences to be drawn from it. *Crutcher v. Noel,* 284 N.C. 568, 201 S.E. 2d 855, *reh. denied,* 285 N.C. 597 (1974). In the case *sub judice,* the offer to purchase which was introduced into evidence stated that Buyer (Bhagu Patel) was not represented by a realtor and that he would "warrant and defend the Seller against any of the said types of fees or commissions." Also, Ellen Goldstein was allowed to testify without objection that Bernard Goldstein told her to let the sale go through because Patel would probably have to pay the commission due to the indemnity clause. We hold, therefore, that the trial court properly overruled defendant's objection since plaintiff's counsel was arguing facts which had been admitted into evidence without objection. We overrule this assignment of error.

[2] Defendant next assigns as error the failure of the trial court to give special instructions it had requested concerning the duty of a real estate broker to inform the property owner that it is the broker's prospect with whom the owner is negotiating. The duty of the trial judge is to declare the law arising on the evidence and to explain the application of the law to that evidence. G.S. 1A-1,

Rule 51(a). When a party tenders a written request for a specific instruction which is correct and supported by evidence, the failure of the court to give the instruction in substance is error. *Faeber v. E.C.T. Corp.*, 16 N.C. App. 429, 192 S.E. 2d 1 (1972).

We believe that the trial court properly instructed the jury on the law applicable to this issue. We do not agree with defendant that the judge should have given instructions on the duty of a broker to inform a seller that a prospective purchaser was procured by the broker's efforts. Rather, the issue before the jury was whether the seller knew or should have known that the broker was the procuring cause of the sale. The court instructed the jury on this issue as follows:

"The third issue, members of the jury, reads as follows: . . . did the defendant prior to the sale of defendant's property know or should it have known by the exercise of reasonable diligence that the plaintiff procured the purchaser. On this issue, members of the jury, the burden of proof, as I have defined that term, is upon the plaintiff to prove to you, the jury, from the evidence and by its greater weight that the defendant knew prior to the sale of its property or should have known by the exercise of reasonable diligence that the purchaser of its property had been procured by the plaintiff.

If the seller of property, instead of negotiating or dealing with the broker, deals directly with the purchaser knowing that the purchaser was sent to him by the broker or someone acting through the broker, then the seller would be liable to the broker for commissions agreed upon upon a sale of such property, or upon a showing that such purchaser was ready, willing, and able to purchase upon terms agreed upon between the seller and broker. . . . If the broker knows that the seller is negotiating with one the broker procured to purchase the property, and the broker has reasonable cause to believe that the seller does not know the broker procured such purchaser, the broker would have a duty to notify the seller of such fact to the end that the seller might not be misled into accepting a reduced price for the property on the theory that he would not be obligated as a result of a sale to pay real estate commissions. And if so knowing, the broker

fails to act to notify the seller, then in such event the broker would not be entitled to recover its commissions, for it would not have performed its obligations under the contract.

If, however, the broker does not know that the seller is negotiating with a purchaser procured by the broker, then in such event the broker would not be required to notify the seller for the law would not require the doing of something or the notification to someone of an act about which the broker had no knowledge. Even if the seller did not actually know that it was dealing with a purchaser procured by the broker and the seller in fact negotiates with a purchaser procured by the broker, the seller nevertheless would be liable for commissions if it could have ascertained with the exercise of reasonable diligence that the broker was in fact the procurer of the purchaser. What is reasonable diligence in ascertaining whether the seller should have known it was dealing directly with a person procured by the broker depends upon the facts and circumstances as you find them to have existed from the evidence at the times in question. Such circumstances include the conduct, statements and acts of the parties, including the acts and declarations of the purchaser to the effect that no broker was involved. However, the mere fact that the purchaser declares or states that no broker is involved standing alone is not sufficient to free the seller of its duty to ascertain that which the exercise of reasonable diligence would have revealed. The exercise of reasonable diligence is such diligence as a reasonably careful and prudent person under the same or similar circumstances would have exercised. . . .

If one of the officers of the defendant corporation knew or should have by the exercise of reasonable diligence ascertained that the purchaser with whom it dealt was procured in fact by the broker, then the corporation is chargeable with such knowledge whether other officers of the corporation knew it or not or should have known it or not by the exercise of reasonable diligence."

It is the general rule that a broker who is the procuring cause of a sale of property is entitled to a commission even though the owner himself makes the sale, unless the provisions of

the contract of employment provide otherwise. *Realty Agency, Inc. v. Duckworth & Shelton, Inc.*, 274 N.C. 243, 162 S.E. 2d 486 (1968); *Jaudon v. Swink*, 51 N.C. App. 433, 276 S.E. 2d 511 (1981). The plaintiff presented ample evidence which tended to show that defendant through its officers had notice that Bhagu Patel was procured as a buyer through the efforts of Frank Dostal. Defendant's evidence contradicted much of plaintiff's evidence, and therefore the issue properly before the jury was whether or not defendant knew or should have known of the broker's involvement. The credibility of each party's witnesses was properly a question for the jury upon all the evidence presented. We find that the court's instructions were proper and therefore overrule this assignment of error.

[3]  Defendant's final assignment of error concerns the court's instructions to the jury on the measure of damages recoverable. Defendant submits that there was an express contract to recover a commission of six percent if the sales price was $750,000, not to recover six percent of the ultimate sales price, regardless of the amount. The fourth issue submitted to the jury concerned the amount plaintiff was entitled to recover of defendant. The trial court instructed that if the jury reached this issue, it would have already determined that the parties had entered into an agreement for the payment of a commission of six percent of the sales price of the property. The jury found that plaintiff was entitled to a recovery of $42,600, six percent of the $710,000 sales price.

     The general rule is that if property is listed with a broker for sale and sale is brought about through the broker as procuring cause, he is entitled to a commission even though the final negotiations are conducted through the owner who accepts a price less than that stipulated to the broker. *Thompson v. Foster*, 240 N.C. 315, 82 S.E. 2d 109, 46 A.L.R. 2d 843 (1954); Annot., 46 A.L.R. 2d 848 (1956). "The law does not permit an owner 'to reap the benefits of the broker's labor without just reward' if he has requested a broker to undertake the sale of his property and accepts the results of services rendered at his request. In such case, *in the absence of a stipulation as to compensation*, he is liable for the reasonable value of those services." (Emphasis added.) *Realty Agency, Inc. v. Duckworth & Shelton, Inc., supra*, at 251, 162 S.E. 2d at 491. *Realty Agency* allowed recovery on *quantum meruit* to a broker who had expended time and efforts to sell defendant's

property, but in that case the broker did not find the prospect to
whom the owner sold the property. Justice Sharp stated that
"[t]his is not a situation in which an owner, who has listed real
estate with the broker at a specified price, reduces the price and
sells it to the broker's prospect. When that occurs, clearly the
broker is entitled to compensation." *Id.* at 251, 162 S.E. 2d at 491.

Other decisions cited by defendant which allowed recovery
on *quantum meruit* do not fit the facts of the case here presented.
In *Thompson v. Foster, supra,* the listing agreement provided
that the broker should receive for his services any sum for which
the property sold in excess of $50,000. The owner dealt directly
with the broker's prospect and sold the property to this prospect
for $50,000. Therefore, the owner's acceptance of this price
deprived the broker of his commission, and the broker was al-
lowed to recover the reasonable value of his services. In *White v.
Pleasants,* 225 N.C. 760, 36 S.E. 2d 227 (1945), *quantum meruit*
recovery was allowed where there was an oral listing contract
stipulating a sales price but setting no rate of compensation to
the broker. *See also Lindsey v. Speight,* 224 N.C. 453, 31 S.E. 2d
371 (1944); *Aiken v. Collins,* 16 N.C. App. 504, 192 S.E. 2d 617
(1972).

The rule allowing *quantum meruit* recovery applies where no
particular rate of commission is stipulated or specified in the
listing agreement between the owner and the broker; but as a
general rule when a sale is made by the owner at a price less
than the broker is authorized to offer, the commission allowed is
the contract rate on the actual sale price. *Baker v. Curtis,* 105
Cal. App. 2d 663, 234 P. 2d 153 (1951); *MacGregor v. Persha,* 174
Minn. 127, 218 N.W. 462 (1928); *Portney v. Frank,* 77 Ohio App.
357, 65 N.E. 2d 290 (1946); *Andrews v. Newton,* 118 Vt. 290, 108 A.
2d 517 (1954); Annot., 46 A.L.R. 2d 848 (1956). This general rule
should be adopted in North Carolina because the agreed rate of
commission accurately reflects the value of the services which the
owner and broker considered fair and reasonable and is deter-
minable with less difficulty than under the somewhat nebulous
*quantum meruit* rule.

In the case *sub judice* the evidence is uncontroverted that
Bernard Goldstein told Ellen that the "prospective price" for the
motel was $750,000 and that plaintiff would receive a six percent

commission. Though the owner subsequently accepted $710,000 for the motel, the broker performed the service of producing a buyer who consummated the sales transaction to the satisfaction of the owner, and in light of the agreed commission rate the broker is entitled to recover six percent of the actual sales price as compensation. Though defendant does not question the validity of the oral listing, we note that oral contracts between broker and owner to negotiate the sale of land are not subject to the Statute of Frauds and are not required to be in writing. *Thompson-McLean, Inc. v. Campbell,* 261 N.C. 310, 134 S.E. 2d 671 (1964). Unquestionably, a written listing by the owner with the real estate broker is desirable, and a written listing may be required by Rule .0106 of the North Carolina Real Estate Licensing Board adopted pursuant to the authority of G.S. 93A-6(a)(15). We find no error in the trial court's instructions on the fourth issue.

The jury has spoken, and we find no prejudicial error in the trial.

No error.

Judges ARNOLD and WHICHARD concur.

---

JUNIOR C. LUMPKINS, EMPLOYEE v. FIELDCREST MILLS, EMPLOYER, SELF-INSURED

No. 8110IC628

(Filed 6 April 1982)

**Master and Servant § 68— occupational disease—finding of insufficient causation—conclusive on appeal**

    In a workers' compensation proceeding, evidence that plaintiff's employment was merely a "possible etiologic factor" in causing his lung disease, supported the Commission's finding that plaintiff's lung disease had an insufficient causal relationship with his employment to grant him compensation and the Commission's conclusion must be affirmed.

APPEAL by plaintiff from the North Carolina Industrial Commission. Opinion and Award entered 24 February 1981. Heard in the Court of Appeals 11 February 1982.

Plaintiff filed a claim for workers' compensation benefits alleging that he is "suffering from an occupational disease caused by exposure to cotton dust." Deputy Commissioner W. C. Delbridge found facts and concluded that "[t]here is insufficient evidence of a causual [sic] relationship between plaintiff's employment and his chronic obstructive lung disease to support an award in this case." The Full Commission affirmed and adopted the deputy commissioner's findings and conclusion, with Commissioner Coy M. Vance filing a dissenting opinion. Plaintiff appeals from the Full Commission's Opinion and Award.

*Michael E. Mauney for plaintiff-appellant.*

*Smith, Moore, Smith, Schell & Hunter, by J. Donald Cowan, Jr., for defendant-appellee.*

HILL, Judge.

The deputy commissioner made the following findings of fact:

1. Plaintiff was born on October 16, 1921 and finished the seventh grade in school. He went to work for Fieldcrest Mills in 1952. When plaintiff first went to work for Fieldcrest Mills he was employed in the weave department where he worked as a weaver and loom cleaner until 1963 and thereafter worked intermittently in both the weave room and inspection department until 1965. From 1965 until the plaintiff retired in 1978 he worked in the inspection area as a cloth checker.

2. During the first years of employment the mill processed cotton material but in the latter years (four or five) before retirement cotton blends and synthetics were processed. In 1975 polyester and rayon were processed. The cloth which would come to the plaintiff for inspection had been washed, dyed, and woven. There was a small amount of dust involved. . . .

3. In the weave room the cotton dust and lint were thick. As a weaver and loom cleaner plaintiff was constantly exposed to cotton dust. The dust would be particularly bad as the looms were being blown off.

4. Plaintiff began experiencing breathing problems consisting of cough and shortness of breath four or five years

before his retirement from his employment. He would notice that his breathing problems would improve when he was away from work either on weekends but would return when he returned to work and was again exposed to the dust and lint. Plaintiff was advised by medical doctors to get out of an environment where there was dust present. Plaintiff stopped working in March of 1978.

5. Since leaving the mill plaintiff has worked part-time as a security person.

6. Plaintiff smoked a pack of cigarettes a day for approximately 25 years until 1979. At that time plaintiff stopped smoking for a short while. He now smokes no more than a pack and a half a month.

7. Dr. Herbert O. Sieker, a member of the Commission's Occupational Disease Panel, examined the plaintiff on February 27, 1979 and reported in part as follows:

. . . .

IMPRESSIONS: 1. Chronic obstructive lung disease.

2. History of hypertensive vascular disease.

The patient has history and findings indicating that he is disabled for work involving strenuous physical activity, but he is capable of engaging in work with moderate degree of activity. In view of the history that symptoms were worse in the last several years with cotton dust exposure, this must be considered as a possible etiologic factor. Patient, however, is clearly not completely disabled, but he should not work in cotton dust in the future."

8. Plaintiff has chronic obstructive lung disease and a history of hypertensive vascular disease.

9. It was Dr. Sieker's impression that the plaintiff was disabled at most for strenuous physical activity in that he could do the same type of work he had been doing for the last four or five years before his retirment but he should work in an environment free of dust, this to include cotton dust. . . .

10. Plaintiff should not work in the cotton dust, but there is insufficient history to implicate this as the causative factor in his chronic obstructive lung disease. . . .

11. There is insufficient evidence of a causual [sic] relationship between plaintiff's employment and his chronic obstructive lung disease to support an award in this case. . . .

As noted above, Deputy Commissioner Delbridge concluded that these facts do not show a sufficient causal relationship between plaintiff's employment and his lung disease to grant him compensation.

Our scope of review in this matter is as follows:

Except as to questions of jurisdiction, the rule is that the findings of fact made by the Commission are conclusive on appeal when supported by competent evidence. This is so even though there is evidence to support a contrary finding of fact. [Citations omitted.] The appellate court does not retry the facts. It merely determines from the proceedings before the Commission whether sufficient competent evidence exists to support its findings of fact.

*Morrison v. Burlington Industries*, 304 N.C. 1, 6, 282 S.E. 2d 458, 463 (1981).

The Workers' Compensation Act contemplates that two events must occur before a workers' compensation claim ripens: (1) injury from an occupational disease, which (2) causes disability. *Taylor v. J. P. Stevens & Co.*, 300 N.C. 94, 265 S.E. 2d 144 (1980); *McKee v. Crescent Spinning Co.*, 54 N.C. App. 558, 284 S.E. 2d 175 (1981).

Plaintiff's third and fourth arguments attack the deputy commissioner's conclusion, in essence, that he is not suffering from an occupational disease. There are three elements necessary to prove the existence of a compensable occupational disease under G.S. 97-53(13): (1) the disease must be due to conditions which are characteristic of a particular employment, (2) the disease is not an "ordinary disease[s] of life to which the general public is equally exposed outside of the employment," *Id.*, and (3) "proof of a causal connection between the disease and the employment." *Hansel v.*

*Sherman Textiles*, 304 N.C. 44, 52, 283 S.E. 2d 101, 106 (1981). *See Booker v. Duke Medical Center*, 297 N.C. 458, 256 S.E. 2d 189 (1979). In *Morrison v. Burlington Industries, supra,* at 12-13, 282 S.E. 2d at 467, our Supreme Court interpreted the latter element to be

> the extent of the disablement *resulting from* said occupational disease, *i.e.*, whether she is totally or partially disabled *as a result of the disease.* If the disablement resulting from the occupational disease is total, the claimant is entitled to compensation as provided in G.S. 97-29 for total disability. If the disablement resulting from the occupational disease is partial, the claimant is entitled to compensation as provided in G.S. 97-30 for partial disability. . . . That means, in occupational disease cases, that disablement of an employee resulting from an occupational disease which arises out of and in the course of the employment, G.S. 97-52 and G.S. 97-2(6), is compensable and claimant has the burden of proof "to show not only . . . disability, but also its degree." *Hall v. Chevrolet Co.*, 263 N.C. 569, 575, 139 S.E. 2d 857, 861 (1965).

(Emphasis original.) The court further discussed the rule of causation in *Hansel v. Sherman Textiles, supra,* at 52-53, 283 S.E. 2d at 106:

> In workers' compensation actions the rule of causation is that where the right to recover is based on injury by accident, the employment need not be the sole causative force to render an injury compensable.
>
> [If the employee] by reason of constitutional infirmaties [sic] is predisposed to sustain injuries while engaged in labor, nevertheless the leniency and humanity of the law permit him to recover compensation if the physical aspects of the employment contribute in some reasonable degree to bring about or intensify the condition which renders him susceptible to such accident and consequent injury.

> *Vause v. Equipment Co.*, 233 N.C. 88, 92, 63 S.E. 2d 173, 176 (1951).

> It has on occasion been implied that a similar rule of causation should prevail in cases where compensation for oc-

cupational disease is sought; however, if a disease is produced by some extrinsic or independent agency, it may not be imputed to the occupation or the employment. *Duncan v. Charlotte*, 234 N.C. 86, 66 S.E. 2d 22 (1951); *Moore v. Stevens & Co.*, 47 N.C. App. 744, 748, 269 S.E. 2d 159, 162 (1980).

However, "*[a] mere possibility of causation is neither 'substantial' nor sufficient.* It must be shown that the disease in question is an occupational disease; *i.e.*, a disease which is due to causes and conditions which are characteristic of and peculiar to claimant's trade, occupation or employment as distinguished from an ordinary disease of life to which the general public is equally exposed outside of the employment." *Walston v. Burlington Industries*, 304 N.C. 670, 679, 285 S.E. 2d 822, 828 (1982) (emphasis added). *See* G.S. 97-53(13). Thus, the following rules now apply:

> (1) an employer takes the employee as he finds [him] with all [his] pre-existing infirmities and weaknesses. (2) When a pre-existing, *nondisabling, non-job-related* condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment or by an occupational disease so that disability results, then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent. (3) On the other hand, when a pre-existing, nondisabling, non-job-related disease or infirmity eventually causes an incapacity for work without any aggravation or acceleration of it by a compensable accident or by an occupational disease, the resulting incapacity so caused is not compensable. (4) When a claimant becomes incapacitated for work and part of that incapacity is caused, accelerated or aggravated by an occupational disease and the remainder of that incapacity for work is not caused, accelerated or aggravated by an occupational disease, the Workers' Compensation Act of North Carolina requires compensation only for that portion of the disability caused, accelerated or aggravated by the occupational disease.

*Morrison v. Burlington Industries, supra*, at 18, 282 S.E. 2d at 470 (emphasis original). Since the determination of whether there is a causal connection between the disease and the employment is a mixed question of law and fact, we may review the record *sub*

*judice* to determine if the findings and conclusion are supported by sufficient evidence. *Barham v. Food World, Inc.*, 300 N.C. 329, 266 S.E. 2d 676 (1980); *Gallimore v. Marilyn's Shoes*, 292 N.C. 399, 233 S.E. 2d 529 (1977).

Finding of Fact Nos. 10 and 11 are critical to the issue of causation. In Finding of Fact No. 10, the deputy commissioner found that "there is insufficient history to implicate this [cotton dust exposure] as the causative factor in his chronic obstructive lung disease." Although we read *Morrison* and *Hansel* merely to require evidence that plaintiff's employment is *a causative factor* in his lung disease, we find evidence to support the deputy commissioner's finding that plaintiff's lung disease has an insufficient causal relationship with his employment to grant him compensation.

Dr. Herber O. Sieker testified as follows:

The cotton dust would implicate that—would be implicated as an aggravating factor and would make me recommend that he is [sic] not work in the cotton dust, but it was my impression that he was disabled at most only for strenuous physical activity.

.   .   .   .

Well, historically he said he had symptoms when he was exposed to the cotton dust in the last four to five years before he stopped working. I don't think from the standpoint of evaluating history one can argue with that and certainly in the future the man should not work in the cotton dust but I don't think that this is the sufficient history to implicate this is [sic] the causative factor in his obstructive lung disease.

.   .   .   .

. . . As I stated in my impression, the cotton dust has to be considered an etiologic fact in causing his symptoms and certainly seeing him as a physician I would recommend that he not work in the cotton dust in the future.

.   .   .   .

From the history I can implicate [plaintiff's employment] as a possible etiologic factor but I cannot strongly say it was the causative or only causative factor.

Dr. Sieker's medical report indicated the presence of chronic obstructive lung disease and a history of hypertensive vascular disease. Further, "[i]n view of the history that symptoms were worse in the last several years with cotton dust exposure, this must be considered as a possible etiologic factor. Patient, however, is clearly not completely disabled, but he should not work in cotton dust in the future."

"In making its findings, the Commission's function is 'to *weigh and evaluate* the *entire* evidence and determine as best it can where the truth lies.'" *Harrell v. J. P. Stevens & Co.*, 45 N.C. App. 197, 205, 262 S.E. 2d 830, 835, *disc. rev. denied*, 300 N.C. 196, 269 S.E. 2d 623 (1980) (emphasis original). The Industrial Commission is the sole judge of the witnesses' credibility and may choose to believe all, a part, or none of any witnesses' testimony. *Id.*; *Morgan v. Thomasville Furniture Industries, Inc.*, 2 N.C. App. 126, 162 S.E. 2d 619 (1968).

Since there is evidence that plaintiff's employment was merely a "possible etiologic factor" in causing his lung disease, we find that the Commission appropriately exercised its function as described above. Our scope of review in this matter therefore mandates that the finding of insufficient causation is conclusive on appeal, and that the opinion and award be affirmed. Unless there is a proper finding that plaintiff suffers from an occupational disease, the analysis required by *Morrison* and *Hansel* is inappropriate. *See Walston v. Burlington Industries, supra; see also Rutledge v. Tultex Corp.*, 56 N.C. App. 345, 289 S.E. 2d 72 (1982).

In light of our disposition of the above arguments, we do not find it necessary to address plaintiff's remaining assignments of error.

Affirmed.

Judge BECTON concurs.

Judge HEDRICK concurs in the result.

CON CO, INC. v. WILSON ACRES APARTMENTS, LTD., McGOWAN
    BUILDERS, INC., KENNEDY MORTGAGE COMPANY, FORD McGOWAN,
    SR., AND FORD McGOWAN, JR.

No. 813SC385

(Filed 6 April 1982)

1. **Laborers' and Materialmen's Liens § 3— subcontractor's lien by subrogation—
   defenses available against contractor**

   Plaintiff subcontractor could not perfect a lien by subrogation under G.S.
   44A-23 where the prime contractor had made an agreement with the land-
   owner that it would not perfect a lien against the real property of the land-
   owner.

2. **Laborers' and Materialmen's Liens § 3.2— claim of lien—notice to owner**

   The fact that plaintiff first tier subcontractor did not give actual notice to
   the owner of a claim against the prime contractor until after it filed a claim of
   lien in the office of the clerk of superior court did not void the claim of lien
   filed in the clerk's office. G.S. 44A-20 and G.S. 44A-18.

3. **Laborers' and Materialmen's Liens § 3— mortgage lender not owner—no
   liability to subcontractor**

   Defendant mortgage lender was not a person "for whom an improvement
   was made" or "who ordered the improvement to be made" so as to be an
   "owner" within the meaning of G.S. 44A-7(3) and thus an "obligor" under G.S.
   44A-17; nor did defendant lender have a power coupled with an interest so as
   to be an agent of the owner within the meaning of G.S. 44A-7(3). Therefore,
   defendant lender did not become obligated to plaintiff first tier subcontractor
   when it advanced money to the owner after being notified of plaintiff's claim of
   lien against the prime contractor and the amount advanced was paid to the
   prime contractor.

APPEAL by plaintiff from *Rouse, Judge.* Judgments entered
23 December 1980 and 16 February 1981 in Superior Court, PITT
County. Heard in the Court of Appeals 19 November 1981.

This is an action to enforce liens. The plaintiff, Con Co, Inc.,
is a corporation which engages in the construction business. The
defendant McGowan Builders, Inc. is a corporation which con-
tracted to build an apartment complex for Wilson Acres Apart-
ments, Ltd., a limited partnership organized under the law of
North Carolina. Kennedy Mortgage Company is a mortgage
lender which financed the project. Ford McGowan and Ford
McGowan, Jr. are the principal stockholders in McGowan
Builders, Inc. and general partners in Wilson Acres Apartments,
Ltd.

On 27 November 1979 the plaintiff filed against property owned by Wilson Acres Apartments, Ltd. in Pitt County notice of a claim of lien by a contractor and a claim of lien by a first tier subcontractor. It then filed actions to enforce the liens.

Wilson Acres Apartments, Ltd. and Kennedy Mortgage Company made motions for summary judgment. The pleadings and papers filed in regard to the motions for summary judgment show the following facts are not in dispute. McGowan Builders, Inc. is a general contractor which contracted with Wilson Acres Apartments, Ltd. to build an apartment complex on land in Pitt County owned by Wilson Acres. On 5 February 1979 the plaintiff entered into a contract with McGowan Builders, Inc. to do certain work on the project. Plaintiff performed its last work on the project on 31 August 1979. After the plaintiff had filed its notices of claims of liens, Wilson Acres Apartments, Ltd. first received actual notice of the claims when it was served with copies of the summons and complaint on 30 December 1979. Kennedy Mortgage Company first received actual notice of the claims when it was served with copies of the summons and complaint on 11 February 1980. The construction contract between McGowan Builders, Inc. and Wilson Acres Apartments, Ltd. contained a provision that McGowan would not file a lien or claim against the real estate owned by Wilson Acres.

Kennedy Mortgage Company was the construction lender for the project. After it was served with a copy of the complaint, Kennedy disbursed to Wilson Acres a sufficient sum of money to pay the claim of plaintiff which sum was paid by Wilson Acres to McGowan Builders, Inc. In its complaint the plaintiff alleged it had entered into an agreement with McGowan Builders, Inc. on 11 July 1979 providing that Ellis Morall, Inc. would complete the work of the plaintiff but McGowan Builders, Inc. had breached this contract by refusing to let Ellis Morall, Inc. complete the work. For that reason the plaintiff alleged it elected to treat the contract to let Ellis Morall, Inc. complete the work as rescinded and treat the contract of 5 February 1979 as still in full force and effect.

The court granted the motions for summary judgment by Wilson Acres Apartments, Ltd. and by Kennedy Mortgage Company. The judge found that each summary judgment was a final

judgment as to the party for whom it was allowed and there was no just reason for delay.

*Smith, Patterson, Follin, Curtis, James and Harkavy, by Norman B. Smith, for plaintiff appellant.*

*Everett and Cheatham, by Edward J. Harper, II and C. W. Everett, Sr., for defendant appellees Wilson Acres, Ltd., McGowan Builders, Inc., Ford McGowan, Sr. and Ford McGowan, Jr.*

*No counsel for Kennedy Mortgage Company.*

WEBB, Judge.

At the outset we note that this action involves multiple parties. Judge Rouse found there was no just reason for delay as to both summary judgments. The judgments are appealable pursuant to G.S. 1A-1, Rule 54(b). *See Industries, Inc. v. Insurance Co.*, 296 N.C. 486, 251 S.E. 2d 443 (1979).

[1] The facts which are not in dispute show that the plaintiff was a first tier subcontractor on the Wilson Acres apartment project. Article 2, Part 2 of Chapter 44A of the General Statutes provides for the perfecting of liens by subcontractors. A lien in favor of a subcontractor may arise either directly under G.S. 44A-18 and G.S. 44A-20 or by subrogation under G.S. 44A-23. If a subcontractor attempts to perfect a lien by subrogation, he is bound by any defenses available against the contractor. *See Mace v. Construction Corp.*, 48 N.C. App. 297, 269 S.E. 2d 191 )1980). In this case the contractor made an agreement with the landowner that it would not perfect a lien against the real estate. The plaintiff is bound by this agreement. It cannot perfect a lien by subrogation. Summary judgment was properly allowed as to the plaintiff's claim for a contractor's lien.

The waiver of the right to establish a lien by the prime contractor does not affect plaintiff's right to perfect a lien as a subcontractor under G.S. 44A-18 which provides:

"Upon compliance with this Article:

    (1) A first tier subcontractor who furnished labor or materials at the site of the improvement shall be entitled to a lien upon funds which are owed to the con-

tractor with whom the first tier subcontractor dealt and which arise out of the improvement on which the first tier subcontractor worked or furnished materials.

\*    \*    \*

(6) The liens granted under this section are perfected upon the giving of notice in writing to the obligor as hereinafter provided and shall be effective upon the receipt thereof by such obligor."

G.S. 44A-20 provides:

"(a) Upon receipt of the notice provided for in this Article the obligor shall be under a duty to retain any funds subject to the lien or liens under this Article up to the total amount of such liens as to which notice has been received.

(b) If, after the receipt of the notice to the obligor, the obligor shall make further payments to a contractor or subcontractor against whose interest the lien or liens are claimed, the lien shall continue upon the funds in the hands of the contractor or subcontractor who received the payment, and in addition the obligor shall be personally liable to the person or persons entitled to liens up to the amount of such wrongful payments, not exceeding the total claims with respect to which the notice was received prior to payment.

\*    \*    \*

(d) If the obligor is an owner of the property being improved, the lien claimant shall be entitled to a lien upon the interest of the obligor in the real property to the extent of the owner's personal liability under subsection (b), which lien shall be enforced only in the manner set forth in G.S. 44A-7 through 44A-16 and which lien shall be entitled to the same priorities and subject to the same filing requirements and periods of limitation applicable to the contractor."

Under this statute when a subcontractor notifies the owner of a claim against the contractor and the owner disburses money to the contractor after such notification, the owner is liable to the subcontractor to the extent of the funds disbursed and the subcontractor may perfect a lien on the realty of the owner. In the

instant case the papers show that the plaintiff notified the owner of a claim against the contractor prior to payment by the owner to the contractor. This would create a debt from Wilson Acres Apartments to Con Co, Inc. and if properly perfected, would create a lien on the land of Wilson Acres Apartments in favor of the plaintiff.

[2] Wilson Acres Apartments, Ltd. argues that the notice was not properly given under G.S. 44A-20 because the plaintiff filed the lien claim before giving actual notice to the obligors. It contends the lien could not have arisen until notice was given and by filing the lien claim before notice was given, it is of no effect. We cannot so hold. We do not believe the fact that the lien claim was filed before the notice was actually served should make a difference. The claim did not ripen into a lien upon the land until Wilson Acres paid McGowan Builders after being notified of the claim. The plaintiff had to file the claim for the lien within 120 days of the last work performed in order to comply with the statute in perfecting the lien. We hold that the fact that the plaintiff did not give actual notice of the claim until after it had filed the claim in the office of the clerk of superior court did not void the claim of lien which was filed in the clerk's office. If Wilson Acres had moved to strike the claim before paying McGowan Builders, it might be a different case.

The appellees also contend that the plaintiff may not bring this action because it is not the real party in interest. They say this is so because by its own allegations in the complaint, the plaintiff shows that Ellis Morall, Inc. had contracted to complete the work for plaintiff and Ellis Morall, Inc. should be the party who brings this action. The plaintiff has also alleged that McGowan Builders, Inc. breached the contract by refusing to allow Ellis Morall, Inc. to complete the work. Plaintiff alleged that because of the material breach by McGowan of the Ellis Morall, Inc. contract, the plaintiff had elected to treat the contract as rescinded. If the plaintiff can prove these allegations, it is the proper party to bring this action.

We hold the superior court was in error in granting the motion for summary judgment for Wilson Acres Apartments as to the plaintiff's claim for a debt against Wilson Acres Apartments and for its claim of lien as a first tier subcontractor on the real property of Wilson Acres Apartments.

[3] As to the claim against Kennedy Mortgage Company, we hold the defendant's motion for summary judgment was properly allowed. Kennedy Mortgage Company financed the construction of the property. Plaintiff argues that Kennedy Mortgage Company is an obligor within the meaning of G.S. 44A-18(6) and G.S. 44A-20 so that when it advanced money to Wilson Acres Apartments after being notified of the plaintiff's claim, it became obligated to the plaintiff for its claim. G.S. 44A-17 provides:

"Unless the context otherwise requires in this Article:

\* \* \*

(3) 'Obligor' means an owner, contractor or subcontractor in any tier who owes money to another as a result of the other's partial or total performance of a contract to improve real property."

G.S. 44A-7 provides:

"Unless the context otherwise requires in this Article:

\* \* \*

(3) An 'owner' is a person who has an interest in the real property improved and for whom an improvement is made and who ordered the improvement to be made. 'Owner' includes successors in interest of the owner and agents of the owner acting within their authority."

The plaintiff contends Kennedy Mortgage Company is an owner within the meaning of G.S. 44A-7(3) which makes it an obligor within the meaning of G.S. 44A-17(3). Kennedy Mortgage would have an interest in the real property since it has a deed of trust upon it. We do not believe, however, that it is a person "for whom an improvement was made" or "who ordered the improvement to be made." The fact that its secured interest was improved by the improvements does not mean the improvement was made for it. The improvement was made for Wilson Acres Apartments, Ltd. Wilson Acres, not Kennedy, ordered the improvements to be made. The plaintiff contends that the provisions of the deed of trust which gives Kennedy Mortgage Company such rights as the right to pay taxes, collect on insurance policies, approve construction, and disburse funds gives the mortgagee a power coupled

State v. Gray

with an interest which is a form of agency. We do not believe the legislative intent is that Kennedy Mortgage Company is an agent within the meaning of this statute. We hold that the plain words of G.S. 44A-7(3) require we determine Kennedy Mortgage Company is not an agent of the owner.

As to the summary judgment in favor of Wilson Acres Apartments, Ltd. we affirm as to the claim for a contractor's lien and reverse and remand for further proceedings in accordance with this opinion as to the claim for a debt against Wilson Acres Apartments, Ltd. and for a lien as a first tier subcontractor against the real property.

Affirmed in part; reversed and remanded in part.

Judges VAUGHN and HILL concur.

---

STATE OF NORTH CAROLINA v. JANEY KAREN GRAY

No. 8123SC949

(Filed 6 April 1982)

1. **Criminal Law § 73— statements by witness—not inadmissible hearsay**

    The trial court did not err in allowing an agent to testify as to conversations and acts he had with a co-conspirator of defendant where two of the statements involved the agent's restatement of what he had said during a drug transaction, another statement was the agent's description of what occurred, not what was said, during the drug sale, and two statements were of what defendant told the agent.

2. **Criminal Law § 73— testimony as to how agent learned of drug deal—admissible**

    Testimony as to how an agent learned that he would receive seven pills of methaqualone for $18 and testimony as to what the agent actually paid defendant was properly admissible as the agent's testimony that a co-conspirator of defendant informed him of the specifics of the deal was not offered to prove the truth of the matter asserted by the co-conspirator and was, therefore, not objectionable as hearsay.

3. **Criminal Law § 33— questions concerning other undercover operations conducted by agent—not prejudicial**

    Defendant failed to show prejudice in the admission into evidence of other undercover operations conducted by an agent during and immediately after a

drug transaction with the defendant since on cross-examination, defense counsel was free to attack the agent's expertise and to destroy any implications that the defendant was involved, or was a suspect, in any of the agent's other investigations.

**4. Narcotics § 4.7— instructions as to lesser offenses—no error**

The trial court did not err in submitting the offense of possession of methaqualone as a lesser included offense of possession of methaqualone with intent to sell or deliver.

**5. Conspiracy § 6; Narcotics § 4— conspiracy to sell or deliver methaqualone—sufficiency of evidence**

The evidence of conspiracy to sell or deliver methaqualone was sufficient for submission to the jury where the evidence tended to show that the alleged co-conspirator took an agent to defendant's residence; that the co-conspirator met with defendant inside the house and then returned to the agent to communicate the specifics of the deal; that the co-conspirator handled the money in the transaction; and that the co-conspirator, the agent and the defendant consummated the deal in defendant's house. G.S. 15A-1227(d) permitted review of the sufficiency of the evidence despite defendant's failure to interpose motions for dismissal or directed verdict at the close of the State's evidence and again at the close of all the evidence.

**6. Narcotics § 5— judgment not conforming with verdict—error**

The trial court committed prejudicial error in entering judgment for a felony, possession with intent to sell or deliver methaqualone, instead of a misdemeanor, simple possession of methaqualone, where defendant was convicted of the misdemeanor.

APPEAL by defendant from *Long, Judge.* Judgments entered 10 April 1981, in Superior Court, WILKES County. Heard in the Court of Appeals 10 February 1982.

Defendant was charged in separate indictments with three felonies: possession with intent to sell and deliver a Schedule II controlled substance, methaqualone; sale and delivery of methaqualone; and conspiracy with Thomas Gwyn [sic] to sell and deliver methaqualone. At her trial, the State presented evidence tending to show that, on 21 January 1980, Bruce Black, a special undercover agent of the State Bureau of Investigation, called Thomas Quinn to inquire about the purchase of some methaqualone. By arrangement the two men met and proceeded to the home of Richard Clyde Gray. There Agent Black gave Quinn $18 with which to purchase methaqualone. The agent was able to follow Quinn into the house where he met the defendant and observed her producing a pill bottle with seven white tablets which she gave to Black. Quinn paid Black's $18 to the defendant,

and the two men left. An expert in the field of forensic chemistry testified that his analysis of one of the pills showed that it was a Schedule II controlled substance, methaqualone.

The defendant offered no evidence. The jury found defendant guilty of possession of methaqualone, sale and delivery of methaqualone, and conspiracy to sell and deliver methaqualone. From judgment imposing active prison terms, defendant appealed.

*Attorney General Edmisten, by Assistant Attorney General Elisha H. Bunting, Jr., for the State.*

*Vannoy, Moore & Colvard, by J. Gary Vannoy, for defendant appellant.*

ARNOLD, Judge.

[1]  By her first assignment of error, defendant contends that the trial court erred in allowing Agent Black to testify as to conversations and acts he had with co-conspirator Thomas Quinn. The basis of defendant's contention is that the acts and conversations amounted to inadmissible hearsay. Defendant's assignment of error encompasses six exceptions, two of which involve Black's restatement of what he said during the drug transaction and do not, therefore, fall within the definition of hearsay. Another one of Black's statements to which defendant took exception was his description of what occurred, not what was said, during the drug sale, and we do not find defendant's hearsay argument applicable. Additionally, Agent Black was allowed, on two occasions to which defendant took exception, to testify about what the defendant said to him. The admission of this testimony did not constitute error. "Any statement made by an accused which is relevant to the issue and not subject to some specific exclusionary rule may be received in evidence against him. This is so even when the statements may have been made at a time when they were not against his interest." *State v. Cobb,* 295 N.C. 1, 14, 243 S.E. 2d 759, 766-67 (1978).

[2]  Under this assignment of error, defendant brings forward one final exception which she took to the trial court's admission of Black's testimony about how he learned that he would receive seven pills for his $18. Black's testimony that Quinn informed him of the specifics of the deal, however, was not offered to prove the

truth of the matter asserted by Quinn and was, therefore, not objectionable as hearsay. 1 Stansbury's North Carolina Evidence § 141 (Brandis Rev. 1973). Defendant's first assignment of error is overruled.

In a later, related assignment of error, defendant contends that the trial court erred in allowing hearsay as to what Black paid defendant. Again we rule that the evidence that Quinn informed Black of the terms of the drug deal did not constitute objectionable hearsay because it was not offered to prove the truth of the matter asserted by Quinn. *Id.* We have also determined at this point that, because we have overruled defendant's assignments of error with respect to this evidence, her fourth assignment of error in which she challenges the trial court's summary of the same evidence has no merit.

[3] Defendant next assigns as error the admission into evidence of other undercover operations conducted by Agent Black during and immediately after the drug transaction with the defendant. Defendant's argument is that such testimony was irrelevant, that it added unfairly to the jury's perception of Black's expertise, and that it allowed the jury to speculate too freely on possible links between the defendant and the other investigations. Assuming *arguendo* that the testimony was irrelevant, this Court can find no resulting prejudice to the defendant. On cross-examination, defense counsel was free to attack Black's expertise and to destroy any implications that the defendant was involved, or was a suspect, in any of Black's other investigations.

[4] By her fifth assignment of error, defendant argues that the trial court erred in charging the jury that possession of methaqualone is a lesser included offense of possession with intent to sell or deliver methaqualone. Defendant's argument has no merit.

Under the general rule in North Carolina, simple possession of contraband is a lesser included offense of possession with intent to sell or deliver the same substance, *State v. Aiken,* 286 N.C. 202, 209 S.E. 2d 763 (1974). The reason for this is that generally the offense of possession does not require proof of an element which is not also required for the offense of possession with intent to sell or deliver. *State v. McGill,* 296 N.C. 564, 251 S.E. 2d 616 (1979). "One crime is not a lesser included offense of another '[i]f each of two criminal offenses, as a matter of law, re-

quires proof of some fact, proof of which fact is not required for conviction of the other offense.' " *Id.* at 568, 251 S.E. 2d at 619, quoting *State v. Overman,* 269 N.C. 453, 465, 153 S.E. 2d 44, 54 (1967).

Defendant here relies heavily on the *McGill* case where the Supreme Court held that possession of more than one ounce of marijuana is not a lesser included offense of possession with intent to sell or deliver marijuana. The Court observed that proof of possession of more than one ounce of marijuana required the State to show possession and an amount of marijuana greater than one ounce. To prove the offense of possession with intent to sell or deliver marijuana, the State must show possession of any amount of marijuana and intent by the accused to sell or deliver it. Hence, the two crimes each contain one element that is not necessary for proof of the other crime, and one is not, therefore, a lesser included offense of the other.

In the case at bar, defendant was charged with possession with intent to sell or deliver methaqualone, and the trial court instructed the jury on that charge as well as on simple possession. Unlike the marijuana charges contained in the *McGill* case, the quantity of methaqualone for the offenses of felonious possession and felonious possession with intent to sell or deliver is immaterial. To prove the offense of possession of methaqualone requires only proof of possession; to prove the offense of possession of methaqualone with intent to sell or deliver requires proof of possession as well as the intent to sell or deliver. Possession is, therefore, a lesser included offense of possession with intent to sell or deliver and the trial court's charge was proper.

[5] Defendant contends that the trial court erred in submitting to the jury the charge of conspiracy to sell or deliver methaqualone. The basis of defendant's contention is that the evidence was insufficient as a matter of law to establish conspiracy. Under G.S. 15A-1227(d), "[t]he sufficiency of all evidence introduced in a criminal case is reviewable on appeal without regard to whether a motion has been made during trial." We will, therefore, review the sufficiency of the evidence in this case to sustain the verdict in the conspiracy charge despite the defendant's failure to interpose motions for dismissal or directed verdict at the close of State's evidence and again at the close of all the evidence.

A motion to dismiss in a criminal case requires consideration of all the evidence in the light most favorable to the State, and the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. *State v. McKinney,* 288 N.C. 113, 215 S.E. 2d 578 (1975). Only evidence favorable to the State is considered, and contradictions and discrepancies in the evidence are for the jury. *Id.*

In order to prove a criminal conspiracy, the State must show an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way. *State v. Bindyke,* 288 N.C. 608, 220 S.E. 2d 521 (1975). In the case *sub judice,* the State, in order to prove conspiracy to sell or deliver methaqualone, had to prove an agreement between Quinn and defendant to sell or deliver methaqualone. After reviewing the evidence in the light most favorable to the State, we conclude that the evidence of conspiracy was sufficient for submission to the jury. The State submitted evidence tending to show that the alleged co-conspirator Quinn took Black to defendant's residence; that Quinn met with defendant inside the house and then returned to Black to communicate the specifics of the deal; that Quinn handled the money in the transaction; and that Quinn, Black and the defendant consummated the deal in defendant's house. This was clearly sufficient evidence that defendant and Quinn were working in tandem in selling the methaqualone. *Cf. State v. Jones,* 47 N.C. App. 554, 268 S.E. 2d 6 (1980) (where defendant drove undercover agents to a house, met and conversed briefly with another person, and received from that person a package of heroin which he then sold to the agents).

[6] Finally we consider defendant's argument that the trial court erred in signing the judgment in Case No. 80CRS7099. The record shows that the judgment was for possession with intent to sell and deliver methaqualone but that defendant's conviction was for simple possession of methaqualone. Possession of seven tablets of methaqualone is a misdemeanor, G.S. 90-95(d)(2), while possession with intent to sell or deliver methaqualone is a felony, G.S. 90-95(b)(1). Although the term of imprisonment imposed upon defendant in the erroneous judgment was within the statutory range for simple possession, we find that the trial court committed prejudicial error in entering the judgment as for a felony in-

stead of a misdemeanor. We, therefore, must vacate the judgment and remand the case for entry of a proper judgment.

Defendant's final assignment of error was contingent upon success in her evidentiary arguments which we have rejected. It is, therefore, without merit.

In summary, in Case No. 80CRS7100 and Case No. 80CRS7101, no error.

In Case No. 80CRS7099, vacated and remanded for entry of judgment consistent with this opinion.

Judges CLARK and WHICHARD concur.

---

SUPERSCOPE, INC. AND MARANTZ PIANO COMPANY, INC. v. DENNIS KINCAID

No. 8125SC619

(Filed 6 April 1982)

**Mortgages and Deeds of Trust § 19.6— injunction to enjoin foreclosure proceeding —withholding payments on note due to breach of employment agreement—denial of injunctive relief improper**

  In an action in which plaintiffs alleged that defendant, who had sold his interest in a piano company to plaintiffs in exchange for a note and deed of trust in the amount of $2,979,042 and who was hired by plaintiff under a three-year employment contract as president of the piano company, had violated his employment contract and breached the fiduciary duties owed plaintiffs, the trial court erred in denying plaintiffs' motion for a preliminary injunction to enjoin foreclosure proceedings instituted by defendant until resolution of the action against defendant. Plaintiffs' evidence indicated a likelihood that they would be able to establish that they were entitled to withold payments on the note to defendant since defendant breached his employment agreement, and injunctive relief was necessary to protect plaintiffs' rights pending resolution of the original litigation.

APPEAL by plaintiffs from *Ferrell, Judge.* Order entered 27 February 1981 in Superior Court, BURKE County. Heard in the Court of Appeals 10 February 1982.

In its complaint plaintiff Superscope alleged that in July 1978, pursuant to a stock purchase agreement, it had purchased

all of the outstanding stock of Marantz Piano Company (formerly Grand Piano Company) from defendant and members of his family. Superscope gave defendant, as the shareholders' agent, a note and deed of trust in the amount of $2,979,042 for the balance due on the sales price of the stock. A security agreement gave defendant a security interest in all personal property of Marantz. Defendant was hired by Superscope under a three-year employment contract as President and Chief Operating Officer of Marantz.

Plaintiffs alleged that defendant had violated his employment contract and breached the fiduciary duties owed plaintiffs. They prayed for $62,000 in damages and asked that the total amount of damages be trebled for defendant's unfair trade practices.

In his answer defendant denied all material allegations in the complaint. In his counterclaim he alleged breach of the employment contract by Superscope, Superscope's failure to pay defendant for stock pursuant to the terms of the note, and abuse of process.

After plaintiffs had instituted this action against defendant, defendant began a foreclosure proceeding against Marantz, alleging default on the note and deed of trust. Plaintiffs moved for a temporary restraining order and preliminary injunction to enjoin the foreclosure proceeding on the grounds of immediate and irreparable harm. In support of their motion plaintiffs presented the affidavit and testimony at the hearing of Anthony Blazina, Vice-President of Superscope and Executive Vice-President of Marantz. Blazina described the details of defendant's misappropriation of funds, mismanagement of the company and other actions constituting breach of his employment contract and of his fiduciary duties. He stated that Marantz withheld payment on the note to defendant for damages caused by defendant and that Marantz had paid all the other shareholders their pro-rata share under the stock purchase agreement (except for defendant's brother, Joseph Kincaid, against whom an additional claim is pending).

Defendant submitted his affidavit in opposition to the motion in which he averred that plaintiffs were experiencing severe financial difficulties and that since the rate of interest (8%) on the note was well below the current rate, he had sustained substantial losses as a result of plaintiffs' failure to pay the indebtedness.

By order dated 27 February 1981, the court found there was no showing of irreparable injury and denied plaintiffs' motion for preliminary injunction. Plaintiffs appeal. Further action on the foreclosure proceeding has been stayed pending appeal.

*Grier, Parker, Poe, Thompson, Bernstein, Gage & Preston by William L. Rikard, Jr., and Elizabeth S. Love for plaintiff appellants.*

*Byrd, Byrd, Ervin, Blanton & Whisnant by John W. Ervin, Jr., for defendant appellee.*

CLARK, Judge.

The sole issue presented to us for review is whether the court erred in denying plaintiffs' motion for a preliminary injunction to enjoin the foreclosure proceedings pending resolution of the action against defendant.

The burden is on plaintiffs to establish their right to a preliminary injunction. In order to justify issuance of a preliminary injunction, plaintiffs must show a likelihood of success on the merits of their case and either that they are likely to sustain irreparable loss unless the injunction is issued or that issuance is necessary for the protection of plaintiff's rights during the course of litigation. *Pruitt v. Williams,* 288 N.C. 368, 218 S.E. 2d 348 (1975). Issuance of an injunction is a matter of discretion to be exercised by the trial court, after weighing the equities and the advantages and disadvantages to the parties. Its purpose is to preserve the *status quo* until trial can be had on the merits. *Huskins v. Hospital,* 238 N.C. 357, 78 S.E. 2d 116 (1953). On appeal from an order granting or denying a preliminary injunction, this Court is not bound by the findings of fact of the trial court, but may review and weigh the evidence and find the facts for itself. *Pruitt v. Williams, supra.*

We think that plaintiffs' evidence was sufficient to show the likelihood of success at trial on the merits. Their evidence tends to show the following: that defendant violated company policies concerning reimbursement for business-related travel, entertainment and car expenses; that he retained duplicate checks for his salary that he was mistakenly issued due to clerical error; that he breached his fiduciary duties owed to the company and breached

his employment contract by not withdrawing as shareholder of firms doing business with plaintiffs and by conducting business with these firms to the profit and advantage of the other firms. The company's profits and goodwill suffered due to his inattention to his managerial duties and responsibilities and by the lack of inventory controls in his operation of the company.

The deed of trust executed by plaintiff Marantz specifically incorporates by reference the terms of the stock purchase agreement. In the stock purchase agreement defendant promised to use his "best efforts" to preserve the business and goodwill of the company. The promissory note also specifically recites that it is subject to the terms of the stock purchase agreement:

"This Promissory Note is issued under and is subject to all of the terms and conditions of the Agreement [stock purchase agreement] and all documents executed and delivered in connection therewith, and is secured by a Security Agreement as described in Article 3.5 of the Agreement and delivered to Payee pursuant to said Agreement.

*The obligations of the undersigned to pay said installments shall be subject to the obligations of the parties as provided in the Agreement.*" (Emphasis added.)

The forecast of plaintiffs' evidence, therefore, indicates a likelihood that they will be able to establish that they were entitled to withhold payments on the note to defendant since defendant breached his employment agreement, his fiduciary duties and the stock purchase agreement.

Turning to the second element which must be proved by plaintiffs, we find that injunctive relief is necessary to protect plaintiffs' rights pending resolution of the original litigation. The note and security deed of trust, which defendant seeks to foreclose, were a part of the transaction involving the sale to plaintiffs of all the outstanding stock of Marantz Piano Company by defendant and others. The transaction included an employment contract in which defendant was hired as President and Chief Operating Officer of the piano manufacturing business. The defendant in his answer and counterclaim, filed 26 September 1980, alleged breach of the employment contract and default on the note secured by the deed of trust. Plaintiffs in their reply denied

the failure to pay defendant his pro-rata share which he claimed was due on the note. The defendant in January 1981 sought a foreclosure under the power of sale in the deed of trust as provided by Article 2A, Chapter 45, General Statutes of North Carolina. If not protected by issuance of a temporary injunction the plaintiffs would have to pay the sum claimed, though at issue in this litigation, to avoid foreclosure sale of the corporate property described in the deed of trust.

In *Investors, Inc. v. Berry*, 293 N.C. 688, 239 S.E. 2d 566 (1977), plaintiffs brought an action to have declared void a default judgment which established a laborer's and materialmen's lien on the property owned by plaintiffs. The trial court refused to grant to plaintiffs a preliminary injunction prohibiting sale of the lands under execution issued on that judgment. The Supreme Court ruled that the trial court erred in denying the preliminary injunction because plaintiffs had sufficiently shown the likelihood of success upon the trial of their case on its merits and that injunctive relief was necessary for the protection of the plaintiffs' property during the course of the litigation in order to avoid the creation of a cloud on title.

Where an injunction is sought to restrain the sale of property upon a deed of trust or other lien, and there is a serious controversy as to default or the amount due, the courts in North Carolina have generally continued the injunction to the final hearing. *See Realty Corp. v. Kalman*, 272 N.C. 201, 159 S.E. 2d 193 (1967); *Smith v. Bank*, 223 N.C. 249, 25 S.E. 2d 859 (1943); *Teeter v. Teeter*, 205 N.C. 438, 171 S.E. 620 (1933); *Wentz v. Land Co.*, 193 N.C. 32, 135 S.E. 480 (1927); *Sanders v. Insurance Co.*, 183 N.C. 66, 110 S.E. 597 (1922); 9 Strong's N.C. Index 3d *Mortgages and Deeds of Trust* § 19.5 (1977).

We concede that the case before us differs from the line of cases cited above in that plaintiffs' claim is unliquidated and based on breach of the management contract rather than the usual controversy over default or the amount paid on the debt, but it is clear in this case that the promissory note, deed of trust, security agreement, and employment agreement, were signed at the same time and related to the same subject matter. Under these circumstances these instruments must be construed together as part of the same transaction. The record on appeal

State v. Jarvis

reveals a bona fide controversy arising under this transaction, a controversy that should be resolved before there is a foreclosure sale of the corporate property which was the subject of the transaction. The order denying the preliminary injunction is

Reversed.

Judges ARNOLD and WHICHARD concur.

STATE OF NORTH CAROLINA v. ROLAND NORMAN JARVIS, JR.

No. 8126SC864

(Filed 6 April 1982)

1. **Criminal Law § 87— asking witness similar question—no prejudicial error**
   The trial court did not err in allowing the State to ask the prosecuting witness, who was thirteen at the time, whether she had heard a tape recording in the prosecutor's office after the witness had already testified that she had not heard the recording since making it.

2. **Criminal Law § 70—testimony and ruling concerning introduction of recording—proper**
   The trial court properly allowed a prosecuting witness in a trial for incest to testify as to a recording's accurate reproduction of events and the recorder's proper functioning. Further, the trial judge properly listened to the recording, allegedly made while the prosecuting witness's adoptive father made advances to her, prior to ruling on its admissibility.

3. **Criminal Law § 34.8— use of recording to show common plan or scheme—instructions proper**
   Where a recording concerning a sexual offense, other than the offense for which the defendant was charged, was played for the jury, the court properly instructed that the State was offering the evidence solely for the purpose of showing that there existed in defendant's mind a common scheme, plan or design to commit the crime for which he was charged.

APPEAL by defendant from *Johnson, Judge.* Judgment entered 7 April 1981, in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 1 February 1982.

Defendant was charged by two indictments, proper in form, with the crimes of incest and second degree rape. At trial, the State's evidence tended to show that, on 25 August 1980, defend-

ant, the adoptive father of the prosecuting twelve-year old witness, forced his daughter to engage in vaginal intercourse. This was not the first time defendant had engaged in sex with the young girl. As early as June 1979, he had begun to fondle her and, in July 1979, had first had intercourse with her. From July 1979 to August 1980, defendant had intercourse with her two or three times a week.

The defendant's evidence tended to show that the prosecuting witness had complained to her mother about the defendant's advances and that the girl's mother and the defendant had taken the girl to a gynecologist for a physical examination. Dr. William Toler, the examining physician, testified that he examined the prosecuting witness in August 1980, and that his examination showed that the girl's hymenal ring was intact. In Dr. Toler's opinion, the child could not have had vaginal intercourse with a normal adult male twenty to forty times without rupturing the hymenal ring. Defendant's evidence further tended to show that his reputation in the community was good.

The State presented rebuttal evidence tending to show that defendant's reputation and character within the community was not good. To rebut Dr. Toler's testimony, Dr. Katherine Johnson, an expert in the field of obstetrics and gynecology, testified that she had examined the prosecuting witness, that the girl's hymenal ring was intact, and that, despite this, in her opinion, the girl could have had vaginal intercourse at least 20 times, depending on the elasticity of the ring.

The jury returned verdicts of guilty to both charges. The trial court sentenced defendant to consecutive prison terms and recommended that defendant be given psychological and physical examinations and any aversion therapy beneficial to the defendant. From this judgment, defendant appealed.

*Attorney General Edmisten, by Special Deputy Attorney General Lester V. Chalmers, Jr., for the State.*

*Levine, Goodman & Carr, by Michael P. Carr, for defendant-appellant.*

MORRIS, Chief Judge.

Prior to defendant's trial, defense counsel filed a motion to suppress a tape recording allegedly made by the prosecuting witness while defendant was forcing her to have sexual intercourse with him. The record shows that, in a pretrial hearing, the trial court, Judge Allen presiding, held an extensive *voir dire* hearing to determine admissibility of the recording. At the end of the hearing, the court entered an order allowing the State to admit the recording into evidence and at trial the recording was, in fact, admitted.

[1] In this appeal, six of the seven questions defendant raises are concerned with alleged errors occurring during the *voir dire* hearing, in the court's order, or with the manner in which the recording was presented to the jury. The first argument is that, during the *voir dire*, the court erred in allowing the State to ask the prosecuting witness whether she had heard the tape recording in the prosecutor's office after the witness had already testified that she had not heard the recording since making it. We find nothing wrong with the trial court's allowing this question. It is apparent from the record that the prosecuting witness, who was thirteen years of age at the time of trial, had forgotten that she had listened to the recording in the prosecutor's office. The prosecutor's question simply rephrased his earlier question calling the witness' attention to the circumstances under which she had heard the recording. We find no prejudicial error which, if corrected, might have led to a different result in the hearing and, therefore, in the trial. G.S. 15A-1443(a).

By his next three assignments of error, defendant contends that the court erred (1) in allowing the prosecuting witness to testify that the recording accurately reproduced everything that happened, (2) in allowing her to testify that the recorder was capable of recording when she made the tape, and (3) by listening to the recording prior to ruling on its admissibility. Further, by his fifth assignment of error, defendant contends that the court erred in admitting the recording because it was not properly authenticated. Although we can find no case squarely on point with the case at bar, we have determined that there is no merit in defendant's argument.

In *State v. Godwin,* 267 N.C. 216, 147 S.E. 2d 890 (1966), the Supreme Court held that tape recordings of telephone conversations between the defendant and the prosecuting witness were properly authenticated and, therefore, admissible into evidence where the prosecuting witness identified the voices and testified that the recordings were a fair and accurate representation of the conversations she had had with the defendant. In a later case, *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971), the Supreme Court enumerated the steps necessary to lay a proper foundation for the admission of a defendant's recorded confession or incriminating statement made to law enforcement officers. Upon objection to the introduction of the recording, the court must conduct a *voir dire* to determine to its satisfaction (1) that the recorded testimony was legally obtained and otherwise competent; (2) that the mechanical device was capable of recording and that it was functioning properly at the time of the recording; (3) that the operator was competent and operated the machine properly; (4) that the recorded voices can be identified; (5) that the recording is accurate and authentic; (6) that the defendant's entire statement was recorded and no changes, additions or deletions, have since been made; and (7) that there was a proper custody and manner of preserving the recording since it was made.

The steps for authentication set forth in *Lynch* have been applied also for authenticating recorded statements made between a defendant and one who later becomes a witness for the State. *See State v. Detter,* 298 N.C. 604, 260 S.E. 2d 567 (1979). The Court in *Detter* stated:

> Whenever a recorded statement is introduced into evidence the seven steps set forth in Lynch should be followed to insure proper authentication of that recording. 29 Am. Jur. 2d Evidence § 436 (1967); Annot., 58 A.L.R. 2d 1024, § 4 (1958) and cases cited therein. It is apparent, from a close reading of both Godwin and Lynch, that the seven steps enumerated in Lynch are but a further breakdown and more precise statement of the requirements for authentication that are subsumed within the second requirement in Godwin that the recording be a "fair and accurate representation of the conversations." *State v. Godwin,* supra at 218, 147 S.E. 2d at 891.

*Id.* at 628, 260 S.E. 2d at 584. We believe that the requirements for admitting into evidence tape recordings made by witnesses

after police intervention, should strictly apply to cases such as the present one where tape recordings are made by victims of an alleged crime before the police have intervened. With these requirements before us, we now review defendant's four assignments of error.

[2] Defendant's argument that the trial court should not have allowed the prosecuting witness to testify as to the recording's accurate reproduction of events and the recorder's proper functioning is patently absurd. Under the *Lynch* requirements, the trial court had to determine that the recording was accurate and that the mechanical device was capable of recording. The only person capable of producing evidence on these issues was the prosecuting witness. Furthermore, we reject defendant's argument that the trial judge should not have listened to the recording prior to ruling on its admissibility. In the *Lynch* case, the Supreme Court stated that, upon an objection to the introduction of a recorded statement, the trial judge should not only hold a *voir dire*, but should also listen to the recording in the absence of the jury. " 'In this way he can decide whether it is sufficiently audible, intelligible, not obviously fragmented, and, also of considerable importance, whether it contains any improper and prejudicial matter which ought to be deleted.' " *State v. Lynch*, supra at 17, 181 S.E. 2d at 571, quoting *State v. Driver*, 38 N.J. 255, 288, 183 A. 2d 655, 672.

Similarly, after carefully reviewing the record in this case, we reject defendant's claim that the trial court's order admitting the recording into evidence was erroneous within the *Lynch* holding. The order about which defendant complains contained sufficient findings of fact supported by competent evidence that would allow the court to conclude, as it did *seriatim*, that the seven requirements of *Lynch* were met.

[3] Defendant's final argument concerning the tape recording is that the court erroneously instructed the jury about the purpose for which the tape recording was admitted. The record shows that the recording was made on a day other than 25 August 1980, the date of the offense for which the defendant was charged. We, therefore, find no merit in defendant's argument that the trial court erred when it instructed the jury that the State was offering the evidence solely for the purpose of showing that there ex-

State v. Ellers

isted in defendant's mind a common scheme, plan or design to commit the crimes for which he was charged.

By his seventh assignment of error, defendant contends that the court erred in admitting into evidence a driver's travel log sheet which allegedly showed where the defendant, a truck driver, was on 24 and 25 August 1980. The basis of defendant's contention is that the prosecutor, who received the sheet two days before trial, failed to comply with a discovery request filed by the defendant. Defendant, however, has failed to include in the record on appeal a copy of his request for discovery or a copy of an order pertaining to discovery. We cannot, therefore, determine whether the State complied with the order or with defendant's request. Nevertheless, in reviewing the record, we find that defendant was given a recess in order to review the log sheet with defendant. This remedy is permissible under G.S. 15A-910(2), and we find, in view of the evidentiary value of the log sheet, that a recess was the appropriate and proper remedy.

In defendant's trial, we find

No error.

Judges VAUGHN and MARTIN (Harry C.) concur.

---

STATE OF NORTH CAROLINA v. JOSEPH DALE ELLERS

No. 815SC925

(Filed 6 April 1982)

1. **Criminal Law § 90.1— showing facts to be other than as testified by witness**
    Where the prosecuting witness testified that he purchased a marijuana cigarette from defendant on the Thursday after Halloween, the State was not precluded from showing, through the testimony of other witnesses, that the purchase was actually made on the Thursday before Halloween.

2. **Indictment and Warrant § 17.2; Narcotics § 2— sale of marijuana—variance in date not fatal**
    There was no fatal variance between an indictment charging the sale of marijuana on 30 October and testimony by the prosecuting witness that the sale occurred on 5 November where the testimony of other witnesses tended to show that the sale occurred on 30 October; time was not of the essence in

the offense charged and no statute of limitations was involved; and defendant presented alibi evidence as to the October date.

**3. Narcotics § 4.5— instructions on sale of marijuana**

The trial court's instructions, when considered in their entirety, placed the burden of proof on the State to prove beyond a reasonable doubt that defendant sold the controlled substance marijuana. G.S. 90-87(7).

**4. Narcotics § 5— sale of marijuana to person under 16 years old—increased punishment provisions inapplicable**

A defendant over 18 years of age who was convicted of "selling" marijuana to a minor under 16 years of age was not subject to the increased punishment of G.S. 90-95(e)(5) since that statute applies only to a person convicted of "delivering" a controlled substance to a person 16 years of age or under.

APPEAL by defendant from *Strickland, Judge.* Judgment entered 2 April 1981 in Superior Court, NEW HANOVER County. Heard in the Court of Appeals 9 February 1982.

Defendant was indicted for selling and delivering marijuana to Billy C. Haskins, aged 12 years, on 30 October 1980, defendant being over the age of 18 years at the time, in violation of G.S. 90-95(a)(1) and (e)(5). The jury returned a verdict of guilty of selling marijuana to a minor under 16 years of age, and defendant was sentenced for a minimum term of 17 years and a maximum term of 20 years imprisonment. Defendant appeals.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General David S. Crump, for the State.*

*Auley M. Crouch, III, for defendant-appellant.*

WELLS, Judge.

Billy Haskins, aged 12, testified at trial that he first purchased a marijuana cigarette from defendant on the morning of 30 October 1980. Defendant was sitting in a van across the street from the school bus stop at the time. Haskins put the cigarette in his pocket and went to school. The next day he flushed it down the toilet because it had gotten crumpled up in his pocket. On the following Thursday, possibly the 5th of November, Haskins purchased two more marijuana cigarettes from defendant at the same bus stop. He smoked part of one, did not like it, and flushed the other down the toilet. The next day he gave the partially smoked cigarette to a friend, Bryan Godwin, at school.

Following Haskins' testimony, defendant filed a motion *in limine* to suppress the testimony of other State's witnesses which might tend to impeach Haskins as to the date of his alleged purchase of the marijuana cigarette. Defendant's motion was denied. Thereafter Bryan Godwin testified that he received a partially smoked marijuana cigarette from Haskins on Friday, 31 October. David Taylor testified that he was with Haskins on 30 October when Haskins purchased a marijuana cigarette from defendant at the bus stop. Clifton Long, the principal of the school attended by Haskins and Godwin, testified that at school on 31 October 1980, he took a large, partially smoked marijuana cigarette from Bryan Godwin and subsequently turned it over to the police, who determined that it contained marijuana.

At the close of the State's evidence, defendant renewed his motion *in limine*, which was again denied. Defendant then presented evidence tending to show that he was not at the bus stop on 30 October, did not purchase or possess the van described by Haskins until 2 November, and never sold Haskins any marijuana.

[1] Defendant's first assignment of error is to the denial of his motion *in limine*. He contends that the testimony of Godwin, Taylor, Long, and Officers Benjamin and Norvell directly contradicted Haskins' testimony regarding the date of the alleged sale of the marijuana cigarette, and that the evidence should have been excluded under the rule that a party may not impeach its own witness in a criminal case, and evidence which is new or contradictory is not admissible for purposes of corroboration unless there is only a slight discrepancy in minor details between testimony of the prosecuting witness and testimony offered in corroboration. *State v. Moore,* 300 N.C. 694, 268 S.E. 2d 196 (1980); *State v. Tinsley,* 283 N.C. 564, 196 S.E. 2d 746 (1973).

The rule that a party may not impeach its own witness does not preclude a defendant or the State from showing a different state of facts on a point through the testimony of other witnesses. "A party may prove that the fact is not as it is stated to be by one of his witnesses; for that is merely shewing (sic) a mistake, to which the best of men are liable." *State v. Tilley,* 239 N.C. 245, 252, 79 S.E. 2d 473, 478 (1953). Haskins testified that he purchased the marijuana cigarette from defendant on the Thursday after

Halloween. The State was not precluded from showing, through the testimony of other witnesses, that the purchase was actually made on the Thursday before Halloween. *Tilley,* supra. This assignment of error is overruled.

[2] Defendant's second assignment of error is premised on his first. He argues that because the testimony of Billy Haskins was the only competent and admissible evidence for the State, and because that testimony tended to show that the sale took place on 5 November, rather than 30 October 1980 as stated in the indictment, there was a material and fatal variance between the indictment and the evidence which deprived defendant of an opportunity to adequately present his defense. We do not find that the variance between the date of the sale alleged in the indictment and the proof is of such magnitude as to require reversal of defendant's conviction. G.S. 15-155; G.S. 15A-924(a)(4). Time was not of the essence in the offense charged, and no statute of limitations was involved. *See State v. Currie,* 47 N.C. App. 446, 267 S.E. 2d 390 (1980); *cert. denied,* 301 N.C. 237, 283 S.E. 2d 134 (1980). After the State presented its entire case, defendant presented alibi evidence as to 31 October, and denied ever selling marijuana to Haskins. Defendant was neither prejudiced nor deprived of his right to present a defense, *see State v. Oden,* 44 N.C. App. 61, 259 S.E. 2d 795 (1979), *ap. dismissed,* 299 N.C. 333, 265 S.E. 2d 401 (1980); *State v. Locklear,* 33 N.C. App. 647, 236 S.E. 2d 376 (1977), *disc. rev. denied,* 293 N.C. 363, 237 S.E. 2d 851 (1977), and this assignment is overruled.

Defendant next assigns error to the trial court's instructions to the jury. Defendant first contends that the court erroneously failed to point out the discrepancy between the State's evidence and the indictment with regard to the date of the alleged offense. Defendant failed to call this alleged misstatement of the evidence to the court's attention before the jury retired, however, and thus waived his right to assert this as grounds for a new trial. *See State v. Hammonds,* 301 N.C. 713, 272 S.E. 2d 856 (1981); App. R. 10(b).

[3] Defendant also contends that the court failed to charge on the element of delivery as it was required to do in view of defendant's indictment for the sale *and* delivery of marijuana. The trial court charged the jury that to find defendant guilty the State

must prove beyond a reasonable doubt that defendant knowingly sold marijuana, a controlled substance, to Billy Haskins, that defendant had reached his 18th birthday at the time and that Haskins had not reached his 16th birthday. The court further charged that, "[t]he transfer of a cigarette of marijuana for the receipt of one dollar would be a sale of a controlled substance." These instructions, when considered in their entirety, *State v. Alston*, 294 N.C. 577, 243 S.E. 2d 354 (1978) placed the burden of proof on the State to prove beyond a reasonable doubt that defendant sold a controlled substance. G.S. 90-87(7); *State v. Dietz*, 289 N.C. 488, 223 S.E. 2d 357 (1976). This assignment of error is overruled.

[4] Defendant's final assignment of error concerns his sentence. Defendant was sentenced to 17 to 20 years imprisonment pursuant to G.S. 90-95(e)(5). That statute provides that the punishment for a violation of G.S. 90-95(a)(1), which is normally a maximum of 10 years in prison or a fine of $10,000 or both, may be increased to a minimum of five years and a maximum of 30 years imprisonment if the person who violates G.S. 90-95(a)(1) is 18 years of age or over and does so by *delivering* a controlled substance to a person 16 years of age or under. The statute makes no provision for increased punishment for one over 18 years of age who is convicted of *selling* marijuana to a minor under 16 years of age, as defendant was. Sale and delivery of controlled substances are two separate, distinct offenses. G.S. 90-95(a)(1); *State v. Dietz*, supra. Defendant in this case was charged with both offenses. *Dietz*, supra. He was convicted only of selling marijuana. The omission of the offense of *sale* of a controlled substance from the provisions of G.S. 90-95(e)(5) is unaccountable. Criminal statutes must be strictly construed, however, *State v. Lucas*, 302 N.C. 342, 275 S.E. 2d 433 (1981) and therefore, while the result here is regrettable, the judgment must be vacated and the case remanded for resentencing.

No error in the trial;

Vacated and remanded for resentencing.

Judges MARTIN (Robert M.) and WEBB concur.

BILL HOLCOMB, ADMINISTRATOR OF THE ESTATE OF IDA S. HEMRIC, DECEASED v.
  HAZEL HEMRIC; CHARLES HEMRIC AND WIFE, MINNIE HEMRIC;
  KATHLEEN H. WAGONER AND HUSBAND, WILMOTH GRAY WAGONER;
  JUDY ANN H. GROCE AND HUSBAND, ALVIS GRAY GROCE

No. 8123SC654

(Filed 6 April 1982)

1. **Executors and Administrators § 19— services rendered decedent—award by arbitrators—setting aside for fraud and collusion—counterclaim to petition to sell realty**

    An award of arbitrators for personal services rendered to decedent could
    be set aside upon a showing of fraud or collusion, and respondent heirs could
    properly raise the issue of the validity of the award by a counterclaim to a
    petition by the administrator to sell realty to make assets to pay debts of the
    estate. Furthermore, an issue of fact as to the propriety of the arbitrators'
    award was raised by the pleadings and should have been decided by a superior
    court judge rather than by the clerk.

2. **Rules of Civil Procedure § 33— interrogatories to arbitrators**

    Interrogatories were improperly served on arbitrators who were not par-
    ties to the action. G.S. 1A-1, Rule 33.

APPEAL by respondents from *Lamm, Judge.* Order signed 23
April 1981 in Superior Court, YADKIN County. Heard in the Court
of Appeals 2 March 1982.

Prior to her death in 1978, Ida S. Hemric was completely
bedridden and required constant and intensive care. Claimants,
Hazel Hemric and Jerry Reece, provided that care for the three
years preceding her death. By agreement between the ad-
ministrator of the estate and the claimants, the question of the
debt of the estate, if any, for the personal services rendered to
the deceased was referred to arbitration. The arbitrators decided
in favor of the claimants, awarding $49,253.00 to Hazel Hemric
and $41,850.90 to Jerry Reece.

Bill Holcomb, the administrator, determined that the estate
had insufficient personal property with which to pay the debts
and costs of the administration of the estate. Pursuant to article
17 of chapter 28A and article 29A of chapter 1 of the General
Statutes of North Carolina, he petitioned the court to authorize
the sale of the estate's real property.

The decedent died intestate, leaving surviving her a
daughter (the claimant Hazel Hemric) and the lineal descendants
of her deceased son, to-wit: Charles Hemric, Kathleen Wagoner,
and Judy Groce. In response to the administrator's petition, the

lineal descendants filed an answer and counterclaim alleging fraud and collusion by and between the administrator, the claimants, and the arbitrators, and asking that the awards be set aside and that a hearing be conducted to determine the validity of any claims against the estate.

The administrator and the claimant Hazel Hemric filed replies to the counterclaim and moved to dismiss the counterclaim. Thereafter, interrogatories to petitioner were served on the administrator, the claimants, and the arbitrators. Hazel Hemric objected to the interrogatories on the ground that she was a named respondent. The arbitrators objected under Rule 33 of the North Carolina Rules of Civil Procedure because they were not parties to the proceeding.

The Clerk of Superior Court of Yadkin County, at a hearing held 19 December 1980, determined that respondents had failed to offer any evidence of fraud or collusion; that the petition to sell the real estate should be granted; that respondents' counterclaim should be dismissed; and that their motion to compel answers to interrogatories should be denied.

The matter was brought before Judge Lamm, who affirmed the order of the clerk as follows:

This Court, after having considered the pleadings herein, the Order entered by The Honorable Harold J. Long, and having heard argument of counsel for both the Petitioner and Respondents, is of the opinion that the Respondents are procedurally in error in filing an Answer and Counterclaim to the Petition for Sale of Realty and that the Order entered by The Honorable Harold J. Long should be affirmed in its entirety. The Court allows the Respondents thirty (30) days from April 22, 1981 to institute a new action.

Claimants, Hazel Hemric and Jerry Reece, appeal that portion of the judge's order allowing respondents thirty days to institute a new action.

Charles and Minnie Hemric, Kathleen and Wilmoth Wagoner, and Judy and Alvis Groce (hereinafter referred to as respondents) appeal the dismissal of their counterclaim and the denial of their motion to compel answers to interrogatories.

*Everett & Everett, by James A. Everett and Lucy C. Everett, for claimant appellants.*

*Franklin Smith for respondent appellants.*

MARTIN (Harry C.), Judge.

We begin our analysis of this case with a statement of the applicable law as found in the pertinent statutes and cases construing them.

N.C.G.S. 28A-19-15 provides the mechanism by which a disputed claim against a decedent's estate may be referred. The finding of the arbitrators under this section is equivalent to a judgment, but "may be impeached in any proceeding against the personal representative" for fraud or collusion. *See In re Estate of Reynolds,* 221 N.C. 449, 20 S.E. 2d 348 (1942); *Lassiter v. Upchurch,* 107 N.C. 411, 12 S.E. 63 (1890).

Under N.C.G.S. 28A-17-1, the personal representative may "apply to the clerk of superior court of the county where the decedent's real property . . . is situated, by petition, to sell such real property for the payment of debts and other claims against the decedent's estate." Although the proceeding to sell land under this section is a special proceeding before the clerk, if equities are involved over which the superior court acquires jurisdiction, it will determine the whole matter. *See Baker v. Carter,* 127 N.C. 92, 37 S.E. 81 (1900). *See also Wadford v. Davis,* 192 N.C. 484, 135 S.E. 353 (1926) (if pleadings raise an issue of fact, it can be tried by a jury); *McNair v. Cooper,* 174 N.C. 566, 94 S.E. 98 (1917) (upon ample evidence in the record, issue of fraud was submitted to the jury). Moreover, although the heirs are concluded by a judgment previously obtained for the debt and may not plead any defense which could have been, but was not, pleaded by the representative, this rule does not apply where fraud or collusion can be shown. *See Person v. Montgomery,* 120 N.C. 111, 26 S.E. 645 (1897); *Tilley v. Bivins,* 112 N.C. 348, 16 S.E. 759 (1893).

*Person* involved a proceeding to sell and pay the debts and costs of administration. The defendants denied that it was necessary to sell the lands, alleging that the personal estate was sufficient to pay the debts if properly and faithfully administered. The Court held that

Holcomb v. Hemric

[t]he heirs must be made parties to a proceeding to sell land for assets, and where they deny that it is necessary to sell, or allege that there are sufficient personal assets if properly administered, or that the debts upon which it is asked that the land be sold are not due by the estate, the Court will not order a sale until these questions are determined. . . .

. . . And if fraud and collusion can be shown between the administrator and the creditor, it may be pleaded where there has been judgment.

120 N.C. at 113, 26 S.E. at 646.

[1] Based on the foregoing, we first conclude that the award of the arbitrators in the case sub judice may be set aside upon a showing of fraud or collusion. Respondents properly raised the issue of the validity of the award by counterclaim under N.C.G.S. 28A-17-1. The heirs should be given the opportunity to resist and prevent the land from being applied to the payment of a debt which they allege was wrongfully obtained. Finally, the pleadings raised an issue of fact — the propriety of the arbitrators' award — and the matter was not one properly before the clerk for determination.

Thus, the trial court erred in both affirming the clerk's order and in concluding that "respondents are procedurally in error in filing an Answer and Counterclaim to the Petition for Sale of Realty."

Because we hold that respondents are entitled to be heard before a superior court judge on the issues raised in their counterclaim, we must address their second assignment of error relating to interrogatories submitted to the petitioner, the claimants, and the arbitrators.

[2] N.C.R. Civ. P. 33 states that "[a]ny party may serve upon any other party written interrogatories to be answered by the party served. . . ." Thus interrogatories were improperly served on the arbitrators. They are not parties to this action. We also note that the trial court acts within its discretion in making and refusing discovery orders. *Travel Agency v. Dunn*, 20 N.C. App. 706, 202 S.E. 2d 812, *cert. denied*, 285 N.C. 237 (1974).

Reversed.

Judges MARTIN (Robert M.) and WHICHARD concur.

---

STATE OF NORTH CAROLINA v. FRANK E. POLLOCK, JR.

No. 813SC1037

(Filed 6 April 1982)

1. **Criminal Law § 91.6— denial of continuance—no violation of right to confrontation**

   Defendant's constitutional right of confrontation was not violated by the denial of his motion for continuance made on the ground that he was not informed until five days before trial that the State intended to use against defendant the testimony of an alleged co-participant in the crimes charged where defendant made no showing that five days was an unreasonably short time to prepare for the adverse testimony or that additional time would have enabled him to secure specific material evidence with which to counteract the adverse testimony.

2. **Criminal Law § 117.3— witness not testifying under grant of immunity—special "scrutiny" instructions not required**

   A witness was not testifying under a "grant of immunity" within the meaning of G.S. 15A-1052(c) where he testified pursuant to an agreement with the State that five of six charges against him would be dropped. Therefore, the trial court was not required to give special instructions concerning the witness's testimony absent a special request by the defendant.

3. **Embezzlement § 5— possession of embezzled property—proof of ownership and embezzlement**

   In a prosecution for possession of embezzled meat and conspiracy to possess embezzled meat, the State's evidence was sufficient to show that the meat defendant was charged with possessing was owned by the Craven County Hospital Corporation as charged in the indictment where a witness testified that he had meat in his truck consigned to the hospital, that he took it to defendant's supermarket, and that he put meat which "belonged" to the hospital in the freezer at defendant's supermarket. Furthermore, the State's evidence was sufficient to show that the meat was embezzled where it tended to show that hospital employees were authorized to receive deliveries of meat purchased by the hospital and to sign invoices therefor, that those employees received such meat and signed such invoices, and that the employees diverted certain hospital meat to others for delivery to a supermarket owned by defendant.

APPEAL by defendant from *Small, Judge.* Judgment entered 2 May 1981 in Superior Court, CRAVEN County. Heard in the Court of Appeals 3 March 1982.

Defendant was charged in proper bills of indictment with possession of embezzled property and conspiracy to possess embezzled property. A jury found defendant guilty as charged, and from a judgment imposing a prison sentence of not more than four nor less than zero years, defendant appeals.

*Attorney General Rufus L. Edmisten, by Associate Attorney William H. Borden, for the State.*

*Donald D. Pollock, for defendant appellant.*

HEDRICK, Judge.

[1] The first assignment of error brought forth in defendant's brief is "[t]he Court's denial of defendant's Motion to Continue." Defendant argues that he was not informed until five days before trial that the State intended to use against defendant the testimony of an alleged co-participant in a scheme to illegally divert quantities of meat belonging to a hospital, and that the denial of his motion for continuance denied him his constitutional rights to the "production of witnesses, effective assistance of counsel, his right to cross examine State's witnesses and his right to confront his accusers."

> Since defendant's motion for continuance is based on a right guaranteed by the Federal and State Constitutions, the decision of the trial judge is reviewable as a question of law. Thus, the question to be answered is: Did the refusal of the trial court to grant the [defendant's] motion for a continuance impinge upon his constitutional right of confrontation, in that it denied him a reasonable time within which to prepare and present his defense?

*State v. Abernathy,* 295 N.C. 147, 159, 244 S.E. 2d 373, 381 (1978). "Continuances should not be granted unless the reasons therefor are fully established," *State v. Rigsbee,* 285 N.C. 708, 711, 208 S.E. 2d 656, 658-59 (1974), and it is desirable that a motion for continuance be supported by an affidavit showing the grounds for continuance. *State v. Rigsbee, supra.* A continuance is proper if

there is a belief that *material* evidence will come to light and such belief is reasonably grounded on known facts, but a mere intangible hope that something helpful to a litigant may possibly turn up affords no sufficient basis for delaying a trial. *State v. Tolley*, 290 N.C. 349, 226 S.E. 2d 353 (1976).

In the present case, defendant had five days in which to prepare a trial strategy for confronting the testimony of the alleged co-participant. Defendant has made no showing that five days was an unreasonably short time to prepare for the adverse testimony. He has not provided an affidavit nor otherwise demonstrated that the additional time afforded by a continuance would have enabled him to secure specific material evidence with which to counteract the adverse testimony. The denial of the motion for continuance did not impinge upon defendant's constitutional rights of confrontation, and this assignment of error is overruled.

[2] By his next assignment of error, defendant argues that the trial court erred in failing to inform the jury prior to the testimony of the alleged co-participant, Charles Koonce, that Koonce was testifying pursuant to an agreement with the State by which five of six charges against him would be dropped; defendant argues also that the trial court erred in not instructing the jury, in its final charge, on interested witnesses. It is defendant's contention that the agreement between Koonce and the State constituted a "grant of immunity" requiring, under G.S. § 15A-1052(c), the court to provide special information and instructions to the jury.

G.S. § 15A-1052(c) provides:

> In a jury trial the judge must inform the jury of the grant of immunity and the order to testify prior to the testimony of the witness under the grant of immunity. During the charge to the jury, the judge must instruct the jury as in the case of interested witnesses.

The statutory "scrutiny" instruction is required, absent a special request by the defendant, only when a witness testifies under immunity. *State v. Bagby*, 48 N.C. App. 222, 268 S.E. 2d 233 (1980). "[S]uch an instruction is not mandated under an arrangement short of 'immunity' (such as charge reduction . . .)" unless the

defendant makes a special request therefor. *State v. Bagby, supra* at 224, 268 S.E. 2d at 234. In the present case, defendant made no special request for a "scrutiny" instruction, and Charles Koonce received no grant of immunity but merely had some of the charges against him dismissed. Hence, G.S. § 15A-1052(c) did not apply and the court was not otherwise required to issue special instructions concerning Koonce's testimony. This assignment of error is without merit.

[3]   Finally, defendant assigns error to the court's failure to dismiss the charges against him at the close of all the evidence. Defendant argues that there was a fatal variance between the allegations contained in the bills of indictment and the proof offered by the State, in that the State failed to offer proof that the meat defendant was charged with possessing was owned, as charged in the bills of indictment, by the Craven County Hospital Corporation. Defendant contends the State's evidence tended to show only that the meat was owned by another entity. Alternatively, defendant argues that the State presented no evidence that the meat was embezzled, as required by the indictments, but only that the meat was stolen.

"[T]he evidence in a criminal case must correspond with the allegations of the indictment which are essential and material to charge the offense." *State v. McDowell,* 1 N.C. App. 361, 365, 161 S.E. 2d 769, 771 (1968). The purpose of the rule as to variance between indictment and proof is to avoid surprise, in that a discrepancy must not be used to ensnare a defendant or to deprive him of an opportunity to present his defense. *State v. Guffey,* 39 N.C. App. 359, 250 S.E. 2d 96 (1979). A motion to dismiss for insufficiency of the evidence requires the trial court to consider the evidence in the light most favorable to the State, to take it as true, and to give the State the benefit of every reasonable inference to be drawn therefrom; if there is evidence from which a jury could find that the offense charged had been committed by the defendant, the motion must be overruled. *State v. Fletcher,* 301 N.C. 515, 271 S.E. 2d 913 (1980).

In the present case, Charles Koonce testified about diversions he made of "hospital meat." One excerpt of that testimony is as follows:

I was at the hospital on that date to make a delivery. I did have meat on my truck consigned to the hospital on that occasion. . . . The merchandise that remained on the truck that I delivered somewhere else was supposed to have went [sic] to the hospital.

Q. And where did you take it?

. . .

A. I carried it to Frank Pollock's Supermarket.

. . .

Q. Describe what you did with it when you arrived there.

. . .

A. I backed up to the back door and put the merchandise that *belonged* to the hospital in the freezer and I told them, you know, what I did and, you know, they paid me off at that time. [Emphasis added.]

This testimony alone is sufficient evidence that the Craven County Hospital Corporation owned the meat which defendant was charged with possessing; hence there was no variance between proof and allegations as to who owned the meat.

To present proof conforming to the "embezzled" property allegation in the indictment, the State needed to present evidence that an agent of the hospital, by the terms of his employment, was to receive hospital-owned meat with which defendant was charged with possessing, and that the agent received such meat in the course of his employment and, knowing that it was not his own, converted it to his own use or fraudulently misapplied it. *See State v. Seay,* 44 N.C. App. 301, 260 S.E. 2d 786 (1979), *disc. rev. denied and appeal dismissed,* 299 N.C. 333, 265 S.E. 2d 401, *cert. denied,* 449 U.S. 826, 66 L.Ed. 2d 29, 101 S.Ct. 89 (1980). The State presented evidence tending to show that such hospital employees as Tony Marshall, Morris Simmons, and Thomas Barry were employed to receive deliveries of meat purchased by the hospital and sign invoices therefor, that those employees received such meat and signed such invoices and ordered that certain hospital meat be diverted to Charles Koonce and others to a

supermarket owned by defendant and that such diversion did occur. Although, as defendant contends, this evidence may show that the meat was "stolen" by Charles Koonce, this evidence also suffices to conform the State's proof to the allegation that the meat which defendant was charged with possessing was embezzled, in that the evidence tends to show a misappropriation of hospital meat by hospital employees. This assignment of error, therefore, has no merit.

We hold defendant had a fair trial free of prejudicial error.

No error.

Chief Judge MORRIS and Judge VAUGHN concur.

---

ANNIE MAE HARRELL, EMPLOYEE, PLAINTIFF v. HARRIET AND HENDERSON YARNS, EMPLOYER AND LIBERTY MUTUAL INSURANCE COMPANY, CARRIER, DEFENDANTS

No. 8110IC712

(Filed 6 April 1982)

1. **Master and Servant §§ 55.1, 68— workers' compensation—injury from occupational disease—no award for injury to important organ**

   Where the Industrial Commission found that plaintiff suffered from "obstructive lung disease" but that her disability was independently caused by non-occupational pulmonary fibrosis, the Commission erred in making an award to plaintiff for "permanent injury to [an] important . . . organ" under G.S. 97-31(24), since that statute applies only to injury by accident and not to an injury caused by an occupational disease.

2. **Master and Servant § 68— workers' compensation—insufficient evidence of disability from occupational disease**

   The evidence required the denial of benefits based on disability from an occupational disease under G.S. 97-52 where there was medical evidence that some portion of plaintiff's total lung impairment might be attributable to cotton dust but that plaintiff's lung impairment was caused primarily by non-occupational pulmonary fibrosis; there was insufficient evidence from which the obstructive component of plaintiff's overall condition could be allocated between occupational and non-occupational causes; and there was no evidence that plaintiff would have suffered less than total impairment of earning capacity (i.e. disability) as a result of her non-occupational lung disease alone.

APPEAL by plaintiff and cross-appeal by defendant from the N.C. Industrial Commission. Opinion and award entered 27 May 1980 and affirmed by the Full Commission 23 February 1981. Heard in the Court of Appeals 9 March 1982.

This action arose when plaintiff sought Workers' Compensation benefits for her chronic lung disease which, she alleged, was an occupational disease compensable under G.S. 97-52. Plaintiff's evidence showed that she had worked for many years in cotton mills, having last worked for defendant Harriet and Henderson Yarns in 1967. Her reason for leaving was unrelated to her health. Plaintiff testified to occurrence of "cold symptoms" prior to leaving defendant's employ, but there was no evidence that she suffered disability or severe breathing problems until several years later.

Medical evidence presented at the hearing clearly showed that plaintiff suffers from chronic lung disease which renders her incapable of physical exertion. She is a middle-aged woman with an eighth grade education and no work experience except as a cotton mill laborer. Plaintiff's incapacity to work at her previous occupation is thus established and there is no evidence of her ability to perform any other work.

Medical evidence overwhelmingly attributed plaintiff's lung impairment primarily to non-occupational "restrictive lung disease." There was some evidence, however, that plaintiff also suffered from "obstructive lung disease" which one doctor thought "could have been contributed to by her cotton dust exposure."

Based on this evidence, the Commission found that plaintiff suffered from an occupational disease, but that her disability was independently caused by non-occupational pulmonary fibrosis. The Commission therefore refused to award disability benefits to plaintiff under G.S. 97-52.

Having concluded, however, that plaintiff suffered from one of the occupational diseases set forth in G.S. 97-53, the Commission held that she was entitled to compensation under G.S. 97-31(24) for "partial loss of lung function."

The Commission awarded plaintiff $4,000 for "permanent injury to [an] important . . . organ." G.S. 97-31(24). Plaintiff appeals and defendant cross-appeals.

*Hassell and Hudson, by Robin E. Hudson, for plaintiff appellant.*

*Maupin, Taylor & Ellis, by David V. Brooks and Richard M. Lewis, for defendant appellee/cross appellant.*

ARNOLD, Judge.

I.

[1] Plaintiff first assigns error to the Commission's failure to award plaintiff benefits under the version of G.S. 97-31(24) in effect at the time she became disabled. We agree that, in occupational disease cases, the date of "injury" is deemed to be the date of disability. *See Frady v. Groves Thread,* 56 N.C. App. 61, 286 S.E. 2d 844 (1982). However, as defendant correctly points out in its cross-appeal, injury caused by an occupational disease does not fall within the scope of G.S. 97-31(24).

Until the passage of G.S. 97-52, some six years after adoption of the Workers' Compensation Act, only injury by "accident" was compensable under any provision of the Act. G.S. 97-52 created an exception to the original statutory scheme, allowing recovery for "[d]isablement or death . . . resulting from an occupational disease. . . ." Nothing is said in this provision or cases construing it which could be interpreted as allowing compensation for injury from occupational disease which falls short of "disablement."

We can only conclude that the Commission, in applying G.S. 97-31(24) to the facts of this case, has misconstrued the adoption of G.S. 97-52 as an implied amendment to G.S. 97-2, the general definitional statute. Only by defining "injury" to include impairment due to occupational disease could the Commission award damages under G.S. 97-31, since occurrence of an injury is required to trigger application of the Act. *Withers v. Black,* 230 N.C. 428, 53 S.E. 2d 668 (1949); *Burton v. American National Insurance Co.,* 10 N.C. App. 499, 179 S.E. 2d 7 (1971). Such a definition is in direct conflict with the clear wording of G.S. 97-2(6) which limits "injury," for purposes of the Act generally, to ". . . injury by accident arising out of and in the course of the employment. . . ." Indeed, the statute specifies that injury ". . . shall not include a disease in any form, except where it results . . . from [an] accident." Since G.S. 97-31 contains no language creating

an exception to this general definition, we hold that it has no applicability to the facts of this case, and that the contrary holding of the Commission must be reversed.

## II.

[2] Plaintiff's second assignment of error is that the trial court erred in failing to award her disability benefits pursuant to G.S. 97-52. She notes that the Commission found as fact that Plaintiff has an occupational disease and that "[i]t can be reasonably presumed that the claimant has suffered diminution of her future earning power" as a result of the occupational disease. Taken in isolation, we would agree with plaintiff that these findings justify remand of the cause for further findings apportioning her disability between occupational and non-occupational causes. *Hansel v. Sherman Textiles*, 304 N.C. 44, 283 S.E. 2d 101 (1981). However, the Commission also found as fact that:

> 10. . . . [Plaintiff] became disabled (from work) as a result of and following contracting non-occupational pulmonary fibrosis. The significant aspect of claimant's current pulmonary disability is as a result of her restrictive lung disease (pulmonary fibrosis) which arose independently of and following her voluntary retirement. . . .

In attempting to resolve the obvious conflict between these findings the Court has carefully reviewed all of the evidence before the Commission and all of its findings. Some of the Commission's findings, *e.g.* that plaintiff was suffering pulmonary impairment at the time of her voluntary retirement, are not supported by the evidence. Others, like those above, are contradictory. It appears to this Court that the Commission adopted these findings for the same reason that the hearing commissioner apparently made them: to characterize the facts in such a way as to attempt to justify at least some compensation for a particularly sympathetic plaintiff, while correctly denying her claim for disability benefits. Indeed, the Commission's humanitarian motives are suggested in its statement that ". . . we are of the opinion that the correct result was reached by the Hearing Commissioner" in spite of its admission that "[c]lose scrutiny of the record is necessary to find that an occupational disease causing any serious problem exists."

The record reveals only the most carefully qualified medical evidence that some portion of plaintiff's total lung impairment might be attributable to cotton dust. The same doctor dismissed as "speculative" any attempt to assess the relative contribution of obstructive impairment to plaintiff's overall condition and stated that tests "indicate[d] the impairment is restrictive." Moreover, there is insufficient evidence from which the obstructive component, itself a minor or even negligible contributor to plaintiff's condition, could be allocated between occupational and non-occupational causes. Finally, there was no evidence whatsoever that plaintiff would have suffered less than total impairment of earning capacity (*i.e.* disability) as a result of her non-occupational lung disease alone. We hold, therefore, that the evidence overwhelmingly requires denial of benefits based on disability from occupational disease.

While we are not unsympathetic to the Commission's attempt to find an alternative statutory basis for allowing this plaintiff to recover attorneys' fees and a moderate award of benefits, we cannot sanction the misapplication of G.S. 97-31(24). Moreover, to do so would create additional confusing precedent in this area of the law.

Reversed.

Judges CLARK and WEBB concur.

STATE OF NORTH CAROLINA v. SAMMY RAY RIDDLE

No. 8128SC1039

(Filed 6 April 1982)

**Automobiles § 113.1— involuntary manslaughter—defendant as driver of car—sufficiency of evidence**

In a prosecution for involuntary manslaughter arising out of an automobile accident, the State's evidence was sufficient for the jury to find that defendant was the driver of the car which struck that of decedent where it tended to show that defendant was observed immediately following the collision exiting from the car which collided with decedent's car; no one other than defendant was observed in, at, or near that car at any time; no evidence could be found to support defendant's story that his friend was driving the car and

ran through the nearby woods after the collision; defendant reached in his pocket and produced the keys to the car when the wrecker driver requested them; defendant told an accident victim and another person at the collision scene that his friend who had been driving owned the car, but he told the investigating patrolman that the car belonged to his girlfriend; defendant told the investigating patrolman that the driver had exited the car from the driver's side, but the patrolman found the door on that side impossible to open because of the damage it had sustained in the collision; defendant indicated that he had known the driver for a long time, but he was unable to describe anything about him except his clothes; and there was evidence tending to show that the alleged driver did not in fact exist.

APPEAL by defendant from *Ferrell, Judge*. Judgment entered 3 June 1981 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 4 March 1982.

Defendant appeals from a judgment of imprisonment entered upon a conviction of involuntary manslaughter.

*Attorney General Edmisten, by Associate Attorney G. Criston Windham, for the State.*

*Swain & Stevenson, by Kenneth T. Davies, for defendant appellant.*

WHICHARD, Judge.

The principal issue is whether the court erred in denying defendant's motion to dismiss. We find no error.

The State's evidence tended to show the following:

Donna Wood, while a passenger in a car driven by her husband, Ronald Wood, suddenly saw car lights in the middle of the road and saw her husband turn the steering wheel toward the right shoulder. There was a collision, and the Wood car went into an adjacent field. Ronald Wood died from injuries sustained in the collision.

Donna Wood saw defendant get out of the other car involved in the collision and walk toward her. He told her that his friend owned and was driving the car, and that his friend had jumped out and run through the woods when the collision occurred. She smelled a strong odor of alcohol about him at that time.

Lloyd Messer observed the accident. As he went by the scene he saw a man "standing at the right-hand door on the

passenger's side" of the car which collided with the Woods car. The man was shutting or opening the door. Messer exited from his vehicle and attempted to assist Mr. Woods. While he was so engaged, defendant approached; and Messer could smell alcohol. Defendant told Messer the car belonged to and had been driven by his friend, and his friend had "run out on him and run through the woods." Messer went to the woods, but could find nothing.

When the investigating patrolman arrived, defendant told him the car belonged to his girl friend. He also told him one Gerald Ray had been driving. He "indicated that Mr. Ray had supposedly left out the driver's door." The patrolman attempted to open that door and was unable to do so because of the damage it had sustained in the collision. The patrolman smelled a strong odor of alcohol about defendant, and observed that defendant was "very hesitant and swaying." In his opinion defendant's faculties were appreciably impaired by some type of alcoholic beverage. Defendant told the patrolman he had consumed four or five drinks of liquor. He told him he had not been driving the car. The only description defendant could give of the alleged driver related to the clothes he wore. The patrolman placed the name Gerald Ray in the PIN machine and found no one in the record by that name.

Another patrolman administered a breathalyzer test to defendant which produced a reading of .14 percent blood alcohol. Defendant also told this patrolman he was not driving the car.

Sheriff's deputies checked the area and could find no evidence "regarding somebody running through the woods." When the wrecker driver requested the keys to the car which collided with the Woods car, defendant "reached in his pocket and got the keys out."

Defendant testified on his own behalf as follows:

He had worked with Gerald Ray seven years previously, but had not seen him in a long time prior to encountering him at a bar the night the collision occurred. Defendant had consumed four or five drinks. He did not know how many Ray had consumed.

Defendant and Ray went to the home of defendant to get the keys to defendant's girl friend's car. Defendant had pled guilty to

driving under the influence three times in the previous ten year period. His license had been in suspension because of a DUI conviction. Consequently, Ray had driven.

Defendant last saw Ray when the car stopped following the accident. While defendant was at the Woods car, he heard something going through the woods. He looked toward his girl friend's car, did not see Ray coming from there toward the Woods car, and assumed that Ray had run.

Defendant admitted that he had produced the keys to the car when the wrecker came. He stated that he had pulled them out of the car when he went to look for the registration at the request of the investigating patrolman.

In ruling on the motion to dismiss, the foregoing evidence had to be considered in the light most favorable to the State, giving the State the benefit of every reasonable intendment and every reasonable inference to be drawn therefrom. If there was substantial evidence — direct, circumstantial, or both — to support a finding that the offense charged had been committed and that defendant committed it, a case was made for the jury, and the motion was properly denied. *State v. McKinney*, 288 N.C. 113, 117, 215 S.E. 2d 578, 581-82 (1975).

Defendant does not dispute that the evidence sufficiently establishes that the offense charged was committed. He contends, however, that it does not suffice to establish that he committed it.

While the evidence that defendant was the driver of the car which struck that of the decedent was entirely circumstantial, "the identity of the driver of an automobile at the time of a collision may be established by circumstantial evidence, either alone or in combination with direct evidence." *Helms v. Rea*, 282 N.C. 610, 616, 194 S.E. 2d 1, 5-6 (1973). "[C]ircumstantial evidence is not only a recognized and accepted instrumentality in the ascertainment of truth, but is essential, and, when properly understood and applied, highly satisfactory in matters of the gravest moment." *Helms* at 616-617, 194 S.E. 2d at 6, *quoting from State v. Alston*, 233 N.C. 341, 344, 64 S.E. 2d 3, 5 (1951).

Viewing the circumstantial evidence here in the light required by the governing principles stated above, we find it sufficient for the jury to pass on in view of the following:

Defendant was observed immediately following the collision exiting from the car which collided with decedent's car. No one other than defendant was observed in, at, or near that car at any time. Lloyd Messer and the Sheriff's deputies checked the woods area nearby and could find no evidence to support defendant's story that his friend who was driving ran through the woods. Defendant reached in his pocket and produced the keys to the car when the wrecker driver requested them.

Further, there were discrepancies within defendant's statements and between defendant's statements and the physical evidence. Defendant told Ms. Woods and Mr. Messer that his friend who had been driving owned the car, but he told the investigating patrolman the car belonged to his girl friend. He told the investigating patrolman the driver had exited from the driver's side, but the patrolman found the door on that side impossible to open because of the damage it had sustained in the collision. He indicated that he had known the driver for a long time, yet he was unable to describe anything about him except his clothes. Finally, there was no other evidence tending to show that the alleged driver even existed; and there was evidence tending to show that he did not. These discrepancies, together with the evidence set forth above tending to connect defendant and no one else to the death vehicle, were sufficient to render defendant's credibility an issue for the jury.

Defendant relies on *State v. Ray*, 54 N.C. App. 473, 283 S.E. 2d 823 (1981). In *Ray* the evidence failed to establish that the car occupied by defendant "had been operated recently." *Ray* at 475, 283 S.E. 2d at 825. The Court there stated that the car occupied by Ray "apparently" hit the other cars. *Ray* at 473, 283 S.E. 2d at 824. The evidence here was clearly sufficient to permit a finding that the car from which defendant exited was in operation at the time of the collision and that it did collide with the car occupied by the decedent. The cases thus are distinguishable.

Defendant also relies on *Jackson v. Virginia*, 443 U.S. 307, 61 L.Ed. 2d 560, 99 S.Ct. 2781 (1979). *Jackson* establishes that federal habeas corpus review of state criminal convictions will be allowed "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324, 61 L.Ed. 2d at 576-77, 99 S.Ct.

at 2791-92. We find the evidence here sufficient to permit a rational trier of fact to find proof of guilt beyond a reasonable doubt.

Defendant also contends the court erred in denying his motion to suppress evidence of his breathalyzer test. Evidence offered on *voir dire* supports the court's findings of fact, which in turn sustain the conclusions leading to denial of the motion. The denial thus was not error.

No error.

Judges MARTIN (Robert M.) and MARTIN (Harry C.) concur.

---

TARA D. ALLEN, BY HER GUARDIAN AD LITEM, CLARENCE ALLEN AND CLARENCE ALLEN, INDIVIDUALLY v. EQUITY & INVESTORS MANAGEMENT CORPORATION AND MUTUAL LIFE INSURANCE COMPANY OF NEW YORK

No. 8110SC681

(Filed 6 April 1982)

**Landlord and Tenant § 9; Negligence § 18— minor injured in common area of apartment — summary judgment improper**

Summary judgment was improperly granted in a negligence action in which a minor plaintiff, age 8, testified that she was injured when her bicycle hit a stump in the recreation area of defendants' apartment building. The issue of whether defendants were negligent in failing to maintain the common area in a safe condition and whether plaintiff was contributorily negligent were for the jury to decide.

APPEAL by plaintiffs from *Bailey, Judge.* Judgment entered 3 March 1981 in Superior Court, WAKE County. Heard in the Court of Appeals 4 March 1982.

This is a negligence action against defendants for injuries sustained by Tara Allen, the minor daughter of plaintiff Clarence Allen, while riding her bicycle at an apartment complex owned by defendants.

Plaintiffs alleged in their complaint that Tara was injured on 18 April 1979 while riding her bicycle near the playground at

Bowling Arms Apartments in Cary, where she lived with her parents. The front wheel of her bicycle struck a tree stump, throwing Tara off her bicycle and causing her to fall down an embankment. Tara suffered severe injuries to her wrist. At the time of the injury, Tara was eight years old. Defendant Mutual Life Insurance Company of New York (MONY) owned the apartment complex at the time of the accident and employed defendant Equity & Investors Management Corporation as its rental agent and manager. Plaintiffs alleged that defendants were negligent in leaving the tree stump in an area where children were likely to play and in failing to keep the common area safe. Plaintiffs sought $100,000 in damages.

In their answer defendants denied all the material allegations of the complaint and pleaded contributory negligence by Tara Allen as a defense.

Tara Allen testified in her deposition that on the day she was injured she had walked her bicycle across a bridge to an area near the recreation center and across the creek from the playground. She was riding her bicycle at a normal speed. The stump she hit was about four to six inches above ground and was not covered by dirt or leaves. Tara testified that if she had been looking down, she could have seen the stump. She hit the stump when she turned her bicycle to go around some trees.

From the granting of defendants' motion for summary judgment, plaintiffs appeal.

*Pinna & Corvette by Ted E. Corvette, Jr. for plaintiff appellants.*

*Johnson, Patterson, Dilthey & Clay by Robert W. Sumner for defendant appellees.*

CLARK, Judge.

The sole issue presented by this appeal is whether the trial court erred in granting defendants' motion for summary judgment. On a motion for summary judgment, G.S. 1A-1, Rule 56, provides that the movant must show the court that there are no genuine issues of material fact to be tried in the case and that the moving party is entitled to summary judgment as a matter of law.

*Vassey v. Burch*, 301 N.C. 68, 269 S.E. 2d 137 (1980). The rule does not authorize the court to decide an issue of fact, but rather to determine whether a genuine issue of fact exists. *Id.* Ordinarily, issues of negligence are not susceptible to summary disposition but should be resolved by trial. Summary judgment is appropriate only in exceptional negligence cases because the applicable standard of care must be applied; as a general rule, the jury must apply the standard of care to the facts of the case after proper instructions from the court. *Id.*

It is undisputed that a landlord-tenant relationship existed between plaintiffs and defendants at the time of the accident. It is also undisputed that Tara's accident occurred in an area of the leased premises which remained under the control of defendants. In two recent cases, this court discussed the landlord's duty to keep common areas in a safe condition. *O'Neal v. Kellett*, 55 N.C. App. 225, 284 S.E. 2d 707 (1981); *Lenz v. Ridgewood Associates*, 55 N.C. App. 115, 284 S.E. 2d 702 (1981). "A residential landlord in North Carolina owes his tenant a statutory duty of exercising ordinary or reasonable care to maintain common areas of the leased premises in a safe condition. G.S. 42-42(a)(3). A violation of that duty is evidence of negligence." *O'Neal v. Kellett, supra*, at 228, 284 S.E. 2d at 710. The duty owed by a landlord is not the duty to warn of unsafe conditions, but rather the duty to correct unsafe conditions. *Lenz v. Ridgewood Associates, supra.* In *Lenz* the court held that if natural accumulations of ice constitute an unsafe condition, the landlord has a duty to correct that condition.

Defendants must be charged with foreseeing that areas set aside for recreational purposes of their tenants would be used as such, and that any unsafe conditions existing in those areas must be corrected. On the issue of defendants' negligence, the evidence shows material facts from which a jury could find that defendants allowed a four- to six-inch stump to remain in a pathway used by tenants and their children for recreational purposes; that the stump constituted an unsafe condition; that defendants knew or in the exercise of ordinary care should have known that the stump existed; that defendants failed to exercise ordinary care to correct the unsafe condition posed by the stump; and that such failure was the proximate cause of Tara's injury. *See Wheeler Terrace, Inc. v. Lynott*, 234 A. 2d 311 (D.C. App. 1967). Defendants argue that a landlord is not liable for injuries from defects

on their premises which are open, obvious and visible. We believe that there is a question of fact whether the presence of the stump constituted an "unsafe" condition which defendants had a duty to correct. This question and that of defendants' negligence must be passed on by a jury and were not suitable issues for summary disposition by the court.

The materials before us do not show plaintiff Tara Allen to have been contributorily negligent as a matter of law. "An infant under 7 years of age is conclusively presumed to be incapable of contributory negligence. (citation omitted) An infant between the ages of 7 and 14 is presumed to be incapable of contributory negligence, but this presumption may be rebutted by evidence showing capacity. 'The test in determining whether the child is contributorily negligent is whether it acted as a child of its age, capacity, discretion, knowledge and experience would ordinarily have acted under similar circumstances.' (citations omitted)." *Welch v. Jenkins*, 271 N.C. 138, 142, 155 S.E. 2d 763, 766 (1967). Plaintiff Tara Allen was eight years old at the time of the accident and is therefore presumed incapable of contributory negligence. Defendants may offer evidence at trial to rebut the presumption and to show Tara's capacity to exercise care for her own safety. Again, this issue is one which is properly determined not by the court but by the jury.

The issues of whether defendants were negligent in failing to maintain the common area in a safe condition, and whether plaintiff Tara Allen was contributorily negligent are for a jury to decide. Therefore, the judgment of the trial court must be and is

Reversed.

Judges ARNOLD and WEBB concur.

THE NORTHWESTERN BANK v. J. DOUGLAS MORETZ

No. 8111DC707

(Filed 6 April 1982)

1. **Uniform Commercial Code § 31— direct dealing with party to instrument—defense of non-performance of condition precedent**
   Where all the evidence indicated that plaintiff dealt directly with defendant, plaintiff took defendant's note subject to any defense defendant could establish of non-performance of a condition precedent. G.S. 25-3-305(2).

2. **Bills and Notes § 19; Uniform Commercial Code § 29— failure of condition precedent—parol evidence**
   Delivery of a note upon a condition which failed may be shown by parol evidence.

3. **Bills and Notes § 20; Uniform Commercial Code § 32— action on note—nonperformance of condition precedent—jury question**
   In an action to recover the balance due on a promissory note, the evidence presented questions of fact for the jury as to whether the note was delivered subject to a condition precedent that plaintiff would "pursue every possible effort" to collect the sum due from a third party by prosecuting the third party for giving plaintiff a worthless check in payment of the sum due and whether plaintiff had fulfilled such condition.

APPEAL by plaintiff from *Christian, Judge*. Judgment entered 11 February 1981 in District Court, LEE County. Heard in the Court of Appeals 9 March 1982.

*James E. Holshouser, Jr., and Love & Wicker, P.A., by Dennis A. Wicker, for plaintiff appellant.*

*Moretz & Moore, by J. Douglas Moretz and G. Hugh Moore, Jr., for defendant appellee.*

WHICHARD, Judge.

Plaintiff's complaint demanded judgment against defendant for the balance due on a promissory note. Defendant's answer pleaded, *inter alia*, that the note was delivered subject to a condition precedent that plaintiff would "pursue every possible effort" to collect the sum due from one Clyde Baker by prosecuting Baker for giving plaintiff a worthless check in payment of the sum due; and that plaintiff had willfully failed to fulfill the condition precedent, thereby relieving defendant of any obligation.

Plaintiff's evidence showed the following:

Clyde Baker applied to plaintiff for a loan to enable him to purchase defendant's automobile. Plaintiff initially denied the application, but subsequently approved it upon defendant's co-signing Baker's note. Baker thereafter gave plaintiff a worthless check in purported payment of the note. Defendant thereupon executed the note at issue in payment of the original note.

Acting on defendant's advice, plaintiff instituted criminal charges against Baker on the worthless check. On request of plaintiff's home office legal counsel, however, an officer of plaintiff thereafter informed the prosecuting attorney by letter that plaintiff had no further interest in the prosecution, because it had been paid in full by defendant as endorser.

Defendant's evidence showed the following:

Defendant signed Baker's note to enable Baker to secure funds with which to purchse defendant's automobile. When an officer of plaintiff advised defendant that Baker had given plaintiff a worthless check in purported payment of the note, and that the note was in default, defendant executed a new note to plaintiff. Defendant told plaintiff's officer he would sign the new note if plaintiff would "continue after Clyde Baker . . ., because he [was] the one that ought to have to pay it." Defendant received no new money for signing the new note, and the new note "was delivered . . . on the condition that [plaintiff] continue to proceed after Clyde Baker." The condition was "a verbal condition or understanding" which defendant reached with plaintiff's officer prior to signing the new note.

Defendant subsequently learned of the letter from plaintiff's officer to the prosecuting attorney, which stated that the original note had been paid in full by the endorser and that plaintiff thus had no further interest in the prosecution. He also learned that plaintiff's local counsel had represented Baker on the worthless check charge and had told plaintiff's officer that plaintiff "did not want to be in the position of prosecuting someone on a bad check under those circumstances."

The jury found that the second note was conditioned upon plaintiff's prosecuting Baker for the worthless check and for his

default on the note; and that plaintiff, through its officer's conduct, breached the condition precedent. Judgment was accordingly entered for defendant, and plaintiff appeals.

Plaintiff's sole contention is that the court erred in denying its motions for directed verdict and judgment notwithstanding the verdict. We find no error.

Plaintiff met its initial burden of proof by introduction of the note at issue, the signing of which was admitted in defendant's answer and his evidence. "When signatures are admitted or established, production of the instrument entitles a holder to recover on it *unless the defendant establishes a defense*." G.S. 25-3-307(2) (emphasis supplied). *See Wolfe v. Eaker*, 50 N.C. App. 144, 272 S.E. 2d 781 (1980), *disc. rev. denied*, 302 N.C. 222, 277 S.E. 2d 69 (1981). Upon introduction of the note, then, the burden of proof shifted to defendant to establish a defense.

[1, 2] One not a holder in due course takes a note subject to the defense of non-performance of any condition precedent. G.S. 25-3-306(c). A holder in due course takes a note free from "all defenses *of any party to the instrument with whom the holder has not dealt*." G.S. 25-3-305(2) (emphasis supplied). All the evidence indicates, and plaintiff does not dispute, that plaintiff dealt directly with defendant. It thus, regardless of whether it was a holder in due course, took defendant's note subject to any defense he could establish of non-performance of a condition precedent. Delivery of a note upon a condition which failed may be shown by parol evidence. *See Perry v. Trust Co.*, 226 N.C. 667, 40 S.E. 2d 116 (1946); *Galloway v. Thrash*, 207 N.C. 165, 176 S.E. 303 (1934); *Thomas v. Carteret County*, 182 N.C. 374, 109 S.E. 384 (1921).

The motions for directed verdict and judgment notwithstanding the verdict presented the question whether the evidence of defendant's alleged defense of delivery subject to an unfulfilled condition precedent was sufficient to entitle him to have a jury pass on it. If there was "any evidence more than a scintilla" to support prima facie establishment of the constituent elements of the defense, the motions were properly denied. *Hunt v. Montgomery Ward and Co.*, 49 N.C. App. 642, 272 S.E. 2d 357 (1980), and authorities cited.

[3]  Defendant testified that he told plaintiff's officer he would sign the new note if plaintiff would "continue after Clyde Baker," and that the new note was delivered to the officer on the condition that plaintiff "continue to proceed after Clyde Baker." He also testified regarding the letter from plaintiff's officer to the prosecuting attorney which stated that the original note had been paid in full by the endorser and that plaintiff thus had no further interest in the prosecution. The letter itself was admitted into evidence as an exhibit. The prosecuting attorney testified that he in fact prosecuted the criminal case against Baker, and that he in fact received the letter.

This evidence presented questions of fact for the jury as to whether the note was delivered subject to a condition precedent, and whether plaintiff had fulfilled the condition. The motions for directed verdict and judgment notwithstanding the verdict thus were properly denied.

Plaintiff contends the motions should have been granted, because there was no evidence that the letter from its officer to the prosecuting attorney affected the judgment in the criminal prosecution against Baker. The test of fulfillment of the condition was not the ultimate judgment against Baker, however, but what plaintiff did or failed to do to secure a judgment requiring Baker to pay the sum due. The contention thus has no merit.

Plaintiff's further contentions that (1) the conditional delivery defense constitutes use of criminal process to enforce payment of a civil obligation, and is thus violative of N.C. Const. art. I, § 28, and (2) the conditional delivery defense is unavailable to defendant because he is an attorney and is thus prohibited by DR7-105, Code of Professional Responsibility, from presenting criminal charges solely to obtain an advantage in a civil matter, are equally without merit.

No error.

Judges MARTIN (Robert M.) and MARTIN (Harry C.) concur.

---

---

VILA J. COLE v. BEN ADAMS AND WINFRED MORRIS ADAMS

No. 814DC573

(Filed 6 April 1982)

**Husband and Wife § 1— goods purchased by wife—liability of husband**

In an action to recover for goods sold on account to defendant wife, the trial court erred in denying defendant husband's motion for directed verdict where the evidence showed that defendants were separated at the times the items were purchased by the wife and plaintiff failed to show that the items were necessaries and that the husband was without justifiable cause in denying the wife such items.

APPEAL by defendant Ben Adams from *Martin (James N.)*, *Judge*. Judgment entered 18 February 1981 in District Court, ONSLOW County. Heard in the Court of Appeals 3 February 1982.

This is an action wherein plaintiff, operator of a general store, seeks to recover $528 charged to defendants' account.

Plaintiff's evidence tends to show the following: On 26 June 1977 the defendants were married and lived together approximately five months before separating. They entered into a separation agreement on 24 February 1978 and were divorced 18 January 1980. Plaintiff testified that prior to her marriage defendant Winfred Adams paid off her account with plaintiff and opened an account in both her and defendant Ben Adams' names. Plaintiff presented bills which showed charges from 26 August 1978 through 27 October 1978. She admitted that she had carried a balance forward of $416.13 but had no knowledge as to when charges totaling this amount were incurred. Plaintiff further admitted that none of the purchases were made by Ben Adams. She terminated Winfred's right to purchase items on account in February 1979 but did not send Ben written notice of the debt and demand payment until 23 October 1980. Winfred admitted that she owed plaintiff $528.00.

At the conclusion of plaintiff's evidence, Ben moved for a directed verdict in his favor. Upon the court's denial of this motion, Ben testified that he closed all joint accounts at the time he and Winfred signed the separation agreement. This agreement specifically provided that neither party would be responsible for debts of the other incurred after execution of said agreement.

The court also denied Ben's motion for a directed verdict made at the close of his evidence. Defendant Ben Adams appeals from the judgment of the trial court ordering him to pay $528.00 to plaintiff.

*No counsel contra.*

*Lanier and Fountain by Charles S. Lanier, for defendant appellant.*

CLARK, Judge.

We initially note that defendant has failed to set forth any assignments of error and exceptions at the conclusion of the record on appeal or in his behalf. Failure to follow the Rules of Appellate Procedure subjects defendant's appeal to dismissal. *Marsico v. Adams,* 47 N.C. App. 196, 266 S.E. 2d 696 (1980). This Court, however, has decided to exercise its discretionary power and consider the one "issue" argued in defendant's brief on its merit. Plaintiff has not filed a brief.

Defendant argues that the trial court erroneously denied his motion for directed verdict because the plaintiff based her case upon the "Doctrine of Necessities" and failed to meet her burden of proof. Since the case was tried by the court without a jury, defendant's motion will be treated as a motion for involuntary dismissal pursuant to Rule 41(b) of the North Carolina Rules of Civil Procedure. The trial court denied defendant's motions to dismiss made at the close of plaintiff's evidence and at the close of all the evidence. This Court has stated that a defendant's motion to dismiss made at the close of all the evidence raises the question of "whether any findings of fact could be made from the evidence which would support a recovery for plaintiffs. (Citation omitted.)" *Neasham v. Day,* 34 N.C. App. 53, 55, 237 S.E. 2d 287, 288-89 (1977).

The "Doctrine of Necessities" as discussed in 2 Lee, North Carolina Family Law § 130 (4th ed. 1980) is used to hold a husband liable to merchants or other outside parties who have furnished necessities to the wife. Necessities, or necessaries, "are those things which are essential to her [a wife's] health and comfort, according to the rank and fortune of her husband." *Id.* § 132 at 128.

>     When the husband and wife are living together, a
> presumption arises that she has been given the authority by
> the husband to purchase suitable household goods on his
> credit. . . .
>
>     Where the husband and wife are living apart, there is no
> presumption *in fact* that she has any authority to pledge his
> credit even for necessaries. The presumption is that she has
> *in fact* no authority. Tradesmen must rebut the presumption
> by showing authority in fact or else bring the case within the
> rule that the husband has, without justifiable cause,
> neglected to provide necessaries for her.

*Id.* § 133 at 130-31. Tradesmen must further prove that the mer-
chandise purchased by the wife is a necessity for her; and that
the merchandise has not otherwise been supplied to her. *Id.* at
130. The general rule is that "in order to hold the husband liable,
a person furnishing necessaries to a wife living separate and
apart from her husband has the burden of showing that either by
agreement or by the husband's fault or misconduct the wife was
justified in living apart from the husband and that the husband
had failed or neglected to supply her with necessaries or to make
adequate provision for her support. . . . A person furnishing
necessaries to a wife living separate and apart from the husband
extends credit at his peril; he is bround to take notice of the
separation and to ascertain by inquiry whether the circumstances
are such as to render the husband liable for the articles fur-
nished." 41 C.J.S. *Husband and Wife* § 52.a. at 516-17 (1944); An-
not. 60 A.L.R. 2d 7 (1958).

    This common law doctrine was applied in *Pool v. Everton*, 50
N.C. (5 Jones) 241 (1858). There the Court reversed a lower court's
judgment awarding $15 to a physician who had rendered services
to defendant's wife. The Court noted that no evidence had been
presented which showed that the wife had cause for her separa-
tion from defendant. In *Sibley v. Gilmer*, 124 N.C. 631, 32 S.E. 964
(1899), the Court interpreted the holding in *Pool* as follows:

>     [I]n cases where the husband and wife had separated, no
> notice of separation need be given to prevent his liability for
> debts contracted by the wife during the separation—even for
> necessaries—the law being that if the separation was without
> good cause on the part of the wife, her debt contracted even

for necessaries was not only not binding on the husband, but such creditors made themselves liable to the husband in an action for damages for extending such credit.

*Id.* at 637, 32 S.E. at 965.

In the case *sub judice*, the trial court erroneously found that plaintiff had met her burden of proof. The evidence is uncontested that the parties were separated at the time the items were charged to the account. The balance of $416.00, which was brought forward on the account, is not at issue. Specifically, plaintiff could not remember whether this amount included items purchased before or after the defendant's marriage. Plaintiff therefore had the burden of showing that the items purchased by Winfred were necessaries; and that Ben was without justifiable cause in denying his wife such items. The court entered a finding of fact in its judgment that the items represented in the account were for necessaries. This finding is actually a conclusion of law which is unsupported by any evidence.

We hold, therefore, that the trial court erred in denying defendant's motion to dismiss since plaintiff failed to meet her burden of proof. The judgment below is

Reversed.

Judges ARNOLD and WHICHARD concur.

IN THE MATTER OF: WALTER KIDDE & COMPANY, INC., POST OFFICE BOX
509, MEBANE, NORTH CAROLINA 27302 v. JACK D. BRADSHAW, ROUTE 1, BOX
365, MEBANE, NORTH CAROLINA 27302, SS. NO. 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, DOCKET NO. 4235 G;
ED FISHER, ROUTE 8, BOX 123, BURLINGTON, NORTH CAROLINA 27215, SS. NO.
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, DOCKET NO. 4242 G; GRADY L. HUNDLEY, ROUTE 2, BOX 576,
GRAHAM, NORTH CAROLINA 27253, SS. NO. 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, DOCKET NO. 4247 G;
DAVID A. TUTTLE, ROUTE 8, BOX 165, BURLINGTON, NORTH CAROLINA 27215,
SS. NO. 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, DOCKET NO. 4277 G; AND EMPLOYMENT SECURITY
COMMISSION OF NORTH CAROLINA, POST OFFICE BOX 25903, RALEIGH,
NORTH CAROLINA 27611

No. 8115SC524

(Filed 6 April 1982)

**Master and Servant § 108.1— unemployment compensation—playing cards not
misconduct**

Employees were not discharged for misconduct in connection with their
work and thus were not disqualified to receive unemployment compensation
benefits where they were accused of and discharged for gambling; the
evidence failed to show that they were gambling in that it showed only that
they were playing cards on the employer's premises but failed to show that
they were playing for anything of value or exchangeable for value; and while
gambling among employees was prohibited by the employer, card playing at
the work place was not explicitly prohibited.

APPEAL by employer from *McLelland, Judge.* Judgment
entered 16 March 1981 in Superior Court, ALAMANCE County.
Heard in the Court of Appeals 13 January 1982.

Employer Walter Kidde and Company, Inc., appeals from a
Superior Court order affirming an Employment Security Commis-
sion decision that four former employees of employer were not
disqualified to receive unemployment benefits. A hearing was
held before Deputy Commissioner V. Henry Gransee, Jr., follow-
ing an appeal from the Appeal Referee's decision that claimants
not be disqualified for unemployment benefits. An appeal had
been taken to the Appeals Referee from a determination of the
Claims Adjudicator that claimants were not disqualified pursuant
to G.S. 96-14(2).

The evidence presented at the hearing before the Appeals
Referee tended to show that on 19 April 1980, at about 1:00 p.m.,
Maintenance Supervisor Jerry Cummings observed claimants in a
maintenance area known as the maintenance "cage." Claimants
were sitting around a piece of electronic equipment, approximate-

ly 30 inches by 30 inches, which was being utilized as a table. The make-shift surface was not a workbench or something around which employees usually sat. Two large tool boxes, about four and one-half feet tall, had been pushed against the end of the cage, obstructing the view into the cage. The tool boxes were not pushed completely together, however, and Cummings could see into the cage. He observed several stacks of washers before the men and saw one of the employees pass a deck of cards to another. It was not a full deck. The claimants looked sheepish and embarrassed when Cummings entered the cage. None of the men were on break time. They were, however, playing between shifts and were otherwise unoccupied. All four knew that the company has a policy against gambling. They later admitted having played poker, but denied playing for money. They were discharged for gambling on the job.

The Appeals Referee found that while the claimants may have been discharged for cause and for good business reasons, they were not playing cards for money and, therefore, were not gambling as their employer alleged. The Commission adopted the Appeals Referee's decision as its own, upholding his determination that claimants not be disqualified from receiving unemployment benefits. The Superior Court affirmed and employer appeals.

*Haynsworth, Baldwin, Miles, Johnson, Greaves and Edwards, by Charles P. Roberts, for plaintiff appellant.*

*Gail C. Arneke and C. Coleman Billingsley, Jr., for Employment Security Commission of North Carolina, appellee.*

MORRIS, Chief Judge.

The sole issue on appeal is whether claimants, were discharged because of misconduct associated with their work and are thus disqualified from receiving unemployment benefits.

Findings of fact of the Commission are conclusive if supported by the evidence, and judicial review is limited to determining whether errors of law have been committed. G.S. 96-15(i). The findings of fact to which appellant excepts are as follows:

5. The employer alleged they were discharged as a result of having found gambling for money while on company property and during a work day.

6. Each of the parties (claimants) involved denies having done any gambling for money. Each party (claimant) does agree that they were playing cards for a game or two, but not with any betting for money involved. Someone had found an incomplete deck of cards and while waiting for job assignments the four claimants fooled around playing a hand or two of cards.

7. The claimants were not playing cards for money and were not therefore gambling as the employer alleged. An employer witness stated that he thought they were gambling, but had not seen any money being passed. He had only observed washers on what might have been used as a card table.

We hold that these findings are fully supported by the testimony given at the hearing and reflected in the record. The findings of fact are, therefore, binding on appeal.

We hold, furthermore, that the facts support the Commission's conclusion that the claimants were not discharged for misconduct in connection with their work.

An employee will be disqualified for benefits if it is determined that he was discharged for misconduct connected with his work. G.S. 96-14(2). "Misconduct" as that word is used in unemployment compensation law has been defined as

> . . . conduct evincing such wilful or wanton disregard of an employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee. . . .

*In Re Collingsworth,* 17 N.C. App. 340, 343-44, 194 S.E. 2d 210, 212-13 (1973), *quoting Boynton Cab Company v. Neubeck,* 237 Wis. 249, 259, 296 N.W. 636, 640 (1941), where the Wisconsin Court noted that "mere inefficiency, unsatisfactory conduct . . . are not to be deemed 'misconduct' . . .". *Id.* at 260, 296 N.W. at 640. The facts support a conclusion that there was no wilful or wanton disregard of the employer's interest.

Claimants were accused of and discharged for gambling. There is no evidence that the men's card playing amounted to gambling, however. Appellant made no showing that money was passed, or that the washers on the make-shift table around which the employees sat had any value, or that they represented something of value. Appellant argues that its rule against gambling need not be limited to gambling for money. Every definition adduced by the parties depicts gambling as a game of chance in which money or something of value is at stake, however. The criminal offense of gambling in North Carolina, for example, is described as "any game of chance at which any money, property, or other thing of value is bet." G.S. 14-292. There is absolutely no evidence that the claimants' play was for anything, tangible or intangible, of value or exchangeable for value.

It is clear from the record and briefs that gambling among employees is prohibited by Walter Kidde and Company, Inc. Card playing, though perhaps undesirable at the workplace, was not explicitly prohibited. Claimants' conduct, therefore, violated no rule, and the Commission could legitimately conclude that claimants were not engaged in conduct evincing substantial disregard for the standard of behavior to which they were expected to adhere.

The judgment of the Superior Court is, for the reasons stated above,

Affirmed.

Judges VAUGHN and MARTIN (Harry C.) concur.

---

STATE OF NORTH CAROLINA v. JIM CLAY HUFF

No. 8121SC1073

(Filed 6 April 1982)

1. Perjury § 2— solicitation of perjury—crime not supplanted by statute

The common law crime of solicitation of perjury has not been supplanted by the subornation of perjury statute, G.S. 14-210.

2. **Criminal Law §§ 4, 16.1; Perjury § 1— solicitation of perjury—infamous offense—original jurisdiction in superior court**

   Solicitation to commit perjury, or attempted subornation of perjury, is an "infamous offense" which is a felony within the original jurisdiction of the superior court. G.S. 14-3(b).

APPEAL by the State from *Mills, Judge.* Order entered 10 June 1981 in Superior Court, FORSYTH County. Heard in the Court of Appeals 9 March 1982.

Defendant was indicted for solicitation to commit the felony of perjury. The indictment alleged that the solicitation was done "in secret and malice, and with deceit and intent to defraud." Through counsel, defendant moved to dismiss the charge in that the indictment failed to charge him with a crime in the manner required by G.S. 15A-924(a) because the common law crime of solicitation of another to commit perjury has been replaced by the statutory offense of subornation of perjury. Defendant also complained that the use of the term "infamous felony" in the charge was vague and indefinite.

At a hearing on 8 June 1981 the trial court dismissed the indictment, *sua sponte,* concluding as a matter of law that solicitation of another to commit perjury is a misdemeanor and therefore not within the original jurisdiction of the superior court under G.S. 7A-271. From the order dismissing the indictment, the State appeals pursuant to G.S. 15A-1445.

*Attorney General Edmisten by Assistant Attorney General Barry S. McNeill for the State.*

*Alexander and Hinshaw by Charles J. Alexander, II, and T. Lawson Newton for defendant appellee.*

CLARK, Judge.

The State challenges the trial court's ruling that the Superior Court of Forsyth County is without jurisdiction to try this case. G.S. 7A-271 and 7A-272 provide that the district court has exclusive and original jurisdiction over trials in all criminal actions below the grade of felony, with several exceptions not here in issue, and that the superior court has exclusive and original jurisdiction over trials of all felony actions.

[1]   Perjury and subornation of perjury are felonies pursuant to G.S. 14-209 and 14-210. Defendant argues that these are the only offenses concerning perjury in North Carolina and asserts that solicitation of perjury as it existed at common law no longer exists, having been supplanted by G.S. 14-210. However, subornation of perjury requires that the State prove two elements: the commission of perjury by the person suborned and the willful procurement or inducement of that person by the suborner. *State v. McBride*, 15 N.C. App. 742, 190 S.E. 2d 658 (1972). Defendant would have us hold that the unsuccessful attempt to suborn perjury is not punishable as a crime. Although we find no North Carolina case law on this point, we agree with the following statement found in 60 Am. Jur. 2d *Perjury* § 68 at 1008 (1972):

> "A futile attempt to induce a witness to commit perjury is a crime, being an act done with the intention of preventing the due course of justice. In order to constitute the offense, the act of the accused must be such that it would have resulted in subornation of perjury on his part and perjury on the part of the person attempted to be suborned, if that person had committed the act that the accused endeavored to have him perform."

[2]   Defendant in this case was charged in the indictment in pertinent part as follows:

> ". . . [Defendant] unlawfully and wilfully did feloniously[,] infamously, and in secret and malice, and with deceit and intent to defraud, did [*sic*] corruptly solicit Jeff Cecil to commit the infamous crime of Perjury by corruptly soliciting the said Jeff Cecil to make a false statement of a material fact under oath, . . ."

The State argues that the solicitation to commit perjury constitutes a felony and is properly within the jurisdiction of the superior court.

Solicitation to commit a felony was a misdemeanor at common law. Perkins, Criminal Law 583 (2d ed. 1969). However, G.S. 14-3(b) states: "If a misdemeanor offense . . . be infamous, done in secrecy and malice, or with deceit and intent to defraud, the offender shall, . . . be guilty of a felony . . . ."

The courts of this State have held that attempts to commit a felony are infamous crimes. *See State v. Harward*, 264 N.C. 746, 142 S.E. 2d 691 (1965) (attempt to commit crime against nature); *State v. Parker*, 262 N.C. 679, 138 S.E. 2d 496 (1964) (attempt to commit armed robbery); *State v. Surles*, 230 N.C. 272, 52 S.E. 2d 880 (1949) (attempt to commit burglary); *State v. Page*, 32 N.C. App. 478, 232 S.E. 2d 460, *disc. rev. denied*, 292 N.C. 643, 235 S.E. 2d 64 (1977) (attempt to obtain money by false pretenses). However, in *State v. Tyner*, 50 N.C. App. 206, 272 S.E. 2d 626 (1980), *disc. rev. denied*, 302 N.C. 633, 280 S.E. 2d 451 (1981), this Court held that solicitation to commit a crime against nature was not an "infamous misdemeanor" so as to be within the original jurisdiction of the superior court. Differentiating between "attempt" and "solicitation," the court stated:

> "The gravamen of the offense of solicitation to commit a felony lies in counseling, enticing, or inducing another to commit a crime. (citation omitted) The offense of solicitation is complete with the act of solicitation, even though there never could be acquiescence in the scheme by the one solicited, (citation omitted) and even where the solicitation is of no effect. (citation omitted)
>
> Attempt to commit a felony, on the other hand, involves an intent to commit the felony indicated and an overt act done for that purpose which goes beyond mere preparation but falls short of the completed offense. . . .
>
> In our view, solicitation to commit a felony and attempt to commit a felony are two separate and distinct offenses. The crime of solicitation, unlike attempt, does not involve an overt act toward the commission of the underlying felony, as the crime of solicitation is complete with the mere act of 'enticing or inducing.' " *Id*. at 207, 272 S.E. 2d at 627.

We believe, however, that the distinction between "attempt" and "solicitation" is not applicable to the offenses of perjury and subornation of perjury. "Strictly speaking it (subornation of perjury) is not a crime that is perpetrated, — it can only be procured. And solicitation, being the most direct and final step in the effort to procure this offense, has properly been recognized as constituting an attempt. It is not attempted perjury, it should be emphasized, but attempted subornation of perjury." *Perkins, supra*,

at 586. Therefore, following the line of cases which hold that an attempt to commit a felony is an infamous offense, we find that solicitation to commit perjury, or more properly attempted subornation, constitutes an "infamous offense."

The wording of the indictment charges that defendant solicited another to commit perjury in secret and malice, and with deceit and intent to defraud. Deceit and intent to defraud are necessary elements of subornation and attempted subornation of perjury. The person who solicits the perjury must have attempted to counsel, entice, or induce another to deceive the court by a false statement under oath. *See State v. Wilson*, 30 N.C. App. 149, 226 S.E. 2d 518 (1976).

We hold, therefore, that solicitation to commit perjury is a felony within the terms of G.S. 14-3(b), and that the Superior Court of Forsyth County does have original jurisdiction over the offense with which defendant is charged.

The order dismissing the indictment against defendant is reversed and this cause is remanded for trial.

Reversed and remanded.

Judges ARNOLD and WEBB concur.

---

LINDA D. HORNEY v. JAMES D. HORNEY

No. 8118DC642

(Filed 6 April 1982)

**Divorce and Alimony § 14.3— insufficient evidence of adultery**
    The evidence in a divorce action was insufficient to support a jury finding that defendant husband had committed adultery where it tended to show only that the husband had been alone with another woman on a few occasions in her office and once or twice at her home, but there was no evidence of feelings of love or of affectionate behavior between the two or that they were found together very late at night, in a state of undress or under otherwise suspicious circumstances.

APPEAL by defendant from *Hatfield, Judge.* Judgment entered 2 September 1980 in District Court, GUILFORD County. Heard in the Court of Appeals 12 February 1982.

This is an action for divorce on grounds of adultery, infliction of indignities and constructive abandonment. The jury found for defendant husband on the issues of indignities and abandonment, and for plaintiff wife on the issue of adultery. Defendant appeals.

Plaintiff's evidence tended to show that the husband had a friendly relationship with one Rebecca Johnson and that the two were alone together on several occasions in Ms. Johnson's office and on at least one occasion at Ms. Johnson's home. Ms. Johnson made telephone calls to defendant when he was out of town on business and admitted in her testimony that they were friends, but denied being in love with defendant or having a sexual relationship with him. The wife testified that the husband was often absent from home on Saturday afternoons prior to the parties' initial separation in 1979. After the parties reconciled a few months later, the husband refused to sleep with the wife and was often away in the evenings. There was also evidence that the husband physically abused the wife and once offered her $10,000 if she would "let him see his girl friend."

Defendant's evidence was that he stopped sleeping with his wife because of her "tantrums." He testified that he had not committed adultery and that he had not offered his wife money to allow him to see a girl friend.

*Walker, Dowda, Ray & Warren, by Perry N. Walker and J. Bruce Morton, for plaintiff appellee.*

*Lunsford and West, by John W. Lunsford, for defendant appellant.*

ARNOLD, Judge.

Defendant brings forward numerous assignments of error relating to the admissibility of certain evidence. While we find it unnecessary to reach these contentions in the disposition of defendant's appeal, we note at the outset that we have considered each of them and found them to be without merit. Nevertheless, while we hold that there was no error in the admission of various circumstantial evidence, and although we recognize that

circumstantial evidence may be sufficient to support a finding of adultery, we conclude that there was insufficient evidence to support the verdict in the case before us.

As plaintiff wife correctly points out, there exists no clear standard for determining the sufficiency of proof of adultery. Indeed, even the doctrine of "inclination and opportunity," which has been the rule most often cited by the courts, has been subjected to exceptions and conflicting interpretations. *See Owens v. Owens*, 28 N.C. App. 713, 222 S.E. 2d 704 (1976). The Court is concerned that this lack of a clear standard has resulted in precisely that which this Court and our Supreme Court have repeatedly held to be impermissible — trial by "suspicion and conjecture." *State v. Gordon*, 225 N.C. 757, 36 S.E. 2d 143 (1945); *Owens v. Owens, supra.*

The difficulty inherent to obtaining evidence of the existence of a supremely private relationship, particularly in view of the complaining spouse's disability to testify thereto, has led to almost wholesale jury discretion in this area of the law. In *Owens, supra*, for example, this Court held that the issue should have been submitted to the jury in spite of a total absence of evidence indicating "adulterous disposition" where the accused wife slept in the same house with another man. It appears, therefore, that opportunity alone may now be sufficient to support a jury verdict of adultery if the opportunity is great enough. In *Owens*, evidence that the two sometimes left the house at the same time and that they were seen shopping together was found sufficient to suggest the requisite "incriminating circumstances."

Given the highly emotional nature of the subject matter, and the degree to which individual jurors' attitudes regarding propriety may vary, we feel a more definite line must be drawn between permissible inference and mere conjecture. In the case at bar, the husband was shown to have been alone with another woman on a few occasions in her office and once or twice at her home. There was no evidence showing that they were found together very late at night, in a state of undress or under otherwise suspicious circumstances. Nor was there any evidence of feelings of "love" or of affectionate behavior between the two. All we apparently have are bits and pieces of circumstantial evidence from which the jury concluded that an adulterous affair had taken

place. We cannot find that this was enough evidence on which to adjudicate the parties' legal rights. Indeed, to hold otherwise would be to subject virtually all friendships between men and women, however innocent, to legal scrutiny.

We find it ironic that the same jury which found the evidence sufficient to conclude defendant committed adultery found defendant did not inflict indignities on his wife. We fail to see, on the facts of this case, how the evidence could have supported the issue on adultery without dictating a finding that he also offered such indignities as to render plaintiff's life intolerable. However, plaintiff has failed to raise the issue of indignities on appeal and we cannot properly consider it.

Having concluded that the trial court erred in denying defendant's motion for a directed verdict on the question of adultery, the defendant is entitled to have that portion of the judgment vacated and reversed. The judgment in all other respects is affirmed.

Reversed in part and affirmed in part.

Judges CLARK and WHICHARD concur.

———————

STATE OF NORTH CAROLINA v. DOUGLAS ATKINS

No. 8127SC1113

(Filed 6 April 1982)

**Burglary and Unlawful Breakings § 5.1; Criminal Law § 60.5— insufficiency of fingerprint evidence**

Evidence that defendant's fingerprint was found on an air conditioner which had been removed from the outside wall of a pawn shop during a breaking and entering of the shop was insufficient to support the conviction of defendant for breaking and entering the pawn shop where there was no other evidence tending to connect defendant with the crime, and there was substantial evidence that defendant had been lawfully in or around the building in which the pawn shop was located at times other than when the crime was committed.

APPEAL by defendant from *Kirby, Judge.* Judgment entered 10 July 1981 in Superior Court, GASTON County. Heard in the Court of Appeals 11 March 1982.

Defendant appeals from a judgment of imprisonment entered upon a conviction for breaking and entering.

*Attorney General Edmisten, by Special Deputy Attorney General John R. B. Matthis and Assistant Attorney General James C. Gulick, for the State.*

*Robert W. Clark, Assistant Public Defender, for defendant appellant.*

WHICHARD, Judge.

The dispositive issue is whether the court erred in denying defendant's motion to dismiss. We hold that it did.

Defendant was charged with feloniously breaking and entering a building occupied by The Pawn Shop of Gastonia, Inc., and with felonious larceny of personal property therefrom. The State's evidence showed the following:

An employee who closed The Pawn Shop on 10 March 1981 observed that the air conditioner in the rear wall was in place when she departed. The next morning one of the owners noticed a hole where the air conditioner had been, and he subsequently saw the air conditioner on the ground outside the building. He also observed a hole in a partition between two rooms in the back of the building. An inventory revealed that property belonging to the Shop worth approximately $12,000 was missing. A hardware store had been located in the building until The Pawn Shop had moved in approximately one week before the breaking, and it had used the same air conditioner.

A police officer who qualified without objection as a fingerprint expert dusted the air conditioner and many areas inside the store for latent fingerprints. He secured fingerprints from the bottom left of the air conditioner, which would have been outside the building had the air conditioner been installed in the hole, which prints matched those subsequently taken from defendant. He had no way to determine exactly how long the prints had been on the air conditioner.

Defendant told another police officer that he had gone to The Pawn Shop on 23 February 1981 and had pawned a silver quarter. He also told this officer he had not been to The Pawn Shop since then, and that he did not remove an air conditioner there.

Defendant testified in his own behalf as follows: He lived about a block and a half from The Pawn Shop. In the past he had helped a man who ran the hardware store when it was in the building to which The Pawn Shop had moved. His work consisted of cleaning up behind the building. There was an air conditioner in the back wall when he was working there. He did not remember touching its bottom left hand side, but he could have done so. He worked there "in early February or late January," and a man named Ernest paid him. He did not steal, or assist anyone in .stealing, from The Pawn Shop.

Ernest Clemmons testified on rebuttal for the State that he was employed by the hardware store; that defendant had worked there in May, 1980; but that to the best of his knowledge defendant had not been employed by the store in January or February, 1981. Defendant had asked him for a job in January or February, 1981, but he did not have any work for him.

The standard for determining the sufficiency of fingerprint evidence to withstand a motion to dismiss has been stated as follows:

[T]estimony by a qualified expert that fingerprints found at the scene of the crime correspond with the fingerprints of the accused, when accompanied by substantial evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed, is sufficient to withstand motion for nonsuit and carry the case to the jury. The soundness of the rule lies in the fact that such evidence logically tends to show that the accused was present and participated in the commission of the crime.

What constitutes substantial evidence is a question of law for the court. What the evidence proves or fails to prove is a question of fact for the jury.

*State v. Miller,* 289 N.C. 1, 4, 220 S.E. 2d 572, 574 (1975). In *Miller* one of the factors on the basis of which the Supreme Court held

the motion to dismiss was properly denied was that "[t]here [was] no evidence whatsoever that defendant was *lawfully* in or around the [building in question] at any time." *Miller* at 6, 220 S.E. 2d at 575. Here, by contrast, there was substantial evidence that defendant had been lawfully in or around the building in which The Pawn Shop was located at times other than when the offenses charged were committed.

In *State v. Irick,* 291 N.C. 480, 492, 231 S.E. 2d 833, 841 (1977), our Supreme Court observed that the fact, standing alone, that a fingerprint of defendant there had been found on the inside frame of a window, through which items had been removed from a burglarized house, did not constitute the requisite " 'substantial' evidence that the print could have only been impressed at the time of the alleged burglary." *See also State v. Scott,* 296 N.C. 519, 251 S.E. 2d 414 (1979).

Here, too, the fingerprint evidence stood alone. It was not "accompanied by substantial evidence of circumstances from which the jury [could] find that the fingerprints could only have been impressed at the time the crime was committed . . . ." *Miller* at 4, 220 S.E. 2d at 574. No other evidence tended in any way to connect defendant to the offenses charged. Hence, judged by the standard of the foregoing cases, the evidence was insufficient to withstand the motion to dismiss.

The judgment is therefore vacated, and the cause is remanded to the trial court for entry of judgment of dismissal.

Vacated and remanded.

Judges MARTIN (Robert M.) and MARTIN (Harry C.) concur.

COUNTY OF BRUNSWICK, NORTH CAROLINA v. TOWN OF BOLIVIA, NORTH CAROLINA

No. 8113SC650

(Filed 6 April 1982)

**Municipal Corporations § 2.1— annexation—no petition signed by owners of area to be annexed**

> The trial court properly ordered and declared the annexation by defendant of property owned by plaintiff illegal, null and void since pursuant to G.S. 160A-58.1, the annexation must have been initiated by a petition signed by all the owners of real property in the area sought to be annexed, and, as the proposed annexed area was solely owned by Brunswick County, a petition signed by residents within and without the Town of Bolivia was not sufficient.

APPEAL by defendant from *Bowen, Judge.* Judgment entered 26 May 1981 in Superior Court, BRUNSWICK County. Heard in the Court of Appeals 1 March 1982.

Defendant appeals from a declaratory judgment that its annexation of non-contiguous property pursuant to G.S. 160A-58.1 is null and void because of an invalid petition.

The parties have stipulated to the following facts. Plaintiff is a political subdivision of the government of the State of North Carolina. Defendant is a municipal corporation in Brunswick County. In a 1975 referendum, voters of Brunswick County approved the removal of the county seat from Southport, North Carolina, to an unincorporated location in the geographical center of Brunswick County. Pursuant to that referendum, the county seat was moved to the new Brunswick County Governmental Center in 1978.

On 17 September 1980, there was a hearing in the Town Hall of the Town of Bolivia to consider a petition for the annexation of the 38.5 acre tract upon which the Brunswick County Governmental Center is located. The petition had been signed by various residents within and without the Town of Bolivia. It had not been signed by any member of the Governing Board of Brunswick County or by all of the citizens and taxpayers of Brunswick County.

As a result of the hearing, the Town Council voted to annex the property upon which the county governmental center is located.

Plaintiff brought an action for a declaratory judgment that the annexation was illegal. The court concluded that the petition circulated pursuant to G.S. 160A-58.1 was invalid because it was not signed by all the owners of the real property described in the area sought to be annexed. The court ordered and declared that the annexation was illegal, null and void.

*John R. Hughes, for plaintiff appellee.*

*Algernon L. Butler, Jr., for defendant appellant.*

VAUGHN, Judge.

Defendant argues that the petition to annex property upon which the Brunswick County Governmental Center is located meets the requirements of G.S. 160A-58.1. We disagree.

The extension of the boundaries of a town or city is a legislative function. *Plemmer v. Matthewson,* 281 N.C. 722, 190 S.E. 2d 204 (1972). A municipal corporation has no power to extend its boundaries by annexation other than that delegated to it by legislative enactment or constitutional provision. *In re Annexation Ordinance,* 296 N.C. 1, 249 S.E. 2d 698 (1978); 2 E. McQuillin, The Law of Municipal Corporations § 7.13 (3rd ed. 1979).

North Carolina allows a city to annex a non-contiguous area pursuant to G.S. 160A-58.1. According to that statute, the annexation must be initiated by a petition signed by all the owners of real property in the area sought to be annexed. Excepted from signing are owners of real property that is wholly exempt from property taxation under the Constitution and laws of North Carolina.

When the power to annex territory is delegated to a municipal corporation, it must be exercised in strict accord with the conferring statute. *In. re Annexation Ordinance,* 296 N.C. at 17, 249 S.E. 2d at 707. The present petition was signed by residents within and without the Town of Bolivia. None of them, however, were property owners of the area sought to be annexed. Nothing in G.S. 160A-58.1 requires or authorizes the signatures of non-property owners. The court, therefore, properly excluded consideration of the fifty-nine signatures on the petition.

The sole property owner of the proposed annexed area was Brunswick County. Defendant correctly points out that the Coun-

ty was not required to sign the petition because it is a tax-exempt property owner. There was, however, no one else authorized to seek annexation. The court properly declared the annexation illegal, null, and void.

Affirmed.

Chief Judge MORRIS and Judge HEDRICK concur.

---

STATE OF NORTH CAROLINA v. WALTER LEE BRYANT, JR.

No. 8117SC1101

(Filed 6 April 1982)

**Criminal Law § 86.3 — impeachment of defendant — admission of prior conviction — further improper cross-examination**

In a prosecution for breaking and entering in which defendant testified on cross-examination that he had been convicted of stealing a police radio from a police station, the trial court erred in permitting the State to further cross-examine defendant as to the details of the theft and his subsequent use of the radio to harass the police, since the cross-examination not only attacked defendant's credibility but also tended to establish him as a person who lacked respect for the law and for those who enforce it.

APPEAL by defendant from *Lamm, Judge.* Judgment entered 6 May 1981 in Superior Court, SURRY County. Heard in the Court of Appeals 10 March 1982.

Defendant was indicted for the felonious breaking and entering of a residence. The State's principal witness was Kenneth Holt, who testified that he, defendant, and two other persons entered the residence of Pauline Fulk on the afternoon of 25 October 1980 and removed various items of property from the house. The following day, Holt confessed his participation to Deputy Sheriffs Richard Bowman and Roger Cook. Officer Cook agreed not to oppose probation for Holt in return for his testimony against defendant. The two officers corroborated Holt's testimony. Pauline Fulk identified a number of items of property taken from her house.

Defendant presented alibi evidence, including his own testimony. From judgment entered on the jury's verdict of guilty, defendant appeals.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Elisha H. Bunting, Jr., for the State.*

*Adam Stein, Appellate Defender, by Assistant Appellate Defender James H. Gold, for defendant-appellant.*

WELLS, Judge.

In one of his assignments of error, defendant contends that the trial court erred in allowing the State to cross-examine defendant as to the details of a prior conviction. The following excerpt from the record provides the basis for this assignment:

Q. What have you been tried and convicted of, Mr. Bryant?

A. I have been tried and convicted of a felony.

Q. What felony?

A. What do you mean?

Q. What felony was it that you were convicted of exactly, sir?

A. For stealing a radio out of a police station at Pilot Mountain.

Q. Stealing a radio out of a police station?

A. Yes, sir.

Q. Did you go in the station and take it out?

A. Yes, sir.

MR. EVERETT: Objection.

COURT: Overruled.

Q. You took that police radio up and down the streets of Pilot Mountain and talked back to the policemen on their radio, didn't you?

A. Yes.

Q. Telling them that you were on such and such a corner; then run away and radio back and tell them where you were again; when they would come toward you, you would run to another corner; isn't that correct?

A. Yes, I did.

Q. You kept that up having them scurrying all over town while all the time you were having a big time with their radio and them running after you, right?

MR. EVERETT: Objection.

COURT: Overruled.

A. Yes, I was drinking at the time and thought I was having fun.

Q. So you admit you were bold enough to go in the police department in broad daylight and take their property out into the streets —

MR. EVERETT: Objection, Your Honor.

COURT: Sustained.

We find that the extent and character of the inquiry here far exceeds the bounds established by our Supreme Court in *State v. Finch*, 293 N.C. 132, 235 S.E. 2d 819 (1977), where the court held that "[w]here a conviction has been established, a limited inquiry into the time and place of conviction and the punishment is proper." *Id.*, at 141. Not only does the cross-examination in this case attack defendant's credibility; it tends to establish him as a person who lacks respect for the law and those whose duty it is to enforce it, thus suggesting to the jury his guilt in this case.

Defendant's remaining assignment of error is based on exceptions to testimony he did not object to at trial. These exceptions may not be asserted on appeal. *See* App. R. 10(b)(1).

In addition to the active sentence given in this case, the defendant's probation in two other cases was revoked. The judgments below are vacated and defendant is to have a new trial.

Vacated;

New Trial.

Judges HILL and BECTON concur.

---

BARBARA KAY S. ROBINSON v. GARY A. ROBINSON

No. 8120DC670

(Filed 6 April 1982)

**Divorce and Alimony § 1— jurisdiction in action for permanent alimony**

    In an action in which plaintiff sought divorce from bed and board and permanent alimony, the trial court properly found it had jurisdiction over defendant under G.S. 1-75.4(12) since defendant was married in North Carolina, he and plaintiff resided as husband and wife in North Carolina, and defendant's alleged abandonment of plaintiff was an act occurring within the State.

APPEAL by defendant from *Huffman, Judge.* Judgment entered 29 January 1981 in District Court, MOORE County. Heard in the Court of Appeals 3 March 1982.

Defendant appeals from the denial of his motion to dismiss for lack of jurisdiction.

Plaintiff and defendant were married on 29 October 1978 in Moore, County, North Carolina. On or about 25 June 1979, defendant removed himself from North Carolina to Naples, Florida. He filed a petition for dissolution of marrige in Hendry County, Florida, on 27 December 1979. Plaintiff was not personally served. The action was dismissed by the court, as was a subsequent motion for annulment filed by defendant in Pineallas County, Florida.

On 29 January 1980, plaintiff filed an action in North Carolina, alleging that defendant had abandoned her and rendered her life burdensome and intolerable. She sought divorce from bed and board, permanent alimony, and an injunction against defendant's filing in Florida courts for a divorce. The summons and verified complaint were personally served on defendant on 14 February 1980.

On 14 February 1980, defendant filed an action for absolute divorce in Collier County, Florida, on the grounds of an irretrievably broken marriage. He attempted service on plaintiff by publication. On 28 March 1980, defendant was granted a final judgment of divorce.

On 14 April 1980, defendant moved to dismiss plaintiff's North Carolina action on the grounds of lack of subject matter and personal jurisdiction. The court denied defendant's motion.

*David G. Crockett, for plaintiff appellee.*

*Seawell, Robbins, May and Rich, by P. Wayne Robbins, for defendant appellant.*

VAUGHN, Judge.

Defendant's only assignment of error is whether the court erred in finding the defendant was subject to the jurisdiction of the North Carolina Courts.

Although the argument is not grounded in an assignment of error, defendant attempts to argue that plaintiff's present claim should have been asserted as a compulsory counterclaim in the divorce action he started in Florida on 27 December 1979. In the first place, there was never personal service on plaintiff in that action. Second, the record fails to disclose that the action was pending at the time plaintiff started the present action. For these reasons, among others, the argument is without merit.

Although plaintiff has the right to bring her present action for alimony, pursuant to G.S. 50-11(d), North Carolina cannot render a valid alimony judgment against defendant unless it has personal jurisdiction over him. *Fleek v. Fleek,* 270 N.C. 736, 155 S.E. 2d 290 (1967). Defendant asserts that any exercise of jurisdiction over his person, pursuant to G.S. 1-75.4, violates the due process clause of the Fourteenth Amendment. We disagree.

Our Supreme Court has interpreted our long-arm statute as asserting personal jurisdiction over non-resident defendants to the full extent permissible under federal due process. *Dillon v. Funding Corp.,* 291 N.C. 674, 231 S.E. 2d 629 (1977). There is a twofold inquiry. We must first determine whether the North Carolina statute permits jurisdiction over this particular defend-

ant. The second inquiry is whether the exercise of jurisdiction will violate due process. *Hankins v. Somers,* 39 N.C. App. 617, 251 S.E. 2d 640, *cert. denied,* 297 N.C. 300, 254 S.E. 2d 920 (1979).

G.S. 1-75.4(12) provides that North Carolina has personal jurisdiction "[i]n any action under Chapter 50 that arises out of the marital relationship within this State, notwithstanding subsequent departure from the State, if the other party to the marital relationship continues to reside in this State." The present parties were married in North Carolina, and plaintiff continues to reside in the State. Furthermore, an action for alimony based on abandonment is considered a claim of "injury to person or property" under G.S. 1-75.4(3). *Brown v. Brown,* 47 N.C. App. 323, 267 S.E. 2d 345 (1980). The court, therefore, properly concluded that North Carolina's statute permits jurisdiction over defendant.

Due process requires minimum contacts with the State such that maintenance of the suit will not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The present defendant was married in North Carolina. He and plaintiff resided as husband and wife in North Carolina. Defendant's alleged abandonment of plaintiff was an act occurring within the State. We conclude that the "minimum contacts" test has been satisfied.

The court properly denied defendant's motion to dismiss.

Affirmed.

Chief Judge MORRIS and Judge HEDRICK concur.

SAROBIA SUTTON v. KENNETH W. SUTTON

No. 8120DC727

(Filed 6 April 1982)

**Divorce and Alimony § 24; Parent and Child § 7.3— failure to deny paternity — defense of non-paternity barred in subsequent aciton**

     *Defendant's failure to deny paternity in a divorce action in which the issue of paternity was duly raised in the complaint barred a defense of non-paternity in a subsequent action for child support between the same parties.*

APPEAL by defendant from *Burris, Judge.* Judgment entered 26 February and 5 March 1981 in District Court, UNION County. Heard in the Court of Appeals 11 March 1982.

Defendant brings this appeal from two orders in which the trial court held that the issue of defendant's paternity of plaintiff's minor child had been finally adjudicated in plaintiff's 1976 divorce action and that defendant was liable for child support.

Plaintiff brought this action against defendant in 1979 for support of their minor child. She alleged that defendant had refused to pay anything for support of his son despite plaintiff's repeated demands. Defendant responded by denying paternity and moved for blood grouping and tissue tests to determine whether he was the father of the child. This order was granted, but later set aside on grounds that the issue of paternity had been adjudicated in the parties' divorce proceeding. From an order granting plaintiff child support and attorney's fees, defendant appeals.

*Perry and Bundy, by H. Ligon Bundy, for plaintiff appellee.*

*Charles D. Humphries for defendant appellant.*

ARNOLD, Judge.

Defendant's sole argument on appeal is that the trial court erred in denying his motion for a paternity test. Defendant contends that the 1976 divorce judgment is not determinative of the issue of paternity because the court made no findings of fact concerning that issue. It is true that no express finding on this issue

was set forth in the divorce order. However, plaintiff raised the issue in her complaint and the court impliedly addressed it by granting defendant visitation privileges and ordering him to pay child support. Moreover, defendant failed to appear or to raise his defense in the original action although he was properly served with process. As this Court stated in *Williams v. Holland*, 39 N.C. App. 141, 148, 249 S.E. 2d 821, 826 (1978), "[i]t is a well established principle in North Carolina . . . that a valid judgment is binding on the parties to it 'as to all issuable matters contained in the pleadings, including all material and relevant matters within the scope of the pleadings, which the parties, in the exercise of due diligence, could and should have brought forward.' *Bruton v. Light Co.*, 217 N.C. 1, 7, 6 S.E. 2d 822, 826 (1940)."

The trial court correctly held that defendant's failure to deny paternity in the original action between the parties, wherein the issue was duly raised in the complaint, operates as a bar to the defense in the subsequent action between the same parties.

Affirmed.

Judges CLARK and WEBB concur.

MAXINE V. MOORE, As EXECUTRIX OF THE ESTATE OF ALLAN PRATT MOORE, AND MAXINE V. MOORE, INDIVIDUALLY v. UNION FIDELITY LIFE IN-SURANCE COMPANY

No. 8121DC651

(Filed 6 April 1982)

Insurance § 67.3 — death benefits under accident policy — instructions on burden of proof

    In an action to recover death benefits under an accident policy wherein plaintiff presented evidence that insured's death was caused by the unexplained firing of a pistol and defendant presented evidence that the death was suicide, the trial court did not err in instructing the jury that if it was unable to determine where the truth lies about insured's death, it should not find an accidental death since defendant's evidence that the death resulted from suicide was offered not to establish an affirmative defense but to rebut the presumption that the death was by accidental means; defendant's evidence was sufficient to rebut such presumption; and the court's instruction properly allocated to plaintiff the burden to prove that the death was by accidental means.

APPEAL by plaintiff from *Tanis, Judge.* Judgment entered 22 January 1981 in District Court, FORSYTH County. Heard in the Court of Appeals on 1 March 1982.

This appeal arises from plaintiff's action to recover on an insurance policy insuring plaintiff's husband, Allan Moore, "against loss incurred by the insured resulting directly and independently of all other causes from accidental bodily injury." Plaintiff sought to invoke the benefits of such policy upon the death of her husband who died as a result of a gunshot wound on 14 September 1973. The policy insuring Allan Moore contained the following provision: "EXCEPTIONS: The insurance provided by this policy does not cover death, disability, or other loss which is caused: . . . (2) by suicide or any attempt thereat (sane or insane) . . . ." At trial, plaintiff presented evidence tending to show that Allan Moore's death was caused by unexplained violence of external means, to wit, the firing of a gun, and defendant presented evidence tending to show that Allan Moore's death was suicide and was caused by his intentionally shooting himself with a gun. The jury was presented the following issue: "Was the death of the Plaintiff's deceased a result of accidental bodily injury?" The jury answered in the negative and the court ordered "that the plaintiff have and recover nothing on her claim against the defendant." Plaintiff appealed.

*Keith & Smithwick, by Thomas J. Keith for plaintiff appellant.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by James H. Kelly, Jr., for defendant appellee.*

HEDRICK, Judge.

The sole argument propounded by plaintiff in her brief is that "[t]he trial court committed prejudicial error by instructing the jury that if they were unable to determine where the truth lies that the insured died as a result of a self-inflicted gunshot wound, that they should not find an accidental death." Plaintiff argues that defendant's contention that Allan Moore's death was suicide is an affirmative defense for which defendant bears the burden of persuasion, and that the court erred in failing to so instruct.

Moore v. Insurance Co.

Our decision on this appeal is controlled by *Moore v. Union Fidelity Life Insurance Co.,* 297 N.C. 375, 255 S.E. 2d 160 (1979), when this same case was before our Supreme Court.

In the present case, plaintiff "had the burden of showing that her husband died as a result of accidental bodily injury within the meaning of the policy issued by defendant." *Moore, supra* at 378, 255 S.E. 2d at 162. Plaintiff did present evidence tending to show that Allan Moore's death was caused by unexplained, violent, and external means. Such evidence raised a presumption that his death was by accidental means; such a presumption, however, "in no event . . . operate[s] to relieve the plaintiff of the burden of persuasion on the issue of accidental death." *Moore, supra* at 382, 255 S.E. 2d at 165. Furthermore, "[i]f evidence of non-accidental death is presented, then the presumption *per se* no longer applies, and the question of accidental death is one for the jury," *Moore, supra* at 382, 255 S.E. 2d at 165.

The evidence offered by defendant which tended to show that Allan Moore's death was a suicide was not, as plaintiff contends, offered to establish an affirmative defense. Rather, such evidence was "evidence of non-accidental death" offered to rebut the presumption of accidental death. The mere presentation of such evidence was sufficient to enable defendant to avoid the mandatory effect of a presumption and to permit the jury to decide, without any peremptory instructions, whether the death was accidental. *Moore, supra.* Defendant, to avoid an instruction that the jury must find an accidental death if it believed the evidence of violent and unexplained death, did not have to prove suicide by a preponderance of the evidence but needed only to present evidence tending to rebut the presumed fact that the death was accidental, *Moore, supra,* and defendant presented such evidence. The burden of persuasion in the present case remained on plaintiff to prove that the death was by accidental means. *Moore, supra.* This burden was properly allocated by the trial court in the instruction challenged by the exception upon which this assignment of error is based. Plaintiff's assignment of error is overruled.

In the trial below, we find

Durham County v. Riggsbee

No error.

Chief Judge MORRIS and Judge VAUGHN concur.

DURHAM COUNTY AND ELLEN MARIE CAPPARELLA v. HAROLD STEVE
RIGGSBEE

No. 8114DC704

(Filed 6 April 1982)

Bastards § 9— inability to relitigate paternity

The trial court lacked authority to attempt to relitigate an issue of paternity since the issue had been finally determined more than three years earlier.

APPEAL by plaintiffs from *Galloway, Judge.* Order entered 23 April 1981 in District Court, DURHAM County. Heard in the Court of Appeals 8 March 1982.

*Durham County Attorney's Office, by Assistant County Attorneys Thomas Russell Odom and S. C. Kitchen, for plaintiff appellants.*

*Clayton and Myrick, by Ronald G. Coulter, for defendant appellee.*

VAUGHN, Judge.

On 13 October 1976, defendant was ordered to pay plaintiff Capparella, defendant's former wife, $40.00 each week for the support of a minor child which the court found to have been born to the marriage. The issue of paternity was raised and fully litigated in that proceeding. Defendant did not appeal and complied with the order through January 1978.

Plaintiff Capparella began receiving public assistance in the form of AFDC through the Durham County Department of Social Services and that resulted in the assignment of her right to obtain child support under the provisions of G.S. 110-137. In February 1981, plaintiff County filed a motion in the cause seeking wage garnishment pursuant to G.S. 110-136 to enforce the child support order.

Defendant then filed a "Motion for Discovery and Stay of Proceedings." The motion was filed under General Statute Rule 35(a). He alleged that he had learned of "a different and reportedly more reliable method for testing a child's paternity. . . ."

On 23 April 1981, Judge Galloway entered an order requiring the mother, father and their child to submit themselves to a tissue typing test, and ordered that the garnishment proceeding be stayed pending the results of the tests.

The judge's lack of authority to attempt to relitigate an issue that had been finally determined more than four years earlier is so obvious that no discussion of the question need be made.

The order is void, and the same is hereby vacated.

Vacated.

Chief Judge MORRIS and Judge HEDRICK concur.

M. NEIL FINGER AND REBECCA B. FINGER v. COLEMAN CARTER AND VIRGINIA H. CARTER

No. 8123DC721

(Filed 6 April 1982)

**Bills and Notes § 20— defense to action on note—summary judgment improper**

In an action to recover the balance due on a promissory note, the issue of whether, in consideration of the execution of the note, plaintiffs executed a written agreement to convey a 25% interest in a 158 acre tract of land was not resolved by plaintiffs' delivery of a quitclaim deed to the 158 acre tract which they say they do not own, and the trial court erred in entering summary judgment for plaintiffs on the basis of the quitclaim deed.

APPEAL by defendants from *Ferree, Judge.* Judgment entered 6 May 1981 in District Court, YADKIN County. Heard in the Court of Appeals 10 March 1982.

Plaintiffs sue for the balance due on a note executed by defendants. Defendants admit the execution of the note. They contend, however, that they are entitled to a set-off in the amount of the balance due because of plaintiffs' alleged failure to carry out

the terms of a written contract for which the note was given. In consideration for the note defendants allege plaintiffs agreed to transfer, among other things:

> "(c) . . . a 25% interest in a 158 acre tract of land located in Ashe County, State of North Carolina; the defendants allege and say that the plaintiffs never complied with this provision of this Agreement."

Plaintiffs moved for summary judgment. By affidavit, they deny ever owning any interest in the 158 acre tract and deny ever agreeing to convey the land to defendants. In their affidavit, they agreed to execute a quitclaim deed to the tract. Their motion for summary judgment was denied by Judge Osborne on 5 May 1981. The case come on for trial on 5 May 1981 before Judge Ferree. On the morning of the trial, a quitclaim deed from plaintiffs to defendants was delivered to defendants. The judge then concluded that there was no genuine issue of fact and entered summary judgment for plaintiffs.

*Finger, Park and Parker, by Raymond A. Parker II, for plaintiff appellees.*

*Steven P. Pixley, for defendant appellants.*

VAUGHN, Judge.

The judgment must be reversed. The issue of whether, in consideration of the execution of the note, plaintiffs executed a written agreement to convey a 25% interest in a 158 acre tract of land in Ashe County remains. It certainly was not resolved by the delivery of a quitclaim deed to land they say they do not own.

Reversed.

Chief Judge MORRIS and Judge HEDRICK concur.

STATE OF NORTH CAROLINA v. JOHNNY A. BORG

No. 8112SC791

(Filed 6 April 1982)

APPEAL by defendant from *Brannon, Judge.* Judgment entered 25 February 1981 in Superior Court, CUMBERLAND County. Heard in the Court of Appeals 11 January 1982.

Defendant was charged with first degree burglary and second degree rape. He pled not guilty to both counts. The evidence adduced at trial tended to show that defendant on 18 October 1980 broke into Angela Schermerhorn's apartment in Fayetteville and had sexual relations with her against her will. The jury found defendant guilty as charged. Defendant appeals from a judgment of imprisonment.

*Attorney General Edmisten, by Assistant Attorney General Roy A. Giles, Jr., for the state.*

*Assistant Public Defender Gregory A. Weeks for defendant appellant.*

MORRIS, Chief Judge.

Counsel for defendant concedes that he finds no prejudicial error in defendant's trial but requests this Court to examine the record for error. Because of the position of the majority of the Supreme Court of the United States in *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed. 2d 493 (1967), *reh. den.* 388 U.S. 924, 87 S.Ct. 2094, 18 L.Ed. 2d 1377 (1967), we have carefully reviewed the entire record of the defendant's trial to determine whether the record contains anything which "might arguably support the appeal" and whether the "case is wholly frivolous". In a dissent, in which Mr. Justice Black and Mr. Justice Harlan joined, Mr. Justice Stewart most aptly pointed out that if the record did in fact present any such arguable issues, the appeal would not be frivolous and counsel certainly would not have filed a brief in which he took the position that the appeal is without merit.

A careful review of all proceedings below convinces us that defendant received a fair trial free from prejudicial error. The appeal is wholly frivolous and totally without merit.

State v. Earnhardt

No error.

Judges VAUGHN and MARTIN (Harry C.) concur.

STATE OF NORTH CAROLINA v. VICKIE ANN EARNHARDT AND WILLIAM
CARL KELLER

No. 8119SC697

(Filed 20 April 1982)

1. **Criminal Law § 157— failure to include proper parts of record—subject to dismissal**

Where defendant failed to include in the record on appeal copies of either the verdict, judgment, notice of appeal or appeal entry, although the information contained in those documents appeared in the record in various places, defendant's case was technically subject to dismissal.

2. **Criminal Law § 11— accessory after fact of voluntary manslaughter—sufficiency of evidence**

The evidence was sufficient to survive defendant's motion to dismiss the charge of accessory after the fact of voluntary manslaughter on the ground that the evidence failed to show that defendant knew the offense had been committed, where the evidence tended to show that defendant knew, before proposing a false story to be told to authorities, that decedent and two men had been fighting, that decedent was left very near to or on the road, and that decedent had been struck and killed by an automobile.

3. **Criminal Law § 102.1— closing argument of district attorney—supported by evidence—portion of argument omitted from record**

The district attorney's characterization in his closing argument that those present at the scene of a crime were "acting like a pack of wolves," did not torture the sense of the record so as to mislead the jury or deprive defendant of a fair trial. Further, a portion of the district attorney's remarks were absent from the record, and when a portion of the argument is omitted from the record, the argument is presumed proper.

4. **Criminal Law § 117.4— instruction regarding State's witness**

An instruction regarding a State's witness's plea bargain for a reduction of charges in exchange for his testimony did not improperly allow the jury to decide why the witness testified.

5. **Criminal Law § 11— accessory after the fact to voluntary manslaughter—instructions**

A court's instruction that "for a person to be guilty of a crime in this case, accessory after the fact of voluntary manslaughter, it is not necessary that he

or she do all of the acts necessary to constitute the crime, but he or she must be present," accurately stated the law of concerted action.

**6. Criminal Law § 111.1— use of "they" in charge to jury**

From the court's use of the pronoun "they" in part of the charge to the jury, it was clear that the trial court was referring to the codefendants, and the instruction did not allow the jury to consider the codefendants' actions against defendant.

**7. Criminal Law § 113.8— accessory after the fact—instruction improper**

In a prosecution for accessory after the fact to voluntary manslaughter, the court erred in instructing that if defendant knew two men "*could* have committed the crime of voluntary manslaughter" and assisted these men in escaping or attempting to escape detection or arrest, then he should be found guilty since it must have been shown that defendant *knew* a felony had been committed.

Judge HEDRICK dissenting.

APPEAL by defendant from *Walker, Judge.* Judgment pronounced 19 February 1981 in Superior Court, ROWAN County. Heard in the Court of Appeals 9 December 1981.

Defendant was arraigned on a charge of accessory after the fact of voluntary manslaughter, entered a plea of not guilty, and was tried with a codefendant.

Donald Ray Lagree, testifying pursuant to a plea negotiation, testified that on the night of 29 June 1980, he and Walter Horne, who are black males, and two white women were drinking liquor at the home of defendant. Clarence Basinger, husband of one of the women, came to the front door of the house and told defendant that he wanted to speak to his wife. Linda Basinger went out to the porch but ran back into the house about fifteen minutes later holding the side of her face, crying. She said that her husband had hit her. Codefendant Vickie Earnhardt, Linda's sister, called the Sheriff's Department. Defendant went outside and talked to Clarence Basinger, then returned and said that Basinger was sorry for what he had done and that he wanted to speak to his wife again. Linda Basinger went back outside, accompanied by defendant. Those remaining inside heard a woman's scream, ran outside, and saw that Linda Basinger had been cut on the arm and was bleeding profusely. Lagree and Horne began arguing with Clarence Basinger, and a fight broke out. Basinger had an open hawkbill knife in his hand; Horne had a pocketknife, and

Lagree, a belt. Basinger fell to the ground and was kicked and stomped. He crawled to the road in front of the house and called from the edge of the road that he was going to return with a shotgun. Basinger was still on the ground in a crawling position. Horne then approached Basinger, and they began fighting again. Horne hit Basinger's head on the road, and Basinger was kicked and stomped. Basinger crossed to the other side of the road, where he was left lying, conscious, with his upper body on the roadway. Defendant was standing in the yard of his house during the fight and did nothing.

Horne and Lagree went back into the house. Lagree, Horne and defendant Earnhardt walked out to the road and found Basinger still conscious and moaning. Horne kicked Basinger in the head. The men discussed whether they should move Basinger out of the road, but within moments, two automobiles simultaneously approached from opposite directions and Basinger was struck by a Ford Pinto. The driver, William Beck, stopped and called an ambulance and the Sheriff's Department. Patrick Beck, Beck's younger brother, and Lagree testified that defendant told Horne, Lagree and Earnhardt not to relate everything, but to tell the following story: Clarence Basinger pulled a knife on his wife and tried to cut her, and defendant tried to wrestle the knife away; defendant saw two black men walking up the road and called to them for help; Basinger ran when he saw the men coming and fell down in the road, where he was hit by an automobile. Defendant rehearsed the story with his companions at least three times. Steve Douglas, the investigating deputy sheriff, testified that defendant told him the story when he met defendant to talk about the incident.

Defendant was convicted of being an accessory after the fact of voluntary manslaughter. He appeals from an order of imprisonment.

*Attorney General Edmisten, by Assistant Attorney General Elisha H. Bunting, Jr., for the state.*

*Davis and Corriher, by Robert M. Davis, for defendant appellant.*

State v. Earnhardt

MORRIS, Chief Judge.

[1] North Carolina Appellate Rule 9(b)(3) stipulates that "the record on appeal in criminal actions shall contain: . . . (vii) copies of the verdict and of the judgment, order, or other determination from which appeal is taken, (viii) a copy of the notice of appeal, or of the appeal entry showing appeal taken orally . . ." Defendant has failed to include copies of either the verdict, judgment, notice of appeal, or appeal entry, although the information contained in those documents does appear in the Record in various places. We call appellant's attention to the requirements of the rule. The rule is a practical one. In addition to insuring that the procedures at trial are presented to the court accurately, it also results in presenting the record to the Court chronologically, without the necessity of the Court's having to search the Record for necessary components. The case is technically subject to dismissal. Because of the severity of the charges against defendant, we have elected to consider the appeal on its merits.

Defendant brings forth three assignments of error. He first contends that the trial court erred in denying his motions to dismiss at the end of the State's evidence and at the end of all the evidence, because, he says, the evidence fails to show that defendant knew Lagree had committed voluntary manslaughter.

[2] In order to prove a person to be an accessory after the fact, it must be shown (1) that the felony was committed, (2) that the accused knew the felony had been committed by the person assisted, and (3) that the accessory personally rendered assistance to the felon. State v. Potter, 221 N.C. 153, 19 S.E. 2d 257 (1942). State v. Martin, 30 N.C. App. 166, 226 S.E. 2d 682 (1976). Defendant contends that the evidence fails to show that he knew the offense had been committed, or that he even knew the victim was in the road. On the contrary, the evidence, according to defendant, shows that he thought Basinger was in the ditch on the far side of the road. We hold that there was sufficient evidence to survive defendant's motions. As the state's brief points out, it makes no difference that defendant may not have actually seen the victim in the road before the automobile struck him. Testimony indicated that defendant knew, before proposing the false story to be told the authorities, that Basinger, Horne, and Lagree were fighting, that Basinger was left very near to or on

the road, and that he had been struck and killed by an automobile. The evidence is, therefore, sufficient, when considered in the light most favorable to the state, to satisfy each element of the offense of accessory after the fact. Indeed, it shows that defendant knew a felony had been committed by Horne or Lagree before he concocted the tale, engineered cooperation among those present, and related the story to Deputy Douglas.

[3] Defendant asserts that the trial court erred in allowing the district attorney to state in his closing argument, with reference to those present at defendant's house, that "they were acting like a pack of wolves." We hold, however, that this characterization did not torture the sense of the record so as to mislead the jury or deprive defendant of a fair trial. The evidence presented showed that defendant and four other persons were drinking at defendant's house; that Clarence Basinger cut his wife; that Lagree and Horne, armed with a belt and knife, viciously beat and kicked Basinger in the presence of the others; that the fighting spilled from the front porch to the yard and into the road; and that the victim was left in the road to be struck by an automobile. This evidence supports the argument of the district attorney.

> [W]hen the prosecuting attorney does not go outside of the record and his characterizations of the defendant are supported by the evidence, the defendant is not entitled to a new trial by reason of being characterized in uncomplimentary terms in the argument.

*State v. Westbrook*, 279 N.C. 18, 39, 181 S.E. 2d 572, 584 (1971); *sentence vacated*, 408 U.S. 939, 92 S.Ct. 2873, 33 L.Ed. 2d 761 (1972). Moreover, we are unable to determine from the record whether the trial judge abused his discretion in controlling the jury argument as the only portion of the district attorney's remarks set forth in the record on appeal is the sentence which is the subject of Exception No. 3A. When a portion of the argument is omitted from the record, the argument is presumed proper. *State v. Hunt*, 37 N.C. App. 315, 246 S.E. 2d 159 (1978).

[4] Defendant argues by his final assignment of error that the trial court erred in several instances in its charge to the jury. Defendant first asserts that the instruction regarding state's witness Lagree's plea bargain for a reduction of charges in ex-

change for his testimony improperly allowed the jury to decide why the witness testified. There is no merit in this contention. The instruction explicitly reminds the jurors that Lagree was an interested witness testifying in accordance with a plea bargain agreement, and warns them to "examine the testimony with great care and caution in deciding whether to believe him."

Defendant excepts to the court's instruction that a conviction of witness Lagree for voluntary manslaughter could be utilized by the jury to decide whether to believe "other testimony at this trial." Defendant contends that this instruction could have caused the jury to use the fact of conviction to decide whether to believe other witnesses. We hold that this instruction, when read with the instruction on the plea bargain, concerned only Lagree and clearly instructed that his guilty plea could only be considered as it bore on the truthfulness of his testimony.

[5] Defendant also excepts to the court's instruction that "for a person to be guilty of a crime in this case, accessory after the fact to voluntary manslaughter, it is not necessary that he or she do all of the acts necessary to constitute the crime, but he or she must be present." Defendant believes that the state must prove that he did all the acts necessary to constitute the crime. We hold that although the state must prove all the elements of the crime, there is no such requirement regarding "acts" committed by the defendant. The trial judge accurately stated the law of concerted action and properly instructed that each element must be proven. It is clear, when this instruction is read as a whole, that the court explained that it is not necessary that defendant do all the acts himself, but that he can be guilty of the crime by acting in concert with others.

[6] Defendant further excepts to the court's use of the pronoun "they" in part of the charge to the jury. Vickie Earnhardt was also on trial in this matter, and it is clear that the trial court was referring to the codefendants. Defendant argues that the instruction was improper because it allowed the jury to consider Vickie Earnhardt's actions against him and did not specify that defendant must have done the acts constituting the crime. The trial court in its charge stated several times that the jury must treat each case and each defendant separately, however. This exception is, therefore, without merit.

[7] Defendant's sixth contention with regard to the jury instructions is that defendant must have known that Horne and Lagree had committed a felony, but that the court charged that if defendant, "knowing Horne and Lagree or Horne or Lagree *could* have committed the crime of voluntary manslaughter, assisted Horne or Lagree in escaping or attempting to escape detection, arrest or punishment . . . ," then he should be found guilty. Defendant argues that it must have been shown that he *knew* a felony had been committed. We agree with this contention but hold, because the court had otherwise consistently stated that defendant must have known that homicide had been committed, that the instructions were proper when read as a whole.

Defendant's final contention concerns the court's instructions on acting in concert. The jury was charged and retired but returned with a request for further instruction on the law of concerted action. Defendant reiterates the argument that to be convicted of a crime a defendant must do all of the acts necessary to constitute the crime, but complains that the instruction again indicated that the defendant was not required to do all the acts necessary to constitute the crime, only that he must be present. However,

> [i]t is not . . . necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principle so long as he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.

*State v. Joyner,* 297 N.C. 349, 357, 255 S.E. 2d 390, 395 (1979). The instruction was, therefore, correct.

In defendant's trial and the judgment rendered, we find

No error.

Judge MARTIN (Robert M.) concurs.

Judge HEDRICK dissents.

Judge HEDRICK dissenting.

Because of the bizarre circumstances giving rise to this case, further elaboration and clarification on several aspects of the whole matter is necessary to an understanding of this appeal and defendant's assignments of error.

The case is entitled *State v. Earnhardt and Keller* with two trial court numbers, 81CRS2038 and 81CRS2039. The record discloses that defendant Keller was indicted for the murder of Clarence Basinger, but he was arraigned on a bill of indictment charging him with accessory after the fact of voluntary manslaughter, number 81CRS2039. The record before us does not disclose what disposition was made in Earnhardt's case, but it is clear that her case is not before us on this appeal. The defendant Keller was found guilty of accessory after the fact of voluntary manslaughter and a judgment imposing a prison sentence of not more than ten nor less than four years was entered on 19 February 1981.

I dissent from the majority's holding that the trial court did not err in denying defendant's "motion to dismiss" made at the close of all the evidence. When all the evidence is considered in the light most favorable to the State, it tends to show the following:

Donald Lagree, the State's principal witness, who under a plea bargain pleaded guilty to voluntary manslaughter, and Walter Horne, black men, were drinking wine and smoking marijuana at Horne's house on the evening of 28 June 1980. Lagree had been drinking scotch and beer all day. At about 9:00 p.m., Linda Basinger and Vickie Earnhardt, white women with two small children, came to Horne's house and said they were having car trouble and requested assistance. Since it was dark, Horne and Lagree had the women's car moved to an area where it could be worked upon under a street light, and then Horne and Lagree switched some spark plug wires around and got the car "running better." As payment, Linda and Vickie bought Horne and Lagree a can of beer and a fifth of Wild Irish Rose wine. Linda then invited the group over to the house of her boyfriend, defendant Keller, to drink some liquor. It was about 11:00 p.m. when the group went to defendant's house located on Castor Road in Rowan County. After they had been drinking whiskey for one to

two hours at defendant's house, Clarence Basinger, Linda's husband, knocked on the door. Defendant Keller answered the door and came back and told Linda that her husband wanted to talk with her. Linda went outside but came back into the house minutes later after having been slapped by her husband. Vickie picked up the phone and said she was calling the Sheriff's Department, and defendant went back outside. Defendant returned and told Linda that her husband was sorry and that he wanted to talk to her again. Linda went back outside and after a few minutes was cut on the arm by a knife wielded by her husband. Lagree and Horne went outside and were verbally threatened and abused by Basinger. A fight broke out among Lagree, Horne, and Basinger. Lagree was wielding a belt; Horne, a pocketknife; and Basinger, a hawkbill knife. The defendant observed the initial blows of this fight. Basinger was knocked to the ground and was kicked and stomped. Basinger "started crawling toward the road," and again verbally threatened Lagree and Horne. A second fight then broke out in which "Walter [Horne] dragged him and he hit his head on the road . . . [,] Walter kicked him . . . [,] [h]e crossed to the left side of the road where he went down again and he was kicked and stomped again as he laid on the road." "Just before the second fight broke out," the defendant "was standing in the yard;" the defendant "didn't do anything as this was going on." After the second fight, Lagree went back to the house. Then Horne, Lagree, and Vickie went out to the road to see how badly Basinger was hurt. Basinger was lying in the road moaning and Horne kicked him again. Minutes later, a car hit Basinger while he was still in the road. After it was realized that Basinger was dead, defendant proposed to Horne, Lagree, and Earnhardt that the entire truth about what happened not be told, but rather that they describe what happened as follows: Defendant tried to prevent Basinger from cutting his wife but was overpowered and called to Lagree and Horne, whom defendant had seen walking up the road, for help; when Basinger saw the men coming, he ran and fell down in the road where he was hit by an automobile. Defendant told this concocted story to the investigating officer when the officer talked to defendant about the incident.

"[T]here must be substantial evidence of all material elements of the crime charged to withstand the motion to dismiss." *State v. Murphy*, 49 N.C. App. 443, 444, 271 S.E. 2d 573,

574 (1980). The essential elements of accessory after the fact of voluntary manslaughter are as follows: (1) that the principal felon had actually committed the felony of voluntary manslaughter; (2) that the accused knew that voluntary manslaughter had been committed by the principal felon; and (3) that the accused assisted the principal felon in his efforts to avoid detection, arrest, or punishment. *See State v. Overman*, 284 N.C. 335, 200 S.E. 2d 604 (1973); *State v. Williams*, 229 N.C. 348, 49 S.E. 2d 617 (1948). Assuming arguendo that the State presented evidence of elements (1) and (3), *supra*, attention must be directed to defendant's argument that there was no evidence that he knew voluntary manslaughter had been committed.

" 'Proximate cause is an element of . . . manslaughter.' *State v. Sherrill*, 28 N.C. App. 311, 313, 220 S.E. 2d 822, 824 (1976)." *State v. Holsclaw*, 42 N.C. App. 696, 699, 257 S.E. 2d 650, 652, *disc. rev. denied and appeal dismissed*, 298 N.C. 571, 261 S.E. 2d 126 (1979). For a person to be guilty of voluntary manslaughter, it is necessary that his acts "be a real cause, a cause without which the decedent's death would not have occurred." *State v. Holsclaw*, *supra* at 699, 257 S.E. 2d at 652. Hence, for the State to present the requisite evidence that defendant in the present case knew that Horne or Lagree had committed voluntary manslaughter, there would have to have been evidence that defendant knew that Horne or Lagree had committed acts without which Basinger's death would not have occurred. At the most, however, the evidence disclosed by the record tends to show that defendant's *knowledge* extended only to the following facts: (1) that Horne and Lagree fought with Basinger, (2) that Basinger somehow ended up on or near the road, and (3) that Basinger was struck and killed by an automobile. There is absolutely no evidence that defendant witnessed or would otherwise know how Basinger got in the road, much less that defendant knew that Horne or Lagree committed acts without which the death would not have occurred. There is no evidence that defendant knew that Horne or Lagree positioned Basinger onto the road, or that he knew that they assaulted Basinger while he was on or near the road. For all the evidence tends to show , defendant could just have easily believed that Basinger volitionally placed himself in the road, rather than believing that his being there owed to Lagree's or Horne's violence. The record tends to show only that when the second

fight between decedent and Lagree and Horne started, defendant "was standing in the yard." This evidence is insufficient to satisfy the requirement that there be evidence that defendant knew that Lagree or Horne committed acts without which Basinger's death would not have occurred, and hence, was insufficient to show that defendant knew that any manslaughter had been committed by anyone.

I feel compelled to point out that the majority dismisses defendant's contention that he did not know that Horne or Lagree had committed voluntary manslaughter by stating that there was evidence that "defendant knew . . . that Basinger was left very near to or on the road," and "that defendant knew a felony had been committed." I have searched the record without success to discover such testimony; moreover, when the evidence is considered in the light most favorable to the State, it is insufficient to raise an inference of such a fact. The burden was on the State to offer evidence of every essential element of the crime charged. Obviously, the State could prove what defendant knew only by circumstantial evidence which would permit the jury to infer knowledge upon the part of defendant Keller. The State offered evidence tending to show only that defendant was present and that he witnessed the first fight between Horne, Lagree, and Basinger, at or very near his house. It was late at night and dark, and the evidence does not disclose that defendant saw or could have seen what occurred on or near the road. In my opinion, the trial judge erred in not granting defendant's timely motion to dismiss.

Aside from the trial court's error in failing to grant the motion to dismiss, the court also committed prejudicial error when it instructed the jury that it could find defendant guilty if the State satisfied the jury beyond a reasonable doubt that defendant knew that Horne or Lagree "*could* have committed the crime of voluntary manslaughter." [Emphasis added.] This erroneous instruction, considering all of the circumstances of the case, is too prejudicial to be hidden by the familiar rule that the charge must be considered contextually as a whole, for when the charge is considered contextually as a whole, the error becomes, in my opinion, much more prejudicial than when considered in isolation. In my opinion, the instruction dealing with the element of defendant's knowledge that voluntary manslaughter had been committed fails

to satisfy the requirement that the judge must declare and explain the law arising on the evidence in the case.

In my opinion, the evidence is insufficient to show that Lagree committed voluntary manslaughter. Even though Lagree was allowed to testify that he had pleaded guilty to voluntary manslaughter, in my opinion, the trial court erred in instructing the jury that it could find defendant guilty of accessory after the fact of voluntary manslaughter if, among other things, it found that Horne or Lagree committed voluntary manslaughter. This error was compounded when the trial court failed to instruct the jury not to consider the evidence that Lagree had pleaded guilty to voluntary manslaughter in determining whether voluntary manslaughter had in fact been committed.

I vote to reverse.

---

PROPST CONSTRUCTION CO. v. NORTH CAROLINA DEPARTMENT OF TRANSPORTATION

No. 8119SC604

(Filed 20 April 1982)

1. **Contracts §§ 20.2, 27.3— contract action—prevention of performance not applicable—issue for jury**

   In a contract action to recover an additional amount for crushed stone used in the construction and paving of a highway for defendant on the ground that the platform scales used to weigh vehicles transporting the stone to the job site were defective and underweighed the stone and that defendant paid only for the amounts of stone shown by the defective scales, plaintiff did not prevent performance of the contract by defendant by failing to supply accurate scales so as to estop plaintiff from claiming additional compensation under the contract where the evidence showed that, while the contract required plaintiff to furnish the scales, it also required defendant to check the scales prior to use; the contract did not establish which party had the continuing responsibility to check the scales; and a representative of defendant normally checked the accuracy of the scales. Furthermore, the evidence presented at a hearing on a motion for summary judgment established a genuine issue of material fact as to how much crushed stone was actually delivered to the project by plaintiff where it tended to show that defendant paid for only 147,568 tons of stone; plaintiff estimated the amount of stone delivered as 177,334 tons by calculating an average weight per truck per day and multiplying that by the number of trucks on a given day; and defendant estimated that 170,974 tons of stone had been used by "cross-sectioning" the stockpiles of the stone.

2. **Rules of Civil Procedure § 56— hearing on summary judgment motion—oral testimony**

> The trial court did not err in allowing oral testimony to be introduced at a hearing on a motion for summary judgment.

APPEAL by plaintiff from *Wood, Judge.* Judgment entered 21 April 1981, in Superior Court, MONTGOMERY County. Heard in the Court of Appeals 9 February 1982.

Plaintiff instituted this action under G.S. 136-29, against the North Carolina Department of Transportation (hereinafter referred to as either DOT or defendant) to recover damages for an alleged breach of contract. In its complaint, plaintiff alleged (1) that it contracted to grade, distribute stone onto, and pave the relocated roadbed of U.S. Highway 220 in Montgomery County; (2) that it was responsible for supplying the crushed stone, referred to as aggregate base coarse (ABC), for which defendant was to pay $5.05 per ton;[1] (3) that the platform scale used to weigh the vehicles transporting the stone to the job site was defective and inaccurate; and (4) that plaintiff delivered to the job site 29,463.25 tons of ABC which the scales did not reflect and for which defendant refused to pay. Additionally, plaintiff alleged that, by its calculations, it delivered to the roadbed 177,334.78 tons of ABC from the four stockpiles supervised and approved by DOT and that DOT's own estimates in "cross-sectioning" showed approximately 170,974 tons on the four stockpiles. Plaintiff, therefore, sought damages in the amount of $148,789.41, since DOT only paid for 147,568 tons of ABC.

Defendant in its Answer denied that it relied on defective scales, that it received more ABC than that for which it paid, and that it breached the contract. Defendant admitted that it had estimated 170,974 tons of ABC, but contended that it had fully compensated plaintiff for all work performed and materials used on the project. By amendment to the Answer, defendant was later allowed to allege, as part of the contract, Section 106-7 of

---

1. Later pleadings show that this aspect of plaintiff's contract was subcontracted to Lessees of B. V. Hedrick Company who, in turn, subcontracted the loading, weighing, and hauling to the road job to Contractor's Services and Supply, Inc., a subsidiary of Dickerson, Inc. The ABC for the job was placed on State owned and approved stockpiles at the quarry site.

*Standard Specifications for Roads and Structures* (July 1972) (hereinafter *Standard Specifications*) which reads:

> When material is to be paid for on a ton basis, the Contractor shall furnish platform scales and a weigh house except as otherwise provided in these specifications. The accuracy of the scales shall be one-half of one percent for all loads. The Contractor's platform scales will be checked by the Commission's Department of Materials and Tests prior to their use for weighing material on a project. . . .

Asserting that it had not waived this section of the contract and that plaintiff had had control of, and responsibility for, the scales, defendant contended that the plaintiff was barred from recovery due to its own material breach of the contract.

Defendant thereafter filed a motion for judgment on the pleadings or, in the alternative, for summary judgment. In its motion, defendant asserted that, if the scales supplied by plaintiff were inaccurate, the inaccuracy and any error resulting therefrom were due to plaintiff's failure to provide accurate scales. If this were the case, plaintiff itself had prevented performance of the contract by the defendant and was "estopped to take advantage of such act by insisting upon complete performance for some undeterminable quantity of stone."

Plaintiff responded with its own motion for summary judgment. After reviewing the pleadings, including interrogatories, affidavits, depositions, and oral testimony, the trial judge concluded that there was no genuine issue of material fact and that plaintiff was not entitled to relief under the contract. The plaintiff excepted to the judgment and appealed. The defendant submitted cross-assignments of error.

*Kluttz, Hamlin, Reamer, Blankenship & Kluttz, by Clarence Kluttz, and Malcolm Blankenship, Jr., for plaintiff-appellant.*

*Attorney General Edmisten, by Associate Attorney Blackwell M. Brogden, Jr., for the State.*

BECTON, Judge.

### Plaintiff's Appeal

Plaintiff assigns as error the trial court's granting of summary judgment in favor of defendant and its denial of partial sum-

mary judgment in favor of plaintiff. Four arguments are presented. For the reasons that follow, we believe the trial court erred in not submitting the case to the jury.

[1]    First, plaintiff contends that the doctrine of prevention relied upon by defendant in its motion for summary judgment was inappropriate under the facts of this case. The doctrine of prevention is that "one who prevents the performance of a condition, or makes it impossible by his own act, will not be permitted to take advantage of the nonperformance." *Harwood v. Shoe*, 141 N.C. 161, 163, 53 S.E. 616, 616 (1906). In order to excuse nonperformance, the conduct on the part of the party who allegedly prevented performance " 'must be wrongful, and . . . in excess of his legal rights.' " *Goldston Brothers v. Newkirk*, 233 N.C. 428, 432, 64 S.E. 2d 424, 427 (1951), *quoting* Page on Contracts, Vol. 5, Sec. 2919, p. 5145. *See also* 6 Corbin on Contracts § 1264 (1962).

Defendant's contention, set forth in its motion for summary judgment, was that plaintiff, by failing to provide accurate weight scales, prevented defendant's performance of the contract and should, therefore, be estopped from taking advantage of its failure. From the documents considered on the motion for summary judgment, however, it appears that defendant's contention oversimplifies a more complex factual situation. When we view the evidence set forth in those documents in the light most favorable to the plaintiff, as must be done in ruling on a motion for summary judgment, *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 29, 209 S.E. 2d 795, 798 (1974), we find that it tended to show that plaintiff, in accordance with the contract, provided the scales for weighing the stones for the highway project; that, under the terms of the contract, defendant had the responsibility to check the scales prior to use; that there was a representative of defendant present at the scales, signing each weight ticket; that, at about the midpoint of the project, the superintendent of hauling (who worked for Dickerson, Inc.) informed defendant's representatives that something was wrong with the scales, "because the weight had . . . [fallen] off so much;" and that the DOT representative agreed that something appeared to be wrong.

When deposed, an employee of Piedmont Scale Service stated that he examined the scales on 22 August 1978, after the project was completed, and found them broken. The scales were "under-

weighing" the vehicles, and the heavier the true weight of the vehicle, the greater the degree of error. Although the contract between plaintiff and defendant did not establish which party had the continuing responsibility to check the scales, Dickerson's superintendent of hauling stated in his deposition that the State "has a man that comes around and checks the scales." Nowhere in defendant's motion and nowhere in the documents considered on the motion for summary judgment do we find any allegation or evidence that plaintiff caused the scales to malfunction.

After reviewing the foregoing evidence, this Court agrees with the plaintiff that the doctrine of prevention does not apply to the circumstances of this case. Again, it is not clear who, plaintiff or defendant, had the responsibility to check the accuracy of the scales. Based upon the deposition of Dickerson's superintendent of hauling, it appears that the defendant normally checked the accuracy of the scales. Under the evidence considered on defendant's motion for summary judgment, plaintiff cannot be said to have "prevented" defendant's performance under the contract, i.e., defendant's payment for the total amount of ABC delivered to the project.

Under the contract, defendant was obligated to pay for the actual tonnage of ABC delivered for the Highway 220 project. Defendant, however, paid only for the amount of ABC which showed on the allegedly defective scales. We believe that the evidence set forth at the hearing on the motions for summary judgment established a genuine issue of material fact as to how much ABC was actually delivered to the project. During the project, as the ABC was delivered to the stockpiles, plaintiff's employees had maintained records of tonnage used on the project by calculating an average weight per truck per day and multiplying that average by the number of trucks on the given day. The total figure they obtained was 177,334.25 tons. Compared with this is the estimate of 170,974 tons made by defendant in "cross-sectioning" the stockpiles. The stockpiles were under the control and supervision of defendant and were depleted at the end of the project. This evidence as well as the evidence derived from the weight tickets should have been allowed to go to the jury in order for the jury to determine the factual dispute concerning tonnage of ABC delivered. Summary judgment in favor of defendant was, therefore, improperly granted.

Having determined that plaintiff should be allowed to present to the jury its evidence of breach of an express contract, we find that plaintiff's argument based on the theory of *quantum meruit* is inappropriate. *"[Q]uantum meruit* must rest in an implied contract," *Burns v. Burns*, 4 N.C. App. 426, 429, 167 S.E. 2d 82, 84 (1969), and there can be no implied contract when there is an enforceable express contract between the parties as to the same subject matter. *Elec-Trol, Inc. v. Contractors, Inc.*, 54 N.C. App. 626, 630, 284 S.E. 2d 119, 121 (1981).

Furthermore, we reject plaintiff's argument that it was entitled to summary judgment on the issue of liability. It is for the jury to determine what amount of ABC was delivered to the project. The tonnage established by using the allegedly defective scales presents a genuine issue as to whether the defendant is liable for more tonnage than that for which it has paid.

Plaintiff's final argument is that the trial court erroneously entered judgment dismissing the complaint for failure to state a claim for relief under G.S. 1A-1, Rule 12(b)(6). In view of the trial court's language and the fact that, by consideration of matters outside the pleadings, defendant's motion to dismiss was converted to a motion for summary judgment under G.S. 1A-1, Rule 56, we have difficulty reading the judgment as allowing defendant's Rule 12(b)(6) motion. To the extent that it is so interpreted, it is erroneous.

### Defendant's Cross-Assignments of Error

[2] Under defendant's cross-assignments of error, it argues that the trial court erred in allowing oral testimony to be introduced into the record at the summary judgment hearing. While this Court has expressed some concern about the "overzealous use" of oral testimony in a hearing in a summary judgment motion, *Walton v. Meir*, 14 N.C. App. 183, 188-89, 188 S.E. 2d 56, 60-61, *cert. denied*, 281 N.C. 515, 189 S.E. 2d 35 (1972), the permissibility of such testimony was noted in *Kessing v. Mortgage Corp.*, 278 N.C. 523, 180 S.E. 2d 823 (1971), on the basis of G.S. 1A-1, Rule 43(e). Consequently, we find no error in the trial court's admission of oral testimony.

In conclusion, summary judgment granted in defendant's favor is

State v. Little

Reversed.

Judge HEDRICK and Judge HILL concur.

STATE OF NORTH CAROLINA v. RODNEY L. LITTLE

No. 8118SC1097

(Filed 20 April 1982)

1. **Constitutional Law § 46; Criminal Law § 91.4— denial of motion for continuance — withdrawal of counsel**

   The trial judge did not err in denying defendant's motion for a continuance in order to allow privately retained counsel time to prepare his case for trial, where (1) defendant's court-appointed attorney noted a disagreement over trial tactics, (2) defendant's mother had been in contact with a privately retained attorney "for two or three weeks," and (3) where defendant was represented ably by the public defender in his first trial, and the public defender stood by to represent him at his retrial.

2. **Criminal Law § 34.4— denial of motion to delete portion of confession proper**

   The trial court did not err in denying defendant's motion to delete a portion of his confession in which he said, "I ran down the steps and ran to the probation office," since it tended to show his departure from the victim's apartment, which was a relevant fact, and its sole relevancy was not to show evidence of an independent crime.

3. **Criminal Law § 113.9— error in charge — curative instruction**

   Where challenged remarks in the trial court's instructions were brought to the trial judge's attention prior to the jury's deliberation, and a curative instruction was given, it is assumed that the jurors understood and complied with such an instruction.

APPEAL by defendant from *Rousseau, Judge*. Judgments entered 5 June 1981 in Superior Court, GUILFORD County. Heard in the Court of Appeals 10 March 1982.

Defendant was indicted for breaking or entering and assault with intent to commit rape. This is defendant's second trial upon these indictments. He was awarded a new trial by this Court in *State v. Little*, 51 N.C. App. 64, 275 S.E. 2d 249 (1981). Defendant again was convicted of both offenses and appeals from judgments of imprisonment.

*Attorney General Edmisten, by Assistant Attorney General Lemuel W. Hinton, for the State.*

*Assistant Public Defender S. Kent Smith for defendant-appellant.*

HILL, Judge.

The State's evidence tends to show that on 21 November 1971, Gail Cotter Murphy lived in an apartment which constituted the second floor of a two-story brick house owned by Greensboro College. Miss Murphy rose late that morning and went to work as the college's assistant director of admissions without eating breakfast or showering. She returned to her apartment at approximately 12:30 p.m. to shower and eat lunch. After her shower, Miss Murphy, dressed only in a towel, saw a black male standing on the roof of the house looking inside. Miss Murphy next saw the black male, whom she identified as defendant, inside her apartment. She said, "Who are you, what do you want?" Defendant replied, "I'm looking for a book store." Miss Murphy directed defendant to the college library, and he left through the back door. As she went to put on her bathrobe, Miss Murphy testified, "I ran into this young black man with the butcher knife in his hand raised." Defendant told her, "I'll hurt you, shut up. Get those glasses off. Get back to that bed." Defendant then began pulling on Miss Murphy's towel and eventually pushed her onto a love seat in the bedroom. Miss Murphy screamed "bloody murder", and defendant jumped back, dropped the knife, and ran out of the apartment. Defendant offered no evidence.

[1] In defendant's first assignment of error, he argues that the trial judge erred in denying his motion for a continuance in order to allow the counsel of his choice to prepare his defense. On 3 June 1981, defendant's case was called for trial. The public defender, then representing defendant, informed the trial judge that defendant's mother had indicated a desire to retain private counsel. In fact, on that date, another attorney was retained to represent defendant. The record indicates that defendant's mother had been in contact with the privately retained attorney "for two or three weeks," and that the Commission on Racial Justice paid a part of the retainer fee.

The public defender moved to withdraw from the case saying, "There has been some friction in this case between myself and [defendant] all along in terms of trial tactics, . . . I think they would be much happier with [the privately retained counsel]." The privately retained counsel moved for a continuance to prepare the case for trial. However, the trial judge stated the following:

> Now, I'm not going to continue this case for you to go out and employ a lawyer. The case is set for trial the first thing in the morning. . . .
>
> . . . . .
>
> . . . You have known over two months that you had a new trial, that you were entitled to a new trial, and I'm not going to delay the trial of the case for you to go out and employ a lawyer. Now, you can either have [the public defender] continue to represent you or if you don't want [the public defender], I will let him withdraw and I will let [the privately retained counsel] represent you and we will try it tomorrow or either you can be tried without a lawyer.

Defendant indicated that he had rather represent himself, but he advised the judge on the following morning that he had elected to proceed with the public defender.

The rule is firmly established that a motion to continue ordinarily is addressed to the sound discretion of the trial judge, and his ruling thereon is not subject to appellate review unless it is shown that the judge abused that discretion. "But when the motion is based on a right guaranteed by the Federal and State Constitutions, the question presented is one of law and not of discretion, and the decision of the court below is reviewable." *State v. Smathers*, 287 N.C. 226, 230, 214 S.E. 2d 112, 114-15 (1975).

Justice Ervin, speaking for the court in *State v. Speller*, 230 N.C. 345, 53 S.E. 2d 294, unequivocally declared: "Both the State and Federal Constitutions secure to every man the right to be defended in all criminal prosecutions by counsel whom he selects and retains. N.C. Const., Art. I, sec. 11; U.S. Const., Amend. XIV." The United States Supreme Court recognized this constitutional right in *Powell v. Alabama*, 287 U.S. 45, 77 L.Ed. 158, 53 S.Ct. 55, with this language: "It is

hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."

*State v. McFadden*, 292 N.C. 609, 611, 234 S.E. 2d 742, 744 (1977). Thus, the denial of defendant's motion in this case presents a constitutional question concerning his right to have counsel of his choice.

Our Supreme Court has recognized, however, that the right to be defended by chosen counsel is not absolute. *State v. McFadden, supra.* Quoting from *People v. Brady*, 275 Cal. App. 2d 984, 993, 80 Cal. Rptr. 418, 423 (1969), our Court stated that

. . . [d]ue process is not denied every defendant who is refused the right to defend himself by means of his chosen retained counsel; other factors, including the speedy disposition of criminal charges, demand recognition, particularly where defendant is inexcusably dilatory in securing legal representation. . . .

*State v. McFadden, supra* at 613, 234 S.E. 2d at 745. In the same vein, the Court observed, "[A]n accused may lose his constitutional right to be represented by counsel of his choice when he perverts that right to a weapon for the purpose of obstructing and delaying his trial." *Id.* at 616, 234 S.E. 2d at 747. We note that a disagreement over trial tactics generally does not render the assistance of counsel ineffective so as to compel the *appointment* of new counsel. *State v. Thacker*, 301 N.C. 348, 271 S.E. 2d 252 (1980); *State v. Robinson*, 290 N.C. 56, 224 S.E. 2d 174 (1976).

Defendant *sub judice* was represented ably by the public defender in his first trial, and the public defender stood by to represent him at this trial. The case was certified to the Guilford County Superior Court from this Court two months before the start of this trial. The record shows that defendant's mother had been in contact with the private counsel two or three weeks before she was retained on the day of the trial. Thus, we find that defendant was dilatory in securing the privately retained counsel. Under these circumstances, when balancing defendant's right to have counsel of his choice with the need for speedy disposition of criminal charges and the orderly administration of the judicial process, it is clear that defendant's constitutional rights have not

been denied. Moreover, the only apparent basis for defendant's dissatisfaction with the public defender was a disagreement over trial tactics. We do not find that defendant was prejudiced in any way by beginning the trial as scheduled with the public defender as his counsel, whom the record shows conducted the defense with preparation and skill. This assignment of error is overruled.

[2] Defendant's second argument assigns as error the trial judge's denial of his motion to delete a portion of his confession in which he said, "I ran down the steps and ran to the probation office." Defendant contends that this portion of his confession contains "prejudicial information unrelated to the offenses for which he was charged."

Although evidence of an unrelated crime is not admissible to prove defendant's guilt of the crime for which he is being tried, *State v. Simpson*, 297 N.C. 399, 255 S.E. 2d 147 (1979), "[i]f such evidence tends to prove any other relevant fact, . . . it will not be excluded merely because it also shows defendant to have been guilty of an independent crime." *State v. Cherry*, 298 N.C. 86, 109, 257 S.E. 2d 551, 565 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed. 2d 796 (1980). The portion of defendant's confession quoted above tends to show his departure from Miss Murphy's apartment, which is a relevant fact; thus, its sole relevancy is not to show evidence of an independent crime. *See generally State v. Taylor*, 301 N.C. 164, 270 S.E. 2d 409 (1980). This assignment of error is without merit.

[3] In his final argument, defendant contends that the trial judge erred by misstating the evidence in his charge to the jury and by failing to correct the misstatements as defendant requested. Apparently, when the judge reviewed the statements given by defendant to the police, he reversed the order of the content of the first two statements. These misstatements were noted to the trial judge, who stated the following:

> [Counsel for defendant has] called to my attention the fact that when I recapitulated the evidence or the statement that the defendant gave the police officer that I probably had it in reverse order somewhere, but I tell you again, members of the jury, that you take your own recollection of it, not that of mine or that of counsel, and if I misstated some of the evidence, you be sure to be guided solely by your own

recollection of the evidence and not what I have said or what counsel has said. You take it solely and simply from what the witness has said.

It is elementary that

any intimation or expression of opinion by the trial judge at any time during the trial which prejudices the jury against the accused is ground for a new trial. Whether the accused was deprived of a fair trial by the challenged remarks must be determined by what was said and its probable effect upon the jury in light of all attendant circumstances, the burden of showing prejudice being upon the appellant.

*State v. Faircloth*, 297 N.C. 388, 392, 255 S.E. 2d 366, 369 (1979). *See* G.S. 15A-1222 & -1232. However, when the challenged remarks are brought to the trial judge's attention prior to the jurors' deliberations, *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981), and a curative instruction is given, it is assumed that the jurors understood and complied with such an instruction. *State v. Siler*, 292 N.C. 543, 234 S.E. 2d 733 (1977).

In *State v. Brown*, 218 N.C. 415, 422, 11 S.E. 2d 321, 325 (1940),

[t]he court charged the jury: "Gentlemen of the jury, the court may be in error as to [an inadvertence of the trial judge called to his attention by defendant]; you will remember the evidence as to that, you will not take the court's recollection. Counsel may be correct in that, the court is not certain as to that, but you will rely upon your recollection as to what the evidence was as to that." If defendant wanted exactly what was said, he could have requested the court to review the evidence on that aspect. If error, it was harmless and not prejudicial.

In the present case, the misstatements were brought to the trial judge's attention in a timely manner. The judge responded thereto with a curative instruction very similar to that in *Brown*. Based upon *Brown* and the principles noted above, we find no prejudicial error in the trial judge's charge to the jury. *See also State v. Jones, supra.*

For these reasons, in defendant's trial, we find

State v. Murphy

No error.

Judges WELLS and BECTON concur.

STATE OF NORTH CAROLINA v. FREDDY MURPHY

No. 8117SC1067

(Filed 20 April 1982)

1. **Robbery § 4.3— use of deadly weapon—sufficiency of evidence**
    The State's evidence was sufficient to show that defendant committed a robbery with a deadly weapon where one victim testified that she saw a weapon in defendant's right hand; the second victim on several occasions referred to the use of "a gun" by defendant; and there was evidence that defendant was seen walking toward the victim's home carrying a rifle.

2. **Criminal Law § 66.1— identity of defendant by sight—acquaintance with defendant—opportunity for observation**
    A robbery victim was sufficiently acquainted with defendant and sufficiently observed her assailant to permit her to identify defendant as her assailant based on "the sound of his voice and the size and shape of him."

3. **Criminal Law § 102.6— prosecutor's jury argument—comment on defendant's objection to confession**
    In an armed robbery case in which defense counsel argued to the jury that "the State has not introduced any statement or confession of the crime . . . ," the district attorney's jury argument that "you don't have the statement to consider, ladies and gentlemen of the jury, because the defendant objected to it" did not constitute a gross impropriety which would require the trial court to intervene *ex mero motu.*

    Judge WHICHARD dissenting.

APPEAL by defendant from *Washington, Judge.* Judgments entered 7 May 1981 in Superior Court, CASWELL County. Heard in the Court of Appeals 9 March 1982.

Defendant appeals his conviction on two counts of armed robbery. At trial the evidence tended to show that on 19 December 1980, between 7:00 and 7:30 p.m., James Sherrill and his wife were at home watching television when they heard a knock at their door. Mr. Sherrill went to the door, and because he did not see anyone immediately, he stepped about a foot outside. At that time, an individual put a gun to his stomach and told him to back

into the house and turn off the light. The robber demanded guns and money and left with a small amount of money ($1.45) from Mrs. Sherrill's purse, and Mr. Sherrill's wallet containing only his food stamps.

Neither of the victims saw the robber's face because it was covered with something plastic. Mrs. Sherrill testified that he was wearing "a waist Army jacket that comes down about halfway of your legs" and that a "long thing covered up with a white slip . . . was pointed straight at my husband's stomach." The robber had another weapon in his right hand that "was a sawed-off looking like gun but it was short." After the robber left, Mrs. Sherrill told her husband that she believed the robber was the defendant, Freddy Murphy.

James Price and Philmore Gillespie testified that on the evening of 19 December 1980, they had seen the defendant in the vicinity of the Sherrill home carrying what seemed like a rifle under his arm. Defendant was wearing an Army jacket.

James Price's son testified that on the evening in question he was outside shooting basketball and spoke with defendant, who was at that time carrying a .22 rifle.

Defendant's witnesses also placed defendant in the vicinity of the Sherrill home on the evening of 19 December. William Murphy, defendant's brother, testified that sometime after 7:30 p.m. he arrived at his mother's house, located close to the Sherrill home, where he saw defendant. The two left for Danville.

*Attorney General Edmisten, by Assistant Attorney General Fred R. Gamin, for the State.*

*Ronald M. Price for defendant appellant.*

MARTIN (Harry C.), Judge.

[1]   Defendant contends there was insufficient evidence that the crime was committed with a deadly weapon. Mrs. Sherrill testified that she saw a weapon in defendant's right hand. Defendant was seen walking toward the Sherrill home carrying a rifle. Mr. Sherrill testified, without objection, "that is when he [the defendant] pointed *a gun* in my stomach and told me to back up and I did. He told me to cut the light off and I did because *the*

*gun* was on me at the time. He told me to sit down and I did because *the gun* was still on me." (Emphasis ours.) Defendant's contention is without merit. *See State v. Thompson*, 297 N.C. 285, 254 S.E. 2d 526 (1979); *State v. Evans*, 25 N.C. App. 459, 213 S.E. 2d 389 (1975).

[2] Defendant further contends there was insufficient evidence that he was the person who committed the crime. We disagree. Mrs. Sherrill testified that she had seen or spoken with the defendant "every day or two" from August to December and that defendant had worked for the Sherrills as a day laborer and had helped them with their tobacco. The witness observed her assailant sufficiently to permit subsequent identification based on "the sound of his voice and the size and shape of him." Her credibility and the weight given to her identification testimony was properly for the jury. Defendant fails to show that the evidence of identification was inherently incredible. *State v. Wilson*, 293 N.C. 47, 235 S.E. 2d 219 (1977).

[3] During his final argument to the jury, defendant's counsel stated: "I argue and contend, ladies and gentlemen of the jury, that the State has not introduced any statement or confession of the crime there to bring before you for you to consider and say this is some other evidence. I have here where the defendant admitted to doing this.  . . . You don't have that evidence before you to consider."

The district attorney, in his closing argument, responded: "Okay, and you don't have the statement to consider, ladies and gentlemen of the jury, because the defendant objected to it." It is defendant's contention that the trial court erred in allowing the district attorney to argue improper matters relating to suppressed evidence and defendant's failure to testify. Defendant did not object to the state's argument, and as a general rule, such failure constitutes waiver. *State v. Coffey*, 289 N.C. 431, 222 S.E. 2d 217 (1976). Moreover, defendant's counsel himself argued the matter of the suppressed evidence and, by implication, defendant's failure to testify; and it appears from the record that the trial court had apprised the jury of the matter of suppressed evidence prior to closing arguments. We find no evidence of gross impropriety upon the record before us that would require the trial court to intervene *ex mero motu*. *State v. Britt*, 288 N.C.

699, 220 S.E. 2d 283 (1975); *State v. Brown*, 39 N.C. App. 548, 251 S.E. 2d 706, *cert. denied*, 297 N.C. 302 (1979). The record does not support a finding of prejudicial error.

Defendant next contends that the trial court erred in commenting on defendant's failure to testify. The court's instructions were proper and in compliance with *State v. Baxter*, 285 N.C. 735, 208 S.E. 2d 696 (1974). Moreover, there is nothing in the record before us to suggest that the trial court erred in stating the applicable law or in its summary of the facts.

No error.

Judge MARTIN (Robert M.) concurs.

Judge WHICHARD dissents.

Judge WHICHARD dissenting.

I respectfully dissent from the majority's failure to find prejudicial error in the district attorney's closing argument. The pertinent facts are these:

Deputy Sheriff L. H. Hamlett testified on recall for the State that he talked with defendant the day following the robbery. Defense counsel then objected "to [defendant's] statement at this time," and the court excused the jury. On *voir dire* Hamlett testified to what defendant had told him. Defendant's statement was in the nature of an alibi and entirely exculpatory. It in no way implicated or tended to implicate him in the robbery with which he was charged.

When the jury returned, the court stated:

Members of the jury, during the course of the trial, the Court has sustained the objection to anyone saying what Freddy Murphy has said on this occasion, this is an objection to what the defendant is alleged to have said to the officer and the Court sustained what Freddy said on the 20th day of December, 1980.

Thereafter defense counsel stated in his closing argument to the jury:

Ladies and gentlemen of the jury, the best evidence that the State of North Carolina can put before you as to the crime and its commission of it and what went on in the house is what you remember as to what Mr. and Mrs. Sherrill testified to as they were there.

I argue and contend, ladies and gentlemen of the jury, that the State has not introduced any statement or confession of the crime there to bring before you for you to consider and say this is some other evidence. I have here where the defendant admitted to doing this. This is not a hard job at all if he says that he did, but you don't have that, ladies and gentlemen. You don't have that evidence before you to consider.

The district attorney then stated in his closing argument:

The defendant said there was no statement, talking about the evidence presented by the State, there was no statement made by the defendant for you to consider. No statement by the defendant for you to consider, that is what the defendant argued to you. Well, ladies and gentlemen of the jury, you remember Mr. Hamlett going to the stand last evening about fifteen of five and I asked him about talking with the defendant, Mr. Murphy, and did he talk with him. Yes, Saturday morning or Saturday afternoon, December the 20th, a statement by the defendant.

Okay, and you don't have the statement to consider, ladies and gentlemen of the jury, because the defendant objected to it. And then the defendant wanted to argue that we have not done our job, wanted to tell you that we have not done our job and brought in a statement for you to consider by the defendant. Well, there it was if he wanted you to consider it, ladies and gentlemen of the jury. If he wanted you to consider it, all he had to do was just be quiet.

The statement by defense counsel was entirely proper. There was in fact no confession in evidence. It is inaccurate to say, as does the majority opinion, that "defendant's counsel himself argued the matter of the suppressed evidence." Defense counsel's argument related to a confession, and the suppressed evidence was not a confession.

Butcher v. Nationwide Life Ins. Co.

The statement by the district attorney, however, conveyed the inevitable impression that defendant had in fact confessed and his confession had been excluded due to some legal technicality. "The district attorney owes honesty and fervor to the State *and fairness to the defendant* in the performance of his duties as a prosecutor." *State v. Britt,* 288 N.C. 699, 710, 220 S.E. 2d 283, 290 (1975). (Emphasis supplied.) The argument suggesting that defendant had confessed when his excluded statement was in fact exculpatory rather than inculpatory was manifestly unfair to defendant. In light of the highly inconclusive nature of the identification evidence, the possibility that the jury convicted defendant by drawing the reasonable inference from this argument that defendant had confessed, when in fact his statement was exculpatory, is by no means remote. The likelihood of prejudice is thus considerable.

I recognize that absent objection the court may have been inadvertent to the district attorney's statement. The court has a duty, however, to see that a defendant's right to a fair trial is sustained. *Britt,* 288 N.C. at 710, 220 S.E. 2d at 290. If the impropriety here was not sufficiently "gross" to evoke *ex mero motu* corrective action, such impropriety is non-extant. The statement, especially in the context of inconclusive identification evidence, rendered defendant's trial manifestly unfair. I therefore vote for a trial *de novo.*

---

ALESIA DEE INMAN BUTCHER v. NATIONWIDE LIFE INSURANCE COMPANY

No. 8117SC652

(Filed 20 April 1982)

**Insurance § 46— death resulting from altercation—no entitlement to accidental death benefits**

Where the insured died as a result of injuries sustained during an altercation with the plaintiff whereby the insured instigated a fight and, in the course of that fight, he obtained a kitchen knife with which he attacked the plaintiff and from which his death resulted, his death was not caused by accidental means under the terms of the insurance policy.

APPEAL by defendant from *Washington, Judge.* Judgment entered 13 February 1981, in Superior Court, SURRY County. Heard in the Court of Appeals 2 March 1982.

In September 1979, plaintiff brought suit against defendant on a life insurance policy under which plaintiff's late husband, Donald Lee Butcher, had been insured. According to her complaint, the life insurance policy provided a $10,000.00 face value, a $10,000.00 accidental death benefit, and a decreasing term rider with a commuted value of $22,410.00, as of 13 April 1978. On 13 April 1978, the insured died as a result of a laceration on the left subclavian artery which occurred during a scuffle with the plaintiff. The complaint alleged that the insurance premiums had been paid in full; that defendant had paid plaintiff, as beneficiary, the face value and the value of the decreasing term rider; but that the defendant had refused to pay the $10,000.00 accidental death benefit. Plaintiff sought the $10,000.00 plus interest from date of death.

Defendant's answer alleged that plaintiff's role in the death of the insured "was wilful, intentional, unlawful, illegal or at the very least culpably negligent" and constituted a violation of Article III of Chapter 31A of the North Carolina General Statutes. Defendant also asserted, *inter alia*, that, if the insured did not die as a result of plaintiff's misconduct, then he died as a result of his own wilful misconduct, and such death would bar any recovery by the plaintiff.

The case was tried before a jury. Through her own testimony, plaintiff offered evidence tending to show that, on the evening of 13 April 1978, at approximately 10:30, plaintiff attempted to awaken her husband, the deceased, who had fallen asleep on the couch. When awakened, the deceased followed plaintiff to the other side of the room and began hitting her on the face. Although he got on top of her, plaintiff managed to escape and run to the kitchen. The deceased followed, throwing glasses at plaintiff. Within a few minutes after plaintiff locked herself in the bathroom, the deceased jiggled the door handle and opened the door. Plaintiff's testimony continued:

> . . . he was standing there with a knife, shaking it at me and saying, "I'll teach you, you bitch. You are not running my life." I was looking at him and said, "D. L., please put the

knife down." But he kept shaking it at me and I reached up to get the knife and my left wrist was cut slightly. He was still shaking the knife and I reached up and grabbed hold of his arm and was trying to keep the knife away from me. I was pushing him back and we kept going back and forth, and blood just started, from where I do not know. It was all over him and me, and he was saying, "Get me to the doctor, quick." We left that room to the other room and he fell in the floor, and I helped him up. We got to the living room and from there to the kitchen and then out to the door to the van, but could not get the van doors open. We tried, and I ran back into the house to get the keys, and D. L. had gone around the van and fell right there in the driveway.

Plaintiff was also allowed to testify as to previous fights she had had with the deceased. On cross-examination, plaintiff testified that she had been convicted of fighting in public and of trespass.

The defendant's evidence consisted of a portion of the autopsy report on the deceased. The report stated that the object producing the wound appeared to have penetrated approximately twelve centimeters deep. Defendant also produced evidence by one of its agents (Beamer) that tended to show that plaintiff was aware of the life insurance policy of which she was the beneficiary. On rebuttal, plaintiff offered the testimony of an employee of the Surry County Sheriff's Department who had called the defendant's agent Beamer after the insured's death. According to this witness, agent Beamer at that time said "that it might be possible that she [plaintiff] did not know about the [insurance] coverage."

The trial court denied defendant's motions for a directed verdict made at the close of plaintiff's evidence and at the close of all the evidence. The case went to the jury and, to the following issue, it returned an affirmative response:

Did the death of Donald Lee Butcher result directly and independently of all other causes from bodily injury caused solely by external, violent and accidental means?

Defendant's motion for judgment notwithstanding the verdict was denied. From judgment awarding plaintiff the accidental death benefit plus interest, defendant appealed.

*Faw, Folger, Sharpe & White, by W. Thomas White and T. Richard Pardue, Jr., and Folger and Folger, by Fred Folger, Jr. and H. Lee Merritt, Jr., for plaintiff-appellee.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by Grover Gray Wilson and Michael L. Robinson, for defendant-appellant.*

MARTIN (Robert M.), Judge.

The Accidental Death Benefit Rider issued on the life of Donald Butcher provided $10,000 insurance against "the death of the Insured . . . [resulting] directly and independently of all other causes from bodily injury caused solely by external, violent and accidental means." In applying the law to the uncontroverted facts of this case, we conclude that the death of the insured was not caused by accidental means and that it was not, therefore, covered by the Accidental Death Benefit Rider. Defendant's motion for a directed verdict should have been allowed.

The term "accidental means" refers to the occurrence or event which produces death and not to the death itself. *Chesson v. Insurance Co.*, 268 N.C. 98, 150 S.E. 2d 40 (1966). The word "accidental" describes the means of death. *Id.* "The motivating, operative and causal factor must be accidental in the sense that it is unusual, unforeseen and unexpected . . .. [T]he emphasis is upon the accidental character of the causation — not upon the accidental nature of the ultimate sequence of the chain of causation." *Fletcher v. Trust Co.*, 220 N.C. 148, 150, 16 S.E. 2d 687, 688 (1941).

In *Scarborough v. Insurance Co.*, 244 N.C. 502, 94 S.E. 2d 558 (1956), the insured (Midgette) was killed as the result of an altercation with another man (Baldwin). The uncontradicted facts were that, while in Norfolk, Virginia, Midgette argued with a stranger, Baldwin, who was sitting on the porch of his home. Midgette, after cursing Baldwin and while in a state of anger, rushed up the steps toward Baldwin; Baldwin jumped to his feet and shoved Midgette back onto a dirt sidewalk. Midgette's head, however, struck the metal water meter which caused injuries resulting in Midgette's death ten days later. There was no question but that the insured was the aggressor. The Court stated with approval the following principle from 45 C.J.S., Insurance, § 753, p. 779:

Where the policy insures against loss of life through accidental means, the principle seems generally upheld that if the death of the insured, although in a sense unforeseen and unexpected, results directly from the insured's voluntary act and aggressive misconduct, or where the insured culpably provokes the act which causes the injury and death, it is not death by accidental means, even though the result may be such as to constitute an accidental injury.

*Id.* at 505, 94 S.E. 2d at 561. The court concluded that "the character and the extent of the insured's aggression under the circumstances . . . are such as to exclude the concept of death by accidental means within the meaning of the policy." *Id.* at 506, 94 S.E. 2d at 561.

Likewise, in another case involving the insured's aggressive conduct, *Clay v. Insurance Co.*, 174 N.C. 642, 94 S.E. 289 (1917), the Supreme Court interpreted a similar "accidental means" clause in a life insurance policy to invoke the test of "whether the insured, being in the wrong, was the aggressor, under circumstances that would render homicide likely as the result of his own misconduct." *Id.* at 693, 94 S.E. at 290. The court adopted the proposition that where a person voluntarily invites another to a " 'deadly encounter . . ., his death, if he sustains a mortal wound, cannot be regarded as accidental by any definition of that term which has been heretofore adopted.' " *Id.* at 693, 94 S.E. at 290, quoting from *Taliaferro v. Travelers' Protective Ass'n.*, 80 Fed. 368, 370 (1897). In *Clay*, it appeared that the insured, after announcing that he would kill his adversary, first wrongfully assaulted him with a pea pole, three or four feet long, "a deadly weapon," and then pursued the fight with a pistol. The insured was shot and killed by his adversary. The Supreme Court concluded that "[s]uch a homicide could in no sense be called accidental; but on the facts as they are now presented the death of one or both of the parties was not unlikely, and that of the insured was fully justified under the law." 174 N.C. at 694, 94 S.E. at 290. While the Court ordered a new trial, it also directed that, if the facts in evidence were as presented by the appeal, the trial court should instruct the jury to return a verdict for the defendant.

In the present case, the insured died as a result of injuries sustained during an altercation with the plaintiff. The evidence

showed that the insured instigated the fight and that, in the course of the fight, he obtained a kitchen knife with which he attacked the plaintiff. His death resulted from a wound caused by the knife. Under North Carolina law, this was not a death by accidental means, and the beneficiary of the accidental means insurance rider was not entitled to recover thereunder.

In attempting to prevent this result, the plaintiff has argued the case of *Logan v. Insurance Co.*, 46 N.C. App. 629, 265 S.E. 2d 447, *disc. review denied*, 301 N.C. 93, --- S.E. 2d --- (1980). That case involved a life insurance policy with language different from the language we find in the policy in this case, and it is not, therefore, controlling.

The defendant's motion for a directed verdict should have been allowed. The case is reversed.

Reversed.

Judges MARTIN (Harry C.) and WHICHARD concur.

---

IN THE MATTER OF: BAPTIST CHILDREN'S HOMES OF NORTH CAROLINA, INC. v. EMPLOYMENT SECURITY COMMISSION OF NORTH CAROLINA

No. 8122SC710

(Filed 20 April 1982)

1. **Master and Servant § 111.1— unemployment compensation—appellate review**

The scope of judicial review of appeals of decisions of the Employment Security Commission is a determination of whether the facts found by the Commission are supported by competent evidence and, if so, whether the findings support the conclusions of law.

2. **Master and Servant § 100— construction of Employment Security Law—consideration of federal statute**

In interpreting the Employment Security Law, serious consideration is to be given to the construction placed upon the federal statute. However, the State has the right, through its courts, to make the final interpretation of its own legislation, and neither the ruling of the Commissioner of Internal Revenue nor that of the Employment Security Commission is conclusive.

**3. Master and Servant § 102— employment security taxes—ordained minister working as house parent at children's home**

An ordained minister who worked as a house parent at a Baptist Children's Home was performing services "in the exercise of his ministry" within the meaning of G.S. 96-8(6)k.15(ii) and was exempt from the Employment Security Law if the Baptist Children's Home was in fact an integral agency of the Baptist State Convention.

APPEAL by plaintiff from *Kivett, Judge.* Judgment entered 16 March 1981 in Superior Court, DAVIDSON County. Heard in the Court of Appeals 9 March 1982.

This is an appeal from affirmation by the Superior Court of the Employment Security Commission's determination that one of plaintiff's employees was covered under the Employment Security Law and that plaintiff must pay unemployment taxes for him. The employee, Ralph H. Grow, Jr., was an ordained Baptist minister who worked as a house parent for plaintiff.

At the hearing before the Commission one of plaintiff's officers testified that plaintiff is an incorporated unit of the Baptist Convention of North Carolina under the Christian Social Services Division of the Convention. Its purpose is to provide services to homeless and dependent children and their families, including unwed mothers and their children. Plaintiff is governed by a board of trustees elected by the Baptist State Convention. Plaintiff presented as an exhibit a determination by the Internal Revenue Service that plaintiff was not responsible for federal employment taxes for Grow.

In its opinion, the Commission found the following facts: Grow had worked for plaintiff as a house parent from 2 January 1978 until 18 August 1979. On 24 August 1979 Grow filed a claim for unemployment benefits. It was then discovered that no earnings had been reported to the Commission as covered wages under Chapter 96 of the General Statutes. Although Grow was an ordained Baptist minister, ordination is not a requirement for the job of house parent. Ministerial functions were not a part of or required for the house parent position. For purposes of unemployment insurance coverage, plaintiff reports for coverage the wages of all of the house parents who are not ordained ministers. The ordained ministers are treated as self-employed, and their wages are not reported.

Plaintiff argued to the Commission that services performed by Grow were "in the exercise of his ministry," and therefore exempt under G.S. 96-8(6)k.15(ii). The Commission held, however, that the mere ordination as minister did not transform Grow's services into those exempt under the Employment Security Law, Chapter 96 of the General Statutes. Grow was performing his duties as a house parent, which were no different from the duties of non-ordained house parents. The Commission determined that the services performed by Grow were covered by the Employment Security Law and therefore plaintiff must pay unemployment contributions for him and other employees in similar positions.

Upon appeal to the Superior Court of Davidson County, the Commission's determination was affirmed. Plaintiff appeals to this Court.

*Blackwell, Blackwell, Canady & Eller by Jack E. Thornton, Jr., for plaintiff appellant.*

*Employment Security Commission of North Carolina Attorney T. S. Whitaker by Staff Attorney V. Henry Gransee, Jr., for defendant appellee.*

CLARK, Judge.

[1] Plaintiff argues that the Superior Court erred in finding that the Commission properly applied the law to the facts and in affirming the Commission's decision. The scope of judicial review of appeals from decisions of the Employment Security Commission is a determination of whether the facts found by the Commission are supported by competent evidence and, if so, whether the findings support the conclusions of law. The reviewing court may not consider the evidence to find the facts itself. G.S. 96-15(i); *In re Enoch*, 36 N.C. App. 255, 243 S.E. 2d 388 (1978).

Chapter 96 of the General Statutes provides for the contribution in prescribed amounts by employers to the Unemployment Insurance Fund on the wages of each employee. G.S. 96-8(6)k.15(ii) excludes from employment covered under the Employment Security Law services performed "by a duly ordained, commissioned, or licensed minister of a church in the exercise of his

ministry or by a member of a religious order in the exercise of duties required by such order; . . ."

The key to a decision on this appeal lies in the interpretation of the statutory phrase "in the exercise of his ministry." More specifically, the question is whether the fact that an individual is an ordained minister sets him apart from others who are not ordained but are employed in the same job as the minister.

The Commission stated in its decision that:

"Although it may be true that an ordained minister is particularly well suited to perform duties as a house parent, the Home does not require that a house parent be ordained and no difference in duties as a house parent flows from the status of the house parent as an ordained minister. The Commission is not persuaded that the mere ordination of an individual as a minister transforms any type of services performed for an employer into exempt services under the Employment Security Law of North Carolina, *ipso facto*. The employee here is not acting in the 'exercise of his ministry' but was specifically hired to perform the function of a house parent."

G.S. 96-8(6)k.15(ii) has not previously been interpreted by our courts. Plaintiff, however, urges us to follow the line of decisions which have interpreted similar federal unemployment compensation laws, since the North Carolina Employment Security Law is based upon federal statutes and was enacted as a part of a cooperative plan between federal and state governments. Under the plan, each state collects a state unemployment tax which it remits to the federal government. The federal government then returns the state revenues along with a federal subsidy to pay unemployment claims made by employees in the state. In order to remain eligible for the federal program, the state must comply with the standards set out in the Federal Unemployment Tax Act (26 U.S.C. § 3301 *et seq.*). *Ascension Lutheran Church v. Employment Sec.*, 501 F. Supp. 843 (W.D.N.C. 1980).

[2]   Our courts have held that in interpreting the Employment Security Law serious consideration is to be given to the construction placed upon the federal statute. *Employment Security Comm. v. Freight Lines*, 248 N.C. 496, 103 S.E. 2d 829 (1958).

However, the State has the right, through its courts, to make the final interpretation of its own legislation, and neither the ruling of the Commissioner of Internal Revenue nor that of the Employment Security Commission is conclusive. *Unemployment Compensation Comm. v. Trust Co.*, 215 N.C. 491, 2 S.E. 2d 592 (1939).

The language of G.S. 96-8(6)k.15(ii), quoted above, is identical to that of 26 U.S.C. § 3121(b)(8)(A), 26 U.S.C. § 3309(b)(2), and 26 U.S.C. § 3401(a)(9). The regulations which interpret these statutes provide that if a minister performs service for an organization operated as an integral agency of a religious organization under the authority of a church or church denomination, all service performed by the minister in the control, conduct and maintenance of the religious organization is "in the exercise of his ministry." 26 C.F.R. § 31.3121(b)(8)-1 and 26 C.F.R. § 31.3401(a)(9)-1. These terms are defined in the regulations as follows:

> "Service performed by a minister in the control, conduct, and maintenance of a religious organization relates to directing, managing, or promoting the activities of such organization. Any religious organization is deemed to be under the authority of a religious body constituting a church or church denomination if it is organized and dedicated to carrying out the tenets and principles of a faith in accordance with either the requirements or sanctions governing the creation of institutions of the faith. The term 'religious organization' has the same meaning and application as is given to the term for income tax purposes."

*Id.*

The Internal Revenue Service has determined that an ordained minister who is a member of the faculty of a church-related college and whose duties do not include the conduct of religious worship or the ministration of sacerdotal functions is performing services "in the exercise of his ministry." Rev. Rul. 71-7, 1971-1 C.B. 282. As set forth in that ruling, the test for determining a minister's status is whether the employer is itself a religious organization under the authority of a religious body constituting a church or church denomination or, if not, whether the employer is operated as an integral agency of such a religious organization. *Id.* at 283. The Internal Revenue Service has held that if the employer is not a religious organization or an integral

agency of a religious organization and the minister's services are not performed pursuant to an assignment by a church, only those services in the conduct of religious worship or ministration of sacerdotal functions are "in the exercise of his ministry." *Boyer v. Commissioner*, 69 T.C. 521 (1977); Rev. Rul. 78-229, 1978-1 C.B. 305; Rev. Rul. 76-323, 1976-2 C.B. 18.

[3] Based upon the foregoing decisions which have interpreted federal statutes identical to our own, we find that if plaintiff is a religious organization or an integral agency of such organization, this State should follow the federal tax determination and find that plaintiff is exempt from payment of unemployment taxes for Mr. Grow. However, although there was uncontested evidence from which the Commission could have found as a fact that plaintiff is an integral agency of the Baptist State Convention, the Commission made no such finding, one way or the other. If there is no finding as to a material fact which is necessary for proper determination of a case, the case must be remanded to the Commission to make a proper finding. *Employment Security Comm. v. Young Men's Shop*, 32 N.C. App. 23, 231 S.E. 2d 157, *disc. rev. denied*, 292 N.C. 264, 233 S.E. 2d 396 (1977). We express our disapproval at the Commission's failure to make a finding concerning plaintiff's status as a religious agency and its subsequent attempt to support its argument on appeal by contending plaintiff cannot be exempt from payment because such an essential finding does not appear in the record.

We vacate the judgment appealed from and remand this cause to the superior court for further remand to the Commission for a determination of whether the Baptist Children's Home is in fact an integral agency of the Baptist State Convention and for proceedings consistent with this opinion.

Vacated and remanded.

Judges ARNOLD and WEBB concur.

STATE OF NORTH CAROLINA v. KEVIN L. RUSH

No. 815SC1144

(Filed 20 April 1982)

1. **Burglary and Unlawful Breakings § 5.8— felonious breaking and entering and felonious larceny — sufficiency of evidence**

   The State's evidence was sufficient to submit the charges of felonious breaking and entering and felonious larceny to the jury where the evidence showed that defendant and another man were seen running along the street of the victim's residence at a time approximating when the theft occurred, they both were carrying large square objects, consistent with the size of stereo speakers and tape deck, the two men were running together before they split at an intersection, and the second man ran between two houses where, less than an hour later, police recovered a tape player stolen from the victim's residence.

2. **Burglary and Unlawful Breakings § 7— failure to instruct on misdemeanor larceny proper**

   In a prosecution for felonious breaking and entering and larceny, the trial judge properly failed to instruct the jury on the lesser included offense of misdemeanor larceny where the uncontradicted testimony was that the property stolen was worth between $1,000 and $1,300.

3. **Criminal Law § 112.4— charge on circumstantial evidence adequate**

   The trial court adequately instructed the jury on the role of circumstantial evidence where it instructed the jury that the State relied on circumstantial evidence and it charged that the jury could not find defendant guilty "unless all of the circumstances, considered together exclude every reasonable possibility of innocence and point conclusively to guilt."

4. **Burglary and Unlawful Breakings § 6— felonious breaking or entering and felonious larceny — disjunctive language in charge — no error**

   The court's instructions in a prosecution for felonious breaking and entering and felonious larceny were proper where the court charged the jury must find defendant broke or entered into the victim's residence with the intent to commit a felony and where the court charged that the State must prove beyond a reasonable doubt "either that the defendant" took the property "after a breaking or entering, *or* that the" property "was worth more than $400."

APPEAL by defendant from *Rouse, Judge.* Judgment entered 12 February 1981 in Superior Court, NEW HANOVER County. Heard in the Court of Appeals 6 April 1982.

Defendant was convicted of felonious breaking and entering and felonious larceny. Judgments imposing prison sentences were entered.

The State's evidence tends to show the following. On 26 September 1980, Calvin Chadwick left his residence at 605 South Third Street, Wilmington, to go on a motorcycle trip. He informed several people of his plans, including defendant. Douglas Tann was left in charge of the house.

Around 1:30 a.m. the following day, Tann left the house. At that time all doors and windows were locked. When he returned after 3:00 a.m., he found two police officers there. The back door of the house was open, and stereo equipment was missing from the living room. The missing equipment included two Pioneer speakers, a Pioneer amplifier, a Pioneer receiver, and a reel to reel tape deck. The equipment's value was between $1000.00 and $1,300.00. Each missing speaker was two feet high and approximately fourteen inches wide, weighing about forty to forty-five pounds. The tape player was approximately twenty-four inches by twenty-four inches, weighing about thirty to forty pounds.

Around 3:00 a.m. the same morning, a police officer had observed two men running along South Third Street. There were no other people or cars in the area. One of the men was defendant. Both men were carrying large dark square objects. At the intersection of Third and Queen Streets, they stopped under a tree. As the officer approached the intersection in his van, the men separated. One of them ran behind a house on the corner. Defendant walked "very briskly" down Queen Street and entered an apartment. The police officer parked in front of the apartment and radioed for assistance.

A few minutes later, defendant emerged from the apartment and walked up to the officer's van. He told the officer that the speakers he had been carrying were his and came from a disco on Castle Street. The officer had asked him no questions and was unaware that defendant had been carrying stereo speakers. The officer also had no knowledge of the theft at 605 South Third Street.

When a back-up officer arrived, defendant invited the men upstairs to his apartment to see the speakers. Defendant showed them two speakers which were hooked up to other stereo equipment. The speakers were dusty and appeared to have been there "for quite awhile." Defendant told the officers not to look in the apartment's other room because a person was inside asleep.

The officers then left defendant's apartment. They searched the area where the two men had stood together and where the second man had run. Between two houses, about forty feet from where the second man had been observed running, the officer found a reel to reel tape player. Calvin Chadwick's name was on the tape player.

Defendant offered evidence that Cynthia Williams was the owner of the speakers in the apartment on Queen Street. She had purchased the speakers at Woolco. Rex Brown testified that sometime after 10:00 p.m. on September 26th, he had seen defendant at Studio 45, a disco on Castle Street. At that time, defendant had some albums with him.

*Attorney General Edmisten, by Assistant Attorney General Daniel C. Oakley, for the State.*

*Office of the Appellate Defender, by Assistant Appellate Defender Lorinzo L. Joyner, and Appellate Defender Adam Stein, for defendant appellant.*

VAUGHN, Judge.

Defendant raises several assignments of error. None of them disclose prejudicial error.

[1] Defendant argues that the court erred in denying his motion to dismiss. He contends that the State's circumstantial evidence created no more than a suspicion on him and was insufficient to submit the charges to the jury. We disagree.

On a motion to dismiss, all evidence is to be viewed in the light most favorable to the State. To survive the motion, the State need not convince the court that the evidence is sufficient to establish each element of the offense beyond a reasonable doubt. The State is required, however, to offer substantial evidence of all material elements of the offense. *State v. Parker,* 268 N.C. 258, 150 S.E. 2d 428 (1966).

"The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury."

*State v. Johnson,* 199 N.C. 429, 431, 154 S.E. 730, 731 (1930). It is immaterial whether the evidence is direct or circumstantial. *State v. Parker, supra.*

In the present case, the evidence is sufficient to find that someone broke into the Chadwick home on South Third Street and stole stereo equipment valued between $1000.00 and $1,300.00. The issue is whether there is competent evidence to support a finding that defendant was involved in the breaking and entering and larceny.

There is no direct evidence that defendant was in "recent possession" of any stolen property. The circumstantial evidence viewed as a whole, however, reasonably leads to the conclusion that defendant was a perpetrator of the offenses committed at 605 South Third Street.

That evidence shows that defendant and another man were seen running along the street of the Chadwick residence around 3:00 a.m., September 27th, a time approximating when the theft occurred. They were both carrying large square objects, consistent with the size of stereo speakers and tape deck. The two men were running together before they split at the intersection of Third and Queen Streets. The second man then ran between two houses. Less than an hour later, police recovered from that area a tape player stolen from the Chadwick residence.

It is reasonable to assume that the tape player was left by someone involved with the breaking and entering of the Chadwick home. Circumstantial evidence also raises the presumption that it was the second unknown man who possessed and then discarded the stolen tape player. Direct evidence links defendant to that man. *Compare with State v. Parker, supra.* From such evidence, we conclude that a jury could reasonably infer that defendant acted in concert with another in committing the offenses of felonious breaking and entering and felonious larceny. Defendant's assignment of error is overruled.

[2] Assignment of error No. 6 is that the trial court committed reversible error in failing to instruct the jury on the lesser included offense of misdemeanor larceny. A trial court is not required to submit instructions on a lesser included offense unless there is evidence from which a jury can find that the lesser included of-

fense was committed. *State v. Summitt,* 301 N.C. 591, 273 S.E. 2d 425, *cert. denied,* 451 U.S. 970, 101 S.Ct. 2048, 68 L.Ed. 2d 349 (1981). In the present cause, the uncontradicted testimony is that some person or persons broke into the Chadwick residence and stole stereo equipment worth between $1000.00 and $1,300.00. The evidence is such that if defendant committed any offense at all, it was a felonious larceny pursuant to a breaking or entering or a felonious larceny involving more than $400.00 worth of property. The court committed no error in failing to instruct on the offense of misdemeanor larceny.

[3] In assignment of error No. 3, defendant argues that the trial court inadequately instructed the jury on the role of circumstantial evidence. "When the evidence relied upon to establish an element of the offense charged is circumstantial, the court must charge the jury that it must return a verdict of not guilty unless the evidence points unerringly to the defendant's guilt and excludes every other reasonable hypothesis." *State v. Hill,* 272 N.C. 439, 444, 158 S.E. 2d 329, 333 (1968); *State v. Hood,* 294 N.C. 30, 239 S.E. 2d 802 (1978). The court in the present cause instructed the jury that the State relied on circumstantial evidence. It charged that the jury could not find defendant guilty "unless all of the circumstances, considered together exclude every reasonable possibility of innocence and point conclusively to guilt." We conclude that the court adequately instructed the jury on the role of circumstantial evidence.

[4] Defendant also excepts to the court's use of disjunctive language in defining the crimes of breaking or entering and larceny. Defendant argues the charge violates the defendant's constitutional right to a unanimous jury verdict. We disagree.

The court instructed the jury that to convict defendant of felonious breaking or entering, it must find defendant broke *or* entered into the Chadwick residence with the intent to commit a felony therein. Defendant argues the instruction is erroneous because it does not require the jury to agree on which of the acts defendant committed. In prosecutions under G.S. 14-54(a), however, it is proper for the court to submit the charge on alternative propositions. *State v. Boyd,* 287 N.C. 131, 145, 214 S.E. 2d 14, 22 (1975). The court did not err in its instructions on felonious breaking or entering.

Defendant makes the same argument regarding the court's instructions on felonious larceny: that the State must prove beyond a reasonable doubt "either that the Defendant Rush took the reel to reel tape player, and other stereo equipment from the building after a breaking or entering, *or* that the reel to reel tape player and other stereo equipment was worth more than four hundred dollars." Contrary to defendant's assertions, it was not error for the court to allow the alternative propositions to be stated together. Proof of either proposition is sufficient to find defendant guilty of felonious larceny. The jury unanimously agreed that defendant was guilty of felonious breaking or entering and felonious larceny. Defendant's assignment of error is overruled.

No error.

Judges MARTIN (Robert M.) and ARNOLD concur.

RONALD L. PURDY v. WALTER THOMAS BROWN

No. 8118SC889

(Filed 20 April 1982)

**Costs § 3; Rules of Civil Procedure § 68— offer of judgment—express exclusion of attorney's fees from "costs then accrued"**
    Defendant's offer of judgment which expressly excluded attorney's fees from the tender of "costs then accrued" was invalid as a G.S. 1A-1, Rule 68 offer of judgment and was thus ineffectual to terminate plaintiff's entitlement to any attorney's fees under G.S. 6-21.1 and expert witness fees which the court might allow in its discretion as a part of the costs of the action.

APPEAL by defendant from *Collier, Judge.* Orders entered 18 June 1981 in Superior Court, GUILFORD County. Heard in the Court of Appeals 7 April 1982.

*Marquis D. Street for plaintiff appellee.*

*Smith, Moore, Smith, Schell & Hunter, by Robert A. Wicker, for defendant appellant.*

WHICHARD, Judge.

Plaintiff brought this action against defendant seeking (1) $2,514.35 for medical expenses incurred for treatment of injuries sustained in an automobile collision allegedly caused by defendant's negligence, (2) lost wages of $381.25 per week from the time of the collision until final adjudication of the claim, (3) $150,000 for permanent injuries and mental and physical suffering, (4) future medical expenses, (5) court costs, (6) $150,000 in punitive damages, and (7) other and further relief deemed proper. Defendant tendered judgment, purportedly pursuant to G.S. 1A-1, Rule 68, "for the sum of $5,001.00, together with the costs, *except any attorneys' fees*, accrued at the time the offer [was] filed." (Emphasis supplied.) The offer further stated that it "expressly exclude[d] any attorneys' fees as a part of any costs accrued."

Plaintiff did not respond to this offer. The jury returned a verdict for plaintiff in the sum of $3,500.00. Plaintiff then moved for allowance of an attorney's fee pursuant to G.S. 6-21.1. The court found that "it does appear that the . . . case falls within the intended purpose of N.C.G.S. 6-21.1 in that the verdict is so small that if the plaintiff must pay his attorney out of his recovery, he may well conclude that it is not economically feasible to prosecute a suit on his claim . . . ." It then allowed an attorney's fee of $1,200.00. The court also ordered payment by defendant, as part of the costs, of expert witness fees to four medical witnesses for plaintiff.

Defendant contends that because of plaintiff's failure to respond to his offer of judgment, G.S. 1A-1, Rule 68, requires that plaintiff bear the costs from the time of the offer of judgment; and that the court thus erred in awarding an attorney's fee and expert witness fees to plaintiff as part of the costs. Because it expressly excluded attorney's fees from the tender of "costs then accrued," we hold the offer of judgment fatally defective and invalid under the rule. The awards were thus in the discretion of the court.

In any personal injury suit where the judgment for recovery of damages is $5,000.00 or less, the presiding judge may allow a reasonable attorney's fee, as a part of the costs, to the attorney representing the litigant who obtained the judgment. G.S. 6-21.1. The judgment here was for $3,500.00. Nothing else appearing,

then, the court had discretion to award an attorney's fee, and had "a large measure of discretion in fixing or recommending the amount to be paid." *Hill v. Jones,* 26 N.C. App. 168, 170, 215 S.E. 2d 168, 170, *cert. denied,* 288 N.C. 240, 217 S.E. 2d 664 (1975). *See also Hubbard v. Casualty Co.,* 24 N.C. App. 493, 211 S.E. 2d 544, *cert. denied,* 286 N.C. 723, 213 S.E. 2d 721 (1975); *Callicutt v. Hawkins,* 11 N.C. App. 546, 181 S.E. 2d 725 (1971).

A party defending a claim may, however, offer to allow judgment to be taken against him as specified in his offer, "with costs then accrued." G.S. 1A-1, Rule 68(a). If the offer is not timely accepted, and the judgment finally obtained is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. *Id.* Defendant here made a timely offer of judgment, purportedly pursuant to this rule, to which plaintiff did not timely respond. Nothing else appearing, then, plaintiff would not be entitled to any costs incurred after the making of the offer.

Defendant's offer, however, expressly excepted attorney's fees from his tender of costs accrued at the time the offer was filed. Counsel for defendant indicated in oral argument that he considered *Hicks v. Alberston,* 284 N.C. 236, 200 S.E. 2d 40 (1973), to authorize the exception of attorney's fees from the judgment offered. In *Hicks* defendant made an offer to allow judgment "for the sum of $150.00 plus the costs accrued to the date of this offer." Plaintiff timely served notice of acceptance of this offer of judgment "for the sum of $150.00 plus the costs accrued to the date of said offer to include as a portion of said costs attorney's fees to be taxed against the defendant pursuant to G.S. 6-21.1 accrued to said date in the discretion of the Court." *Id.* at 237, 200 S.E. 2d at 41. The Supreme Court stated that the attorney's fee provided for by G.S. 6-21.1 is not in addition to the court costs but " 'a part of the court costs,' " and that plaintiff's language in his acceptance regarding attorney's fees thus simply "proceeded from a reasonable interpretation by the plaintiff of the defendant's offer." *Id.* at 241, 200 S.E. 2d at 43. The Court then stated: "If this was not the interpretation intended by the defendant, the misunderstanding is due to ambiguous language used by the defendant in making his offer and the defendant must bear any loss resulting therefrom." *Id.*

Defendant apparently relies on the sentence just quoted to support express exclusion of attorney's fees from his tender of

costs accrued at the time of the offer. That sentence was not essential to the holding in *Hicks*, and we do not view it as authorizing the exclusion of attorney's fees from a Rule 68 offer of judgment. Nor do we find other authority in this jurisdiction dispositive of the issue.

G.S. 1A-1, Rule 68(a), was adopted almost verbatim from Rule 68 of the Federal Rules of Civil Procedure. The United States District Court for the State of Colorado has held that an offer of judgment pursuant to that rule which excluded attorney's fees then accrued was fatally defective and invlaid on that account. *Scheriff v. Beck*, 452 F. Supp. 1254 (1978). The court stated: "Rule 68 does not permit an offeror to choose which accrued costs he is willing to pay." *Id.* at 1260. *See also In Re McCay*, 12 B.R. 138 (1981) (offer to pay $500 "in full settlement of your client's claim" held not to conform to Fed. R. Civ. P. 68, adopted by Bankruptcy Rules, Rule 768, because it did not include costs accrued, which include attorney's fees in the discretion of the court, as required by the rule).

In the absence of controlling authority to the contrary, we view the *Scheriff* rule as the preferable policy. Rule 68 does not expressly authorize exclusion of attorney's fees from the tender of "costs then accrued." It requires, as part of an offer of judgment valid thereunder, tender of "costs then accrued." By statute, the presiding judge may, in a personal injury suit where the judgment is $5,000.00 or less, allow a reasonable attorney's fee to the party obtaining the judgment, "to be taxed *as a part of the court costs.*" G.S. 6-21.1 (Emphasis supplied.) An attorney's fee allowed in such actions is thus a part of the costs, and a fee for attorney services rendered through the time the Rule 68 offer is extended is a part of the "costs then accrued" within the intent and meaning of that phrase as used in the rule. *See Yates Motor Co. v. Simmons*, 51 N.C. App. 339, 276 S.E. 2d 496, *disc. rev. denied*, 303 N.C. 320, 281 S.E. 2d 660 (1981). An exclusion of attorney's fees for services through the time of offer thus renders an offer in non-conformance with the requirement of the rule that the offer include "costs then accrued."

Defendant's tender of judgment exclusive of attorney's fees was therefore fatally defective and invalid as a Rule 68 offer of judgment for its failure to comport with this requirement of the

rule. It was thus ineffectual to terminate plaintiff's entitlement to any attorney's fees and expert witness fees which the court might allow.

Defendant's contention that G.S. 6-21.1 should not apply in cases brought in the Superior Court Division seeking judgments in excess of $5,000.00 is without merit. The amount of the judgment obtained, not the amount of the judgment sought, governs applicability of the statute. The judgment obtained here was within the range which invokes operation of the statute.

Because defendant's tender was fatally defective and invalid as a Rule 68 offer of judgment, the awarding of costs remained in the court's discretion. No abuse has been shown in the exercise of that discretion to award an attorney's fee and expert witness fees to plaintiff. The orders appealed from are therefore affirmed.

Affirmed.

Judges WEBB and WELLS concur.

STATE OF NORTH CAROLINA v. WILLIAM LAWRENCE LAY

No. 8127SC696

(Filed 20 April 1982)

1. **Criminal Law § 149— appeal from motion to suppress—time for filing prosecutor's certificate**

   The Court of Appeals had jurisdiction to hear an appeal by the State from an order granting defendant's motion to suppress where the State gave oral notice of appeal on the day judgment was entered and where the State filed the prosecutor's certificate approximately a month before the record on appeal was filed. G.S. 15A-979(c), G.S. 15A-1448(a)(1).

2. **Indictment and Warrant § 16— same warrant used for misdemeanor and felony charge—effect of quashal in misdemeanor charge on felony charge**

   Where the State elected to prosecute a felony and a misdemeanor charge against defendant separately, and where the charges stemmed from a search pursuant to one search warrant, the State was not collaterially estopped from proceeding under the search warrant on the felony charge, after the District Court in the misdemeanor case ordered the same warrant quashed on defendant's motion to suppress. G.S. 15A-612(a)(1) and G.S. 15A-627(a).

APPEAL by the State from *Kirby, Judge.* Judgment entered 13 May 1981 in Superior Court, CLEVELAND County. Heard in the Court of Appeals 9 December 1981.

The State appeals the grant of defendant's motion to suppress evidence obtained as a result of a search. The background of this case is as follows. On 7 August 1980, a search warrant was issued for defendant's residence, on probable cause to believe that defendant possessed illegal distillery equipment and controlled substances. The search executed that day revealed that defendant possessed one pint of non-tax-paid liquor, a misdemeanor violation of G.S. 18A-6, and 9,000 tablets of Methaqualone, a felony under G.S. 90-95(a)(1). The State elected to prosecute the charges against defendant separately, and proceeded first on the misdemeanor charge in district court. On defendant's motion to suppress, on 2 November 1980, District Judge Harris found that "[t]he search warrant does not meet the statutory requirements . . .", and ordered that the search warrant be quashed, and evidence seized pursuant to the warrant be suppressed. The prosecutor then dismissed the misdemeanor charge against defendant, and did not appeal Judge Harris' ruling.

On 20 January 1981, the State obtained indictments against defendant for possession, possession with intent to sell and deliver, and trafficking in controlled substances. In Superior Court, defendant moved to suppress evidence obtained from the 7 August search, on the ground that the State should be collaterally estopped from introducing such evidence since Judge Harris quashed the warrant and the State did not appeal his order. Judge Kirby heard the motion, and on 13 May 1981 filed an order granting defendant's motion to suppress, holding that the State was collaterally estopped from relitigating the issue of the search warrant's validity. From this order, the State appeals.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Joan H. Byers, for the State.*

*Harris, Bumgardner & Corry, by Tim L. Harris and Seth H. Langson, for defendant-appellee.*

WELLS, Judge.

Two issues are raised in this appeal: whether this Court has jurisdiction to hear the State's appeal, and whether Judge Kirby

correctly applied the doctrine of collateral estoppel to bar the State's relitigation of the validity of the search warrant, on defendant's motion to suppress on the felony charge in Superior Court.

[1] Whether we have jurisdiction to hear this appeal is the threshold issue. The State's right to appeal derives solely from applicable statutes, which must be strictly construed. *State v. Harrell*, 279 N.C. 464, 183 S.E. 2d 638 (1971); *State v. Dobson*, 51 N.C. App. 445, 276 S.E. 2d 480 (1981). G.S. 15A-1448(a)(1) requires that notice of appeal be given within ten days after entry of judgment. This the State did, by giving oral notice of appeal on 13 May 1981, the day judgment was entered. The State did not, however, file the prosecutor's certificate required by G.S. 15A-979(c)[1] until 3 June 1981, a date outside the ten day period of G.S. 15A-1448(a)(1). In its recent decision in *State v. Turner*, --- N.C. --- (No. 166A81, filed 30 March 1982), our Supreme Court reversed the decision of the Court of Appeals, reported at 54 N.C. App. 631, 284 S.E. 2d 142 (1981), and held that G.S. 15A-1448(a)(1) and G.S. 15A-979(c) need not be construed together to require that the prosecutor's certificate also be filed within ten days of judgment. "We hold that the certificate envisioned by G.S. 15A-979(c) is timely filed if it is filed prior to the certification of the record on appeal to the appellate division." The prosecutor's certificate in this case having been filed on 3 June 1981, and the record on appeal having been filed 2 July 1981, we hold that the certificate required by G.S. 15A-979(c) was timely filed, and that this Court has jurisdiction to consider the State's appeal in this case. This assignment of error is therefore overruled.

---

1. § 15A-979. Motion to suppress evidence in superior and district court; orders of suppression; effects of orders and of failure to make motion.

(c) An order by the superior court granting a motion to suppress prior to trial is appealable to the appellate division of the General Court of Justice prior to trial upon certificate by the prosecutor to the judge who granted the motion that the appeal is not taken for the purpose of delay and that the evidence is essential to the case. The appeal is to the appellate court that would have jurisdiction if the defendant were found guilty of the charge and received the maximum punishment. If there are multiple charges affected by a motion to suppress, the ruling is appealable to the court with jurisdiction over the offense carrying the highest punishment. (1979, c. 723.)

[2]  The determinative issue in this appeal is whether the State is collaterally estopped from proceeding under the search warrant on the felony charge, after the District Court in the misdemeanor case ordered the same warrant quashed on defendant's motion to suppress. Applying the criteria set out for application of the doctrine of collateral estoppel in *King v. Grindstaff*, 284 N.C. 348, 200 S.E. 2d 799 (1973), defendant contends that the same issue was involved in both motions to suppress: the validity of the search warrant; that this issue was raised and actually litigated in the district court; the warrant's validity was material and relevant to the disposition in the district court; and that the outcome, or granting of defendant's suppression motion, was necessary and essential to the resulting judgment, which was a voluntary dismissal by the State of the misdemeanor charge against defendant.

Our courts have recognized the utility and equity of applying the doctrine of collateral estoppel to criminal cases where the requisite conditions have been met. *Ashe v. Swenson*, 397 U.S. 436, 25 L.Ed. 2d 469, 90 S.Ct. 1189 (1970); *see King v. Grindstaff*, supra. Our review of this case indicates that the controlling factor here is not whether the common law doctrine of collateral estoppel applies, however, but whether such an application, under these facts, would be consistent with this state's criminal procedure statutes.

Defendant's case was calendared in District Court for the morning of 23 October 1980, at which time defendant was to be tried on the misdemeanor charge and a preliminary hearing was to be held on the three felony counts. Defendant's cases were not called until the afternoon session of court, however, and by then the State's witnesses were unavailable to testify. On defendant's motion, Judge Harris agreed to hear only defendant's motion to suppress evidence in the misdemeanor case; he further decided not to call the felony cases for preliminary hearing at that time. Judge Harris then granted defendant's motion to suppress, ordered the warrant quashed, and the State dismissed the misdemeanor charge against defendant. Defendant later appeared in District Court for preliminary hearing on the felony charges, but the State announced in open court that it would not afford defendant a preliminary hearing; instead, it would seek bills of indictment directly from the grand jury. True bills of indictment as

to all three felonies were returned by the grand jury on 20 January 1981.

Under our criminal procedure statutes, the State has two ways in which it may bring a defendant to trial on a felony charge. Pursuant to G.S. 15A-612(a)(1), the State first may bring a probable cause hearing against defendant in District Court. If the District Court determines there is probable cause, defendant's case is bound over to Superior Court for trial. G.S. 15A-612(a)(1); G.S. 15A-627(a). If the District Court finds no probable cause, it must dismiss the charges against defendant. G.S. 15A-612(a)(3). Section (b) of that statute provides, however, that "No finding made by a judge under this section precludes the State from instituting a subsequent prosecution for the same offense." Thus, despite a finding of no probable cause made by a District Court, the State may subsequently seek an indictment on the same felony charge. G.S. 15A-627; *State v. Foster*, 282 N.C. 189, 192 S.E. 2d 320 (1972); *State v. Boltinhouse*, 49 N.C. App. 665, 272 S.E. 2d 148 (1980); *see* G.S. 15A-701(a1)(3). Further, the State may bypass the preliminary hearing entirely, and initially seek an indictment from the grand jury. G.S. 15A-627; *State v. McGee*, 47 N.C. App. 280, 267 S.E. 2d 67 (1980), *disc. rev. denied*, 301 N.C. 101, 273 S.E. 2d 306 (1980).

Assuming, *arguendo*, that after Judge Harris granted defendant's motion to suppress on the misdemeanor charge, he also held the preliminary hearing on the felony charges, quashed the warrant and excluded the contraband seized pursuant to it from evidence, and ruled that no probable cause existed for the felony charges, the State would not have been precluded from seeking an indictment on the felonies, and the District Court's ruling would have no legal effect whatsoever. G.S. 15A-612(b). It would be logically inconsistent to allow the ruling made by Judge Harris in the misdemeanor case to nullify statutory rights granted the State in prosecuting the felonies. We hold, therefore, that Judge Kirby erred in concluding that the State was collaterally estopped from asserting, in Superior Court, the validity of the search warrant upon which the State was relying in the felony indictments. The judgment below is

Reversed.

Judges ARNOLD and MARTIN (Harry C.) concur.

GAIL M. BROOKS v. CAROLINA TELEPHONE AND TELEGRAPH COMPANY

No. 8120SC795

(Filed 20 April 1982)

1. **Master and Servant § 9— action for termination pay—summary judgment improper**

   The trial court erred in entering summary judgment for defendant employer in plaintiff's action to recover termination pay where an affidavit filed by defendant in support of its motion for summary judgment admitted plaintiff's employment in a management position and admitted that it had in effect a termination allowance applicable to management employees.

2. **Master and Servant § 9— action for overtime pay—summary judgment proper**

   The trial court properly entered summary judgment for defendant employer in plaintiff's action to recover overtime pay where plaintiff admitted in her affidavit that she was not entitled to overtime pay but asserted that defendant had violated its overtime policy by giving male management employees compensatory time off for overtime.

3. **Master and Servant § 10.2— wrongful discharge—insufficiency of complaint**

   Plaintiff's complaint was insufficient to state a claim for relief for wrongful discharge from her employment where plaintiff failed to allege that her employment was for a fixed term.

APPEAL by plaintiff from *Smith (Donald L.), Judge.* Judgment entered 9 June 1981 in Civil Superior Court, MOORE County. Heard in the Court of Appeals 31 March 1982.

Plaintiff's complaint contains four counts. In her first count, plaintiff alleges that she was employed by defendant for a number of years in a supervisory position; that she was wrongfully discharged; that defendant's personnel policy for management employees provides for a termination allowance upon discharge; and that she was entitled to 30 weeks salary upon her termination.

In her second count, plaintiff alleges that defendant's personnel policy provided that no employee would be discriminated against because of sex; that male management employees were compensated for overtime work, while plaintiff was not; and that she was entitled to compensation for 60 hours overtime.

In her third count, plaintiff alleges that defendant engaged in a campaign of unfriendly acts toward her to induce her to resign, causing her mental anguish.

In her fourth count, plaintiff alleges that under defendant's personnel policy, she was entitled to four weeks vacation pay upon termination.

Defendant answered admitting plaintiff's employment, alleging that plaintiff was terminated for inadequate job performance, and denying the remaining essential allegations in the complaint.

After the pleadings were joined, defendant moved for summary judgment. In support of its motion, defendant offered the affidavit of P. J. Long, Assistant Vice President of Human Resources. Mr. Long stated that he had primary responsibility for development, implementation, and interpretation of personnel practices for defendant. The remainder of Long's affidavit is, verbatim, as follows:

2. On January 30, 1980, the last day on which she was employed by the Company, Gail M. Brooks was working as a Business Office Supervisor in Fayetteville, North Carolina which was a salaried, management position. Employees occupying salaried, management positions with the Company are expected to perform the duties of their positions and are not entitled to compensatory time off or overtime pay for hours worked in excess of a forty hour week. This policy applied to Mrs. Brooks as well as all other salaried, management employees.

3. From time to time, the senior management of the Company will adopt internal working practices applicable to management employees. The adoption of such practices represents a unilateral management decision and such practices can be unilaterally amended or withdrawn by management.

4. Personnel Administration Practice, Section 0992-0002CT, Issue 5, Item 12, Termination Allowance was made applicable to management employees as a result of unilateral action by senior management. In the discretion of senior management, such practice was, and continues to be, subject to change or cancellation by unilateral decision.

Plaintiff responded with her affidavit, as follows:

1. That during my employment with Carolina Telephone and Telegraph Company, I was aware of a Personnel Practice and Procedure policy for the company. Vacation pay and time off were given according to the Practice Manual and I was aware of the fact that there would be no overtime pay or compensation for management personnel. However, I believe that this particular practice was violated by the company.

2. One of the reasons that I continued in employment with the company was my understanding of the rights and entitlements that I would be receiving by continuing my employment. I believe that those rights and entitlements were assured to me by the Personnel and Practice Manual for the company.

In addition to the foregoing affidavits, the trial court considered plaintiff's verified complaint. The trial court entered summary judgment for defendant on all four of plaintiff's counts. Plaintiff has appealed from that judgment.

*Pollock, Fullenwider, Cunningham & Patterson, P.A., by Bruce T. Cunningham, Jr., for plaintiff-appellant.*

*Tally & Tally, by John C. Tally, for defendant-appellee.*

WELLS, Judge.

[1] In count one of her complaint, plaintiff has in effect alleged that her employment contract was breached. Although plaintiff did allege that she was wrongfully discharged, the closing paragraph in this count and her prayer for relief make it clear that she is seeking to recover not for wrongful discharge, but for failure of defendant to pay compensation earned during her employment. We quote, in pertinent part, as follows:

9. That the personnel administration policy for management employees provides for a termination allowance to any employee who is dismissed or induced to resign for unadaptability or inability to perform properly the duties of the job. That the Plaintiff would be entitled to thirty (30) weeks of termination allowance due to the fact that she had been employed for in excess of fifteen (15) years.

WHEREFORE, the Plaintiff prays that she have and recover of the Defendant a sum equal to thirty (30) weeks of the Plaintiff's salary as termination allowance, and that the costs of this action be taxed against the Defendant.

Pursuant to the allegation set out in her first count, plaintiff would be entitled at trial to show that her contract of employment with defendant entitled her to the termination pay she seeks to recover. Defendant's denial of plaintiff's allegations as to her entitlement to such pay puts this matter at issue. Summary judgment, pursuant to the provisions of G.S. 1A-1, Rule 56 of the Rules of Civil Procedure, may be entered only when the moving party has been able to show that there is no genuine issue as to any material fact remaining to be tried. *Easter v. Hospital*, 303 N.C. 303, 278 S.E. 2d 253 (1981); *Vassey v. Burch*, 301 N.C. 68, 269 S.E. 2d 137 (1980); *Pitts v. Pizza, Inc.*, 296 N.C. 81, 249 S.E. 2d 375 (1978); *Savings & Loan Assoc. v. Trust Co.*, 282 N.C. 44, 191 S.E. 2d 683 (1972); *Kessing v. Mortgage Corp.*, 278 N.C. 523, 180 S.E. 2d 823 (1971). In its affidavit in support of its motion for summary judgment, defendant has admitted plaintiff's employment in a management position and admitted that it had in effect a termination allowance applicable to management employees. Defendant's assertion, however, that such a provision was subject to changes or cancellation simply does not address the factual issue of whether plaintiff became entitled to such an allowance during and by reason of her employment. Such an employment contract provision, recognizably cancellable at will by an employer, would nevertheless operate to protect employees within its coverage during their employment and during the effective operation of such a provision. *See e.g., Thomas v. College*, 248 N.C. 609, 104 S.E. 2d 175 (1958). *Compare Briggs v. Mills*, 251 N.C. 642, 111 S.E. 2d 841 (1960). Defendant, in support of its position, relies on the decisions of our Supreme Court in *Still v. Lance*, 279 N.C. 254, 182 S.E. 2d 403 (1971); *Tuttle v. Lumber Co.*, 263 N.C. 216, 139 S.E. 2d 249 (1964); and *Howell v. Credit Corp.*, 238 N.C. 442, 78 S.E. 2d 146 (1953); and the decision of this Court in *Williams v. Biscuitville, Inc.*, 40 N.C. App. 405, 253 S.E. 2d 18 (1979), *disc. rev. denied*, 297 N.C. 457, 256 S.E. 2d 810 (1979). Those cases dealt with each employee's right to continued employment and did not deal with the issue of benefits or compensation earned *during*

employment. Those cases are not apposite to the case now before us.

Summary judgment as to plaintiff's claim in Count One was erroneously entered and must be reversed.

[2] In her second count, plaintiff seeks compensation for overtime pay. In its affidavit, defendant asserted that management employees were not entitled to overtime pay. In her affidavit, defendant admits that she was not entitled to such pay. Her allegations that defendant violated its overtime policy by giving male employees compensatory time off for overtime does not in this case state a cause of action in plaintiff's favor. Summary judgment was properly entered as to Count Two.

[3] In her third count, plaintiff seeks to recover for mental anguish resulting from her wrongful discharge. Plaintiff has not alleged that her employment was for a fixed term. This is fatal to an action for wrongful discharge, it being settled law that employment for an indefinite term may be terminated at will by either the employer or the employee. *Nantz v. Employment Security Comm.*, 290 N.C. 473, 226 S.E. 2d 340 (1976); *Still v. Lance*, supra. Summary judgment was properly entered as to Count Three.

In her fourth count, plaintiff seeks to recover vacation pay. Liberally construed, count four sets out a claim for vacation pay earned during her employment. Defendant's affidavit does not address, much less rebut such a claim. For the reasons stated in our discussion of Count One, summary judgment was erroneously entered as to Count Four.

The result is:

As to the claims for relief set out in:

Count One, reversed.

Count Two, affirmed.

Count Three, affirmed.

Count Four, reversed.

Judges HILL and BECTON concur.

CLARENCE EDWARD DAVIDSON AND CAROLYN TUGGLE DAVIDSON v.
    GASTON COUNTY DEPARTMENT OF SOCIAL SERVICES FOR THE
    ADOPTION OF MARGARET MICHELLE (DAVIDSON)

No. 8127SC803

(Filed 20 April 1982)

1. **Adoption § 2— adoption proceeding—transfer to superior court—jurisdiction of motion to open child's records**

Where the clerk of superior court transferred an adoption proceeding to the civil issue docket for trial in the superior court pursuant to G.S. 1-273, the superior court had jurisdiction under G.S. 1-276 to determine petitioners' motion that the records of respondent Department of Social Services relating to the child be opened to them in order that they might prepare for the adoption proceeding.

2. **Adoption § 2— adoption proceeding—opening of child's records to petitioners**

The trial court's findings were insufficient to support its conclusion that the best interests of a child sought to be adopted by petitioners and of the public required that records of a department of social services pertaining to the child should be partially opened to the petitioners in order for them to prepare for the adoption hearing.

APPEAL by defendant from *Burroughs, Judge.* Judgment entered 16 April 1981 in Superior Court, GASTON County. Heard in the Court of Appeals 31 March 1982.

Petitioners are seeking to adopt Margaret Moore, who resided in their home as a foster child for two and one-half years. Respondent refuses to give petitioners the necessary consent to adopt Margaret, because she is one of four siblings whom respondent feels should be placed together. On 19 January 1981, petitioners filed a motion in the cause requesting that respondent's records on Margaret be opened to them, in order to prepare for the adoption hearing. The Clerk of Superior Court denied the motion on 30 January and transferred the case to Superior Court for trial, pursuant to G.S. 1-273. Petitioners then filed another motion on 8 April requesting access to respondent's records. Judge Burroughs heard the motion, and entered an order filed 16 April containing the following relevant findings of fact, conclusions of law, and judgment:

FINDINGS OF FACT

. . .

6. The information sought to be revealed is necessary for the best interest of the child and the public.

7. Only a partial release of information is necessary at this time.

CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the parties.

2. The information sought to be revealed is necessary for the best interest of the child and the public.

IT IS THEREFORE, ORDERED:

1. The D.S.S. will furnish to the Attorney for the Petitioners a copy of pages one, two, three, four, five and six of Form D.S.S. 1808, Children Serv. (DSS—CW-4)-Rev. 11-74 report on proposed adoption; Clarence Edward Davidson (adopting father), Carolyn Tuggle Davidson (adopting mother), dated December 30, 1980. Said information will be provided within ten calendar days of the date of this ORDER.

2. That the content, results, and interpretation of any and all psychological history be furnished by the D.S.S. to the Attorney for the Petitioners not less than ten calendar days prior to any hearing on the merits of this motion. Said psychological information will be furnished on Margaret Michelle Moore and her siblings.

Respondent appeals from this order.

*Frederick R. Stann, for petitioners-appellees.*

*Catherine C. Stevens, for respondent-appellant.*

WELLS, Judge.

Two issues are raised by this appeal: one, whether the Superior Court had subject-matter jurisdiction to hear petitioners' motion, and two, whether the trial court properly granted

the partial opening of respondent's adoption file on Margaret Michelle Moore.

[1] Respondent first contends that the Superior Court lacked jurisdiction to hear plaintiff's motion, arguing that adoption is by a special proceeding before the Clerk of Superior Court, G.S. 48-12, and that the Superior Court has no jurisdiction in an adoption proceeding except on appeal from the Clerk, relying on G.S. 48-26(b); *In re Custody of Simpson*, 262 N.C. 206, 136 S.E. 2d 647 (1964); *In re Daughtridge*, 25 N.C. App. 141, 212 S.E. 2d 519 (1975). While respondent's arguments do correctly reflect general legal principles, they ignore a separate procedural and jurisdictional scheme for cases initially heard before the Clerk, which is set out in Chapter 1 of the General Statutes. G.S. 1-273 provides:

§ 1-273. Clerk to transfer issues of fact to civil issue docket.

If issues of law and of fact, or of fact only, are raised before the clerk, he shall transfer the case to the civil issue docket for trial of the issues at the next ensuing session of the superior court. (C.C.P., c. 115; Code, s. 256; Rev., s. 588; C.S., s. 634; 1971, c. 381, s. 12.)

G.S. 1-276 further provides:

§ 1-276. Judge determines entire controversy; may recommit. —

Whenever a civil action or special proceeding begun before the clerk of a superior court is for any ground whatever sent to the superior court before the judge, the judge has jurisdiction; and it is his duty, upon the request of either party, to proceed to hear and determine all matters in controversy in such action, unless it appears to him that justice would be more cheaply and speedily administered by sending the action back to be proceeded in before the clerk, in which case he may do so. (1887, c. 276; Rev., s. 614; C.S., s. 637.)

Following a hearing on petitioners' 19 January motion, the Assistant Clerk of Superior Court denied the motion and entered an order finding facts and concluding that: "[i]ssues of fact and/or law have been raised and that such matters should properly be transferred to the civil issue docket for trial at the next ensuing term of Superior Court pursuant to G.S. 1-273." By their motion

Davidson v. Dept. of Social Services

dated 8 April, petitioners requested that the Superior Court judge grant them a hearing. Judge Burroughs determined that he had jurisdiction to hear the motion, and subsequently granted it. There is no evidence to indicate that the judge elected to remand the matter to the Clerk. We find that the Superior Court properly exercised jurisdiction in this matter pursuant to G.S. 1-276, and overrule respondent's assignment of error. *See Oxendine v. Dept. of Social Services*, 303 N.C. 699, 281 S.E. 2d 370 (1981).

[2] In its second assignment of error, respondent contends that Judge Burroughs' finding of fact that the information sought to be revealed is necessary for the best interest of the child and the public, is unsupported by the evidence and does not support the conclusion of law. We find merit in this contention.

In *In re Spinks*, 32 N.C. App. 422, 232 S.E. 2d 479 (1977), this court interpreted G.S. 48-26 for the first time, and held that multiple, and possibly conflicting interests should be carefully evaluated and weighed by the court in deciding whether to open adoption records. These interests include, *inter alia*, those of the child, the adoptive parents, the natural parents, and the public.

> The determination as to what is in the best interest of the child or the public should be made by weighing the totality of the circumstances. As in child custody and support cases, the trial judge in this type of case is given wide discretion. Nevertheless, he is required to make sufficient findings from which it can be determined that the orders are justified and appropriate. *Ramsey v. Todd,* 25 N.C. App. 605, 214 S.E. 2d 307 (1975); *Crosby v. Crosby,* 272 N.C. 235, 158 S.E. 2d 77 (1967); *Powell v. Powell,* 25 N.C. App. 695, 214 S.E. 2d 808 (1975); *Swicegood v. Swicegood,* 270 N.C. 278, 154 S.E. 2d 324 (1967).

*Id.* at 428; *see also* "The Adoptee's Right of Access to Sealed Adoption Records in North Carolina," 16 Wake Forest L. Rev. 563 (1980); Survey, "Domestic Relations," 56 N.C.L. Rev. 1045 (1978); Annot., 83 A.L.R. 3d 800. We find that in this case, there were insufficient findings of fact to support the conclusion of law that it was in the best interest of the child and the public that respondent's records be opened to petitioners. For this reason, the order of the trial court must be vacated.

Vacated and remanded.

Judges HILL and BECTON concur.

DOROTHY J. PRICE v. ELDRIDGE C. PRICE

No. 812DC755

(Filed 20 April 1982)

**Divorce and Alimony § 29.2; Judgments § 37.4— consent judgment not res judicata to claim in later action**

    A consent judgment between plaintiff and defendant which related only to alimony, child support and child custody did not constitute res judicata in a subsequent action in which plaintiff sought (1) an absolute divorce, and (2) a declaratory judgment and accounting claim whereby plaintiff's role in a cattle raising operation be looked into and plaintiff be given equal credit and ownership of the profits and assets.

APPEAL by plaintiff from *Ward, Judge.* Judgment entered 22 May 1981 in District Court, MARTIN County. Heard in the Court of Appeals 30 March 1982.

On 16 May 1980, plaintiff filed a domestic action against her husband of over thirty years. She sought custody of the minor child of the parties, support, counsel fees, a writ of possession of the homeplace and a divorce from bed and board. Plaintiff also asked that defendant be restrained from selling personal property, particularly farm animals and equipment, which she alleged that defendant was selling in order to keep money and property away from plaintiff.

Defendant filed an answer to plaintiff's complaint, plaintiff moved for pendente lite relief and on 9 July 1980, the parties entered into a consent judgment. This judgment provided that plaintiff and defendant would live separate and apart with plaintiff having sole possession of the homeplace. It also provided that plaintiff have custody of the minor child and for support for plaintiff and the minor child and for counsel fees.

On 19 February 1981 plaintiff filed an action in District Court seeking (1) an absolute divorce based upon defendant's adultery,

and (2) a declaratory judgment and accounting claim whereby plaintiff's role in the cattle raising operation be looked into and plaintiff be given equal credit and ownership of the profits and assets.

The trial court granted the parties a divorce based on one year's separation. The court, however, found that the plaintiff did or should have brought forward the matter of the cattle in the earlier proceeding in which the consent judgment was entered. The trial court found that plaintiff was estopped from litigating this issue in a new trial and granted summary judgment for defendant.

*Twiford, Trimpi, Thompson & Derrick by John G. Trimpi, for the plaintiff-appellant.*

*Gurganus & Bowen by Edgar J. Gurganus, for the defendant-appellee.*

MARTIN (Robert M.), Judge.

The plaintiff asserts on appeal that the trial court erred in finding that the consent judgment of 9 July 1980 constituted res judicata as to the second claim of the February 1981 action which resulted in summary judgment for the defendant. We agree with plaintiff.

The general rule in North Carolina is that a "judgment on the merits is conclusive not only as to matters actually litigated and determined, but also as to all matters properly within the scope of the pleadings which could and should have been brought forward." *Painter v. Board of Education*, 288 N.C. 165, 173, 217 S.E. 2d 650, 655 (1975). The court in *Painter*, 288 N.C. at 173, 217 S.E. 2d 655 went on to quote from *Gibbs v. Higgins*, 215 N.C. 201, 204-05, 1 S.E. 2d 554, 557 (1939) saying:

> " '. . . The plea of *res ajudicata* applies, except in special cases, not only to the points upon which the court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject in litigation and which the parties *exercising reasonable diligence*, might have brought forward at the time and determined respecting it.' [Citations omitted.]"

The consent judgment between plaintiff and defendant related only to alimony, child support and child custody. The subject matter of this action is a business enterprise operated by plaintiff and defendant and plaintiff's interest therein. We cannot say that plaintiff should have litigated this matter in the previous domestic proceeding. Therefore, the trial court's entry of summary judgment for defendant was improper.

The order of the trial court is

Reversed.

Judges MARTIN (Harry C.) and WHICHARD concur.

---

GWENDOLYN PARKS SMITH v. LONNIE SMITH

No. 8126DC814

(Filed 20 April 1982)

**Divorce and Alimony § 1— nonresident plaintiff—jurisdiction of court in county where defendant does not reside**

    Where plaintiff, a resident of the state of Virginia, filed an action for absolute divorce in the district court of Mecklenburg County, and defendant resided in Rowan County, the district court in Mecklenburg had jurisdiction to try the action since defendant made no appearance and made no motion to remove the case to Rowan County. G.S. § 7A-244; G.S. § 50-8.

APPEAL by plaintiff from *Lanning, Judge.* Judgment entered 29 June 1981 in District Court, MECKLENBURG County. Heard in the Court of Appeals on 31 March 1982.

*Ronald Williams for plaintiff appellant.*

*No counsel for defendant appellee.*

HEDRICK, Judge.

Plaintiff, a resident of the state of Virginia, filed this action for absolute divorce in the district court of Mecklenburg County against the defendant, a resident of Rowan County, North Carolina. Personal service was had on and accepted by the de-

fendant as provided by G.S. § 1A-1, Rule 4(j). The defendant made no appearance. The trial judge, *ex mero motu*, dismissed the "action" on the grounds that "the District Court of Mecklenburg County" lacked jurisdiction because the action was filed in Mecklenburg County by a nonresident plaintiff against a defendant who was a resident of Rowan County, North Carolina.

The district court of North Carolina "is, under the provisions of G.S. § 7A-244, a court of general jurisdiction *for the trial* of civil actions and proceedings for . . . divorce." *Austin v. Austin*, 12 N.C. App. 286, 293, 183 S.E. 2d 420, 426 (1971). G.S. § 50-3, which states that summons for divorce proceedings shall be returnable to the court of the county in which either plaintiff or defendant resides, and G.S. § 50-8, which states that a complainant who is a nonresident of this State shall bring any divorce action in the county of defendant's residence, are not jurisdictional, and relate only to venue. These statutory venue requirements may be waived. *See Smith v. Smith*, 226 N.C. 506, 39 S.E. 2d 391 (1946); *see also Denson v. Denson*, 255 N.C. 703, 122 S.E. 2d 507 (1961); *Nelms v. Nelms*, 250 N.C. 237, 108 S.E. 2d 529 (1959). If an action for divorce be instituted in a county in the State other than the county of proper venue, "the action may be tried therein, unless the defendant before the time of answering expires demands in writing that the trial be had in the proper county." *Smith v. Smith, supra* at 509, 39 S.E. 2d at 393-94.

In the present case, defendant made no appearance and obviously made no motion to remove the case to Rowan County; thus, venue was waived. The district court in Mecklenburg County had jurisdiction to try the action, and the order dismissing the action must be reversed and the cause remanded for further proceedings to the district court held in Mecklenburg County.

The cost of the appeal to this Court will be taxed against the plaintiff.

Reversed and remanded.

Chief Judge MORRIS and Judge VAUGHN concur.

## CASES REPORTED WITHOUT PUBLISHED OPINION

### FILED 20 APRIL 1982

| | | |
|---|---|---|
| DIXON v. DIXON<br>No. 814DC994 | Onslow<br>(80CVD777) | Order Vacated &<br>Cause Remanded |
| HAZELWOOD v. HAZELWOOD<br>No. 8118DC564 | Guilford<br>(77CVD1020) | Reversed &<br>Remanded |
| HONEYWELL v. LINK<br>No. 8126SC896 | Mecklenburg<br>(80CVS8213) | Appeal Dismissed |
| IN RE JAMISON<br>No. 8125DC989 | Catawba<br>(78J170) | Affirmed |
| IN RE MOSS<br>No. 8127DC982 | Cleveland<br>(80J19) | Dismissed |
| INSURANCE CO. v. PRUITT<br>No. 8123DC764 | Wilkes<br>(81CVD37) | Affirmed |
| PERRY v. RICH CO.<br>No. 811SC756 | Perquimans<br>(80CVS109) | Affirmed |
| POST v. POST<br>No. 8118DC733 | Guilford<br>(80CVD6871) | Affirmed |
| ROWE v. ROWE<br>No. 815DC773 | Pender<br>(81CVD2) | Affirmed |
| RYCKMAN v. GCC<br>No. 8119SC975 | Randolph<br>(80CVS1027) | Affirmed |
| SMITH v. DICKINSON<br>No. 8118SC858 | Guilford<br>(80CVS6798) | Affirmed |
| STATE v. AGNEW<br>No. 8128SC1184 | Buncombe<br>(81CRS7221A & B) | No Error |
| STATE v. GRADY<br>No. 818SC1159 | Wayne<br>(80CR15282) | No Error |
| STATE v. GRAHAM<br>No. 818SC1044 | Lenoir<br>(80CRS13050) | No Error |
| STATE v. HOOVER<br>No. 8121SC991 | Forsyth<br>(80CRS52192) | No Error |
| STATE v. JONES<br>No. 811SC1188 | Pasquotank<br>(81CRS975) | No Error |
| STATE v. LOVE<br>No. 8126SC1061 | Mecklenburg<br>(80CRS2126)<br>(80CRS2127) | No Error |

STATE v. LUCAS            Moore           No Error
No. 8120SC886            (81CRS717)
                        (81CRS1429)

STATE v. MATSON          Onslow          No Error
No. 814SC1136           (80CRS19719)

STATE v. SHACKLEFORD     Pitt            No Error
No. 813SC1149           (80CRS14075)

Judge VAUGHN concurring in part and dissenting in part to the decision in *Simmons v. C. W. Myers Trading Post* which begins on page 549.

I agree that it was error to exclude plaintiff's testimony as to value.

I respectfully disagree and dissent from that portion of the opinion holding that defendant's alleged failure to make the repair is a violation of G.S. 25A-20, so as to trigger a treble damage claim under G.S. 25A-44(4).

The agreement does not alter the terms of any express warranty. The only warranty in the contract is, in substance, as follows. The property is leased "as is," except that defendant will make the following repairs:

"fix faucet, thermostat, bath door, 2 glass in windows, washing machine, h.w. heater, cabinet doors, floors, fix bottom refrigerator, stove needs top. broken window in front bedroom, put caps over vents in back of front bedroom."

Plaintiff alleges the repairs were not made. Defendant contends they were all made. A breach of the contract to make the repairs is not an unfair trade practice under G.S. 25A-44. Plaintiff is only entitled to recover her damages, if any, flowing from that alleged breach.